UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE PAPST LICENSING GMBH & CO. KG LITIGATION | Misc. Action No. 07-493 (RMC) |
| This Document Relates To:<br>ALL CASES | MDL Docket No. 1880 |

**PAPST'S POSITION PAPER CONCERNING KEY
SCHEDULING ORDER AND PROTECTIVE ORDER ISSUES**

Robert F. Muse
Joshua A. Levy
Kerry C. Dent
STEIN MITCHELL & MEZINES, LLP
1100 Connecticut Ave, NW
Washington, D.C. 20036
(202) 737-7777

James P. White
Jerold B. Schnayer
Joseph E. Cwik
WELSH & KATZ, LTD.
120 South Riverside Plaza,
22nd Floor
Chicago, IL 60606
(312) 655-1500
*Attorneys for Papst Licensing GmbH & Co. KG*

**<u>INTRODUCTION</u>**

At the status hearing on January 31, 2008, this Court ordered the parties to file, on March 12, 2008, a proposed protective order and a discovery schedule identifying, among other things, "lead and liaison counsel," and materials relating to the "Markman hearing and briefing." (1/31/09 Transcript p. 19.)    Despite efforts by the parties to reach common ground, each side has submitted its own proposal because disagreements remain.  Accordingly, the court will be required to determine the appropriate and fair process to put in place for this MDL proceeding. Some of these areas of disagreement are relatively orthodox procedural matters.  However, three of the areas of disagreement are uniquely tied to patent litigation and thus require further explication:  (1) the timing of the *Markman* hearing; (2) whether it is necessary to appoint lead counsel in this matter; and (3) the definition and scope of prosecution bar material in the Protective Order.  We do so by way of this brief.

In connection with the first issue, the Camera Manufacturers propose that a *Markman* hearing be scheduled in mid to late July, which will be just a few months into fact discovery, and around five months before their proposed fact discovery cutoff date.  Papst Licensing GmbH & Co. KG ("Papst"), on the other hand, proposes that this Court adopt the majority view and hold the *Markman* hearing after the bulk of all fact discovery is complete.  To this end, Papst proposes that a hearing take place in mid-September to discuss how to proceed with the *Markman* hearing and all matters relating thereto.  (*See* Papst's Proposed Scheduling and Case Management Order No. 1, part I(B).)   It is preferable to hold such a hearing after discovery is mostly complete because it will permit the Court to consider evidence developed during discovery, will allow the parties to focus on what claim terms are truly in dispute, and will hopefully promote judicial economy and avoid the necessity of revisiting claim construction issues later in the case.  Quite

contrary to the Camera Manufacturer's suggestions, an early *Markman* hearing will permit neither efficiency nor fairness.

In connection with the issue of whether to appoint lead counsel, the Camera Manufacturers contend that no such appointment is necessary in this case. Papst, however, maintains that lead counsel should be appointed on behalf of all the parties in order to promote the efficient handling of this MDL, as contemplated by the *Manual for Complex Litigation, Fourth*, which governs these proceedings. (Papst's Proposed Order, part I(E).)

Finally, in connection with the parties' proposed Protective Orders, the Camera Manufacturers' definition of Prosecution Bar material is overly broad and the Camera Manufacturers have not met their burden of establishing the need for their proposed language.

Papst's arguments are set forth below, but before doing so, we present a bit of background that provides context to Papst's positions.

## BACKGROUND OF PAPST LICENSING, THE PATENTS IN SUIT, AND PATENT CLAIMS GENERALLY

### *Papst Licensing*

The forerunner of Papst Licensing is a German company called Papst Motoren, a motor manufacturing company started by Herman Papst in the 1940's. Papst Motoren designed, manufactured, and sold small high precision motors, which were eventually used in applications such as hard disk drives, tape recorder drives, video recorder drives, cooling fans for electronic equipment, floppy disk drives, CD ROMs, and other similar applications. The company had a reputation for innovation. Mr. Papst was the named inventor in over 300 patents, and when Papst Motoren was sold to another German company in 1992, the company had over 500 patents worldwide. Papst Motoren still exists today under its new owner, and continues to be a leading designer and manufacturer of small high precision motors and related equipment.

2

At the time Papst Motoren was sold, the President of the company was Georg Papst, the son of Herman Papst, who also was an engineer.  In 1993, Georg Papst started Papst Licensing, and purchased the then-current patents and patent applications of Papst Motoren.  Papst Licensing is in the business of monitoring and enforcing these patent rights purchased from Papst Motoren.

Papst Licensing acquired, relatively recently, the rights to the two patents at issue in these MDL proceedings from a small German company called Labortechnik Tasler GmbH.  The President of Labortechnik Tasler GmbH is Michael Tasler, the inventor of the patents in suit.  Mr. Tasler started his company to manufacture and sell products that are covered by his patents.  Because Mr. Tasler's company lacks sufficient funds to enforce these patents against other companies who infringe upon Mr. Tasler's patented invention, Mr. Tasler's company has an agreement with Papst Licensing whereby Papst will enforce the Tasler patents against infringers, such as the Camera Manufacturers in these MDL proceedings, and Mr. Tasler will receive a portion of the proceeds recovered by Papst in licensing and enforcing the two Tasler patents.  Without this agreement with Papst, Mr. Tasler would otherwise be unable to enforce his patents.

### *The Patents In Suit*

By way of background, the Supreme Court in *Markman v. Westview Instruments, Inc*., noted that a patent contains two distinct elements: (1) the specification "describing the invention 'in such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use the same'"; and (2) one or more "claims," which "particularly poin[t] out and distinctly clai[m] the subject matter which the applicant regards as his invention."  517 U.S. 370, 373 (1996) (brackets and ellipses in original, citations omitted).  The claims define the scope of a patent grant.  *Id*.  When deciding the meaning of a patent claim, the courts must "interpret the technical aspects of the document, and indeed its overall meaning, from the vantage point of one

3

skilled in the art."  *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1309 (Fed. Cir. 1999).

Papst alleges that the Camera Manufacturers have infringed two patents:  U.S. Patent No. 6,895,449 and U.S. Patent No. 6,470,399.  (Exhibits A and B, attached.)  The products charged with infringement of these patents include, *inter alia*, digital cameras, and concern the operation of the microprocessor controlled electronic circuits that control the operation of the digital cameras, and how information stored in the cameras, such as electrical signals representative of pictures taken by a camera, is transferred to personal computers.  As shown in the attached exhibits, the patents themselves are highly technical documents containing complicated drawings, and are directed toward persons skilled in the art of the patents' subject matter.  As explained below, permitting significant discovery to take place before this Court undertakes the task of interpreting the patents in suit will enable the parties to narrow the issues the Court needs to address in any *Markman* hearing, and, in the long run, conserve the resources of this Court and the parties.

## ARGUMENT

### I.     THE *MARKMAN* HEARING SHOULD NOT BE SCHEDULED UNTIL AFTER DISCOVERY IS COMPLETE

In their Proposed Scheduling Order, the Camera Manufacturers suggest that a *Markman* hearing be held in "mid to late July," and further propose that fact discovery end on December 19, 2008, with expert discovery ending on March 20, 2009.  Papst vigorously opposes any schedule that would have the *Markman* hearing take place before any meaningful discovery is complete, and suggests, instead, that the *Markman* hearing be held after the bulk of discovery yet before the trial of this matter.

In *Markman*, the Supreme Court ruled that the interpretation of patent claims is a question of law to be determined by the court rather than a question of fact to be decided by the jury. 517 U.S. at 372. The Federal Circuit has held, however, that "*Markman* does not obligate [a] trial judge to conclusively interpret claims at an early stage in a case," and that courts have the discretion to engage in claim construction "at a time when the parties have presented a *full picture of the claimed invention and prior art*." *Sofamor Danek Group, Inc. v. DePuy-Motech, Inc.*, 74 F.3d 1216, 1221 (Fed. Cir. 1996) (emphasis added). Most courts that have considered the issue of when to hold a *Markman* hearing have concluded that the best time to hold such a hearing is after the close of discovery:

> Although the Federal Circuit has not mandated a time for conducting Markman hearings, *courts generally hold them* before the infringement trial and *after the parties have conducted discovery* relating to their respective contentions as to claim construction. Within this District, for instance, *it is a common practice for courts to conduct Markman hearings after discovery is completed*.

*Metrologic Instruments, Inc. v. Symbol Techs., Inc.*, 460 F. Supp. 2d 571, 582 (D.N.J. 2006) (citations omitted, emphasis added) (court conducted *Markman* hearing after discovery was completed). In *Toter Inc. v. Visalia*, the defendants, like the Camera Manufacturers here, moved the court to schedule a *Markman* hearing before the discovery was complete. 1997 U.S. Dist. LEXIS 18898 (E.D. Cal. July 14, 1997) (unreported). The court denied the motion, however, because discovery was required before the *Markman* hearing, and "an early *Markman* hearing would not promote the interest of judicial economy . . .." *Id*. at *10; *see also Rates Tech. Inc. v. Mediatrix Telecom, Inc.*, 2007 U.S. Dist. LEXIS 52781, at *22-23 (E.D.N.Y. Mar. 16, 2007) (denying motion to schedule *Markman* hearing, which would have been premature before discovery was completed).[1]

---

[1] For additional cases recognizing that Markman hearings should be held after the close of discovery, *see S.S. White Burs, Inc. v. Neo-Flo, Inc.*, 2003 U.S. Dist. LEXIS 7718 at *7-8 (E.D. Pa. May 2, 2003)

5

Law review articles and other commentators have likewise agreed that the best time for a *Markman* hearing is after complete discovery. *See* William F. Lee & Anita K. Krug, Still Adjusting to Markman: A Prescription for Timing of Claim Construction Hearings, 13 Harv. J.L. & Tech. 55, 86 (1999) ("When all of these factors are placed in the analysis, there is generally one 'right' time for a *Markman* hearing: after all discovery has been completed, at the time the court considers the parties' summary judgment motions."); and John W. Shaw, PLI Order No. G0-00ZN, Markman Hearings – When is the Best time? (July 2002) ("the courts have begun to coalesce around holding claim construction hearings at some time after the close of fact discovery and before trial commences.")

There are a number of reasons why the *Markman* hearing should not be held prior to the close of discovery in this case. First, a pre-discovery *Markman* hearing would deprive the Court of relevant evidence relating to claim construction. In *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, the Federal Circuit confirmed that it is proper for a judge to consider extrinsic evidence to interpret technical aspects of the patent properly "to ensure that his or her understanding of the technical aspects of the patent is not entirely at variance with the understanding of one skilled in the art." 182 F.3d 1298, 1309 (Fed. Cir. 1999). Extrinsic evidence is "that evidence which is external to the patent and file history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles." *Id*. at 1308 (citing *Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1584 (Fed. Cir. 1996)). The court continued:

---

("Markman hearings are scheduled at the end of discovery so that the parties have enough time to exchange the information which will make the hearing meaningful."); *Centillion Data Sys., Inc. v. Amer. Mgmt. Sys., Inc.*, 138 F. Supp. 2d 1117, 1120 (S.D. Ind. 2001) ("[B]efore a Markman issue is ripe, discovery or case management should have progressed to the point where parties and the court can be reasonably certain which claim terms are at issue, in other words, which claims and elements the plaintiff alleges were infringed."); and *Conopco, Inc. v. Warner-Lambert Co.*, 2000 U.S. Dist. LEXIS 1601 at *13 (D.N.J. Jan. 26, 2000) ("[C]ourts have held that Markman hearings to determine proper claim construction are inappropriate prior to completion of discovery.").

> [I]t is entirely appropriate, perhaps even preferable, for a court to consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field. . . . While a judge is well-equipped to interpret the legal aspects of the document, he or she must also interpret the technical aspects of the document, and indeed its overall meaning, from the vantage point of one skilled in the art.

*Id.* at 1309; *see also Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 n.5 (Fed. Cir. 1998) (en banc) (district court may use extrinsic evidence as an aid "in coming to a correct conclusion as to the true meaning of the language employed in the patent.")  Thus, this Court should not schedule the *Markman* hearing until claim construction discovery is complete, so that it will have the benefit of extrinsic evidence relating to claim interpretation, including, for example, inventor testimony and other relevant technical evidence.  *See Caterpillar, Inc. v. Detroit Diesel Corp.*, 1996 U.S. Dist. LEXIS 20573, at *3 (N.D. Ind. May 30, 1996) (court declined to construe claims of patent in suit until the parties had an opportunity to conduct discovery and develop extrinsic evidence relating to claim construction.  "The court is reluctant to decline to accept or rely upon extrinsic evidence in performing this [claim construction] task before that evidence can even feasibly be presented."); *Toter Inc. v. Visalia*, 1997 U.S. Dist. LEXIS 18898, at *12 (E.D. Cal. July 14, 1997) (Dist. Ct. denied Defendant's motions for a *Markman* hearing, to exclude extrinsic evidence, and to stay discovery: "Nothing in *Vitrionics* or its progeny prohibits a court from *accepting* extrinsic evidence in the process of interpreting a claim."); and *Loral Fairchild Corp. v. Victor Co. of Japan*, 911 F. Supp. 76, 79 (E.D.N.Y. 1996) (J. Rader sitting by designation) ("A trial court faced with conflicting views of technical terms may prudently enlist the aid of qualified experts to determine the meaning of the claim terms.  As in this case, this proceeding to assist the court in ascertaining the law is likely to occur after discovery in which the parties have exchanged information relevant to their understanding of the claims.")

Another reason why the *Markman* hearing should be scheduled after the close of all discovery is that it will give Papst an opportunity to fully identify the extent of its infringement claims.  While Papst is aware of some patent claims infringed by the Camera Manufacturers, as set forth in the pleadings, many of the aspects of the infringing technology are within electronic devices and will only become available to Papst through the discovery process. The very nature of a patent claim necessarily involves technical and confidential information, the discovery of which will allow a party to assess the full extent of its claim.  The typical patent case inevitably begets the need to expand and fine- tune a claim on the basis of discovery, and that is the way we expect discovery to unfold in this case.  When Papst obtains a full understanding of the Camera Manufacturers' devices, it may need to add more infringement allegations and this may in turn bring into play the definition of patent claim terms that may not currently be in issue between the parties.  *Westvaco Corp. v. Viva Magnetics Ltd.*, 2002 U.S. Dist. LEXIS 17177 at *9 (S.D.N.Y. Sept. 17, 2002) (unpublished) (court postponed construction of patent claims "until sufficient discovery has been conducted to identify the accused product(s), narrow and/or frame with greater certainty the claims in dispute, and focus the litigation.")

Along these lines, an early claim construction may lead to a risk that the parties' focus will change and/or new claim terms will become important as the case develops.  This, in turn, could require the courts to revise and revisit claim construction decisions more than once.  *See Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc.*, 2002 U.S. Dist. LEXIS 17, at *16-*17 (S.D.N.Y. Jan. 3, 2002) (court revisited patent claim construction performed five years earlier, where earlier ruling was "without the benefit a complete record" and "took place long before discovery was complete."); *TM Patents, L.P. v. Int'l Business Machines*, 121 F. Supp. 2d 349, 378 (S.D.N.Y. 2000) (court noted a "gaping hole" in its previous *Markman* decision because parties now disagreed as to the meaning of a term that was not even

at issue during the *Markman* hearing.); and *MKS Instruments, Inc. v. Advanced Energy Indus., Inc.*, 204 F.Supp. 2d 720, 722 (D. Del. 2002) (resolution of summary judgment motion required construction of additional term that was not at issue at the earlier claim construction hearing).

In *Thomson Consumer Elecs., Inc. v. Innovatron, S.A.*, the court, at the request of both parties, conducted a *Markman* hearing at an early stage of the case, then expressed "misgivings" about whether that was the most efficient way to proceed.  43 F. Supp. 2d 26 (D.D.C. 1999). The court observed that a number of problems can arise when a *Markman* hearing is conducted before discovery is complete.  *Id.* at 28-29.  The court likened an early decision on claim construction, without understanding how the ruling will impact on the question of infringement or validity, to an advisory opinion in violation of Article III's case or controversy requirement:

> The parties have an actual and concrete dispute about the meaning of many of the claim terms.  However, their request for construction of those terms is not tied to any specific request for relief. Review of the proposed orders submitted by the parties after the hearing demonstrate that what is sought borders on an advisory opinion in violation of Article III's case or controversy requirement.

*Id.*  Similarly, an early *Markman* hearing in the case at bar, before discovery is complete and before the parties have taken a firm and final stance on the issues of validity and infringement, could lead to a potentially advisory opinion in violation of Article III.

For these several reasons, Papst respectfully requests that its p roposalconcerning the timing of the *Markman* hearing, contained in Section I(B) of Papst's Proposed Scheduling and Case Management Order, be adopted by the Court.

## II.    LEAD COUNSEL SHOULD BE APPOINTED FOR ALL PARTIES

A second area of disagreement relating to the Scheduling Order is whether lead counsel should be appointed in this case.  At the status hearing on January 31, 2008, the Court ordered the parties to file on March 12, 2008, a "discovery schedule identifying lead and liaison counsel . . .."  (1/31/08 Transcript p. 19.)  However, rather than include such a discovery schedule, the

Camera Manufacturers filed, on February 27, 2008, a "Motion for Clarification" in which they asked for an "Order relieving the parties of their obligation to appoint lead counsel and liaison counsel for the March 12, 2008 filing," and asking "to be heard on the issue of lead and liaison counsel at the March 20, 2008 Status Conference." (Doc. No. 23, p. 1.) The motion was granted in a minute order dated February 28, 2008.

In their Motion for Clarification, the Camera Manufacturers contend that "the terms 'lead counsel' and 'liaison counsel' are used in different ways in different cases" and further claim that "such lead or liaison counsel is unnecessary given the limited number of parties and counsel that are involved in this case and the fact that the Camera Manufacturers already are coordinating with each other successfully." (Doc. No. 23, Memo in Support, p. 2.) However, the First Practice & Procedure Order entered in this MDL proceeding states that "[t]he Court will be guided by the *Manual for Complex Litigation 4th*, approved by the Judicial Conference of the United States, and counsel are directed to familiarize themselves with that publication." (Doc. No. 3 par. 15.) The *Manual for Complex Litigation*, in turn, expressly provides for and recommends the appointment of "designated counsel" (divided into two categories—liaison counsel and lead counsel) to avoid the problems that may arise when numerous parties are represented by separate counsel, which may "waste time and money, confuse and misdirect the litigation, and burden the court unnecessarily." *Manual for Complex Litigation, Fourth*, § 10.22.

The Manual for Complex Litigation, which governs this case, provides clear definitions of the roles of liaison and lead counsel, so the Camera Manufacturer's professed confusion about the roles of such counsel is without merit. Papst maintains that the appointment of lead counsel is necessary in this case in order to avoid the problems that can arise when there are multiple

parties in a case.[2]  In this proceeding, there are presently ten different Camera Manufacturer

parties, with additional parties soon to be joined.[3]  Due to the large number of parties, the

appointment of lead counsel is critical to the efficient operation of this case.  *See In re Cardinal*

*Health, Inc. Erisa Litigation*, 225 F.R.D. 552, 554 (S.D. Ohio 2005) ("because of the large

number of parties in this ERISA action, efficient management of the action mandates the

selection of lead counsel and liaison counsel."); and *In re Payment Card Interchange Fee and*

*Merchant Discount Antitrust Litigation*, 2006 U.S. Dist. LEXIS 45727, at *30 (E.D.N.Y. Feb.

24, 2006) ("[t]he appointment of lead counsel is recognized as a useful and helpful way to avoid

duplication of effort and a means to streamline what could otherwise be inefficient and unruly

proceedings.").  The fact that the Camera Manufacturers "already are coordinating with each

other successfully" (Doc. No. 23 p. 2) is beside the point.  Apart from the fact that it is early in

the litigation, and the time may come when the Camera Manufacturers do not get along so well,

the appointment of lead counsel will aid in the efficient management of this case so that the

Court and Papst will have only one counsel to deal with on behalf of the Camera Manufacturers

instead of several, in connection with discovery and motion practice.

Section I(E) of the proposed Scheduling Order submitted by Papst contains a section

concerning the appointment, and defining the duties, of Lead Counsel, based upon the procedure

set forth in the *Manual for Complex Litigation, Fourth*, Section 40.22.  Because this Court has

already ordered that this proceeding is to be governed by the Manual for Complex Litigation,

which recommends the appointment of Lead Counsel, and because the appointment of lead

---

[2] Papst believes that if Lead Counsel is appointed as set forth in its Proposed Scheduling Order, then the appointment of Liaison Counsel will not be necessary.

[3] Papst recently filed an infringement suit in the District Court of Illinois against Ricoh, based on its sale of digital cameras.  Papst will be filing a request with the Panel on Multidistrict Litigation to have the Ricoh lawsuit transferred to these MDL proceedings as a "tag-along" action.  Papst may also file lawsuits against additional infringers of the patents at issue here, which will likely be the subject of additional "tag-along" actions.

counsel will provide for a more efficient and cost-effective way of dealing with this case, Papst

respectfully requests that the parties be required to appoint Lead Counsel as set forth in Papst's

Proposed Scheduling Order.

### III. THIS COURT SHOULD REJECT THE CAMERA MANUFACTURER'S PROVISIONS CONCERNING PROSECUTION BAR INFORMATION

The parties have also disagreed about certain provisions relating to prosecution bar

materials, as set forth below.

### A. The Court Should Adopt Papst's Definition of "Prosecution Bar Information."

In order to prevent the Camera Manufacturers from using the "Prosecution Bar

Information" designation as an litigation weapon (rather than as its intended use as a shield),

Papst has narrowly tailored a proposed "Prosecution Bar Information" category to specifically

address the concerns in this case. Specifically, "Prosecution Bar Information" would be defined

as:

> Confidential Information that (1) contains each of the limitations of the
> Confidential Information described above [in the Protective Order], (2) concerns
> only the technical aspects of those products of the Camera Manufacturers that
> have been on sale anywhere in the world for less than two years, (3) is of the type
> of information relevant to the scope of coverage of the patents-in-suit, (4) is a
> trade secret, and (5) may be disclosed only to those persons listed in paragraph 7
> below. "Prosecution Bar Information" shall not apply to information (i)
> independently developed and rightfully in the possession of a party, (ii) legally
> obtained from third parties; or (iii) that is publicly available.

On the other hand, the Camera Manufacturers have proposed the following overly broad

and vague definition of "Prosecution Bar Information":

> Information or materials designated as "**Highly Confidential – Prosecution Bar
> Information**" shall be those things of a proprietary technical nature that could be of
> value to a competitor or potential customer of the party or third party holding the
> proprietary rights thereto when prosecuting patent applications relating to the technology
> disclosed, discussed, or documented in the materials so marked. Examples of such
> information or materials include a party's trade secret or confidential technical

information, including without limitation specification and design documents, schematics, blueprints, CAD drawings and data, source code, and other technical documents and information.  The Camera Manufacturers and third parties may designate materials as "Highly Confidential – Prosecution Bar Information," but under no circumstances shall Papst as the producing party designate any materials as "Highly Confidential – Prosecution Bar Information."

Papst's language is preferable because it eliminates definitional ambiguities that the Camera Manufacturers may use to improperly designate nearly all confidential documents as prosecution bar documents.

The Camera Manufacturers have complained that Papst's proposed prosecution bar is too narrow, but offer NO reasons why their documents need broader protection than the tailored protections offered by Papst.  On this issue, the Camera Manufacturers' failure of proof should be dispositive because it's the Camera Manufacturers' burden, as the movant on this issue, to protect their own documents.[4]   The Camera Manufacturers have offered none of the required "specific evidence" to show the harm that would result, nor have they have articulated the required "specific facts" to support their request.[5]  Specifically, the Camera Manufacturers have submitted no evidence nor offered any declaration to even remotely explain what is so confidential in any single camera, how knowledge of any specific confidential camera feature

---

[4] When moving for a protective order to limit discovery, the movant must establish good cause  "by demonstrating the specific evidence of the harm that would result." *Jennings v. Family Mgmt.*,  201 F.R.D. 272, 275 (D.D.C. 2001); *Zentih Radio v. Matsushita Electric Industrial Co.*, 529 F.Supp. 866, 892 (E.D. Pa. 1981)("a protective order should always be narrowly drawn"); *Citizens First National Bank v. Cincinnati Ins. Co.*, 178 F.3d 943, 945 (7th Cir. 1999)("The determination of good cause cannot be elided by allowing the parties to seal whatever they want, for then the interest in publicity will go unprotected") The burden is on the movant to establish that a protective order should be granted.  *Fonville v. District of Columbia*, 230 F.R.D. 38, 40 (D.D.C. 2005).
[5] Rule 26(c) of the Federal Rules of Civil Procedure requires the party moving for a protective order to demonstrate "good cause" for limiting the discovery sought. Fed. R. Civ. P. 26(c); *Alexander v. FBI,* 186 F.R.D. 71, 75 (D.D.C. 1998); *Lohrenz v. Donnelly*, 187 F.R.D. 1, 3 (D.D.C. 1999). To do so, the movant must articulate specific facts to support its request and cannot rely on speculative or conclusory statements. See *Alexander,* 186 F.R.D. at 75; *FEC v. GOPAC, Inc.*, 897 F. Supp. 615, 617 (citing *Avirgan v. Hull*, 118 F.R.D. 252, 254 (D.D.C. 1987)). In fact, "the moving party has a heavy burden of showing 'extraordinary circumstances' based on 'specific facts' that would justify such an order." *Alexander*, 186 F.R.D. at 75.

could be used in prosecution, or how any harm could result from the disclosure of any specific

camera feature. Instead, the Camera Manufacturers have only relied on legally insufficient,

speculative, and conclusory statements. Based upon this lack of specific facts and evidence, the

Court should not impose the restrictions proposed by the Camera Manufacturers because they

have not met their burden on this issue.

Papst's prosecution bar category should be adopted because it will significantly increase

the chances of the settlement. Under Papst's proposed Protective Order, two of its in-house

counsel will be allowed to view the lower lever Confidential Information, but will not be allowed

to view Prosecution Bar Information. If the Camera Manufacturers are permitted to essentially

designate any information as Prosecution Bar Information, Papst's in-house counsel will

effectively be denied any substantive knowledge concerning the strength of Papst's infringement

positions and the potential damages. Absent this substantive knowledge, Papst will be unable to

make an informed settlement decision. Accordingly, Papst's proposal should be adopted as it

will greatly enhance the chances of settlement.

Papst's prosecution bar category should also be adopted because it is narrowly tailored to

interests in this case as follows:

- If any Camera Manufacturer product is two years old or older, that product has become obsolete in the industry, would have no competitive value to the Camera Manufacturer, and thus need not be protected as Prosecution Bar Information. The accused products have a very short life cycle often existing for no more than a year before being replaced with a new version. Information regarding any products two years or older would also not impact the drafting of any of Papst's pending patent applications because if Papst's patent applications are issued in the future Papst could only assert infringement against the products existing at that time in the future. Put another way, Papst could only assert infringement against those future products made, used, sold, imported or offered for sale *after* any new patent is issued by the Patent Office.

- Prosecution Bar Information should be of a technical nature because otherwise the Camera Manufacturers could designate all of their financial information, such as the number of products sold and similar licensing rates, precluding the ability of Papst's

principals from learning of the required information to engage in meaningful settlement discussions.

• Any Camera Manufacturer technical information outside the technical scope of the patents-in-suit need not be protected as Prosecution Bar Information because it is not the subject of any current or planned Papst patent applications.

• Prosecution Bar Information should be restricted to a "trade secret" so that an objective standard exists in deciding which information to so designate.

**B.     Any Camera Manufacturer Pretrial Testimony Should Not Be Presumed Prosecution Bar Information Unless Papst Objects Otherwise**

In paragraph 6(b) of the Camera Manufacturers' Protective Order, they propose that any Camera Manufacturer pretrial testimony be presumed Prosecution Bar Information without any good cause shown, as follows:

The designation of information or material as "Confidential," "Highly Confidential – Outside Counsel Only," or "Highly Confidential – Prosecution Bar Information" for purposes of this Protective Order shall be made in the following manner by the Producing Party:

* * *

(b)     in the case of depositions or other pretrial testimony:  The parties shall treat all deposition and other pretrial testimony of the Camera Manufacturers or any of their directors, agents, employees, or other representatives, and of third parties as "Highly Confidential – Prosecution Bar Information" unless and until such testimony is re-designated as not Protected Information or as a lower level of confidentiality.  The parties shall treat all deposition and other pretrial testimony of Papst or any of its directors, agents, employees, or other representatives as "Highly Confidential – Outside Counsel Only" unless and until such testimony is re-designated as not Protected Information or as a lower level of confidentiality.  The parties shall treat all deposition and other pretrial testimony of Papst's consultants or experts that relies upon "Highly Confidential – Prosecution Bar Information" of any of the Camera Manufacturers as "Highly Confidential – Prosecution Bar Information" unless and until such testimony is re-designated as not Protected Information or as a lower level of confidentiality.  The party offering the testimony so designated shall make a good faith effort to re-designate such testimony upon a reasonable request by another party.  The parties may modify this procedure for any particular deposition or proceeding through agreement on the record at such deposition or proceeding or otherwise by written stipulation, without further order of the Court; provided, however, that any such modification is subject to review by the Court, if appropriate.  If any Protected Information is disclosed during the course of a deposition, that portion of the deposition record reflecting such Protected Information

15

shall be sealed and stamped with the designated degree of confidentiality, and access thereto shall be limited pursuant to the other terms of this Protective Order.

As discussed above, the burden protecting documents under a Protective Order lies with the party who is seeking the protection and should only be granted upon "good cause shown." Here, the Camera Manufacturers' proposal is overly broad and completely inconsistent with this principle of law because it presumes that *all* pretrial testimony constitutes Prosecution Bar Information without any type of "good cause" shown.

**<u>CONCLUSION</u>**

For the reasons stated herein, Papst  respectfully request this Court enter the Proposed Scheduling Order submitted with this Position Paper.

Dated:  March 12, 2008

<u>/s/ Joseph E. Cwik</u>
James P. White
Jerold B. Schnayer
Joseph E. Cwik
WELSH & KATZ, LTD.
120 South Riverside Plaza ● 22nd Floor
Chicago, Illinois 60606
(312) 655-1500

Robert F. Muse
Joshua A. Levy
Kerry C. Dent
STEIN MITCHELL & MEZINES, LLP
1100 Connecticut Ave, NW
Washington, D.C. 20036
(202) 737-7777

*Attorneys for Defendant/Counter-Plaintiff Papst Licensing GmbH & Co. KG*

(12) **United States Patent**                    (10) **Patent No.:**      **US 6,895,449 B2**
Tasler                                           (45) **Date of Patent:**        **May 17, 2005**

(54) **FLEXIBLE INTERFACE FOR COMMUNICATION BETWEEN A HOST AND AN ANALOG I/O DEVICE CONNECTED TO THE INTERFACE REGARDLESS THE TYPE OF THE I/O DEVICE**

(75) Inventor: **Michael Tasler**, Wuerzburg (DE)

(73) Assignee: **Labortechnik Tasler GmbH**, Wuerzburg (DE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 369 days.

(21) Appl. No.: **10/219,105**

(22) Filed: **Aug. 15, 2002**

(65) **Prior Publication Data**

US 2002/0199037 A1  Dec. 26, 2002

**Related U.S. Application Data**

(62) Division of application No. 09/331,002, filed on Jun. 14, 1999.

(30) **Foreign Application Priority Data**

Mar. 4, 1997    (DE) ......................................... 197 08 755
Mar. 3, 1998    (EP) ................................. PCT/EP98/01187

(51) Int. Cl.⁷ ......................................... G06F 13/14
(52) U.S. Cl. ............................... **710/16**; 710/8; 710/64; 709/220
(58) Field of Search ............................... 710/8, 16, 64, 710/11, 12, 15, 62, 63; 703/23, 24, 25; 709/220, 222

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,548,783 A | * | 8/1996 | Jones et al. ................... | 710/16 |
| 5,596,628 A | * | 1/1997 | Klein ..................... | 379/93.11 |
| 5,628,030 A | * | 5/1997 | Tuckner ..................... | 710/64 |
| 6,012,113 A | * | 1/2000 | Tuckner ..................... | 710/64 |
| 6,266,711 B1 | * | 7/2001 | Ishikawa et al. .............. | 710/8 |
| 6,363,081 B1 | * | 3/2002 | Gase ........................ | 370/466 |
| 6,725,293 B1 | * | 4/2004 | Nakayama et al. ........... | 710/36 |
| 6,728,844 B2 | * | 4/2004 | Sanada et al. .............. | 711/152 |

* cited by examiner

*Primary Examiner*—Jeffrey Gaffin
*Assistant Examiner*—Harold Kim
(74) *Attorney, Agent, or Firm*—Glenn Patent Group; Michael A. Glenn

(57)                    **ABSTRACT**

An interface device (**10**) provides fast data communication between a host device with input/output interfaces and a data transmit/receive device, wherein the interface device (**10**) comprises a processor means (**13**), a memory means (**14**), a first connecting device (**12**) for interfacing the host device with the interface device, and a second connecting device (**15**) for interfacing the interface device (**10**) with the data transmit/receive device. The interface device (**10**) is configured by the processor means (**13**) and the memory means (**14**) in such a way that, when receiving an inquiry from the host device via the first connecting device (**12**) as to the type of a device attached to the host device, regardless of the type of the data transmit/receive device, the interface device sends a signal to the host device via the first connecting device (**12**) which signals to the host device that it is communicating with an input/output device.

**18 Claims, 2 Drawing Sheets**





*FIG.1*



*FIG.2*

US 6,895,449 B2

**1**

# FLEXIBLE INTERFACE FOR COMMUNICATION BETWEEN A HOST AND AN ANALOG I/O DEVICE CONNECTED TO THE INTERFACE REGARDLESS THE TYPE OF THE I/O DEVICE

## RELATED APPLICATIONS

This application is a divisional application of copending application Ser. No. 09/331,002 filed Jun. 14, 1999.

## DESCRIPTION

The present invention relates to the transfer of data and in particular to interface devices for communication between a computer or host device and a data transmit/receive device from which data is to be acquired or with which two-way communication is to take place.

Existing data acquisition systems for computers are very limited in their areas of application. Generally such systems can be classified into two groups.

In the first group host devices or computer systems are attached by means of an interface to a device whose data is to be acquired. The interfaces of this group are normally standard interfaces which, with specific driver software, can be used with a variety of host systems. An advantage of such interfaces is that they are largely independent of the host device. However, a disadvantage is that they generally require very sophisticated drivers which are prone to malfunction and which limit data transfer rates between the device connected to the interface and the host device and vice versa. Further, it is often very difficult to implement such interfaces for portable systems and they offer few possibilities for adaptation with the result that such systems offer little flexibility.

The devices from which data is to be acquired cover the entire electrical engineering spectrum. In a typical case, it is assumed that a customer who operates, for example, a diagnostic radiology system in a medical engineering environment reports a fault. A field service technician of the system manufacturer visits the customer and reads system log files generated by the diagnostic radiology system by means a portable computer or laptop for example. If the fault cannot be localized or if the fault is intermittent, it will be necessary for the service technician to read not only an error log file but also data from current operation. It is apparent that in this case fast data transfer and rapid data analysis are necessary.

Another case requiring the use of an interface could be, for example, when an electronic measuring device, e.g. a multimeter, is attached to a computer system to transfer the data measured by the multimeter to the computer. Particularly when long-term measurements or large volumes of data are involved is it necessary for the interface to support a high data transfer rate.

From these randomly chosen examples it can be seen that an interface may be put to totally different uses. It is therefore desirable that an interface be sufficiently flexible to permit attachment of very different electrical or electronic systems to a host device by means of the interface. To prevent operator error, it is also desirable that a service technician is not required to operate different interfaces in different ways for different applications but that, if possible, a universal method of operating the interface be provided for a large number of applications.

To increase the data transfer rates across an interface, the route chosen in the second group of data acquisition systems

**2**

for the interface devices was to specifically match the interface very closely to individual host systems or computer systems. The advantage of this solution is that high data transfer rates are possible. However, a disadvantage is that the drivers for the interfaces of the second group are very closely matched to a single host system with the result that they generally cannot be used with other host systems or their use is very ineffective. Further, such types of interface have the disadvantage that they must be installed inside the computer casing to achieve maximum data transfer rates as they access the internal host bus system. They are therefore generally not suitable for portable host systems in the form of laptops whose minimum possible size leaves little internal space to plug in an interface card.

A solution to this problem is offered by the interface devices of IOtech (business address: 25971 Cannon Road, Cleveland, Ohio 44146, USA) which are suitable for laptops such as the WaveBook/512 (registered trademark). The interface devices are connected by means of a plug-in card, approximately the size of a credit card, to the PCMCIA interface which is now a standard feature in laptops. The plug-in card converts the PCMCIA interface into an interface known in the art as IEEE 1284. The said plug-in card provides a special printer interface which is enhanced as regards the data transfer rate and delivers a data transfer rate of approximately 2 MBps as compared with a rate of approx. 1 MBps for known printer interfaces. The known interface device generally consists of a driver component, a digital signal processor, a buffer and a hardware module which terminates in a connector to which the device whose data is to be acquired is attached. The driver component is attached directly to the enhanced printer interface thus permitting the known interface device to establish a connection between a computer and the device whose data is to be acquired.

In order to work with the said interface, an interface-specific driver must be installed on the host device so that the host device can communicate with the digital signal processor of the interface card. As described above, the driver must be installed on the host device. If the driver is a driver developed specifically for the host device, a high data transfer rate is achieved but the driver cannot be easily installed on a different host system. However, if the driver is a general driver which is as flexible as possible and which can be used on many host devices, compromises must be accepted with regard to the data transfer rate.

Particularly in an application for multi-tasking systems in which several different tasks such as data acquisition, data display and editing are to be performed quasi-simultaneously, each task is normally assigned a certain priority by the host system. A driver supporting a special task requests the central processing system of the host device for processor resources in order to perform its task. Depending on the particular priority assignment method and on the driver implementation, a particular share of processor resources is assigned to a special task in particular time slots. Conflicts arise if one or more drivers are implemented in such a way that they have the highest priority by default, i.e. they are incompatible, as happens in practice in many applications. It may occur that both drivers are set to highest priority which, in the worst case, can result in a system crash.

EP 0685799 A1 discloses an interface by means of which several peripheral devices can be attached to a bus. An interface is connected between the bus of a host device and various peripheral devices. The interface comprises a finite state machine and several branches each of which is assigned to a peripheral device. Each branch comprises a

US 6,895,449 B2

3

data manager, cycle control, user logic and a buffer. This known interface device provides optimal matching between a host device and a specific peripheral device.

The specialist publication IBM Technical Disclosure Bulletin, Vol. 38, No. 05, page 245; "Communication Method between Devices through FDD Interface" discloses an interface which connects a host device to a peripheral device via a floppy disk drive interface. The interface consists in particular of an address generator, an MFM encoder/decoder, a serial/parallel adapter and a format signal generator. The interface makes it possible to attach not only a floppy disk drive but also a further peripheral device to the FDD host controller of a host device. The host device assumes that a floppy disk drive is always attached to its floppy disk drive controller and communication is initiated if the address is correct. However, this document contains no information as to how communication should be possible if the interface is connected to a multi-purpose interface instead of to a floppy disk drive controller.

It is the object of the present invention to provide an interface device for communication between a host device and a data transmit/receive device whose use is host device-independent and which delivers a high data transfer rate.

This object is achieved by an interface device according to claim 1 or 12 and by a method according to claim 15.

The present invention is based on the finding that both a high data transfer rate and host device-independent use can be achieved if a driver for an input/output device customary in a host device, normally present in most commercially available host devices, is utilized. Drivers for input/output devices customary in a host device which are found in practically all host devices are, for example, drivers for hard disks, for graphics devices or for printer devices. As however the hard disk interfaces in common host devices which can be, for example, IBM PCs, IBM-compatible PCs, Commodore PCs, Apple computers or even workstations, are the interfaces with the highest data transfer rate, the hard disk driver is utilized in the preferred embodiment of the interface device of the present invention. Drivers for other storage devices such as floppy disk drives, CD-ROM drives or tape drives could also be utilized in order to implement the interface device according to the present invention.

As described in the following, the interface device according to the present invention is to be attached to a host device by means of a multi-purpose interface of the host device which can be implemented, for example, as an SCSI interface or as an enhanced printer interface. Multi-purpose interfaces comprise both an interface card and specific driver software for the interface card. The driver software can be designed so that it can replace the BIOS driver routines. Communication between the host device and the devices attached to the multi-purpose interface then essentially takes place by means of the specific driver software for the multi-purpose interface and no longer primarily by means of BIOS routines of the host device. Recently however drivers for multi-purpose interfaces can also already be integrated in the BIOS system of the host device as, alongside classical input/output interfaces, multi-purpose interfaces are becoming increasingly common in host devices. It is of course also possible to use BIOS routines in parallel with the specific driver software for the multi-purpose interface, if this is desired.

The interface device according to the present invention comprises a processor means, a memory means, a first connecting device for interfacing the host device with the interface device, and a second connecting device for inter-

4

facing the interface device with the data transmit/receive device. The interface device is configured by the processor means and the memory means in such a way that the interface device, when receiving an inquiry from the host device via the first connecting device as to the type of a device attached to the host device, sends a signal, regardless of the type of the data transmit/receive device, to the host device via the first connecting device which signals to the host device that it is communicating with an input/output device. The interface device according to the present invention therefore simulates, both in terms of hardware and software, the way in which a conventional input/output device functions, preferably that of a hard disk drive. As support for hard disks is implemented as standard in all commercially available host systems, the simulation of a hard disk, for example, can provide host device-independent use. The interface device according to the present invention therefore no longer communicates with the host device or computer by means of a specially designed driver but by means of a program which is present in the BIOS system (Basic Input/Output System) and is normally precisely matched to the specific computer system on which it is installed, or by means of a specific program for the multi-purpose interface. Consequently, the interface device according to the present invention combines the advantages of both groups. On the one hand, communication between the computer and the interface takes place by means of a host device-specific BIOS program or by means of a driver program which is matched to the multi-purpose interface and which could be regarded as a "device-specific driver". On the other hand, the BIOS program or a corresponding multi-purpose interface program which operates one of the common input/output interfaces in host systems is therefore present in all host systems so that the interface device according to the present invention is host device-independent.

In the following, preferred embodiments of the present invention will be explained in more detail with reference to the drawings enclosed, in which:

FIG. 1 shows a general block diagram of the interface device according to the present invention; and

FIG. 2 shows a detailed block diagram of an interface device according to a preferred embodiment of the present invention.

FIG. 1 shows a general block diagram of an interface device 10 according to the present invention. A first connecting device 12 of the interface device 10 can be attached to a host device (not shown) via a host line 11. The first connecting device is attached both to a digital signal processor 13 and to a memory means 14. The digital signal processor 13 and the memory means 14 are also attached to a second connecting device 15 by means of bi-directional communication lines (shown for all lines by means of two directional arrows). The second connecting device can be attached by means of an output line 16 to a data transmit/receive device which is to receive data from the host device or from which data is to be read, i.e. acquired, and transferred to the host device. The data transmit/receive device itself can also communicate actively with the host device via the first and second connecting device, as described in more detail in the following.

Communication between the host system or host device and the interface device is based on known standard access commands as supported by all known operating systems (e.g. DOS, Windows, Unix). Preferably, the interface device according to the present invention simulates a hard disk with

5

6

a root directory whose entries are "virtual" files which can be created for the most varied functions. When the host device system with which the interface device according to the present invention is connected is booted and a data transmit/receive device is also attached to the interface device **10**, usual BIOS routines or multi-purpose interface programs issue an instruction, known by those skilled in the art as the INQUIRY instruction, to the input/output interfaces in the host device. The digital signal processor **13** receives this inquiry instruction via the first connecting device and generates a signal which is sent to the host device (not shown) again via the first connecting device **12** and the host line **11**. This signal indicates to the host device that, for example, a hard disk drive is attached at the interface to which the INQUIRY instruction was sent. Optionally, the host device can send an instruction, known by those skilled in the art as "Test Unit Ready", to the interface device to request more precise details regarding the queried device.

Regardless of which data transmit/receive device at the output line **16** is attached to the second connecting device, the digital signal processor **13** informs the host device that it is communicating with a hard disk drive. If the host device receives the response that a drive is present, it then sends a request to the interface device **10** to read the boot sequence which, on actual hard disks, normally resides on the first sectors of the disk. The digital signal processor **13**, whose operating system in stored in the memory means **14**, responds to this instruction by sending to the host device a virtual boot sequence which, in the case of actual drives, includes the drive type, the starting position and the length of the file allocation table (FAT), the number of sectors, etc., known to those skilled in the art. Once the host device has received this data, it assumes that the interface device **10** according to a preferred embodiment of the present invention is a hard disk drive. In reply to an instruction from the host device to display the directory of the "virtual" hard drive simulated by the interface device **10** with respect to the host device, the digital signal processor can respond to the host device in exactly the same way as a conventional hard disk would, namely by reading on request the file allocation table or FAT on a sector specified in the boot sequence, normally the first writable sector, and transferring it to the host device, and subsequently by transferring the directory structure of the virtual hard disk. Further, it is possible that the FAT is not read until immediately prior to reading or storing the data of the "virtual" hard disk and not already at initialization.

In a preferred embodiment of the present invention, the digital signal processor **13**, which need not necessarily be implemented as a digital signal processor but may be any other kind of microprocessor, comprises a first and a second command interpreter. The first command interpreter carries out the steps described above whilst the second command interpreter carries out the read/write assignment to specific functions. If the user now wishes to read data from the data transmit/receive device via the line **16**, the host device sends a command, for example "read file xy", to the interface device. As described above, the interface device appears to the host device as a hard disk. The second command interpreter of the digital signal processor now interprets the read command of the host processor as a data transfer command, by decoding whether "xy" denotes, for example, a "real-time input" file, a "configuration" file or an executable file, whereby the same begins to transfer data from the data transmit/receive device via the second connecting device to the first connecting device and via the line **11** to the host device.

Preferably, the volume of data to be acquired by a data transmit/receive device is specified in a configuration file described in the following by the user specifying in the said configuration file that a measurement is to last, for example, five minutes. To the host device the "real-time input" file then appears as a file whose length corresponds to the anticipated volume of data in those five minutes. Those skilled in the art know that communication between a processor and a hard disk consists of the processor transferring to the hard disk the numbers of the blocks or clusters or sectors whose contents it wishes to read. By reference to the FAT the processor knows which information is contained in which block. In this case, communication between the host device and the interface device according to the present invention therefore consists of the very fast transfer of block numbers and preferably of block number ranges because a virtual "real-time input" file will not be fragmented. If the host device now wants to read the "real-time input" file, it transfers a range of block numbers to the interface device, whereupon data commences to be received via the second connecting device and data commences to be sent to the host device via the first connecting device.

In addition to the digital signal processor instruction memory, which comprises the operating system of the digital signal processor and can be implemented as an EPROM or EEPROM, the memory means **14** can have an additional buffer for purposes of synchronizing data transfer from the data transmit/receive device to the interface device **10** and data transfer from the interface device **10** to the host device.

Preferably, the buffer is implemented as a fast random access memory or RAM buffer.

Further, from the host device the user can also create a configuration file, whose entries automatically set and control various functions of the interface device **10**, on the interface device **10** which appears to the host device as a hard disk. These settings can be, for example, gain, multiplex or sampling rate settings. By creating and editing a configuration file, normally a text file which is simple to understand with little prior knowledge, users of the interface device **10** are able to perform essentially identical operator actions for almost any data transmit/receive devices which can be attached to the second connecting device via the line **16**, thus eliminating a source of error arising from users having to know many different command codes for different applications. In the case of the interface device **10** according to the present invention it is necessary for users to note the conventions of the configuration file once only in order to be able to use the interface device **10** as an interface between a host device and almost any data transmit/receive device.

As a result of the option of storing any files in agreed formats in the memory means **14** of the interface device **10**, taking into account the maximum capacity of the memory means, any enhancements or even completely new functions of the interface device **10** can be quickly implemented. Even files executable by the host device, such as batch files or executable files (BAT or EXE files), and also help files can be implemented in the interface device, thus achieving independence of the interface device **10** from any additional software (with the exception of the BIOS routines) of the host device. On the one hand, this avoids licensing and/or registration problems and, on the other hand, installation of certain routines which can be frequently used, for example an FFT routine to examine acquired time-domain data in the frequency domain, is rendered unnecessary as the EXE files are already installed on the interface device **10** and appear in the virtual root directory, by means of which the host device can access all programs stored on the interface device **10**.

US 6,895,449 B2

7

In a preferred embodiment of the present invention in which the interface device 10 simulates a hard disk to the host device, the interface device is automatically detected and readied for operation when the host system is powered up or booted. This corresponds to the plug-and-play standard which is currently finding increasingly widespread use. The user is no longer responsible for installing the interface device 10 on the host device by means of specific drivers which must also be loaded; instead the interface device 10 is automatically readied for operation when the host system is booted.

For persons skilled in the art it is however obvious that the interface device 10 is not necessarily signed on when the computer system is powered up but that a special BIOS routine or a driver for a multi-purpose interface can also be started on the host device during current operation of the computer system in order to sign on or mount the interface device 10 as an additional hard disk. This embodiment is suitable for larger workstation systems which are essentially never powered down as they perform, e.g. mail functions or monitor processes which run continuously, for example, in multi-tasking environments.

In the interface device according to the present invention an enormous advantage is to be gained, as apparent in the embodiment described in the following, in separating the actual hardware required to attach the interface device 10 to the data transmit/receive device from the communication unit, which is implemented by the digital signal processor 13, the memory means 14 and the first connecting device 12, as this allows a plurality of dissimilar device types to be operated in parallel in identical manner. Accordingly, many interface devices 10 can be connected to a host device which then sees many different "virtual" hard disks. In addition, any modification of the specific hardware symbolized by the second connecting device 15 can be implemented essentially without changing the operation of the interface device according to the present invention. Further, an experienced user can intervene at any time on any level of the existing second connecting device by making use of the above mentioned option of creating a configuration file or adding or storing new program sections for the second connecting device.

An important advantage of the interface device 10 of the present invention is that it also permits extremely high data transfer rates by using, for data interchange, the host device-own BIOS routines which are optimized for each host device by the host device manufacturer or BIOS system manufacturer, or by using driver programs which are normally optimized and included by the manufacturers of multi-purpose interfaces. Furthermore, due to the simulation of a virtual mass storage device, the data is managed and made available in such a way that it can be transferred directly to other storage media, e.g. to an actual hard disk of the host device without, as it were, intervention of the host device processor. The only limitation to long-term data transfer at high speed is therefore imposed exclusively by the speed and the size of the mass storage device of the host device. This is the case as the digital signal processor 13 already formats the data read by the data transmit/receive device via the second connecting device 15 into block sizes suitable for a hard disk of the host device, whereby the data transfer speed is limited only by the mechanical latency of the hard disk system of the host device. At this point, it should be noted that normally data flow from a host device must be formatted in blocks to permit writing to a hard disk and subsequent reading from a hard disk, as known by those skilled in the art.

8

The said data transfer rate can be increased further by setting up a direct memory access (DMA) or RAM drive in the host system. As those skilled in the art know, the setting up of a RAM drive requires processor resources of the host device, with the result that the advantage of writing the data to a hard disk drive of the host device essentially without the need for processor resources is lost.

As described above, a data buffer can be implemented in the memory means 14 to permit independence in terms of time of the data transmit/receive device attached to the second connecting device from the host device attached to the first connecting device. This guarantees error-free operation of the interface device 10 even for time-critical applications in multi-tasking host systems.

FIG. 2 shows a detailed block diagram of an interface device 10 according to the present invention.

A digital signal processor (DSP) 1300 is, in a manner of speaking, the heart of the interface device 10. The DSP can be any DSP but preferably has a 20-MB on-chip random access memory (RAM). Certain instruction sets, for example, can be stored in the RAM already integrated in the DSP. An 80-MHz clock generator is attached to the DSP 1300 in order to synchronize the DSP. The DSP implements a fast Fourier transformation (FFT) in real time and also optional data compression of the data to be transferred from the data transmit/receive device to the host device in order to achieve greater efficiency and to permit interoperation with host devices which have a smaller memory.

In the preferred embodiment of the interface device 10 shown in FIG. 2, the first connecting device 12 of FIG. 1 contains the following components: an SCSI interface 1220 and a 50-pin SCSI connector 1240 for attachment to an SCSI interface present on most host devices or laptops. The SCSI (small computer system interface) interface 1220 translates the data received via the SCSI connector 1240 into data understood by the DSP 1300, as known by those skilled in the art. Further, the first connecting device 12 comprises an EPP (enhanced parallel port) with a data transfer rate of approx. 1 MBps which delivers a more moderate data transfer rate of 1 MBps by comparison to the data transfer rate of 10 MBps of the SCSI interface. The EPP 1260 is connected to a 25-pin D-shell connector 1280 to permit attachment to a printer interface of a host device for example. Optionally, the first connecting device 12 also comprises a 25-pin connector 1282 which permits the attachment of 8 digital outputs and 8 digital inputs 1284 at a host device.

Preferably, the second connecting device comprises 8 BNC inputs with the calibration relay 1505, a block 1510 with 8 device amplifiers with an overvoltage protection of ±75 V, this block being connected in turn to 8 sample/hold (S&H) circuits 1515. The calibration relays are relays which permit controlled changeover between a test voltage and a calibration reference voltage. Each sample/hold circuit is connected to a corresponding input of an 8-channel multiplexer 1520 which feeds its output signals via a programmable amplifier 1525 into an analog/digital converter (ADC) with 12 bit and 1.25 MHz 1530 and to the DSP 1300. The ADC 1530 is controlled by means of a 20-bit timer 1535, as known by persons skilled in the art. The programmable amplifier 1525 and the 8-channel multiplexer 1520 are controlled via an amplifier channel selection circuit 1540 which is in turn controlled by the DSP 1300.

The complete interface device 10 is supplied with power by an external AC/DC converter 1800 which delivers a digital supply voltage of ±5 V and is attached to a DC/DC

US 6,895,449 B2

9

converter **1810** which can deliver analog supply voltages of ±5 V and ±15 V as required for the interface device **10**. Further, the DC/DC converter controls a precision voltage reference **1820** which controls the 8 BNC inputs **1505** and the ADC **1530** as well as a digital/analog converter (DAC) **1830** which permits, via an output amplifier block with 4 output amplifiers **1840** and a 9-pin connector **1850**, analog output direct from the DSP **1300** to an output device, e.g. printer device or monitor device, which can be attached via the 9-pin connector **1850**, thus providing the option of monitoring the data transferred to the host device or also, for example, of viewing an FFT to obtain rapid and comprehensive data analysis without using processor time of the host device.

In FIG. **2** the memory means **14** of FIG. **1** is implemented by an EPROM **1400** which, in a preferred embodiment of the present invention, contains the operating system of the digital signal processor **1300**. A random access memory with an access time of 15 ns and a size of 512 KB or optionally 1024 KB **1420** serves as a data buffer to achieve independence in terms of time of the output line **16** from the output lines **11a**, **11b** and **11c** to the data transmit/receive device and to the host device respectively. As described above, in a preferred embodiment of the present invention the digital signal processor **1300** already contains a 20-KB on-chip RAM **1440** which can store certain instruction sets, functions and also smaller application software units.

The connection, symbolized by the line **16**, of the interface device **10** to any data transmit/receive device implements, by means of the blocks **1505–1535**, an analog input with a sampling rate of 1.25 MHz and quantization of 12 bits. There are 8 channels with an overvoltage protection of ±75 V. By means of the programmable amplifier **1525** the channels can be programmed independently of each other in voltage ranges up to a maximum of ±10 V. Unused channels can be grounded internally to reduce channel intermodulation. The block **1515** is implemented as a monolithic high-precision, high-speed sample/hold amplifier for simultaneous sampling of all channels. The precision voltage reference **1820** provides a high-precision, temperature-compensated monolithic energy gap voltage reference for auto-calibration of each channel and each gain. Further, offset fine adjustment for each channel is implemented by the same.

The blocks **1830**, **1840** and **1850** implement a direct analog output for the digital signal processor **1300**, and the DAC **1830** provides a data transfer rate of 625 kHz and a quantization of 12 bits. The block **1840** comprises 4 channels with a common output latch.

Further, the interface device **10** comprises a digital input/output device implemented by the blocks **1284** and **1290**. Here there are 8 digital inputs, 8 digital outputs with a common latch, and the digital port can be attached preferably to a side panel of the interface device **10** so that the port itself can easily be accessed.

The digital signal processor **1300** provides on-board digital data processing. In particular, it is a high-performance DSP with a clock speed of 80 MHz and a 20-bit timer **1535**.

As described above, the first connecting device **12** comprises the SCSI interface **1220** with a peak transfer rate of 10 MBps. An optional PCMCIA-to-SCSI adapter permits high-speed communication with laptop computers which are desirable and in widespread use, particularly by mobile service technicians. The EPP **1260** with its associated connector **1280** permits data transfer at a more moderate rate.

As described above, the interface device **10** is supplied with power by means of an external AC/DC adapter which

10

has a universal power input (85–264 VAC, 47–63 Hz). Interference suppression complies with the standards EN 55022, curve B and FFC, Class B). Further, it is also in accordance with international safety regulations (TÜV, UL, CSA). The interface device **10** is externally shielded and achieves a value of 55 dB at 30–60 MHz and a value of approximately 40 dB at 1 GHz, and therefore complies with the MILSTD 285-1 standard.

As described above, communication between the host device and the multi-purpose interface can take place not only via drivers for input/output device customary in a host device which reside in the BIOS system of the host device but also via specific interface drivers which, in the case of SCSI interfaces, are known as multi-purpose interface ASPI (advanced SCSI programming interface) drivers. This ASPI driver, which can also be referred to as an ASPI manager, is specific to a special SCSI host adapter, i.e. to a special multi-purpose interface, and is normally included by the manufacturer of the multi-purpose interface. Generally speaking, this multi-purpose interface driver has the task of moving precisely specified SCSI commands from the host system program to the host system SCSI adapter. For this reason, the command set is almost identical to that of the SCSI interface itself. Essentially, only status and reset commands for the host adapter have been added.

The ASPI driver can be used if the hard disk was not already addressable at boot time or if the SCSI-related BIOS routines of the host computer were still disabled. Here too, the steps needed to initialize the interface device, preferably as a virtual hard disk, are similar to the steps taken when initializing at boot time.

In general terms, the ASPI manager comprises two sides. One side is the proprietary, hardware-oriented side. It is responsible for converting all commands into a form required by the corresponding multi-purpose interface. The hardware-oriented side of the ASPI driver is therefore matched to a very specific type of multi-purpose interface or SCSI interface. The other side is known as the user software side. This side is totally independent of the proprietary operating characteristics of the SCSI adapter and is therefore identical for all SCSI interfaces. This permits SCSI programming which is however independent of the individual SCSI adapter types.

In contrast to communication between the host device and the interface device according to the present invention on the basis of a BIOS driver, the use of such an ASPI driver for communication between the host device and the interface device according to the present invention allows various further possibilities of the SCSI multi-purpose interface to be exploited. In the case described above, the interface device which preferably signs on and behaves as a virtual hard disk is detected by the BIOS driver of the host computer at boot time and is configured as a hard disk. This step does not however support active requests sent by the interface device to the host computer. If however the virtual hard disk wishes to write data actively to, for example, a hard disk of the host computer or wishes to initiate communication with the processor of the host computer, the host computer must recognize the request of the virtual hard disk and tolerate a further issuer of instructions on its bus. If the interface device behaves solely like a virtual hard disk, it would always receive and never issue commands. The BIOS has no objections to an additional issuer of commands that actively wishes to place data on the bus of the host device but the BIOS does not support the device in recognizing corresponding requests of the interface device or in granting the interface device permission to access the bus.

US 6,895,449 B2

11                                                          12

Using the ASPI manager the interface device according to the present invention can now obtain active access to an SCSI hard disk of the host device connected to the same SCSI bus which, in contrast to the interface device, cannot be a virtual but a real SCSI mass storage device or also a further interface device according to the present invention. Thereupon, the interface device according to the present invention can write the desired data to the SCSI hard disk of the host computer totally independently of the host computer or can communicate with the same in some other manner. The interface device according to the present invention therefore initially behaves passively as a virtual hard disk and then, as required and using the driver software for the multi-purpose interface, actively on the same SCSI bus. This means however that the interface device according to the present invention, using a driver software for the multi-purpose interface which comprises the BIOS routines customary in host devices and simultaneously provides the option of active participation, can, regardless of the type of the data transmit/receive device attached to the second connecting device, behave initially as a virtual and at the same time passive hard disk but can, as required, participate actively on the bus so as to be able to initiate communication directly with other SCSI hard disks of the host device by bypassing the processor of the host device.

Using a standard interface of a host device, the interface device according to the present invention permits communication with any host device. By simulating an input/output device to the host device and, in a preferred embodiment, by simulating a virtual mass storage device, the interface device 10 is automatically supported by all known host systems without any additional sophisticated driver software. The simulation of a freely definable file structure on the "virtual" hard disk provides simple operation and expansion options and, through the implementation of any programs, independence from special software implemented on the host device. Help files included on the interface device 10 and plug-and-play support ensure ease of use even in portable, flexible host devices. Despite the very simple user interface, experienced users are free at any time to intervene in the functions of the interface device 10 on system level. The interface device 10 thus provides a universal solution which can cover the entire spectrum of possible data transmit/receive devices.

What is claimed is:

1. An interface device for communication between a host device, which comprises drivers for input/output devices customary in a host device and a multi-purpose interface, and a data transmit/receive device comprising the following features:

   a processor;

   a memory;

   a first connecting device for interfacing the host device with the interface device via the multi-purpose interface of the host device; and

   a second connecting device for interfacing the interface device with the data transmit/receive device,

   wherein the interface device is configured by the processor and the memory in such a way that the interface device, when receiving an inquiry from the host device as to the type of a device attached to the multi-purpose interface of the host device, sends a signal, regardless of the type of the data transmit/receive device attached to the second connecting device of the interface device, to the host device which signals to the host device that it is a storage device customary in a host device,

whereupon the host device communicates with the interface device by means of the driver for the storage device customary in a host device, and

wherein the interface device is arranged for simulating a virtual file system to the host, the virtual file system including a directory structure.

2. An interface device in accordance with claim 1, in which the directory structure has a configuration file for setting and controlling functions of the interface device or an executable or a batch file for conducting a routine stored in the memory or a data file used for transferring data from the data transmit/receive device to the host device or a help file for giving help on handling the interface device.

3. An interface device in accordance with claim 2 wherein the configuration file is a text file.

4. An interface device in accordance with claim 2 wherein the executable file includes a Fast Fourier Transform routine for transforming data acquired by the second connecting device into the frequency domain and for examining frequency domain data.

5. An interface device in accordance with claim 2 wherein the executable file includes a data compression routine for compressing data to be transmitted from the data transmit/receive device to the host device.

6. An interface device in accordance with claim 1 wherein, in response to a request from the host to read a boot sequence, the processor is arranged to send a virtual boot sequence to the host.

7. An interface device in accordance with claim 6 wherein the virtual boot sequence includes a starting position and a length of a file allocation table, an indication of a type of the storage device or a number of sectors of the storage device.

8. An interface device in accordance with claim 7 wherein, in response to a request from the host to display a directory of the storage device, a processor is arranged for transferring the file allocation table and the directory structure to the host.

9. An interface device in accordance with claim 1 wherein the file allocation table and the directory structure is transferred to the host in response to a request from the host to read data from or store data to the storage device.

10. An interface device in accordance with claim 1 wherein the directory structure includes a data file for transferring data from the data transmit/receive device to the host device wherein the processor is arranged to interpret a request from the host to read the data file as a request for a data transfer from the data transmit/receive device to the host, so that data is transmitted from the second connecting device to the first connecting device and to the host.

11. An interface device in accordance with claim 10 wherein the directory structure further includes a configuration file for specifying a time period for a measurement by the data transmit/receive device, wherein the interface device is arranged for simulating a length of the data file to the host that corresponds to an anticipated volume of data produced by the data transmit/receive device in the specified time period.

12. An interface device in accordance with claim 1 wherein the file allocation table includes information on numbers of blocks occupied by the data file wherein the interface device is arranged for receiving block numbers or a block number range from the host when the host wants to read the data file, and wherein the interface device is arranged to start a data transfer to the host, when the block numbers or the block number range is received from the host.

13. An interface device in accordance with claim 12 wherein the processor is arranged for formatting the data

US 6,895,449 B2

13

acquired by the second connecting device into blocks having a predetermined size, the predetermined size being suited for the storage device.

**14**. An interface device in accordance with claim **1** wherein the functions are gain, multiplex or synchronization settings of the second connecting device.

**15**. An interface device in accordance with claim **1** wherein the storage device is a hard disk.

**16**. An interface device in accordance with claim **1** wherein the memory has a data buffer for permitting independence in terms of time of the data transmit/receive device attachable to the second connecting device from the host device attachable to the first connecting device.

**17**. An interface device for communication between a host device, which comprises a multi-purpose interface and a specific driver for this interface, and a data transmit/receive device comprising the following features:

a processor;

a memory;

a first connecting device for interfacing the host device with the interface device via the multi-purpose interface of the host device; and

a second connecting device for interfacing the interface device with the data transmit/receive device,

where the interface device is configured using the processor and the memory in such a way that the interface device, when receiving an inquiry from the host device as to the type of a device attached at the multi-purpose interface of the host device, sends a signal, regardless of the type of the data transmit/receive device attached to the second connecting device of the interface device, to the host device which signals to the host device that it is a storage device customary in a host device,

14

whereupon the host device communicates with the interface device by means of the specific driver for the multi-purpose interface, and

wherein the interface device is arranged for simulating a virtual file system to the host, the virtual file system including a file allocation table and a directory structure.

**18**. A method of communication between a host device, which comprises drivers for input/output devices customary in a host device and a multi-purpose interface, and a data transmit/receive device via an interface device comprising the following steps:

interfacing of the host device with a first connecting device of the interface device via the multi-purpose interface of the host device;

interfacing of the data transmit/receive device with a second connecting device of the interface device;

inquiring by the host device at the interface device as to the type of device to which the multi-purpose interface of the host device is attached;

regardless of the type of the data transmit/receive device attached to the second connecting device of the interface device, responding to the inquiry from the host device by the interface device in such a way that it is a storage device customary in a host device, whereupon the host device communicates with the interface device by means of the usual driver for the storage device, and

wherein the interface device is arranged for simulating a virtual file system to the host, the virtual file system including a file allocation table and a directory structure.

* * * * *

US006470399B1

(12) **United States Patent**
Tasler

(10) **Patent No.:**     **US 6,470,399 B1**
(45) **Date of Patent:**     **Oct. 22, 2002**

(54) **FLEXIBLE INTERFACE FOR COMMUNICATION BETWEEN A HOST AND AN ANALOG I/O DEVICE CONNECTED TO THE INTERFACE REGARDLESS THE TYPE OF THE I/O DEVICE**

(75) Inventor: **Michael Tasler**, Würzburg (DE)

(73) Assignee: **Labortechnik Tasler GmbH**, Wuerzburg (DE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/331,002**

(22) PCT Filed: **Mar. 3, 1998**

(86) PCT No.: **PCT/EP98/01187**

§ 371 (c)(1),
(2), (4) Date: **Jun. 14, 1999**

(87) PCT Pub. No.: **WO98/39710**

PCT Pub. Date: **Sep. 11, 1998**

(30)     **Foreign Application Priority Data**

Mar. 4, 1997     (DE) ........................................ 197 08 755

(51) Int. Cl.$^7$ ............................................. **G06F 13/14**
(52) U.S. Cl. ..................... **710/16**; 710/62; 710/63
(58) Field of Search .............................. 710/15, 16, 11, 710/12, 62, 63, 64; 703/23, 24, 25

(56)     **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,291,611 A | 3/1994 | Davis et al. |
| 5,297,124 A * | 3/1994 | Plotkin et al. ................. 703/25 |
| 5,430,855 A * | 7/1995 | Walsh et al. ................... 703/23 |
| 5,444,644 A | 8/1995 | Divjak |
| 5,487,154 A | 1/1996 | Gunji |
| 5,499,378 A * | 3/1996 | McNeill et al. ............... 703/24 |
| 5,506,692 A | 4/1996 | Murata |
| 5,510,774 A | 4/1996 | Loncle |
| 5,548,783 A * | 8/1996 | Jones et al. ................... 710/15 |
| 6,012,113 A * | 1/2000 | Tuckner ...................... 710/64 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 195 28 889 A1 | 2/1997 |
| EP | 0 436 458 A2 | 7/1991 |
| EP | 0 685 799 A1 | 12/1995 |
| JP | 06301607 A | 10/1994 |
| JP | 08110883 A | 4/1996 |
| WO | WO94/19746 | 9/1994 |

OTHER PUBLICATIONS

Steve Martin, "PC–based Data Acquisition in an Industrial Environment," pp. 1–3 (1990).
Payne et al., "High Speed PC–based Data Acquisition Systems," IEEE, pp. 2140–2145 (1995).
National Instruments Corporation, "Dynamic Signal Acquisition and DSP Board for the PC AT," IEEE 488 and VXIbus Control, Data Acquisition, and Analysis, pp. 3–118–3–123, (1994).
IBM Corporation, "Communication Method between Devices through FDD Interface," IBM Technical Disclosure Bulletin, vol. 38 (No. 05), p. 245 (May, 1995).

* cited by examiner

*Primary Examiner*—Thomas Lee
*Assistant Examiner*—Thuan Du
(74) *Attorney, Agent, or Firm*—Patton Boggs LLP

(57)     **ABSTRACT**

An interface device (**10**) provides fast data communication between a host device with input/output interfaces and a data transmit/receive device, wherein the interface device (**10**) comprises a processor means (**13**), a memory means (**14**), a first connecting device (**12**) for interfacing the host device with the interface device, and a second connecting device (**15**) for interfacing the interface device (**10**) with the data transmit/receive device. The interface device (**10**) is configured by the processor means (**13**) and the memory means (**14**) in such a way that, when receiving an inquiry from the host device via the first connecting device (**12**) as to the type of a device attached to the host device, regardless of the type of the data transmit/receive device, the interface device sends a signal to the host device via the first connecting device (**12**) which signals to the host device that it is communicating with an input/output device.

**15 Claims, 2 Drawing Sheets**





FIG.1



FIG.2

US 6,470,399 B1

1

# FLEXIBLE INTERFACE FOR COMMUNICATION BETWEEN A HOST AND AN ANALOG I/O DEVICE CONNECTED TO THE INTERFACE REGARDLESS THE TYPE OF THE I/O DEVICE

## FIELD OF THE INVENTION

The present invention relates to the transfer of data and in particular to interface devices for communication between a computer or host device and a data transmit/receive device from which data is to be acquired or with which two-way communication is to take place.

## BACKGROUND OF THE INVENTION

Existing data acquisition systems for computers are very limited in their areas of application. Generally such systems can be classified into two groups.

In the first group host devices or computer systems are attached by means of an interface to a device whose data is to be acquired. The interfaces of this group are normally standard interfaces which, with specific driver software, can be used with a variety of host systems. An advantage of such interfaces is that they are largely independent of the host device. However, a disadvantage is that they generally require very sophisticated drivers which are prone to malfunction and which limit data transfer rates between the device connected to the interface and the host device and vice versa. Further, it is often very difficult to implement such interfaces for portable systems and they offer few possibilities for adaptation with the result that such systems offer little flexibility.

The devices from which data is to be acquired cover the entire electrical engineering spectrum. In a typical case, it is assumed that a customer who operates, for example, a diagnostic radiology system in a medical engineering environment reports a fault. A field service technician of the system manufacturer visits the customer and reads service log files generated by the diagnostic radiology system by means a portable computer or laptop for example. If the fault cannot be localized or if the fault is intermittent, it will be necessary for the service technician to read not only an error log file but also data from current operation. It is apparent that in this case fast data transfer and rapid data analysis are necessary.

Another case requiring the use of an interface could be, for example, when an electronic measuring device, e.g. a multimeter, is attached to a computer system to transfer the data measured by the multimeter to the computer. Particularly when long-term measurements or large volumes of data are involved is it necessary for the interface to support a high data transfer rate.

From these randomly chosen examples it can be seen that an interface may be put to totally different uses. It is therefore desirable that an interface be sufficiently flexible to permit attachment of very different electrical or electronic systems to a host device by means of the interface. To prevent operator error, it is also desirable that a service technician is not required to operate different interfaces in different ways for different applications but that, if possible, a universal method of operating the interface be provided for a large number of applications.

To increase the data transfer rates across an interface, the route chosen in the second group of data acquisition systems for the interface devices was to specifically match the

2

interface very closely to individual host systems or computer systems. The advantage of this solution is that high data transfer rates are possible. However, a disadvantage is that the drivers for the interfaces of the second group are very closely matched to a single host system with the result that they generally cannot be used with other host systems or their use is very ineffective. Further, such types of interface have the disadvantage that they must be installed inside the computer casing to achieve maximum data transfer rates as they access the internal host bus system. They are therefore generally not suitable for portable host systems in the form of laptops whose minimum possible size leaves little internal space to plug in an interface card.

## DESCRIPTION OF PRIOR ART

A solution to this problem is offered by the interface devices of IOtech (business address: 25971 Cannon Road, Cleveland, Ohio 44146, USA) which are suitable for laptops such as the WaveBook/512 (registered trademark). The interface devices are connected by means of a plug-in card, approximately the size of a credit card, to the PCMCIA interface which is now a standard feature in laptops. The plug-in card converts the PCMCIA interface into an interface known in the art as IEEE 1284. The said plug-in card provides a special printer interface which is enhanced as regards the data transfer rate and delivers a data transfer rate of approximately 2 MBps as compared with a rate of approx. 1 MBps for known printer interfaces. The known interface device generally consists of a driver component, a digital signal processor, a buffer and a hardware module which terminates in a connector to which the device whose data is to be acquired is attached. The driver component is attached directly to the enhanced printer interface thus permitting the known interface device to establish a connection between a computer and the device whose data is to be acquired.

In order to work with the said interface, an interface-specific driver must be installed on the host device so that the host device can communicate with the digital signal processor of the interface card. As described above, the driver must be installed on the host device. If the driver is a driver developed specifically for the host device, a high data transfer rate is achieved but the driver cannot be easily installed on a different host system. However, if the driver is a general driver which is as flexible as possible and which can be used on many host devices, compromises must be accepted with regard to the data transfer rate.

Particularly in an application for multi-tasking systems in which several different tasks such as data acquisition, data display and editing are to be performed quasi-simultaneously, each task is normally assigned a certain priority by the host system. A driver supporting a special task requests the central processing system of the host device for processor resources in order to perform its task. Depending on the particular priority assignment method and on the driver implementation, a particular share of processor resources is assigned to a special task in particular time slots. Conflicts arise if one or more drivers are implemented in such a way that they have the highest priority by default, i.e. they are incompatible, as happens in practice in many applications. It may occur that both drivers are set to highest priority which, in the worst case, can result in a system crash.

EP 0685799 A1 discloses an interface by means of which several peripheral devices can be attached to a bus. An interface is connected between the bus of a host device and various peripheral devices. The interface comprises a finite

US 6,470,399 B1

3

state machine and several branches each of which is assigned to a peripheral device. Each branch comprises a data manager, cycle control, user logic and a buffer. This known interface device provides optimal matching between a host device and a specific peripheral device.

The specialist publication IBM Technical Disclosure Bulletin, Vol. 38, No. 05, page 245; "Communication Method between Devices through FDD Interface" discloses an interface which connects a host device to a peripheral device via a floppy disk drive interface. The interface consists in particular of an address generator, an MFM encoder/decoder, a serial/parallel adapter and a format signal generator. The interface makes it possible to attach not only a floppy disk drive but also a further peripheral device to the FDD host controller of a host device. The host device assumes that a floppy disk drive is always attached to its floppy disk drive controller and communication is initiated if the address is correct. However, this document contains no information as to how communication should be possible if the interface is connected to a multi-purpose interface instead of to a floppy disk drive controller.

SUMMARY OF THE INVENTION

It is an object of the present invention to provide an interface device for communication between a host device and a data transmit/receive device whose use is host device-independent and which delivers a high data transfer rate.

In accordance with a first aspect of the present invention, this object is met by an interface device for communication between a host device, which comprises drivers for input/output devices customary in a host device and a multi-purpose interface, and a data transmit/receive device comprising: a processor; a memory; a first connecting device for interfacing the host device with the interface device via the multi-purpose interface of the host device; and a second connecting device for interfacing the interface device with the data transmit/receive device, wherein the interface device is configured by the processor and the memory in such a way that the interface device, when receiving an inquiry from the host device as to the type of a device attached to the multi-purpose interface of the host device, sends a signal, regardless of the type of the data transmit/receive device attached to the second connecting device of the interface device, to the host device which signals to the host device that it is an input/output device customary in a host device, whereupon the host device communicates with the interface device by means of the driver for the input/output device customary in a host device.

In accordance with a second aspect of the present invention, this object is met by an interface device for communication between a host device, which comprises a multi-purpose interface and a specific driver for this interface, and a data transmit/receive device comprising: a processor; a memory; a first connecting device for interfacing the host device with the interface device via the multi-purpose interface of the host device; and a second connecting device for interfacing the interface device with the data transmit/receive device, wherein the interface device is configured using the processor and the memory in such a way that the interface device, when receiving an inquiry from the host device as to the type of a device attached at the multi-purpose interface of the host device, sends a signal, regardless of the type of the data transmit/receive device attached to the second connecting device of the interface device, to the host device which signals to the host device that it is an input/output device customary in a host device,

4

whereupon the host device communicates with the interface device by means of the specific driver for the multi-purpose interface.

In accordance with a third aspect of the present invention, this object is met by a method of communication between a host device, which comprises drivers for input/output devices customary in a host device and a multi-purpose interface, and a data transmit/receive device via an interface device comprising the steps of interfacing of the host device with a first connecting device of the interface device via the multi-purpose interface of the host device; interfacing of the data transmit/receive device with a second connecting device of the interface device; inquiring by the host device at the interface device as to the type of device to which the multi-purpose interface of the host device is attached; regardless of the type of the data transmit/receive device attached to the second connecting device of the interface device, responding to the inquiry from the host device by the interface device in such a way that it is an input/output device customary in a host device, whereupon the host device communicates with the interface device by means of the usual driver for the input/output device.

The present invention is based on the finding that both a high data transfer rate and host device-independent use can be achieved if a driver for an input/output device customary in a host device, normally present in most commercially available host devices, is utilized. Drivers for input/output devices customary in a host device which are found in practically all host devices are, for example, drivers for hard disks, for graphics devices or for printer devices. As however the hard disk interfaces in common host devices which can be, for example, IBM PCs, IBM-compatible PCs, Commodore PCs, Apple computers or even workstations, are the interfaces with the highest data transfer rate, the hard disk driver is utilized in the preferred embodiment of the interface device of the present invention. Drivers for other storage devices such as floppy disk drives, CD-ROM drives or tape drives could also be utilized in order to implement the interface device according to the present invention.

As described in the following, the interface device according to the present invention is to be attached to a host device by means of a multi-purpose interface of the host device which can be implemented, for example, as an SCSI interface or as an enhanced printer interface. Multi-purpose interfaces comprise both an interface card and specific driver software for the interface card. The driver software can be designed so that it can replace the BIOS driver routines. Communication between the host device and the devices attached to the multi-purpose interface then essentially takes place by means of the specific driver software for the multi-purpose interface and no longer primarily by means of BIOS routines of the host device. Recently however drivers for multi-purpose interfaces can also already be integrated in the BIOS system of the host device as, alongside classical input/output interfaces, multi-purpose interfaces are becoming increasingly common in most host devices. It is of course also possible to use BIOS routines in parallel with the specific driver software for the multi-purpose interface, if this is desired.

The interface device according to the present invention comprises a processor means, a memory means, a first connecting device for interfacing the host device with the interface device, and a second connecting device for interfacing the interface device with the data transmit/receive device. The interface device is configured by the processor means and the memory means in such a way that the interface device, when receiving an inquiry from the host

5

6

device via the first connecting device as to the type of a device attached to the host device, sends a signal, regardless of the type of the data transmit/receive device, to the host device via the first connecting device which signals to the host device that it is communicating with an input/output device. The interface device according to the present invention therefore simulates, both in terms of hardware and software, the way in which a conventional input/output device functions, preferably that of a hard disk drive. As support for hard disks is implemented as standard in all commercially available host systems, the simulation of a hard disk, for example, can provide host device-independent use. The interface device according to the present invention therefore no longer communicates with the host device or computer by means of a specially designed driver but by means of a program which is present in the BIOS system (Basic Input/Output System) and is normally precisely matched to the specific computer system on which it is installed, or by means of a specific program for the multi-purpose interface. Consequently, the interface device according to the present invention combines the advantages of both groups. On the one hand, communication between the computer and the interface takes place by means of a host device-specific BIOS program or by means of a driver program which is matched to the multi-purpose interface and which could be regarded as a "device-specific driver". On the other hand, the BIOS program or a corresponding multi-purpose interface program which operates one of the common input/output interfaces in host systems is therefore present in all host systems so that the interface device according to the present invention is host device-independent.

BRIEF DESCRIPTION OF THE DRAWINGS

In the following, preferred embodiments of the present invention will be explained in more detail with reference to the drawings enclosed, in which:

FIG. 1 shows a general block diagram of the interface device according to the present invention; and

FIG. 2 shows detailed block diagram of an interface device according to a preferred embodiment of the present invention.

DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

FIG. 1 shows a general block diagram of an interface device 10 according to the present invention. A first connecting device 12 of the interface device 10 can be attached to a host device (not shown) via a host line 11. The first connecting device is attached both to a digital signal processor 13 and to a memory means 14. The digital signal processor 13 and the memory means 14 are also attached to a second connecting device 15 by means of bidirectional communication lines (shown for all lines by means of two directional arrows). The second connecting device can be attached by means of an output line 16 to a data transmit/receive device which is to receive data from the host device or from which data is to be read, i.e. acquired, and transferred to the host device. The data transmit/receive device itself can also communicate actively with the host device via the first and second connecting device, as described in more detail in the following.

Communication between the host system or host device and the interface device is based on known standard access commands as supported by all known operating systems (e.g. DOS, Windows, Unix). Preferably, the interface device

according to the present invention simulates a hard disk with a root directory whose entries are "virtual" files which can be created for the most varied functions. When the host device system with which the interface device according to the present invention is connected is booted and a data transmit/receive device is also attached to the interface device 10, usual BIOS routines or multi-purpose interface programs issue an instruction, known by those skilled in the art as the INQUIRY instruction, to the input/output interfaces in the host device. The digital signal processor 13 receives this inquiry instruction via the first connecting device and generates a signal which is sent to the host device (not shown) again via the first connecting device 12 and the host line 11. This signal indicates to the host device that, for example, a hard disk drive is attached at the interface to which the INQUIRY instruction was sent. Optionally, the host device can send an instruction, known by those skilled in the art as "Test Unit Ready", to the interface device to request more precise details regarding the queried device.

Regardless of which data transmit/receive device at the output line 16 is attached to the second connecting device, the digital signal processor 13 informs the host device that it is communicating with a hard disk drive. If the host device receives the response that a drive is present, it then sends a request to the interface device 10 to read the boot sequence which, on actual hard disks, normally resides on the first sectors of the disk. The digital signal processor 13, whose operating system in stored in the memory means 14, responds to this instruction by sending to the host device a virtual boot sequence which, in the case of actual drives, includes the drive type, the starting position and the length of the file allocation table (FAT), the number of sectors, etc., known to those skilled in the art. Once the host device has received this data, it assumes that the interface device 10 according to a preferred embodiment of the present invention is a hard disk drive. In reply to an instruction from the host device to display the directory of the "virtual" hard disk drive simulated by the interface device 10 with respect to the host device, the digital signal processor can respond to the host device in exactly the same way as a conventional hard disk would, namely by reading on request the file allocation table or FAT on a sector specified in the boot sequence, normally the first writable sector, and transferring it to the host device, and subsequently by transferring the directory structure of the virtual hard disk. Further, it is possible that the FAT is not read until immediately prior to reading or storing the data of the "virtual" hard disk and not already at initialization.

In a preferred embodiment of the present invention, the digital signal processor 13, which need not necessarily be implemented as a digital signal processor but may be any other kind of microprocessor, comprises a first and a second command interpreter. The first command interpreter carries out the steps described above whilst the second command interpreter carries out the read/write assignment to specific functions. If the user now wishes to read data from the data transmit/receive device via the line 16, the host device sends a command, for example "read file xy", to the interface device. As described above, the interface device appears to the host device as a hard disk. The second command interpreter of the digital signal processor now interprets the read command of the host processor as a data transfer command, by decoding whether "xy" denotes, for example, a "real-time input" file, a "configuration" file or an executable file, whereby the same begins to transfer data from the data transmit/receive device via the second connecting device to the first connecting device and via the line 11 to the host device.

US 6,470,399 B1

7

Preferably, the volume of data to be acquired by a data transmit/receive device is specified in a configuration file described in the following by the user specifying in the said configuration file that a measurement is to last, for example, five minutes. To that device the "real-time input" file then appears as a file whose length corresponds to the anticipated volume of data in those five minutes. Those skilled in the art know that communication between a processor and a hard disk consists of the processor transferring to the hard disk the numbers of the blocks or clusters or sectors whose contents it wishes to read. By reference to the FAT the processor knows which information is contained in which block. In this case, communication between the host device and the interface device according to the present invention therefore consists of the very fast transfer of block numbers and preferably of block number ranges because a virtual "real-time input" file will not be fragmented. If the host device now wants to read the "real-time input" file, it transfers a range of block numbers to the interface device, whereupon data commences to be received via the second connecting device and data commences to be sent to the host device via the first connecting device.

In addition to the digital signal processor instruction memory, which comprises the operating system of the digital signal processor and can be implemented as an EPROM or EEPROM, the memory means 14 can have an additional buffer for purposes of synchronizing data transfer from the data transmit/receive device to the interface device 10 and data transfer from the interface device 10 to the host device.

Preferably, the buffer is implemented as a fast random access memory or RAM buffer.

Further, from the host device the user can also create a configuration file, whose entries automatically set and control various functions of the interface device 10, on the interface device 10 which appears to the host device as a hard disk. These settings can be, for example, gain, multiplex or sampling rate settings. By creating and editing a configuration file, normally a text file which is simple to understand with little prior knowledge, users of the interface device 10 are able to perform essentially identical operator actions for almost any data transmit/receive devices which can be attached to the second connecting device via the line 16, thus eliminating a source of error arising from users having to know many different command codes for different applications. In the case of the interface device 10 according to the present invention it is necessary for users to note the conventions of the configuration file once only in order to be able to use the interface device 10 as an interface between a host device and almost any data transmit/receive device.

As a result of the option of storing any files in agreed formats in the memory means 14 of the interface device 10, taking into account the maximum capacity of the memory means, any enhancements or even completely new functions of the interface device 10 can be quickly implemented. Even files executable by the host device, such as batch files or executable files (BAT or EXE files), and also help files can be implemented in the interface device, thus achieving independence of the interface device 10 from any additional software (with the exception of the BIOS routines) of the host device. On the one hand, this avoids licensing and/or registration problems and, on the other hand, installation of certain routines which can be frequently used, for example an FFT routine to examine acquired time-domain data in the frequency domain, is rendered unnecessary as the EXE files are already installed on the interface device 10 and appear in the virtual root directory, by means of which the host device can access all programs stored on the interface device 10.

8

In a preferred embodiment of the present invention in which the interface device 10 simulates a hard disk to the host device, the interface device is automatically detected and readied for operation when the host system is powered up or booted. This corresponds to the plug-and-play standard which is currently finding increasingly widespread use. The user is no longer responsible for installing the interface device 10 on the host device by means of specific drivers which must also be loaded; instead the interface device 10 is automatically readied for operation when the host system is booted.

For persons skilled in the art it is however obvious that the interface device 10 is not necessarily signed on when the computer system is powered up but that a special BIOS routine or a driver for a multi-purpose interface can also be started on the host device during current operation of the computer system in order to sign on or mount the interface device 10 as an additional hard disk. This embodiment is suitable for larger workstation systems which are essentially never powered down as they perform, e.g. mail functions or monitor processes which run continuously, for example, in multi-tasking environments.

In the interface device according to the present invention an enormous advantage is to be gained, as apparent in the embodiment described in the following, in separating the actual hardware required to attach the interface device 10 to the data transmit/receive device from the communication unit, which is implemented by the digital signal processor 13, the memory means 14 and the first connecting device 12, as this allows a plurality of dissimilar device types to be operated in parallel in identical manner. Accordingly, many interface devices 10 can be connected to a host device which then sees many different "virtual" hard disks. In addition, any modification of the specific hardware symbolized by the second connecting device 15 can be implemented essentially without changing the operation of the interface device according to the present invention. Further, an experienced user can intervene at any time on any level of the existing second connecting device by making use of the above mentioned option of creating a configuration file or adding or storing new program sections for the second connecting device.

An important advantage of the interface device 10 of the present invention is that it also permits extremely high data transfer rates by using, for data interchange, the host device-own BIOS routines which are optimized for each host device by the host device manufacturer or BIOS system manufacturer, or by using driver programs which are normally optimized and included by the manufacturers of multi-purpose interfaces. Furthermore, due to the simulation of a virtual mass storage device, the data is managed and made available in such a way that it can be transferred directly to other storage media, e.g. to an actual hard disk of the host device without, as it were, intervention of the host device processor. The only limitation to long-term data transfer at high speed is therefore imposed exclusively by the speed and the size of the mass storage device of the host device. This is the case as the digital signal processor 13 already formats the data read by the data transmit/receive device via the second connecting device 15 into block sizes suitable for a hard disk of the host device, whereby the data transfer speed is limited only by the mechanical latency of the hard disk system of the host device. At this point, it should be noted that normally data flow from a host device must be formatted in blocks to permit writing to a hard disk and subsequent reading from a hard disk, as known by those skilled in the art.

US 6,470,399 B1

9                                                                          10

The said data transfer rate can be increased further by setting up a direct memory access (DMA) or RAM drive in the host system. As those skilled in the art know, the setting up of a RAM drive requires processor resources of the host device, with the result that the advantage of writing the data to a hard disk drive of the host device essentially without the need for processor resources is lost.

As described above, a data buffer can be implemented in the memory means **14** to permit independence in terms of time of the data transmit/receive device attached to the second connecting device from the host device attached to the first connecting device. This guarantees error-free operation of the interface device **10** even for time-critical applications in multi-tasking host systems.

FIG. **2** shows a detailed block diagram of an interface device **10** according to the present invention.

A digital signal processor (DSP) **1300** is, in a manner of speaking, the heart of the interface device **10**. The DSP can be any DSP but preferably has a 20-MB on-chip random access memory (RAM). Certain instruction sets, for example, can be stored in the RAM already integrated in the DSP. An 80-MHz clock generator is attached to the DSP **1300** in order to synchronize the DSP. The DSP implements a fast Fourier transformation (FFT) in real time and also optional data compression of the data to be transferred from the data transmit/receive device to the host device in order to achieve greater efficiency and to permit interoperation with host devices which have a smaller memory.

In the preferred embodiment of the interface device **10** shown in FIG. **2**, the first connecting device **12** of FIG. **1** contains the following components: an SCSI interface **1220** and a 50-pin SCSI connector **1240** for attachment to an SCSI interface present on most host devices or laptops. The SCSI (small computer system interface) interface **1220** translates the data received via the SCSI connector **1240** into data understood by the DSP **1300**, as known by those skilled in the art. Further, the first connecting device **12** comprises an EPP (enhanced parallel port) with a data transfer rate of approx. 1 MBps which delivers a more moderate data transfer rate of 1 MBps by comparison to the data transfer rate of 10 MBps of the SCSI interface. The EPP **1260** is connected to a 25-pin D-shell connector **1280** to permit attachment to a printer interface of a host device for example. Optionally, the first connecting device **12** also comprises a 25-pin connector **1282** which permits the attachment of 8 digital outputs and 8 digital inputs **1284** at a host device.

Preferably, the second connecting device comprises 8 BNC inputs with the calibration relay **1505**, a block **1510** with 8 device amplifiers with an overvoltage protection of ±75 V, this block being connected in turn to 8 sample/hold (S&H) circuits **1515**. The calibration relays are relays which permit controlled changeover between a test voltage and a calibration reference voltage. Each sample/hold circuit is connected to a corresponding input of an 8-channel multiplexer **1520** which feeds its output signals via a programmable amplifier **1525** into an analog/digital converter (ADC) with 12 bit and 1.25 MHz **1530** and to the DSP **1300**. The ADC **1530** is controlled by means of a 20-bit timer **1535**, as known by persons skilled in the art. The programmable amplifier **1525** and the 8-channel multiplexer **1520** are controlled via an amplifier channel selection circuit **1540** which is in turn controlled by the DSP **1300**.

The complete interface device **10** is supplied with power by an external AC/DC converter **1800** which delivers a digital supply voltage of ±5 V and is attached to a DC/DC converter **1810** which can deliver analog supply voltages of ±5 V and ±15 V as required for the interface device **10**. Further, the DC/DC converter controls a precision voltage reference **1820** which controls the 8 BNC inputs **1505** and the ADC **1530** as well as a digital/analog converter (DAC) **1830** which permits, via an output amplifier block with 4 output amplifiers **1840** and a 9-pin connector **1850**, analog output direct from the DSP **1300** to an output device, e.g. printer device or monitor device, which can be attached via the 9-pin connector **1850**, thus providing the option of monitoring the data transferred to the host device or also, for example, of viewing an FFT to obtain rapid and comprehensive data analysis without using processor time of the host device.

In FIG. **2** the memory means **14** of FIG. **1** is implemented by an EPROM **1400** which, in a preferred embodiment of the present invention, contains the operating system of the digital signal processor **1300**. A random access memory with an access time of 15 ns and a size of 512 KB or optionally 1024 KB **1420** serves as a data buffer to achieve independence in terms of time of the output line **16** from the output lines **11a**, **11b** and **11c** to the data transmit/receive device and to the host device respectively. As described above, in a preferred embodiment of the present invention the digital signal processor **1300** already contains a 20-KB on-chip RAM **1440** which can store certain instruction sets, functions and also smaller application software units.

The connection, symbolized by the line **16**, of the interface device **10** to any data transmit/receive device implements, by means of the blocks 1505–1535, an analog input with a sampling rate of 1.25 MHz and quantization of 12 bits. There are 8 channels with an overvoltage protection of ±75 V. By means of the programmable amplifier **1525** the channels can be programmed independently of each other in voltage ranges up to a maximum of ±10 V. Unused channels can be grounded internally to reduce channel intermodulation. The block **1515** is implemented as a monolithic high-precision, high-speed sample/hold amplifier for simultaneous sampling of all channels. The precision voltage reference **1820** provides a high-precision, temperature-compensated monolithic energy gap voltage reference for auto-calibration of each channel and each gain. Further, offset fine adjustment for each channel is implemented by the same.

The blocks **1830**, **1840** and **1850** implement a direct analog output for the digital signal processor **1300**, and the DAC **1830** provides a data transfer rate of 625 kHz and a quantization of 12 bits. The block **1840** comprises 4 channels with a common output latch.

Further, the interface device **10** comprises a digital input/output device implemented by the blocks **1284** and **1282**. Here there are 8 digital inputs, 8 digital outputs with a common latch, and the digital port can be attached preferably to a side panel of the interface device **10** so that the port itself can easily be accessed.

The digital signal processor **1300** provides on-board digital data processing. In particular, it is a high-performance DSP with a clock speed of 80 MHz and a 20-bit timer **1535**.

As described above, the first connecting device **12** comprises the SCSI interface **1220** with a peak transfer rate of 10 MBps. An optional PCMCIA-to-SCSI adapter permits high-speed communication with laptop computers which are desirable and in widespread use, particularly by mobile service technicians. The EPP **1260** with its associated connector **1280** permits data transfer at a more moderate rate.

As described above, the interface device **10** is supplied with power by means of an external AC/DC adapter which

US 6,470,399 B1

11

has a universal power input (85–264 VAC, 47–63 Hz). Interference suppression complies with the standards EN 55022, curve B and FFC, Class B). Further, it is also in accordance with international safety regulations (TÜV, UL, CSA). The interface device 10 is externally shielded and achieves a value of 55 dB at 30–60 MHz and a value of approximately 40 dB at 1 GHz, and therefore complies with the MILSTD 285-1 standard.

As described above, communication between the host device and the multi-purpose interface can take place not only via drivers for input/output devices customary in a host device which reside in the BIOS system of the host device but also via specific interface drivers which, in the case of SCSI interfaces, are known as multi-purpose interface ASPI (advanced SCSI programming interface) drivers. This ASPI driver, which can also be referred to as an ASPI manager, is specific to a special SCSI host adapter, i.e. to a special multi-purpose interface, and is normally included by the manufacturer of the multi-purpose interface. Generally speaking, this multi-purpose interface driver has the task of moving precisely specified SCSI commands from the host system program to the host system SCSI adapter. For this reason, the command set is almost identical to that of the SCSI interface itself. Essentially, only status and reset commands for the host adapter have been added.

The ASPI driver can be used if the hard disk was not already addressable at boot time or if the SCSI-related BIOS routines of the host computer were still disabled. Here too, the steps needed to initialize the interface device, preferably as a virtual hard disk, are similar to the steps taken when initializing at boot time.

In general terms, the ASPI manager comprises two sides. One side is the proprietary, hardware-oriented side. It is responsible for converting all commands into a form required by the corresponding multi-purpose interface. The hardware-oriented side of the ASPI driver is therefore matched to a very specific type of multi-purpose interface or SCSI interface. The other side is known as the user software side. This side is totally independent of the proprietary operating characteristics of the SCSI adapter and is therefore identical for all SCSI interfaces. This permits SCSI programming which is however independent of the individual SCSI adapter types.

In contrast to communication between the host device and the interface device according to the present invention on the basis of a BIOS driver, the use of such an ASPI driver for communication between the host device and the interface device according to the present invention allows various further possibilities of the SCSI multi-purpose interface to be exploited. In the case described above, the interface device which preferably signs on and behaves as a virtual hard disk is detected by the BIOS driver of the host computer at boot time and is configured as a hard disk. This step does not however require active requests sent by the interface device to the host computer. If however the virtual hard disk wishes to write data actively to, for example, a hard disk of the host computer or wishes to initiate communication with the processor of the host computer, the host computer must recognize the request of the virtual hard disk and tolerate a further issuer of instructions on its bus. If the interface device behaves solely like a virtual hard disk, it would always receive and never issue commands. The BIOS has no objections to an additional issuer of commands that actively wishes to place data on the bus of the host device but the BIOS does not support the host device in recognizing corresponding requests of the interface device or in granting the interface device permission to access the bus.

Using the ASPI manager the interface device according to the present invention can now obtain active access to an

12

SCSI hard disk of the host device connected to the same SCSI bus which, in contrast to the interface device, cannot be a virtual but a real SCSI mass storage device or also a further interface device according to the present invention. Thereupon, the interface device according to the present invention can write the desired data to the SCSI hard disk of the host computer totally independently of the host computer or can communicate with the same in some other manner. The interface device according to the present invention therefore initially behaves passively as a virtual hard disk and then, as required and using the driver software for the multi-purpose interface, actively on the same SCSI bus. This means however that the interface device according to the present invention, using a driver software for the multi-purpose interface which comprises the BIOS routines customary in host devices and simultaneously provides the option of active participation, can, regardless of the type of the data transmit/receive device attached to the second connecting device, behave initially as a virtual and at the same time passive hard disk but can, as required, participate actively on the bus so as to be able to initiate communication directly with other SCSI hard disks of the host device by bypassing the processor of the host device.

Using a standard interface of a host device, the interface device according to the present invention permits communication with any host device. By simulating an input/output device to the host device and, in a preferred embodiment, by simulating a virtual mass storage device, the interface device 10 is automatically supported by all known host systems without any additional sophisticated driver software. The simulation of a freely definable file structure on the "virtual" hard disk provides simple operation and expansion options and, through the implementation of any programs, independence from special software implemented on the host device. Help files included on the interface device 10 and plug-and-play support ensure ease of use even in portable, flexible host devices. Despite the very simple user interface, experienced users are free at any time to intervene in the functions of the interface device 10 on system level. The interface device 10 thus provides a universal solution which can cover the entire spectrum of possible data transmit/receive devices.

What is claimed is:

1. An interface device for communication between a host device, which comprises drivers for input/output devices customary in a host device and a multi-purpose interface, and a data transmit/receive device, the data transmit/receive device being arranged for providing analog data, comprising:

a processor;

a memory;

a first connecting device for interfacing the host device with the interface device via the multi-purpose interface of the host device; and

a second connecting device for interfacing the interface device with the data transmit/receive device, the second connecting device including a sampling circuit for sampling the analog data provided by the data transmit/receive device and an analog-to-digital converter for converting data sampled by the sampling circuit into digital data,

wherein the interface device is configured by the processor and the memory to include a first command interpreter and a second command interpreter,

wherein the first command interpreter is configured in such a way that the command interpreter, when receiving an inquiry from the host device as to a type of a device attached to the multi-purpose interface of the

US 6,470,399 B1

13

host device, sends a signal, regardless of the type of the data transmit/receive device attached to the second connecting device of the interface device, to the host device which signals to the host device that it is an input/output device customary in a host device, whereupon the host device communicates with the interface device by means of the driver for the input/output device customary in a host device, and

wherein the second command interpreter is configured to interpret a data request command from the host device to the type of input/output device signaled by the first command interpreter as a data transfer command for initiating a transfer of the digital data to the host device.

2. An interface device according to claim 1,

wherein the drivers for input/output drivers customary in a host device comprise a hard disk driver, and the signal indicates to the host device that the host device is communicating with a hard disk.

3. An interface device according to claim 1,

wherein the memory means comprises a buffer to buffer data to be transferred between the data transmit/receive device and the host device.

4. An interface device according to claim 1,

wherein the multi-purpose interface of the host device is an SCSI interface and the first connecting device also comprises an SCSI interface.

5. An interface device according to claim 1,

wherein the processor is a digital signal processor.

6. An interface device according to claim 2,

wherein the data to be transferred from the data transmit/receive device to the host device in the interface device is formatted in a suitable format for a hard disk present in the host device.

7. An interface device according to claim 2,

which further comprises a root directory and virtual files which are present on the signaled hard disk drive and which can be accessed from the host device.

8. An interface device according to claim 7,

wherein the virtual files comprise a configuration file in text format which are stored in the memory means and using which the user can configure the interface device for a specific data transmit/receive device.

9. An interface device according to claim 7,

wherein the virtual files comprise batch files or executable files for the microprocessor means which are stored in the interface device in order to perform data processing, independently of the host device, of data received via the second connecting device.

10. An interface device according to claim 7,

wherein the virtual files comprise batch files or executable files for the host device which are stored in the interface device.

11. An interface device for communication between a host device, which comprises a multi-purpose interface and a specific driver for this interface, and a data transmit/receive device, the data transmit/receive device being arranged for providing analog data, comprising:

a processor;

a memory;

a first connecting device for interfacing the host device with the interface device via the multi-purpose interface of the host device; and

a second connecting device for interfacing the interface device with the data transmit/receive device, the second connecting device including a sampling circuit for sampling the analog data provided by the data transmit/receive device and an analog-to-digital converter for converting data sampled by the sampling circuit into digital data,

14

where the interface device is configured using the processor and the memory to include a first command interpreter and a second command interpreter,

wherein the first command interpreter is configured in such a way that the interface device, when receiving an inquiry from the host device as to the type of a device attached at the multi-purpose interface of the host device, sends a signal, regardless of the type of the data transmit/receive device attached to the second connecting device of the interface device, to the host device which signals to the host device that it is an input/output device customary in a host device, whereupon the host device communicates with the interface device by means of the specific driver for the multi-purpose interface, and

wherein the second command interpreter is configured to interpret a data request command from the host device to the type of input/output device signaled by the first command interpreter as a data transfer command for initiating a transfer of the digital data to the host device.

12. An interface device according to claim 11, wherein in addition to the first connecting device of the interface device, there is a further input/output device at the multi-purpose interface of the host device, and wherein the interface device can communicate directly with said further input/output device via the specific driver for the multi-purpose interface.

13. An interface device according to claim 11,

wherein the multi-purpose interface is an SCSI interface, and wherein the specific driver for the multi-purpose interface is an ASPI manager.

14. A method of communication between a host device, which comprises drivers for input/output devices customary in a host device and a multi-purpose interface, and a data transmit/receive device, the data transmit/receive device being arranged for providing analog data, via an interface device, comprising:

interfacing of the host device with a first connecting device of the interface device via the multi-purpose interface of the host device;

interfacing of the data transmit/receive device with a second connecting device of the interface device, the second connecting device including a sampling circuit for sampling the analog data provided by the data transmit/receive device and an analog-to-digital converter for converting data sampled by the sampling circuit into digital data;

inquiring by the host device at the interface device as to the type of device to which the multi-purpose interface of the host device is attached;

regardless of the type of the data transmit/receive data attached to the second connecting device of the interface device, responding to the inquiry from the host device by the interface device in such a way that it is an input/output device customary in a host device, whereupon the host device communicates with the interface device by means of the usual driver for the input/output device, and

interpreting a data request command from the host device to the type of input/output device customary in the host device as a data transfer command for initiating a transfer of the digital data to the host device.

15. A method according to claim 14,

wherein the drivers for input/output devices customary in a host device comprise a driver for a storage device and in particular for a hard disk drive.

*   *   *   *   *