IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE PAPST LICENSING GMBH & CO.
KG LITIGATION

_____

This Document Relates To:

Casio, No. 06-cv-1751

Misc. Action No. 07-493 (RMC)
MDL Docket No. 1880

PROPOSED DISCOVERY PLAN

Casio Inc. and Casio Computer Co., Ltd. (collectively "Casio"), hereby

provide this proposed discovery plan pursuant to the Order of the Court dated

April 24, 2008 (docket #77).   The parties met and conferred, pursuant to

paragraph 4 of the Court's April 24 Order, and were able to agree on few issues.

There are, however, issues for which Casio requests the Court's assistance.[1]

I.     REQUESTED CLARIFICATION OF THE APRIL 24 ORDER

Paragraph 6(b) of the Court's April 24 Order (docket #77) stated that

each party is limited to twenty-five interrogatories, twenty-five document

requests, and twenty-five requests for admission.  Casio and Papst disagree as to

_____

[1]     A draft of this report was sent to counsel for Papst on the morning of May 7, but
despite urging from Casio's counsel, counsel for Papst did not provide any edits or text
until 6:00 p.m. on May 8 – the day it was due.  The revision Papst provided at that time
had removed all of the Casio text.  Counsel for Casio scrambled to put its text back in
the report, and provided its revisions to counsel for Papst at 7:45 p.m. (6:45 p.m. for
Papst's counsel).  But counsel for Papst, Mr. Schnayer, left the office, sending an email
that said he would not provide any additional revisions to the report and asking Casio
to obtain an extension (something Casio had previously  expressly declined to do, as
we are ordered to report to the Court today).  Therefore, Casio cannot file a joint report
and submits this report containing only its positions.

whether this means that Papst may now serve additional discovery requests on Casio.

On April 8, 2008, in response to thorough briefing and a hearing that addressed the issue, this Court expressly held that "no further written discovery requests shall be allowed between Casio and Papst." Docket #36, ¶4. This effectively reconfirmed the May 14, 2007 Order of Judge Kessler that there would be no further written discovery requests between Casio and Papst after July 1, 2007 – a deadline that passed long ago. As the April 24 Order does not vacate either the Court's April 8, 2008 Order, or the earlier Order of Judge Kessler, Casio does not believe the Court intended to again open up written discovery for Casio and Papst.[2] Indeed, if Papst and Casio were to serve discovery requests all over again, it would have been inconsistent for the Court to order them to meet and confer now for the purpose of determining the specific scope of further discovery. April 24 Order, ¶4 (docket #77).

Casio has already been forced to deal with 148 document requests from Papst, many very detailed interrogatories served on both Casio Japan and Casio America, and 130 requests for admission. Dealing with the Papst discovery requests was a painful and expensive experience. The Court found the Papst discovery requests "outrageously over the top" and "stunning" in their over breadth, served in "bad faith," and struck them in their entirety. *Id.* ¶2; May

---

[2]    *See* Exhibit C at 27 (to counsel for Papst: "you're dangerously close to being so grossly overbroad <u>and you're too late to change it now</u> and now what are you going to do? How can I enforce it? I mean, you've let yourself get to the end of a limb") (emphasis added).

6 Order, fn 2 (docket #82).  If the Court now combines that ruling with an order effectively allowing Papst to simply start the written discovery process anew, the only party that will have been punished as a result of Papst's discovery abuse is Casio because it would have to bear the additional burden and costs associated with responding to additional written discovery served ten months after the deadline.

Casio does not understand the Court to have intended to reverse itself on this issue, and Casio again urges the Court to deny Papst's request to reopen this Pandora's Box and the substantial expense associated with it.

Casio has produced over 100,000 pages of documents, including tens of thousands of pages directly on the technology at issue.  After Papst has reviewed those documents in detail, if it believes there are additional documents needed and has good reason for this belief, Casio will supplement its production.  The approach Papst wants to take – serving another overbroad set of requests for documents before it even bothers to review the documents it already has – will only add additional layers of expense and burden for both Casio and the Court.  Papst has what it needs, and if its counsel would simply review the Casio production documents that should become clear.

Papst claims that Casio should respond to the discovery requests that are attached as Exhibit A.  Those requests were only served on counsel for Casio at 3:00 p.m. on the same afternoon this submission was due.  Counsel for Casio was not given sufficient time to comment on these new requests, except to state

that Papst should not be allowed any additional written discovery.  Indeed,

counsel for Casio has spent the last several days focusing on a different

"narrowed" set of Papst requests that counsel for Papst served on Casio and

presented as its proposed compromise on the Casio document production.  *See*

Exhibit B and fn 3, *infra*.

II.    <u>DISCOVERY RESPONSES</u>

<u>Papst document Production</u>:  Casio has not received any documents

from Papst since the stay was lifted.  While Papst now states that some

documents will be produced this week, they concede that this will not be all the

Papst documents, and there is no deadline for them to complete the

production.  Accordingly, Casio requests an order that Papst produce all its

documents within ten days.

<u>Papst Responses to Interrogatories</u>:  Papst has agreed to provide, this

week, full responses to Casio's outstanding interrogatories, as ordered in

paragraphs 6(k) – 6(o) of the April 24 Order.

<u>Casio's Production</u>:  Pursuant to paragraph 5 of the Court's Order, Casio

produced additional documents on May 6.  Approximately 69,000 additional

documents, or about an additional 23 boxes worth, were produced that day.

With regard to the scope of the Casio production, the parties agreed that

Casio would produce a number of additional documents, including things like

service manuals and documents sufficient for an understanding of the specific

relevant technology.  Casio's plan was to include in this joint submission a

specific list of what the parties would jointly agree to be the scope of any future

Casio production.

But after working with Papst to reach agreements per the Court's Order,

Papst rendered the agreements entirely meaningless by serving new document

requests. Exhibit B. Casio had provided concessions on what it was willing to

produce, in order to reach a final, amicable resolution, only to find out two days

later that Papst was still demanding an outrageous scope of production.[3]

---

[3]    Papst claimed that the new requests (Exhibit B) were "narrowed" per the Court orders and instructions. Despite the numbering on the actual requests, they were not even close to the 25 request limit ordered by the court, as was clear from the vast array of documents demanded in the "instructions" to the requests (instructions 21-30). While purporting to limit some of the requests to certain features of the cameras, they nevertheless continued to demand documents from every Casio-related company all over the world (definition number 1) that had any mention of any of these features, including every technical document virtually ever written or created anywhere in the world (see, e.g., instructions 21 and 25), every document on the development history of every such feature (*id.*); every marketing plan, advertisement, brochure, bulletin, and market study, all over the world, making any reference to any of the features (instruction 23); every document from every "patent related" federal or state lawsuit, administrative proceeding, ITC proceeding, Patent Office proceeding, and "international cases and proceedings filed in any tribunal" anywhere in the world, that involves the cameras (request 12, instruction 13); every document related to prosecution of every patent and application all over the world that even partially mentions any of the features (request 17); etc. According to the requests, the documents identified in these "instructions" (obviously in large part simply copied from Papst's first set of requests) were only "examples" of what must be produced. Papst even expanded its requests in some respects, insisting that, for every responsive document that has ever been destroyed by any Casio related company worldwide in the last 23 years (instructions 1 and 17), Casio must identify the person who destroyed it, the date it was destroyed, the reasons for and circumstances surrounding the destruction (instruction 7). Papst also demanded that Casio produce every document relating to every review or analysis of any competitor product with these features (instruction 21), every document showing every tweak to any related software that has been made over the past 23 years (*id.*), every communication between every Casio employee from every country of the world with manufacturers or suppliers of integrated circuitry (*id.*), etc. At the April 22 telephonic hearing, the Court expressly warned Papst about using discovery "as a weapon" and told counsel for Papst: "don't do it again" (Exhibit C at 5). The message did not sink in.

III.     **THE PENDING MOTIONS**

In paragraphs 2 and 3 of the Court's April 24 Order (docket #77), the Court held the sanctions issues from the pending Casio motions in abeyance. The resolution of the issues in these pending motions will significantly impact on the discovery between Casio and Papst, and Casio respectfully requests early resolution of these outstanding issues. Casio also understands that Papst intends to request early resolution of these issues.

Resolution of Casio's motion for sanctions related to Papst's responses to Casio's interrogatories (docket #37) will dictate whether Casio and Papst need to address discovery related only to topics that may, as a result of the motion, no longer be in issue between Casio and Papst. That is, Casio has requested in that motion sanctions that, if ordered by the Court, would narrow the scope of needed discovery. Resolution of the sanctions portions of the Motion to strike (docket #38) may be relevant to the question of whether Papst may serve additional discovery requests, as one of the requested sanctions was that Papst's "bad faith" should preclude them from serving more requests. Accordingly, Casio respectfully request early resolution of these pending issues.[4]

_____

Counsel for Casio has been grappling with this outrageous set of document requests – Papst's proposal for "compromise" and formally served on Casio pursuant to Federal Rule 26(g) – for the last several days. Only after counsel for Papst learned that Casio would show these requests to the Court did Papst serve another set, allegedly further narrowed. Counsel for Casio has not had the opportunity to focus on the new set, as they were not served until 3:00 p.m. on the day of this submission.

[4]     The sanctions requests in the Motion to Strike are also important because Casio incurred very substantial expenses in dealing with those requests, the Motion to Strike, and the two Papst motions to compel (which were denied in their entirety). Casio

Dated: May 8, 2008                    Respectfully submitted,


                                      /s/ J. Kevin Fee
                                      J. Kevin Fee, Esq. (D.C. Bar No. 494016)
                                      Morgan, Lewis & Bockius LLP
                                      1111 Pennsylvania Avenue, NW
                                      Washington, D.C. 20004
                                      Tel.: (202) 739-3000
                                      Fax: (202) 739-3001

                                      Scott D. Stimpson
                                      The Law Office of Scott D. Stimpson
                                      Suite 1102
                                      445 Hamilton Avenue
                                      White Plains, N.Y. 10601
                                      Tel: 203-258-8412

                                      **Attorneys for Plaintiff and Counter-
                                      Defendant Casio Inc. and Counter-
                                      Defendant Casio Computer Co., Ltd.**

---

requested reimbursement of its fees and costs associated with these tasks that were all necessitated only by the Papst overbroad approach to its discovery requests. The Court has already held that the Papst discovery requests were "outrageously over the top," "hugely overbroad," and "absolutely stunning" in their over-breadth (Exhibit C, tr. at 4, 17, 33), warned Papst about "playing those games" and "using discovery as a weapon...." (*id.* at 4-5), and has also held that they were "propounded in bad faith" (May 6 Order, fn 2, docket #82). Casio therefore respectfully suggests that the expenses Casio incurred with regard to these requests must be borne by Papst. See Fed. R. Civ. P. 26(g) ("If a certification violates this rule without substantial justification, the court . . . must impose an appropriate sanction" and the sanction may include "reasonable expenses, including attorney's fees"); Fed. R. Civ. P. 37(a)(5)(B) ("If the motion [to compel] is denied, the court . . . must, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party or deponent who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees."); *see also* Exhibit C (page 45: "It is so overwritten, so overbroad. It is so incredibly expensive and burdensome. . . "; and page 8: "I will be really rough with somebody that I think is only playing delay and expense games.").

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE PAPST LICENSING GMBH & CO.
KG LITIGATION

This Document Relates To:
ALL CASES

Misc. Action No. 07-493 (RMC)

MDL Docket No. 1880

**PAPST LICENSING GMBH & CO. KG'S
THIRD REVISED FIRST SET OF REQUESTS FOR THE PRODUCTION OF
DOCUMENTS AND THINGS TO THE DEFENDANTS**

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Papst Licensing

GmbH & Co. KG ("Papst") requests that each of the Defendants or Camera

Manufacturers (defined below) produce the following documents and things for

inspection and copying in accordance with the Definitions and Instructions set forth

herein. If the manner of production is not otherwise agreed upon, production shall be at

the offices at Welsh & Katz, Ltd., 120 South Riverside, 22nd Floor, Chicago, Illinois

60606, within thirty (30) days after service hereof, or as the parties may otherwise agree.

**DEFINITIONS AND INSTRUCTIONS**

1.   As used herein, "Camera Manufacturer, " "Defendant," "You" or "Your"

means Casio Inc., Casio Computer Co., Ltd., Fujifilm Corporation, Fujifilm U.S.A., Inc.,

Matsushita Electric Industrial Co., Ltd., Victor Company of Japan, Ltd., Olympus Corp.,

Olympus Imaging America, Inc.,  Samsung Techwin Co., Samsung Opto-Electronics

America, Inc., Panasonic Corporation of North America, JVC Company of America,

Ricoh Company, Ltd., Ricoh Americas Corporation, Ricoh Corporation, Hewlett-Packard

1

any other Product manufacturer or seller subsequently added to this MDL, all of their

predecessor(s) and successor(s) in interest, and any person employed by or for any or all

of these entities, and all of their attorneys, accountants, and consultants.

2.   As used herein, the term "document" shall have the full meaning ascribed to it

under Rule 34 of the Federal Rules of Civil Procedure.  Defendants shall search for and

the produce any responsive documents written in English, in whole or in part, regardless

of whether a Defendant also produces the same or similar document written in a foreign

language.

3.   If any of the information requested to be produced is available in machine-

readable form (such as punch cards, paper or magnetic tapes, drums, disks, or core

storage), state the form in which it is available and describe the type of computer or other

machinery required to access the information. If the information requested is only

available in machine-readable form, indicate whether you possess any existing program

which will print the records in some form, and identify the person(s) who is/are familiar

with the program. If no program exists, state whether you could develop one or whether

an existing program could be modified to print records in a readable form.

4.   The terms "concerning," "relating to, " or "related to" in regard to a particular

subject shall mean, without limitation, assessing, analyzing, constituting, containing,

comprising, describing, discussing, embodying, reflecting, evidencing, identifying,

mentioning, memorializing, stating, referring directly or indirectly to or in any way

relevant to such subject.

5.   In the event any information, document, or thing responsive to these requests

is not provided by reason of a claim of privilege or work product, or for any other reason,

then the following shall be provided with respect to such information, document, or thing: (a) a brief description of the subject matter of the information, document, or thing; (b) the identity of the author or creator of the information, document, or thing; (c) the source of the information, document, or thing; (d) all recipients of the information, document, or thing (including, but not limited to those receiving copies and blind copies); (e) the date the information, document, or thing (or any copy or draft thereof which is not identical to the original) was created; and (f) the basis upon which the information, document, or thing is being withheld.  With respect to any information that is redacted, the redacting party must in addition to the requirements above identify all pages by Bates Number where any redaction has occurred.

6.   As used herein, "and" or "or" shall be construed conjunctively or disjunctively, or both conjunctively and disjunctively, so as to acquire the broadest meaning possible.

7.   As used herein, "person" shall include, but is not limited to, any natural person, business, partnership, corporation, or other entity, and any employee, agent, attorney, or representative of any of the foregoing.

8.   As used herein, the term "Product" shall mean all Digital Cameras made or sold by each Defendant.  As to the Olympus parties and the Hewlett-Packard parties, the term "Product" shall also include all products made or sold by each Defendant (whether or not a Digital Camera) that acquire external light images and/or sound, and then process the external light images or sound into digital electrical signals representative of the external light images and/or sound, and then transfer those digital electrical signals to an

electronic memory, and then transfer those digital electrical signals to a personal

computer, and wherein the Product also communicates with a personal computer.

9.      As used herein, "Patents-in-Suit" refers to United States Patent No.

6,895,449 ("the '449 patent") and United States Patent No. 6,470,399 ("the '399 patent").

10.     As used herein, "Specific Features" means those Product features

concerning (1) how the Products electronically connect to and interact with various types

of computers, (2) what standards and/or command sets are used by the Products to

communicate with computers, (3) how digital information (including digital information

representative of pictures and sounds) is transmitted back and forth between the Products

and a computer to which they are connected, (4) the file systems used to store digital

information in Products (including digital information representative of pictures and

sounds), and (5) how the master boot record (MBR) and any boot sector(s) are generated

by each Product during formatting of a memory chip and/or in response to an inquiry

from a host computer.

11.     Where appropriate, the singular form of a word should be interpreted in

the plural and *vice versa*, and the masculine form of a word shall be interpreted to also

include the feminine and *vice versa*, to obtain the broadest possible meaning.

12.     These document requests are continuing in nature.  If after making its

initial response hereto (and up until the time of any hearing or trial), each of the

Defendants or their attorneys, agents, or representatives obtain or become aware of any

further information or documents responsive to these requests that was unavailable at the

time of the initial response hereto, each of the Camera Manufacturers are requested to

produce such information and documents.

13.     Unless indicated otherwise, these requests apply to all documents and materials from 1985 to the present date.

14.     The methods and format of each of the Camera Manufacturers' production shall be as follows:

15.     Format of Production

(a)     With respect to all responsive paper documents, each Defendant shall serve concurrently with its responses to these requests its estimated costs to produce to Papst all responsive hard copy documents in single-page Tagged Image File Format ("TIFF") with an accompanying Summation load file.  To the extent available, the load file shall contain for each document the beginning Bates number, the ending Bates number, a description of the source for the document.  Each page of a produced document shall have a legible, unique page identifier ("Bates Number") and confidentiality legend (where applicable) on the face of the image at a location that does not obliterate, conceal, or interfere with any information from the source documents.  No other legend or stamp will be placed on the document image other than the Bates Number, confidentiality legend (where applicable), and redactions.

Should any Defendant convert any or all paper documents into any electronic format (such as TIFF or .pdf) at its own cost at any time, each such Defendant shall inform Papst of that fact, describe the electronic format that the documents exist in, and inform Papst of the estimated costs to obtain copies of these electronic files all within five days of any conversion.

In addition, hard copies shall be produced as they were kept in the ordinary course of business.  This shall include stapling of documents, segregating individual file folder

and ordering groups of file folders and documents as they were kept in the ordinary course of business.  The parties shall also provide for each group of documents to the extent known (1) the name of the person(s) and/or group(s) whose file each group of documents came from, and (2) an identification of the custodian(s) of each group of documents, all as the documents were kept in the ordinary course of business.  Hard copies and things shall be maintained at a document depository in the United States and shall be reasonably accessible to all parties upon reasonable notice.

(b)     The parties shall produce all responsive electronic documents as they are kept in the usual course of business, or as otherwise agreed between the parties.    Should any Defendant convert any or all electronic documents into any other electronic format (such as TIFF or .pdf) at their own cost at any time, each such Defendant shall inform Papst of that fact, describe the electronic format that the documents exist in, and inform Papst of the estimated costs to obtain copies of these electronic files all within five days of any conversion.

Each Defendant shall serve concurrently with its responses to these requests its estimated costs to produce to Papst all responsive electronic documents in single-page Tagged Image File Format ("TIFF") with an accompanying Summation load file.  To the extent available, the load file shall contain for each document the beginning Bates number, the ending Bates number, a description of the source from which the document came, a description of the computer from which the document came, the associated file name, and the associated directory path for the document.   Documents that present imaging or formatting problems shall be promptly identified and the Parties shall meet and confer to attempt to resolve the problems.  Each page of a produced document shall

have a legible, unique page identifier ("Bates Number") and confidentiality legend (where applicable) on the face of the image at a location that does not obliterate, conceal, or interfere with any information from the source documents. No other legend or stamp will be placed on the document image other than the Bates Number, confidentiality legend (where applicable), and redactions. Each party will bear the burden and cost of any OCR post-processing. Papst is willing to mutually agree that during the first round of exchanging documents the parties need not exchange metadata, except as referenced above. If any party should later desire to obtain additional metadata, the parties will attempt to work it out amicably. An extracted text file of electronic documents shall be made part of the load file associated with each electronic document.

## REQUESTS FOR DOCUMENTS AND THINGS

1.      All documents relating to the development history of each Specific Feature[1] in each and every Product[2] of the Defendants.

2.      Documents sufficient to show the monthly sales (in revenues and in units) for each Product in each country from January 1, 1999 to present.

3.      Two functional samples of each and every Product used, manufactured, sold, offered for sale or imported into the United States since October 22, 2002.

4.      All advertising, marketing and promotional documents in the United States that address and/or discuss, in whole or in part, the Specific Features in any and all Products of the Defendants since January 1, 1999.

---

[1] The term "Specific Feature" is defined in the Definitions and Instructions section above.
[2] The term "Product" is defined in the Definitions and Instructions section above.

5.     Documents sufficient to show the overall construction and/or operation of each and every Product of the Defendant that has been used, manufactured, sold, offered for sale, or imported into the United States since October 22, 2002, including but not limited to, all user manuals, service manuals, overall product specifications, overall software requirements, and overall source code.

6.     All documents primarily concerning the subject matter, construction and/or operation of one or more of the Specific Features in each and every Product of the Defendants that has been used, manufactured, sold, offered for sale, or imported into the United States since October 22, 2002.

7.     All documents relating to the Defendants' alleged invalidity and/or unenforceability of the Patents-In-Suit.

8.     All documents relating to the Defendants' alleged non-infringement of the Patents-In-Suit.

9.     All documents relating to the interpretation, scope and meaning of the claims in the Patents-In-Suit.

10.     Documents sufficient to show the identification of those entities and/or individuals who are the most knowledgeable concerning the research, development, and design of one or more of the Specific Features for each and every Product of the Defendants.

11.     All documents relating to the Patents-In-Suit, Papst, LT Tasler, Michael Tasler and/or Labortechnik Tasler GmbH, including but not limited to, all documents relating to any and all work done by and/or products of Michael Tasler and/or Labortechnik Tasler GmbH.

12.    All transcripts, discovery responses and expert reports in the United States wherein a Defendant or its expert witness has described and/or discussed, in whole or in part, how its Products operate with respect to any or all of the Specific Features.

13.    All documents and things identified in, the identification of which is requested in, responsive to, or reviewed in formulating a response to Papst Licensing's First Joint Set of Interrogatories to the Defendants.

14.    All documents relating to the level of ordinary skill in the art pertaining to the Patents-In-Suit.

15.    All documents relating to any secondary considerations of  non-obviousness or obviousness, including but not limited to, the following: (1) the commercial success of the Products attributable to the claimed inventions, rather than something else, such as innovative marketing, (2) the claimed inventions satisfied a long felt need, (3) the attempt and failure of others to make the claimed inventions, (4) skepticism of the claimed inventions by experts, (5) praise by others of the claimed inventions, (6) teaching away of the claimed inventions by others, (8) copying of the claimed inventions by others, (9) experts or persons of ordinary skill in the field of the inventions expressing surprise at the making of the claimed inventions, (10) the inventor proceeded contrary to accepted wisdom, and (11) the claimed inventions achieved unexpected results.

16.    All document retention policies in place from the time each Defendant first started its research and development of the Specific Features up until today's date.

17.    All patents, patent applications and file histories of any of the Defendant's U.S. patents or patent applications that address, in whole or in part, the Specific Features of the Defendants' Products.

18.    Documents and things sufficient to show the details of the operation of each Product that has been used, manufactured, sold, offered for sale, or imported into the United States since October 22, 2002 with respect to how sound waves and/or light images are converted to representative analog signals, and how those electrical signals are converted to representative digital signals.

Dated: May 8, 2008                              /s/ Jerold B. Schnayer
                                                James P. White
                                                Jerold B. Schnayer
                                                Joseph E. Cwik
                                                WELSH & KATZ, LTD.
                                                120 South Riverside Plaza ● 22nd Floor
                                                Chicago, Illinois 60606
                                                (312) 655-1500

                                                Robert F. Muse
                                                Joshua A. Levy
                                                Kerry C. Dent
                                                STEIN MITCHELL & MEZINES, LLP
                                                1100 Connecticut Ave, NW
                                                Washington, D.C. 20036
                                                (202) 737-7777
                                                **Attorneys for Defendant/Counter-Plaintiff Papst Licensing GmbH & Co. KG**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing PAPST LICENSING GMBH & CO. KG'S THIRD REVISED FIRST JOINT SET OF REQUESTS FOR THE PRODUCTION OF DOCUMENTS AND THINGS TO THE CAMERA MANUFACTURERS was served on this the 8th day of May, 2008 upon the attorneys for the Camera Manufacturers as follows:

***For The Casio Parties*** (via e-mail in both Microsoft Word and .pdf format)*:*
Laura Krawczyk
Morgan Lewis & Bockius
101 Park Avenue
New York, NY 10178-0060
Phone:  (212) 309-6000
Fax:  (212) 309-6001
lkrawczyk@morganlewis.com

J. Kevin Fee
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
jkfee@morganlewis.com

Scott D. Stimpson
The Law Office of Scott Stimpson
Suite 1102
445 Hamilton Avenue
White Plains, NY 10601
stimpsonlaw@gmail.com

***For The Samsung Parties*** (via e-mail in both Microsoft Word and .pdf format)*:*
Patrick J. Kelleher
Drinker Biddle Gardner Carton
191 North Wacker Drive
Suite 3700
Chicago, IL 60606-1698
Phone:  (312) 569-1375
Fax:  (312) 569-3375
Patrick.kelleher@abr.com

***For The Fujifilm Parties*** (via e-mail in both Microsoft Word and .pdf format)*:*
Steven J. Routh
Sten A. Jensen
John R. Inge
Robert Wolinsky

Hogan & Hartson, LLP
555 Thirteenth Street, N.W.
Washington, DC 20004
Phone:  (202) 637-5600
Fax:  (202) 637-5910
sjrouth@hhlaw.com
sajensen@hhlaw.com
JRInge@HHLAW.com
RBWolinsky@HHLAW.com


***For the Olympus Parties*** (via e-mail in both Microsoft Word and .pdf format)*:*
Richard de Bodo
Rachel M. Cappoccia
Hogan & Hartson, LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
Phone:  (310) 785-4694
Fax:  (310) 785-4601
rdebodo@hhlaw.com
rmcappoccia@hhlaw.com

***For The Matsushita and Victory Company of Japan Parties*** (via e-mail in both
Microsoft Word and .pdf format):
Richard de Bodo
Rachel M. Capoccia
Hogan & Hartson, LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
Phone: (310) 785-4694
Fax: (310) 785-4601
rdebodo@hhlaw.com
rmcapoccia@hhlaw.com


Adam K. Levin, Esq.
Hogan & Hartson LLP
555 13th Street, NW
Washington, DC 20004
aklevin@hhlaw.com

***For the Ricoh Parties***:
Paul Devinsky
McDermott Will & Emery LLP
600 13th Street, NW
Washington, DC 20005-3096
(202) 756-8369
Fax: (202) 756-8087
pdevinsky@mwe.com

***For Hewlett-Packard Parties:***
Heather N. Mewes
Fenwick & West, LLP
555 California St., 12th Floor
San Francisco, CA 94104
(415) 875-2300
hmewes@fenwick.com

/s/ Jerold B. Schnayer
Attorney for Papst Licensing GmbH & Co.
KG

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE PAPST LICENSING GMBH & CO.
KG LITIGATION

This Document Relates To:
 ALL CASES

Misc. Action No. 07-493 (RMC)

MDL Docket No. 1880

**PAPST LICENSING GMBH & CO. KG'S
SECOND REVISED FIRST SET OF REQUESTS FOR THE PRODUCTION OF
DOCUMENTS AND THINGS TO THE DEFENDANTS**

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Papst Licensing

GmbH & Co. KG ("Papst") requests that each of the Defendants or Camera

Manufacturers (defined below) produce the following documents and things for

inspection and copying in accordance with the Definitions and Instructions set forth

herein. If the manner of production is not otherwise agreed upon, production shall be at

the offices at Welsh & Katz, Ltd., 120 South Riverside, 22nd Floor, Chicago, Illinois

60606, within thirty (30) days after service hereof, or as the parties may otherwise agree.

**DEFINITIONS AND INSTRUCTIONS**

1. As used herein, "Camera Manufacturer, " "Defendant," "You" or "Your"

means Casio Inc., Casio Computer Co., Ltd., Fujifilm Corporation, Fujifilm U.S.A., Inc.,

Matsushita Electric Industrial Co., Ltd., Victor Company of Japan, Ltd., Olympus Corp.,

Olympus Imaging America, Inc.,  Samsung Techwin Co., Samsung Opto-Electronics

America, Inc., Panasonic Corporation of North America, JVC Company of America,

Ricoh Company, Ltd., Ricoh Americas Corporation, Ricoh Corporation, any other

1

Product manufacturer or seller subsequently added to this MDL and all of their

predecessor(s) and successor(s) in interest, parent(s), subsidiaries, related and affiliated

persons or entities, and any person employed by or for any or all of these entities, and all

agents or representatives (including but not limited to their attorneys, accountants, and

consultants).

  2. As used herein, the term "document" shall have the full meaning ascribed to it

under Rule 34 of the Federal Rules of Civil Procedure including, without limitation, the

original (and every copy of the original which differs in any way from it) of any written

or graphic matter or any medium of any type or description upon which intelligence or

information is recorded or from which intelligence or information can be perceived,

which is or has been in the possession, custody, or control of each Defendant, or of which

each Defendant has knowledge, including, without limitation: electronic mail;

correspondence; memoranda; stenographic or handwritten notes; technical literature;

specifications; plans; blueprints; drawings, charts; computer tapes, print-outs, and any

other computer or electronic data capable of being produced in document form or

displayed electronically; advertising or promotional materials; laboratory notebooks;

financial records; contracts; drafts; agreements; instructions; studies; publications; films;

prints; voice recordings; reports; surveys; forecasts; minutes; statistical compilations; and

every copy of such writing, record, or graphic matter where such copy is a draft or not

identical to the original document or where such copy contains any commentary or

notation whatsoever, handwritten or otherwise, that does not appear on the other copies

or on the original.  The term "document" shall include any document in any language.

Defendants shall search for and the produce any responsive documents written in

English, in whole or in part, regardless of whether a Defendant also produces the same or similar document written in a foreign language.

3.   If any of the information requested to be produced is available in machine-readable form (such as punch cards, paper or magnetic tapes, drums, disks, or core storage), state the form in which it is available and describe the type of computer or other machinery required to access the information. If the information requested is only available in machine-readable form, indicate whether you possess any existing program which will print the records in some form, and identify the person(s) who is/are familiar with the program. If no program exists, state whether you could develop one or whether an existing program could be modified to print records in a readable form.

4.   As used herein, the term "relate" (or variants thereof such as "relating" or "related"), when used in connection with a document or thing, shall mean, without limitation, any document or thing that constitutes, contains, embodies, evidences, concerns, reflects, identifies, states, refers directly or indirectly to, or is in any way relevant to the particular subject matter identified.

5.   In the event any information, document, or thing responsive to these requests is not provided by reason of a claim of privilege or work product, or for any other reason, then the following shall be provided with respect to such information, document, or thing: (a) a brief description of the subject matter of the information, document, or thing; (b) the identity of the author or creator of the information, document, or thing; (c) the source of the information, document, or thing; (d) all recipients of the information, document, or thing (including, but not limited to those receiving copies and blind copies); (e) the date the information, document, or thing (or any copy or draft thereof which is not

identical to the original) was created; and (f) the basis upon which the information, document, or thing is being withheld.  With respect to any information that is redacted, the redacting party must in addition to the requirements above identify all pages by Bates Number where any redaction has occurred.

6.   As used herein, "and" or "or" shall be construed conjunctively or disjunctively, or both conjunctively and disjunctively, so as to acquire the broadest meaning possible.

7.   In the event a responsive document has been destroyed: (a) identify the person(s) who destroyed it; (b) the date it was destroyed; (c) the reasons why it was destroyed; and (d) the circumstances under which it was destroyed.

8.   As used herein, the term "day" or "date" shall mean the exact day, month, and year. If the exact date is not ascertainable, the best available approximation should be provided.

9.   As used herein, "person" shall include, but is not limited to, any natural person, business, partnership, corporation, or other entity, and any employee, agent, attorney, or representative of any of the foregoing.

10.   As used herein, "Product" shall mean all designs, implementations, models, and versions of all products made, sold or offered for sale by each Defendant (whether or not a Digital Camera) that acquire external light images and/or sound, and then process the external light images or sound into digital electrical signals representative of the external light images and/or sound, and then transfer those digital electrical signals to an electronic memory, and then transfer those digital electrical signals to a personal computer, and wherein the Product also communicates with a

personal computer.

11.    As used herein, "Patents-in-Suit" refers to United States Patent No. 6,895,449 ("the '449 patent") and United States Patent No. 6,470,399 ("the '399 patent").

13.    As used herein, "Lawsuit" means any type of legal action where any and all of the Camera Manufacturers were parties or participants of any kind including, but not limited to, lawsuits filed in federal or state courts, administrative proceedings, ITC proceedings, USPTO proceedings and any international cases or proceedings filed in any tribunal.

14.    As used herein, "Specific Features" means those Product features concerning (1) how the Products electronically connect to and interact with various types of computers, (2) what standards and/or command sets are used by the Products to communicate with computers, (3) how digital information (including digital information representative of pictures and sounds) is transmitted back and forth between the Products and a computer to which they are connected, (4) the file systems used to store digital information in Products (including digital information representative of pictures and sounds), and (5) how the master boot record (MBR) and any boot sector(s) are generated by each Product during formatting of a memory chip and/or in response to an inquiry from a host computer.

15.    Where appropriate, the singular form of a word should be interpreted in the plural and *vice versa*, and the masculine form of a word shall be interpreted to also include the feminine and *vice versa*, to obtain the broadest possible meaning.

16. These document requests are continuing in nature.  If after making its initial response hereto (and up until the time of any hearing or trial), each of the Camera Manufacturers or their attorneys, agents, or representatives obtain or become aware of

any further information or documents responsive to these requests that was unavailable at the time of the initial response hereto, each of the Camera Manufacturers are requested to produce such information and documents.

17.    Unless indicated otherwise, these requests apply to all documents and materials from 1985 to the present date.

18.    The methods and format of each of the Camera Manufacturers' production shall be as follows:

19.    Format of Production

(a)    With respect to all responsive paper documents, each Defendant shall serve concurrently with its responses to these requests its estimated costs to produce to Papst all responsive hard copy documents in single-page Tagged Image File Format ("TIFF") with an accompanying Summation load file.  To the extent available, the load file shall contain for each document the beginning Bates number, the ending Bates number, a description of the source for the document.  Each page of a produced document shall have a legible, unique page identifier ("Bates Number") and confidentiality legend (where applicable) on the face of the image at a location that does not obliterate, conceal, or interfere with any information from the source documents.  No other legend or stamp will be placed on the document image other than the Bates Number, confidentiality legend (where applicable), and redactions.

Should any Defendant convert any or all paper documents into any electronic format (such as TIFF or .pdf) at its own cost at any time, each such Defendant shall inform Papst of that fact, describe the electronic format that the documents exist in, and

inform Papst of the estimated costs to obtain copies of these electronic files all within five days of any conversion.

In addition, hard copies shall be produced as they were kept in the ordinary course of business. This shall include stapling of documents, segregating individual file folder and ordering groups of file folders and documents as they were kept in the ordinary course of business. The parties shall also provide for each group of documents to the extent known (1) the name of the person(s) and/or group(s) whose file each group of documents came from, and (2) an identification of the custodian(s) of each group of documents, all as the documents were kept in the ordinary course of business. Hard copies and things shall be maintained at a document depository in the United States and shall be reasonably accessible to all parties upon reasonable notice.

(b)    The parties shall produce all responsive electronic documents as they are kept in the usual course of business, or as otherwise agreed between the parties.    Should any Defendant convert any or all electronic documents into any other electronic format (such as TIFF or .pdf) at their own cost at any time, each such Defendant shall inform Papst of that fact, describe the electronic format that the documents exist in, and inform Papst of the estimated costs to obtain copies of these electronic files all within five days of any conversion.

Each Defendant shall serve concurrently with its responses to these requests its estimated costs to produce to Papst all responsive electronic documents in single-page Tagged Image File Format ("TIFF") with an accompanying Summation load file. To the extent available, the load file shall contain for each document the beginning Bates number, the ending Bates number, a description of the source from which the document

came, a description of the computer from which the document came, the associated file name, and the associated directory path for the document.  Documents that present imaging or formatting problems shall be promptly identified and the Parties shall meet and confer to attempt to resolve the problems.  Each page of a produced document shall have a legible, unique page identifier ("Bates Number") and confidentiality legend (where applicable) on the face of the image at a location that does not obliterate, conceal, or interfere with any information from the source documents.  No other legend or stamp will be placed on the document image other than the Bates Number, confidentiality legend (where applicable), and redactions.  Each party will bear the burden and cost of any OCR post-processing.  Papst is willing to mutually agree that during the first round of exchanging documents the parties need not exchange metadata, except as referenced above.  If any party should later desire to obtain additional metadata, the parties will attempt to work it out amicably.  An extracted text file of electronic documents shall be made part of the load file associated with each electronic document.

20.    The following list of subject matters are collectively referred to as "Product Limitations":

20.1    The acquisition and processing of light images, sound waves and/or analog signals by Products including, for example, the conversion of light images into electrical signals representative of the light images.

20.2    The processing by Products of electrical signals representative of light images, sound waves and/or analog signals including, for example, the conversion of analog signals representative of light images into digital electrical signals, and the transfer of those digital electrical signals to an electronic memory.

20.3    The operation of any computer program stored in a memory of a Product as it concerns any of the other subject matters set forth in this list.

20.4    The storage of digital signals representative of light images, sound waves and/or analog signals in the memory of Products, including but not limited to the

storage of such digital signals in external memory cards and other electronic
memory capable of being operatively attached to Products

20.5    The interconnection of Products to a personal computer.

20.6    The transfer of digital electrical signals representative of light images,
sound waves and/or analog signals from a Product to a personal computer
including, for example, the process by which the personal computer recognizes
how to communicate with and receive data from the Product.

20.7    The process by which Products communicate with and transfer
information to and/or from a personal computer attached to Products.

20.8    The memory of a Product where digital signals are stored, the file system
used to store digital signals in the Product's  memory, and the process by which
the memory of a Product is formatted.

To the extent a responsive document _only_ relates to a very specific engineering

subject matter not included in one of the Product Limitations defined above, that

responsive document need not be produced.  For example, a Defendant need not produce

a document if the document only relates the engineering specifications of a zoom lens.

However, if a document is responsive to a request generally and/or contains any

information relevant to any one of the Product Limitations, in whole or in part, the entire

document shall be produced.  For example, responsive documents to be produced would

include documents describing the overall operation of a Product, a schematic diagram

showing some or all of the components of a Product, and/or a specification describing the

overall operation of a Product, even though one of the Product Limitations is not

expressly discussed.

21.    Examples of the types of documents that are responsive to Request No. 1,

but only to the extent the documents address one or more of the Specific Features, in

whole or in part, include, but are not limited to, the following: all documents relating to

the research, development, design, re-design, prototype production and/or testing of any and all of the Specific Features in each of the Defendants' Products; all engineering specifications, assembly drawings, production drawings, parts drawings, schematic drawings, block diagrams, parts lists, bills of material, prototypes,  specification sheets, sales manuals, brochures, instruction or operating manuals, service manuals, user manuals, technical publications, technical documentation, white papers, or technical bulletins relating to any and all of the Specific Features in each of Defendants' Products; all documents relating to any attempt to design around the Patents-in-Suit; all documents concerning the issue of why a Defendant chose any of the Specific Features for use in any and all Products; all documents that describe and/or discuss at least in part the development history of each of the Specific Features in Defendants' Products;  all documents concerning a Defendant's review and/or analysis of any and all Specific Features in a Product manufactured by a Defendant's competitor; all documents concerning and/or comprising source code related to any firmware, executable code, and/or any computer program used in connection with any and all of the Specific Features; all documents describing and/or concerning the operation of the source code related to any firmware, executable code, and/or computer program used in connection with any and all of the Specific Features; all documents concerning and/or used during the development of the source code related to any firmware, executable code, and/or computer program, including but not limited to software requirements, documents and specifications, used in connection with any and all of the Specific Features; all documents that describe or concern how information is transferred from any and all Products to an external personal computer when attached to each such Product; all documents that

describe how digital data representative of an image captured by a Product is stored in the digital memory of any and all Products; all documents that describe how digital data representative of a sound recording is stored in the digital memory of any and all Products; all documents that concern and/or describe the design or operation of the PictBridge and/or USB DirectPrint features of each Product, including but not limited to the Casio Digital Camera as described in CAP-000694, Exhibit A hereto; all documents that concern and/or describe the "USB DIRECT-PRINT ... standard proposed by Seiko Epson Corporation" as referred to on CAP-000694, Exhibit A hereto; all documents relating to any and all Specific Features of a Product as used with a computer with a Microsoft Windows operating system; and all documents that concern any and all Specific Features of Product as used with an Apple computer; all documents that describe any and all details of how to download pictures and/or the operation of downloading pictures stored in any and all Products to an external computer when connected to each such camera; all documents that concern and/or describe the DCF (Design rule for Camera File system) protocol, an example for which is described on page CAP-001691, Exhibit B hereto; all documents which describe and/or discuss how visual images are processed into digital images, and/or how those digital images are processed by any and all Products, so that they are stored in a digital memory; all documents commenting on the value, usefulness and/or desirability of the specific features of any and all Products; all specifications concerning any and all Specific Features, and/or individual parts included in any Specific Features; and all documents concerning and/or comprising communication between employees, agents and/or representatives of a Defendant and any employees, agents and/or representatives of Microsoft, Apple, manufacturers and/or

11

any suppliers of integrated circuitry addressing the connection of Products to a personal

computer and/or transfer of digital information between a Product and a personal

computer.

22.     Examples of the types of documents that are responsive to Request No. 2,

include, but are not limited to, the following: documents identifying each Product by each

corresponding model name, model number and/or part number such that Papst can easily

identify each Product in the responsive documents and the corresponding number of units

sold and revenues earned by region and country (including the United States) on a month

by month basis for each Product.

23.     Examples of the types of documents that are responsive to Request No. 4,

but only to the extent the documents address one or more of the Specific Features, in

whole or in part, include, but are not limited to, the following: any and all marketing

plans or internal marketing reports that refer to or address any and all of the Specific

Features of each Defendant's Products; all advertisements, brochures, bulletins, and other

advertising a Defendant has prepared or has had others prepare that refer to or address

any and all of the Specific Features of each Defendant's Products; a sample of each

advertisement, brochure, or press release used by a Defendant that refers to or addresses

any and all Specific Features, and market studies and/or focus groups that relate to or

address, at least in part, any of the Specific Features.

24.     Examples of the types of documents that are responsive to Request No.

5, include, but are not limited to, the following:  two functional samples of each and

every Product; documents sufficient to show the overall construction, operation, use,

intended use or potential use of any and all Products; overall engineering specifications,

assembly drawings, production drawings, parts drawings, schematic drawings, block

diagrams, parts lists, bills of material,  specification sheets, instruction manuals,

operating manuals, service manuals, or user manuals for each Product.

      25.     Examples of the types of documents that are responsive to Request No. 6,

but only to the extent the documents address one or more of the Specific Features, in

whole or in part,  include, but are not limited to, the following:  all documents which refer

to or discuss, in whole or in part, to the properties, characteristics, advantages and/or

disadvantages of any and all the Specific Features; all documents relating to the

construction, operation, use, intended use or potential use of any and all the Specific

Features; all documents relating to technical descriptions, operating instructions, repair

instructions or consumer instructions for any and all of the Specific Features; all

engineering specifications, assembly drawings, production drawings, parts drawings,

schematic drawings, block diagrams, parts lists, bills of material, prototypes,

specification sheets, sales manuals, brochures, instruction or operating manuals, service

manuals, user manuals, technical publications, technical documentation, white papers, or

technical bulletins relating to any and all of the Specific Features; all documents

concerning and/or comprising source code related to any firmware, executable code,

and/or any computer program used in connection with any and all of the Specific

Features; all documents describing and/or concerning the operation of the source code

related to any firmware, executable code, and/or computer program used in connection

with any and all of the Specific Features; all documents concerning and/or used during

the development of the source code related to any firmware, executable code, and/or

computer program, including but not limited to software requirements, documents and

specifications, used in connection with any and all of the Specific Features; all documents that describe or concern how information is transferred from any and all Products to an external personal computer when attached to each such Product; all documents that describe how digital data representative of an image captured by a Product is stored in the digital memory of any and all Products; all documents that describe how digital data representative of a sound recording is stored in the digital memory of any and all Products; all documents that concern and/or describe the design or operation of the PictBridge and/or USB DirectPrint features of each Product, including but not limited to the Casio Digital Camera as described in CAP-000694, Exhibit A hereto; all documents that concern and/or describe the "USB DIRECT-PRINT ... standard proposed by Seiko Epson Corporation" as referred to on CAP-000694, Exhibit A hereto; all documents relating to any and all Specific Features of a Product as used with a computer with a Microsoft Windows operating system; and all documents that concern any and all Specific Features of Product as used with an Apple computer; all documents that describe any and all details of how to download pictures and/or the operation of downloading pictures stored in any and all Products to an external computer when connected to each such camera; all documents that concern and/or describe the DCF (Design rule for Camera File system) protocol, an example for which is described on page CAP-001691, Exhibit B hereto; all documents which describe and/or discuss how visual images are processed into digital images, and/or how those digital images are processed by any and all Products, so that they are stored in a digital memory; all documents commenting on the value, usefulness and/or desirability of the specific features of any and all Products; all specifications concerning any and all Specific Features, and/or individual parts

included in any Specific Features; and all documents concerning and/or comprising communication between employees, agents and/or representatives of a Defendant and any employees, agents and/or representatives of Microsoft, Apple, manufacturers and/or any suppliers of integrated circuitry addressing the connection of Products to a personal computer and/or transfer of digital information between a Product and a personal computer.

26.    Examples of the types of documents that are responsive to Request No. 7 include, but are not limited to, the following:  all documents and things that support, contradict or otherwise provide the basis, in whole or in part, for a Defendant's Complaint, Counterclaim, Answer, or Affirmative Defenses in this action as they relate to the issues of invalidity or unenforceability; all documents, including all legal opinions of counsel, recording, or evidencing a Defendant having ever made a study of the patentability, validity or unenforceability of the Patents-in-Suit and/or any related patents and/or patent applications relating thereto; all documents constituting, recording, or evidencing any of Defendants' alleged prior art, including, but not limited to, all documents that provide written corroboration that any actual product constituting alleged prior art was or was not on sale or sold anywhere in the world; all documents and things supporting or refuting any and all alleged secondary indicia of non-obviousness relevant to a Defendant's invalidity contentions;  all legal opinions, conclusions, and work product concerning whether or not the Patents in Suit are valid and/or enforceable; and all documents relating to the development history, sales, testing, construction and/or operation of any of Defendants' alleged prior art devices as those documents relate to any or all of the Specific Features.

27. Examples of the types of documents that are responsive to Request No. 8 include, but are not limited to, the following: documents and things that support, contradict or otherwise provide the basis, in whole or in part, for a Defendant's assertion or belief that a Defendant does not or has not infringed the Patents-in-Suit in any manner; documents which establish or tend to establish that a Defendant has or has not induced others to infringe or contributed to others' infringement of any claim of the Patents-in-Suit; documents and things concerning whether Products infringe or do not infringe the Patents-in-Suit; documents and things concerning whether any and all non-Defendant Products infringe or do not infringe the Patents-in-Suit; and all legal opinions, conclusions, and work product concerning whether or not any and all Products infringe or do not infringe the Patents-in-Suit.

28. Examples of the types of documents that are responsive to Request No. 9 include, but are not limited to, the following: all documents, including all legal opinions of counsel, recording or evidencing a Defendant having ever made a study of the claim scope of the Patents-in-Suit; and all documents that a Defendant, its employees, consultants, or experts have considered, consulted, or relied upon in interpreting or construing the claims of the Patents-in-Suit, including but not limited to excerpts from books, dictionaries, treatises and the like. The examples of development history documents described in paragraph 21 above are also responsive and are incorporated herein.

29. Examples of the types of documents that are responsive to Request No. 10 include, but are not limited to, the following: documents sufficient to identify a Defendant's personnel structure relating to the Specific Features of the Products,

including a person's name, general involvement in, and job title for each of the

Defendant's management, research, development, manufacture, design and engineering

personnel involved with the research, development and design of any and all Specific

Features in Defendants' Products; representative documents that show the involvement of

a Defendant's parent companies, sister companies or related entities that are or were

involved in the conception, design, research, development, or manufacture of any and all

Specific Features in Defendants' Products; and representative organizational charts

showing the persons at a Defendant who worked on the design, development, and/or

manufacture of each of the Specific Features in Defendants' Products.

      30.    Examples of the types of documents that are responsive to Request No.

11 include, but are not limited to, the following: documents sufficient to show a

Defendant's knowledge or awareness of the Patents-in-Suit; documents sufficient to show

the contents of any discussion at any board of directors, management, or similar control

group meeting concerning the Patents-In-Suit; and documents sufficient to show all of

Defendant's communications with any person or entity (except for legal counsel)

concerning the Patents-in-Suit; and all documents relating to any and all work done by

and/or products of Michael Tasler and/or Labortechnik Tasler GmbH.

## <u>REQUESTS FOR DOCUMENTS AND THINGS</u>

      1.    All documents relating to the development history of each Specific

Feature[1] in each and every Product[2] of the Defendants.  See, Instruction No. 21.

---

[1] The "Specific Feature" term is defined in paragraph 14 of the Definitions and Instructions section above.
[2] The "Product" term is defined in the Definitions and Instructions section above.

2.      Documents sufficient to show the monthly sales (in revenues and in units) for each Product in each country from 1985 to present.  See, Instruction No. 22.

3.      Documents that discuss whether any advertising, marketing and/or promotional efforts have impacted the sales of any Product of the Defendants.

4.      All advertising, marketing and promotional documents that address and/or discuss, in whole or in part, the Specific Features in any and all Products of the Defendants since January 1, 1999.  See, Instruction No. 23

5.      Documents sufficient to show the overall construction and/or operation of each and every Product of the Defendant that has been used, manufactured, sold, offered for sale, or imported into the United States since October 22, 2002.  See, Instruction No. 24.

6.      All documents relating to or referring to, at least in part, the construction and/or operation of each of the Specific Features in each and every Product of the Defendants that has been used, manufactured, sold, offered for sale, or imported into the United States since October 22, 2002.  See, Instruction No. 25.

7.      All documents relating to the Defendants' alleged invalidity and/or unenforceability of the Patents-In-Suit.  See, Instruction No. 26.

8.      All documents relating to the Defendants' alleged non-infringement of the Patents-In-Suit.  See, Instruction No. 27.

9.      All documents relating to the interpretation, scope and meaning of the claims in the Patents-In-Suit.  See, Instruction No. 28.

10.     Documents sufficient to show the identification of those entities and/or individuals who have been involved in the research, development, design, construction,

testing, manufacture and engineering of each of the Specific Features for each and every Product of the Defendants.  See, Instruction No. 29.

11.    All documents referring to or addressing the Patents-In-Suit, Papst, LT Tasler, Michael Tasler and/or Labortechnik Tasler GmbH.  See, Instruction No. 30.

12.    All documents, from any and all patent related Lawsuits to which a Defendant has been a party, wherein a Defendant has described and/or discussed, in whole or in part, how its Products operate with respect to any or all of the Specific Features.

13.    All documents and things identified in, the identification of which is requested in, responsive to, or reviewed in formulating a response to Papst Licensing's First Joint Set of Interrogatories to the Defendants.

14.    All documents relating to the level of ordinary skill in the art pertaining to the Patents-In-Suit.

15.    All documents relating to any secondary considerations of  non-obviousness or obviousness, including but not limited to, the following: (1) the commercial success of the Products attributable to the claimed inventions, rather than something else, such as innovative marketing, (2) the claimed inventions satisfied a long felt need, (3) the attempt and failure of others to make the claimed inventions, (4) skepticism of the claimed inventions by experts, (5) praise by others of the claimed inventions, (6) teaching away of the claimed inventions by others, (8) copying of the claimed inventions by others, (9) experts or persons of ordinary skill in the field of the inventions expressing surprise at the making of the claimed inventions, (10) the inventor

proceeded contrary to accepted wisdom, and (11) the claimed inventions achieved unexpected results.

16.     All document retention policies in place from the time each Defendant first started its research and development of the Specific Features up until today's date.

17.     All documents relating to the patent prosecution of any of the Defendant's U.S. or non-U.S. patents or patent applications that address, in whole or in part, the Specific Features of the Defendants' Products.

18.     Documents and things sufficient to show the details of the operation of each Product with respect to how sound waves and/or light images are converted to representative analog signals, and how those electrical signals are converted to representative digital signals.

Dated: May 2, 2008                                    /s/ Jerold B. Schnayer
                                                      James P. White
                                                      Jerold B. Schnayer
                                                      Joseph E. Cwik
                                                      WELSH & KATZ, LTD.
                                                      120 South Riverside Plaza • 22nd Floor
                                                      Chicago, Illinois 60606
                                                      (312) 655-1500

                                                      Robert F. Muse
                                                      Joshua A. Levy
                                                      Kerry C. Dent
                                                      STEIN MITCHELL & MEZINES, LLP
                                                      1100 Connecticut Ave, NW
                                                      Washington, D.C. 20036
                                                      (202) 737-7777
                                                      **Attorneys for Defendant/Counter-Plaintiff Papst Licensing GmbH & Co. KG**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing PAPST LICENSING GMBH & CO. KG'S SECOND REVISED FIRST JOINT SET OF REQUESTS FOR THE PRODUCTION OF DOCUMENTS AND THINGS TO THE CAMERA MANUFACTURERS was served on this the 2nd day of May, 2008 upon the attorneys for the Camera Manufacturers as follows:

***For The Casio Parties*** (via e-mail in both Microsoft Word and .pdf format)*:*
Laura Krawczyk
Morgan Lewis & Bockius
101 Park Avenue
New York, NY 10178-0060
Phone:  (212) 309-6000
Fax:  (212) 309-6001
lkrawczyk@morganlewis.com

J. Kevin Fee
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
jkfee@morganlewis.com

Scott D. Stimpson
The Law Office of Scott Stimpson
Suite 1102
445 Hamilton Avenue
White Plains, NY 10601
stimpsonlaw@gmail.com

***For The Samsung Parties*** (via e-mail in both Microsoft Word and .pdf format)*:*
Patrick J. Kelleher
Drinker Biddle Gardner Carton
191 North Wacker Drive
Suite 3700
Chicago, IL 60606-1698
Phone:  (312) 569-1375
Fax:  (312) 569-3375
Patrick.kelleher@abr.com

***For The Fujifilm Parties*** (via e-mail in both Microsoft Word and .pdf format)*:*
Steven J. Routh
Sten A. Jensen
John R. Inge
Robert Wolinsky

Hogan & Hartson, LLP
555 Thirteenth Street, N.W.
Washington, DC 20004
Phone:  (202) 637-5600
Fax:  (202) 637-5910
sjrouth@hhlaw.com
sajensen@hhlaw.com
JRInge@HHLAW.com
RBWolinsky@HHLAW.com


***For the Olympus Parties*** (via e-mail in both Microsoft Word and .pdf format)*:*
Richard de Bodo
Rachel M. Cappoccia
Hogan & Hartson, LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
Phone:  (310) 785-4694
Fax:  (310) 785-4601
rdebodo@hhlaw.com
rmcappoccia@hhlaw.com

***For The Matsushita and Victory Company of Japan Parties*** (via e-mail in both
Microsoft Word and .pdf format):
Richard de Bodo
Rachel M. Capoccia
Hogan & Hartson, LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
Phone: (310) 785-4694
Fax: (310) 785-4601
rdebodo@hhlaw.com
rmcapoccia@hhlaw.com

Adam K. Levin, Esq.
Hogan & Hartson LLP
555 13th Street, NW
Washington, DC 20004
aklevin@hhlaw.com

**_For the Ricoh Parties_**:
Michael Switzer
McDermott Will & Emery LLP
227 West Monroe Street
Chicago, Illinois 60606-5096
mswitzer@mwe.com

/s/ Jerold B. Schnayer
Attorney for Papst Licensing GmbH & Co.
KG

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE: PAPST LICENSING          :
GMBH & CO. KG LITIGATION        :
                                :        Misc. Action No. 07-493
                                :        MDL Docket No. 1880
                                :
                                :        Washington, D.C.
                                :        Tuesday, April 22, 2008
--------------------------x              2:30 p.m.


TRANSCRIPT OF TELECONFERENCE
BEFORE THE HONORABLE ROSEMARY M. COLLYER
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiffs:         Robert F. Muse, Esquire
                            Kerri Dent, Esquire
                            STEIN, MITCHELL & MEZINES
                            1100 Connecticut Avenue, NW
                            Washington, DC  20036

                            James P. White, Esquire
                            Jerold B. Schnayer, Esquire
                            Joseph Swik, Esquire
                            WELSH & KATZ, LTD.
                            120 South Riverside Plaza 22nd Floor
                            Chicago, IL 60606-3912


For the Defendants:         SCOTT D. STIMPSON, Esquire
                            The Law Office of Scott Stimpson
                            445 Hamilton Ave.
                            White Plains, NY  10601

                            J. Kevin Fee, Esquire
                            Laura Krawczyk, Esquire
                            Kevin He, Esquire
                            MORGAN LEWIS & BOCKIUS LLP
                            1111 Pennsylvania Avenue, NW
                            Washington, DC  20004

COPY

```
 1   Appearances continued:

 2   For the Defendants:          PATRICK J. KELLEHER, Esquire
                                  Drinker Biddle & Reath LLP
 3                                191 North Wacker Drive
                                  Suite 3700
 4                                Chicago, IL  60606-1698

 5

 6   Court Reporter:              CRYSTAL M. PILGRIM, RPR
                                  United States District Court
 7                                District of Columbia
                                  333 Constitution Avenue, NW
 8                                Room 4704
                                  Washington, DC  20001
 9

10   Proceedings recorded by machine shorthand, transcript produced
     by computer-aided transcription.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE DEPUTY CLERK:  Miscellaneous Action 07-493, Papst

2    Licensing Digital Camera Patent Litigation versus Casio

3    America, Incorporated, et al.

4          Counsel, please identify yourselves for the record.

5          MR. STIMPSON:  For Casio is Scott Stimpson and with

6    me is Kevin Fee, Laura Krawczyk and Kevin He, all of Morgan

7    Lewis.

8          MR. WHITE:  For Papst it's Jim White, Jerry Schnayer,

9    and Joseph Swik.

10         MR. STIMPSON:  Actually, I'm advised that Kevin Fee

11   was lost for some reason.

12         Your Honor, I can conference him back in, if that's

13   okay.

14         THE COURT:  Yes.

15         MR. STIMPSON:  I think I can.

16   You're back on the conference call?

17         MR. FEE:  Thank you.  Sorry about that, Your Honor.

18         THE COURT:  Alrighty.  We're going to make an

19   experiment today to do this by telephone so that people don't

20   have to travel for purposes of arguing what are discovery

21   motions.

22         What it means though is that only one person can speak

23   at a time because only one person can be heard at a time.

24         I don't usually use a gavel because I don't need it in

25   court.  But I do have a gavel and I will use it if people are

1    talking over each other because sometimes the noise of the

2    gavel is loud enough to sort of break through.

3         Do you understand what I'm saying?

4              MR. STIMPSON:  Yes, Your Honor.

5              MR. WHITE:  Yeah, Your Honor.

6              MR. SCHNAYER:  Yes, Your Honor.

7              THE COURT:  Now, Papst if Mr. White is going to speak

8    for Papst, then Mr. White is going to speak for Papst.  If

9    Mr. Schnayer wishes to speak to a specific issue, he can speak

10   to a specific issue.  He cannot argue the same points or issues

11   that Mr. White is arguing.

12             MR. WHITE:  Understood, Your Honor.

13             THE COURT:  All right.  Now I'm going to start with,

14   I have four motions here to discuss.  One is Papst's motion to

15   compel production.  One is Papst's motion to compel

16   interrogatory answers.

17        One is Casio's motion for sanctions and to strike

18   Papst's discovery request and one is Casio's motion for

19   sanctions.  These are all kind of related and wrapped up as

20   kind of joint issues.

21        Let me start with the concept that I have three points

22   to make.  One is that the initial Papst's discovery requests

23   were outrageously over the top.  And I don't know about

24   sanctions at the moment.  But I do know that they were

25   outrageously over the top, and I am hopeful that Papst will not

1  be playing those games with the other defendants who are in

2  this case and coming.  I got notice today that Hewlett-Packard

3  would be joining us soon.

4        So I just want to tell Papst's lawyers that we are doing

5  a streamlined piece of litigation here and we are not using

6  discovery as a weapon.  It is a tool of discovery, and so don't

7  do it again.  Now let's move on.

8        The bifurcation which I have ordered it seems to me

9  omits or takes care of 35 requests for production of documents.

10  If you go through it you can figure out which ones they are.

11  And so I think that we don't have to worry about those and we

12  don't have to talk about them.

13        The real question is, the problem that I have is that

14  each of you has filed with me documents that were timely when

15  you filed them last June.  They're not actually timely right

16  now because events have proceeded.

17        Now Papst in its original requests which I said were

18  outrageously over the top says no, no, we've limited them.  And

19  on page 3 of their motion to compel which is document 45 on

20  this docket, Papst lists the eight areas in which it says it

21  really needs discovery.

22        Casio responds and says no, no, no, they say they've

23  narrowed it, but it's not really narrowed and in any event,

24  it's far too broad but we will produce some things.

25        Then if I move forward to document 51 in this docket, I

1  find that Papst redefines what it's seeking on page 1 of that

2  document.  So if I look at document 45 it says number one,

3  Papst is asking about the acquisition and processing of light

4  images by cameras including for example, the conversion of

5  light images into electrical signals representative of the

6  light images.

7      But on page 1 of Papst's reply, Papst tells me no, we've

8  only sought quote, the processing by a camera of electrical

9  signals representative of light signals including the

10 conversion of analog signals representative of light images, et

11 cetera.

12     So you see, I don't know what Papst has asked for.  I

13 can't tell you what Casio has responded.  Casio said last

14 spring we're going to produce some documents.  You haven't told

15 me what documents, if any, Casio has produced in the meantime.

16 I mean, you guys are caught up in litigating something that is

17 half a year or more old.

18     Really, do we need to litigate this?  Do you absolutely

19 have to have an answer to these ancient questions?  Can't I

20 just say listen, this is a patent litigation suit and it's time

21 that we stop playing games and moved forward.

22     Papst has to redo its discovery and it has to redo it in

23 simple English.  But more than that, more than that, Papst

24 maybe this is the way to do this, that Papst should be required

25 to submit a statement to contain a detailed explanation of its

1  infringement contentions which everybody has been asking for

2  since this began.  I assume that Papst has been acting in good

3  faith as it wondered around the world approaching Digital

4  Camera manufacturers, demanding royalties, that Papst has an

5  idea as to how these Digital Cameras infringe its patent.  So I

6  think the thing to do now is to say okay, Papst, put them up.

7       In Papst's briefs because these were filed way last

8  spring, it's still arguing as if Casio is the plaintiff and

9  it's the poor defendant.  After all, Casio came into this

10  litigation let them be prepared to move first.

11       I've already told you Papst is going to be treated as

12  the plaintiff.  Casio and all of the other manufacturers as

13  defendants because that's really the reality of the situation.

14  So Papst has to speak first.  And it's time that Papst did so.

15       Now, let me get back to these motions.  Do you really

16  need me to rule on them all?

17       MR. STIMPSON:  Your Honor, this is Scott Stimpson

18  speaking for Casio.

19       I think three of the motions are very closely related,

20  the motion to strike and two Papst's motions to compel.

21       Actually, Your Honor, our motion to strike might resolve

22  a lot of these issues, I am hopeful, because we have proposed

23  that we produce documents relating and sufficient to show the

24  structure and operation of the camera, and I would hope that

25  that would be enough.

1       I mean, one of the things Your Honor mentioned was the
2   possibility of Papst redoing this discovery and serving
3   additional requests.
4       From Casio's perspective, I mean, we've been through
5   this and it's been an absolute nightmare.
6       THE COURT:  Well, the question is has Casio responded
7   to Papst's discovery?  Well, the first question is what is
8   Papst's discovery?  I mean, I cannot tell you from looking at
9   the documentation you've given me and all of the briefs exactly
10  what it is that Papst is currently asking for or was currently
11  asking for let's say pick a time period last August.  I have no
12  way of knowing because this is a moving bobble.
13      Now this is not the way that you guys should be
14  litigating and it's certainly not the posture you want to be in
15  front of a Court.  You look like you're all playing delay games
16  and expense games instead of serving your clients.
17      Now, I will not allow delay and expense games.  I will
18  be really rough with somebody that I think is only playing
19  delay and expense games.  But this is when the case was before
20  two other judges.
21      So if Papst, if you're confident that Casio knows what
22  Papst has been asking for and if Papst is happy with the
23  information it's received from Casio, well then, fine.  That's
24  great.
25      If you don't know what Papst was asking for, you're in

1  the same position I am and Papst hasn't even told me.  All

2  Papst tells me is well, we've backed up a little.  We started

3  in a simply outrageous place and we've backed up some, but I

4  don't know how far.

5      And I mean, I know that telling Papst that they started

6  in an outrageous place is delivering any new news to any of

7  you.  So that's, you know, and besides which Magistrate Judge

8  Robinson already ruled on this.

9      MR. SCHNAYER:  Your Honor, this is Schnayer.

10     May I speak, please?

11     THE COURT:  Yes, sir.

12     MR. SCHNAYER:  Can I start -- this may take a bit of

13 time too.

14     THE COURT:  I do not want any history.  Mr.Mr.

15 Schnayer, you wasted my time at the last hearing.  Do not waste

16 my time again by positing your client as a really good

17 wonderful group of guys.

18     Now I want you to address the issues we're talking about

19 today.

20     MR. SCHNAYER:  Yes, Your Honor.

21     Let me start by then getting very specific if I can with

22 the issues, the things that are at issue here.  Your Honor, we

23 sent a letter to the opposing counsel dated June 12th, 2007

24 which is part of our filing document 52, I guess it's actually

25 45.

1      The document is Exhibit E to our motion to compel and
2  what we do is we tried to make a list of items that were items
3  that were relevant to the claim language at issue involved in
4  the lawsuit.

5      What we did if you look at our Exhibit F, we take
6  exactly those claim language and we refer specifically to claim
7  one of the patent.  We describe in there with regard to claim
8  one exactly where in the patent claim that it calls for that
9  particular element.  So we tried to be very specific so we can
10  show the Court where that occurred.

11      So each one of our eight elements we showed support in,
12  support in the patent claim.  Recently, Your Honor, Casio --
13  not recently -- but in the end of the last case that was down,
14  when it was down before the prior Judge, they answered
15  supplemental interrogatory answers.  And in those answers they
16  raised the elements of two of the claims that were at issue.
17  Claim one of one patent and claim two is the other patent.

18      If you go through it, it's several pages long, they
19  exactly contest the meaning of claim elements that relate to
20  those particular, the eight items that we included on our list.
21  So they have hotly contested.  They have put those at issue in
22  the case.

23      Then that is one reason why we decided that if we were
24  going to limit things to relate to the issues in the case, the
25  things that they put at issue are things that we should direct

1   our attention to.  They have contested what the claims mean and

2   whether they're, the devices are covered by those claim

3   elements.  So what we tried to do is to say let's limit what

4   we're asking for to those particular elements.

5        Those are the ones that they put at issue.  Those are

6   the ones that they're going to complain about.  Those are the

7   ones that they're addressing in their interrogatory answers so

8   let's put those at issue.

9        By the way, Your Honor, Papst recently filed in

10  accordance with, we had a conference a few weeks ago, we filed

11  our contentions responding very specifically to those claim

12  elements that they had.  We put in a lot of detail.  We're

13  trying to comply with our discovery obligations.

14       We addressed all of, they had pieces of prior art they

15  claim were relevant, we addressed every single piece of prior

16  art.  We explained prior art, we explained why it wasn't

17  invalidating and all of the claim elements, all of their

18  interpretations we explained in great detail why they're wrong

19  and why we don't agree they're correct.

20       THE COURT:  What is the file docket number of the

21  document you're talking about?

22       MR. SCHNAYER:  I'm looking at -- where these

23  attachments are?

24       THE COURT:  Your contentions in a lot of detail and

25  all of that, what docket number is that?

12

1          MR. SCHNAYER:  It's not filed, it was discovery that

2     was served.  We certainly can send you a copy of it.

3          THE COURT:  Well, filed and served are different.

4     You make me feel better, keep going.

5          MR. SCHNAYER:  You don't have a copy.  We agreed not

6     to, I think we're not suppose to file those.

7          THE COURT:  Correct.

8          MR. SCHNAYER:  Unless it becomes an issue.

9       So we actually provided them with a lot of detail.

10    We're trying to comply with our discovery obligations.  We

11    exactly addressed the issues that they addressed.  But those

12    are the questions that are at issue in this case.

13         And there's a lot of, there's a lot of issues now that

14    that raises under the patent law.  Number one, when you got to

15    know what the level of skill and the art is you got to know

16    what the claim language means.  You got to know what there's,

17    what they call secondary abuse and ability.

18         Secondary dependability are more significant then other

19    issues to the patentability. What they are attempting --

20    failure by others.  Skepticism by people skilled in the art,

21    long felt need, commercial success.  These are very well

22    defined patent law concepts and we tried to address in our

23    papers, in our document requests those issues and then when

24    Casio complained about it and we understand it's a fair amount

25    of documents, but how do you get the documents that are

1   relevant to the patent issues that are in this case without

2   getting them?

3          We limited it, to try to limit it to the issues that

4   we felt were the technical issues that are involved

5   specifically with the claims and with which Casio agreed with

6   because that's the exact issues they raised in their papers.

7        And so we did try and limit the discovery that we had in

8   this case.  And I don't know how to deal with these issues.

9   Unfortunately, some of these are very broad issues.  We tried

10  to cite case law to show you these were issues that are

11  relevant in the patent law.

12         I was involved in a case recently --

13         THE COURT:  I don't need -- wait, wait.  Stop, stop.

14  I don't need to hear more about that.

15         MR. SCHNAYER:  Yes, ma'am.

16         THE COURT:  What I'm trying to do is figure out where

17  we go from here.  Let me just take you through the Papst motion

18  to compel the production of documents.

19         MR. SCHNAYER:  Yes, ma'am.

20         THE COURT:  The first thing is you argue on page 3,

21  this is document number 45 in the docket which is the only way

22  I can keep track of what we're doing, is that here we've

23  limited our requests for documents and we've limited them to

24  these eight issues that are listed there.

25         And then you say Casio must produce documents for

1  products that may yet be accused of infringement.  If things

2  were not used, manufactured, sold or offered for sale, licensed

3  or imported into the United States, they're not relevant and I

4  don't see that Casio has to produce information about them.  I

5  know you have an argument about that.  I'm just telling you I

6  don't see where that comes from.

7       Then we have Casio must produce documents relating to

8  activities outside of the United States.  Communications with

9  customer sales, revenues, profits and marketing materials.

10  These are activities outside of the United States, I don't see

11  that they're relevant.  I literally don't see how

12  communications with customers anywhere else in the world are

13  relevant.  And you haven't limited that request in any fashion

14  to allow it to be relevant.  So all of that gets stricken at

15  the moment.

16       Casio cannot withhold documents on the basis of

17  confidentiality.  I think we have resolved that with a

18  protective order.

19       Casio must, request documents on a date certain.  Casio

20  has agreed to produce all responsive and non-privileged

21  documents.

22       Has that been done?

23       MR. STIMPSON:  Your Honor, we have produced

24  additional documents but they have not all been produced, the

25  reason being that we had a protective order which is now

1  resolved.  They are all going to be produced.  We can start

2  that production as early as maybe this week or next week.  And

3  we have not received many, many documents.

4          THE COURT:  Well, don't talk about what you haven't

5  received.  Talk about what you're going to do.

6       So this is not completed yet and your answer is well, we

7  needed a protective order.  You now have a protective order,

8  you will get this done within two weeks.

9          MR. STIMPSON:  We will, Your Honor.  Thank you.

10         THE COURT:  All right, Casio must produce all other

11 relevant documents.

12      Then we turn the page.  Casio's financial documents.  We

13 don't need financial documents because we've bifurcated.

14      Papst has requested documents on the legal control issue

15 to show that Casio Japan and Casio U.S.A. do have control over

16 other Casio entities.  Just on the face of it since Casio Japan

17 is a defendant, we don't give a damn, excuse the French, for

18 whether Casio U.S.A. has control.  And we will assume that it

19 does not.  If you find any reason to believe that it might,

20 then it might and you can follow that through.  But your

21 request for documents to Casio U.S.A. for documents from some

22 place in Hong Kong or anywhere else is inappropriate and

23 improper.  You can ask Casio Japan about those things and then

24 Casio Japan can argue about their relevance.

25      Now we get down to the details of the information

1  systems.  We have been around and around about the  information

2  systems.  I still don't understand why you want it or need it.

3  And I'm striking it unless you come up with a better reason.

4       Then we move on to documents regarding other lawsuits.

5  You want a previous admissions on claim interpretations and the

6  operation of its cameras.  I'm not quite sure what documents --

7  I'm sorry, I have actually read through all of this but right

8  now I can't recall right now.  What documents, what kinds of

9  other documents are you looking for?

10       MR. SCHNAYER:  We know of one particular case, Your

11  Honor, which was recent we referred to in our papers and the,

12  there were cases where Casio was sued for patent infringement

13  we understand and of these very same product and the issue is

14  if they have documents that were produced or information from

15  that lawsuit that's relevant to this lawsuit, we think it's

16  appropriate that they produce it.

17       These are very, the issues involved in the cases I think

18  are similar.  They involve the electronics of the devices that

19  are at issue here.  And I think we'll probably find it will

20  tell us a lot of details about it.

21       THE COURT:  Okay, but you didn't tell me what

22  documents did you ask for.

23       MR. SCHNAYER:  Well, we asked for the pleadings, and

24  if they produced documents in the case if there was document

25  requests where we can see what kind of documents were produced

1   or things of that nature, then we would like to --

2           THE COURT:  So what you want is for Casio to produce

3   in this litigation everything it produced in another litigation

4   with another party?

5           MR. SCHNAYER:  Yes, Your Honor.

6           THE COURT:  Well that, I mean, that's just grossly

7   overbroad.  I'm sorry, you can't ask things like that.  You

8   have to figure out what your claims are, and then identify

9   whatever kinds of documents you think might be in another piece

10  of litigation and you limit your requests to those kinds of

11  documents.  You don't know the precise document, you know, the

12  one with Bates stamp number 1242, of course not.  But you can't

13  ask for every document ever produced in response to somebody

14  else's document requests.

15          If you think there's something relevant in there to the

16  electronics of the camera operation, then figure out a way to

17  ask for that unless you're already too late.  But that, I mean,

18  that's just, this is the problem we have with the way that you

19  put together your discovery.

20          You did it, I don't know swarth dearth, is that the way

21  you describe this kind of thing?  But it's simply stunning,

22  absolutely stunning and I'm sorry I didn't have the case to

23  begin with because I would have addressed it a long time ago.

24  Here we are a year later and it's long over, water over the dam

25  and I'm still fussing about this nonsense.

1       All right, prior art.  You asked for prior art and Casio

2  said only the prior art on which it intends to rely.

3       How do you defend that position?

4           MR. SCHNAYER:  Here's the problem, Your Honor.

5           THE COURT:  No, no, that's Mr. Schnayer, right?

6           MR. SCHNAYER:  This is Mr. Schnayer.

7           THE COURT:  I don't need to hear from Mr. Schnayer.

8  I misspoke, forgive me if I indicated I did.

9       Who I need to hear from is Mr. Stimpson.

10          MR. STIMPSON:  Yes, Your Honor.

11      If we're not relying on prior art, I don't see how it's

12 relevant.  I mean, Papst has not put forth any position that

13 would -- what I'm really concerned about here is for example,

14 their request is every piece of prior art.  Now on the face of

15 that that may not seem so bad.

16      For example, Casio has I don't know, maybe hundreds of

17 patent applications relating to the technology and every one of

18 those you get prior art cited against every patent application.

19 I mean, we literally read the Papst requests which requires us

20 to prove all that.  It would just be an enormous undertaking.

21      And if there's anything specific that Papst needs for

22 whatever reason, certainly any prior art that we're relying on

23 it is after all a defense, I mean, we'll give it to them.

24          THE COURT:  Read to me because I don't have it -- oh,

25 I do have it but it's hard for me to find -- the exact request

1  for documents here.

2         MR. STIMPSON:  Let me see, this is 51?

3         THE COURT:  Fifty, 51 and 53.

4         MR. STIMPSON:  Fifty-one says all documents

5  constituting recording, evidencing or referring to any alleged

6  prior art relevant.  All documents provide written

7  corroboration.

8         I'm just referring to one more time.  So they refer

9  first of all, it says anything relevant to the fact in the suit

10  and that's a problem because how do we define that.  But if

11  there's anything we're going to rely on of course we're going

12  to give it to them.  If there's anything else that they

13  specifically need, then we would be happy to consider that by

14  just telling us anything relevant to the patent which Papst is

15  interpreting to be relevant to Digital Cameras that is just an

16  enormous undertaking.

17         THE COURT:  Well, now the patents, Mr. Schnayer, what

18  would you tell me because you referenced electronics, what

19  would you tell me these patents actually cover in English?

20         MR. SCHNAYER:  The only way really for me to tell you

21  that is to go through the claims the way I did before.  They

22  cover and I can do this from memory.  But they cover, it's a

23  combination of elements including, and they put this all at

24  issue in recent interrogatory.

25         THE COURT:  No, answer my question.  Don't get

1    argumentative, just answer my question.

2          MR. SCHNAYER:  Could you repeat it, please?

3          THE COURT:  Yeah, tell me what these patents actually

4    cover?

5          MR. SCHNAYER:  I'll do the best I can without patent,

6    the claim in front of me.  They cover variations of a transmit

7    receive device attached to a device called an interface device.

8    The interface device has a circuitry which some of the claims

9    require circuits that sample, signals that come from the data

10   transmit receive device, and then there's an A P converter

11   which converts the analog signal to digital.  Then there is a

12   processor which processes the information, and typically can

13   store the information in a memory that then also this interface

14   device can be hooked up to a standard computer which has

15   software drivers which are customary in device -- excuse me --

16   they have software drivers which are for input output devices

17   customary for example, like a hard disk drive.

18         What happens is the device sends a signal, the computer

19   you connect this interface device to the, to the computer, and

20   the computer sends a signal out saying what are you.  It sends

21   out an inquiry.  There's generally first an interpreter which

22   is a software/hardware function.  In other words, it's a

23   computer operating a certain way which will then send a signal,

24   will send a signal back generally indicating that is it for

25   example, a hard disk drive when in fact it's really connected

1  to a camera.

2      Then the computer is then able to communicate with the,

3  with the interface device by way of that specific driver which

4  typically is a very efficient driver to transport the

5  information which was originally downloaded to the memory for

6  example, and it transmits it to the computer.

7      Now there's some claims directed for example, to exactly

8  how it transmits that information.  Some of the claims require

9  hard disk drives.  The particular information, we generated

10 some very, very, specific interrogatories to these what are

11 called identifiers in computer language.  They're particular

12 pieces of information that you look for and if you know they're

13 there then it goes a long way to tell you whether there's an

14 infringing device.

15     Those are interrogatories we addressed to everybody but

16 Casio because this issue came up about whether we can serve

17 more requests on them.  Those interrogatories we were going to

18 actually propose off the record to Casio, haven't had a chance

19 yet that if they would agree to answer those, those would go a

20 long way to get us a lot of the information we need.

21     But that's a generality of what this patent concerns.

22 It's this interface device with particular circuitry that

23 operates in a certain way and it could be connected to a

24 computer that operates in a certain way.  And the data transmit

25 receive device is for example, a lens.  And it's the way

1    information data like a picture image could come in and then

2    it's made into signals that can then be processed by this

3    interface device.

4        THE COURT:  What does this have to do with the

5    conversion of light images into electrical signals?

6        MR. SCHNAYER:  Because the issue of converting light

7    images into a particular signal is exactly, they claim that

8    the, that is not present in their device and they claim that

9    the data transmit receive device, there's several issues.

10       One is they claim that it doesn't have to be connected

11   to the interface device, they say it could be interchangeable.

12   And they claim that that word doesn't cover their device, their

13   camera.  But the issue of how the light comes in and how it's

14   processed is very significant and how it's processed internally

15   by the micro processor of the control circuit of the camera

16   tells us whether it infringes or not.

17       THE COURT:  Okay.  So then how would you better

18   define your requests for all documents about prior art relevant

19   to the patents in suit?  What does that mean?  What are you

20   asking for?

21       MR. SCHNAYER:  Your Honor, to the extent that they

22   are going to assert prior art against our patents, certainly

23   they should be required to identify those.

24       THE COURT:  Well, yes.  They say, Casio says that any

25   prior art that they're going to rely upon they're going to

1    produce and you're unhappy with that limitation.

2        So I'm saying well, what did you mean when you said

3    prior art relevant to the patents?  I mean, you just described

4    to me what the patents do.

5        MR. SCHNAYER:  If they're going to -- it's the rest

6    of the request that we're concerned about.  It's not the

7    beginning part.

8        If they say we're going to give you all prior art that

9    we consider to be relevant and that we're going to be using,

10   that's fine.  As long as they're limited to that.  But the rest

11   of it is what is important.

12       It says including all documents that provide written

13   corroboration that any actual product constituting alleged

14   prior art was not on sale or sold anywhere in the United

15   States.

16       Prior art doesn't have to be a patent.  It could be

17   somebody invented something.  One of the problems is that if

18   you want to, if you want to be able to cross-examine their

19   prior art, you need all of the background details of that prior

20   art.  So what they may have done for example, and I can tell

21   you I'm sure they did regarding some Kodak prior art.

22       If they have any information about that prior art or

23   devices built in accordance with that prior art, then that's

24   the information we may need to cross-examine that prior art to

25   show what it really meant.  They may say oh, look at what this

1  prior art teaches and they may have documents in their file

2  that show that's not what it teaches, it teaches something

3  different.

4      THE COURT:  Wait, wait, let me go back and read that

5  to me agin.

6      You said written corroboration that any, keep going, any

7  product that was prior art was not on sale?  Is that what you

8  said?

9      MR. SCHNAYER:  Right.  One of the issues is if you

10  had documents concerning prior art one of the issues is whether

11  there was a device on sale in the United States, more than one

12  year, there's a period of time but specifically about the time

13  that patent, he came up with this invention.

14      And they could come in with some documents trying to

15  show that this device was on sale and I have had this happen in

16  cases where they present some of the evidence and not all of

17  the evidence.  There may be other evidence to show that what

18  was sold didn't work.  And all we want to do is make sure that

19  they don't give us part of the information, they give us all

20  the information so we can cross-examine it.  And that's what

21  and that's real clear, that's what we meant by this.  They got

22  to give us all of the information about the prior art so that

23  they can't argue it being something different and we can't

24  cross-examine it.

25      If it's on sale, they assert it's on sale, they got to

1   give us the good documents and bad documents, everything about

2   that document that is on sale so we're not surprised.

3   Otherwise, we have no way of cross examining.

4           THE COURT:  But what you said was written

5   corroboration that any product that was prior art was not on

6   sale.  You didn't say was on sale, you said was not on sale.

7           MR. SCHNAYER:  Right.  And that would be for example,

8   documents -- they may say oh, look, this device was sold.  And

9   here's a document, here's the sales brochure or something that

10  shows that it's on sale.

11          And we may say, wait a minute.  Here's another document

12  to show that it never was delivered, to show it wasn't on sale.

13  They want to show it was on sale.  We want to show it wasn't on

14  sale.

15          THE COURT:  Okay.  Mr. Stimpson, do you understand

16  that?

17          MR. STIMPSON:  I think so, Your Honor.  I think it's,

18  there's no particular prior art I'm thinking of right now, but

19  what they're saying I think is if we're saying a piece of prior

20  art is prior art because it was on sale and we got documents

21  showing it wasn't in fact on sale, then we got to give it to

22  them.  And that's okay, if we're going to do that, we'll give

23  them documents showing that it was on sale.  If we have

24  documents showing that it wasn't on sale, then we'll give them

25  that too.

1          THE COURT:  Alrighty.

2          MR. SCHNAYER:  In addition, Your Honor, if there's

3    any evidence about prior art which relates to the subject

4    matter relevant to the patents in suit, then I think they

5    should be required to produce it.  For example --

6          THE COURT:  I'm afraid that your language is

7    overbroad.  Subject matter that was relevant to the patents in

8    suit.

9          Now, sir, you have to ask for things with more clarity

10   than that if you want to get your request enforced.  I mean,

11   that is a bunch of words that has no meaning, except in your

12   mind, it has no meaning to a reader.  It's too broad.

13        I mean, you just, you can't ask me to enforce that

14   request.  Who knows what you mean?  It's not possible to

15   discern from the words themselves.

16        You know, you're going to have to learn to do this, at

17   least in this case, you're going to have to learn to do this

18   with a lot more specificity than that kind of stuff.  Because I

19   cannot say to Casio you got to produce it because I don't know

20   what you're even asking for.  And I can't ask Casio to spend

21   time on the telephone repeatedly so you can explain to us what

22   it was you meant.

23        MR. SCHNAYER:  Your Honor, may I raise one issue,

24   please?

25        THE COURT:  Yes.

1          MR. SCHNAYER:  One of the things that I would expect

2    to happen with regard to these particular requests counsel for

3    Casio is an experienced patent attorney.  And if we were to sit

4    down and review these together and really had a good faith

5    discussion about these particular requests, I think that he

6    knows what would be appropriate and what he understands, he

7    understands what these are about.  And I think that would be

8    one way for us to try and resolve these matters, and, you know,

9    try and reach agreement on some of this.

10          THE COURT:  Well, you submitted these to the Judge in

11    June of 2007 which means you submitted them to Casio longer ago

12    than that.  And there's been a whole lot of time to talk about

13    and all you managed to do, and this is not directed to you

14    personally, Mr. Schnayer, is just argue about things, the two

15    of you, you're having a great time.

16          Now let me go on.  I think I've gone through Papst's

17    original motion pretty much except for the documents

18    demonstrating the identity of individuals and businesses

19    involved in Casio's infringing activities.

20          Again, I think that you're dangerously close to being so

21    grossly overbroad and you're too late to change it now and now

22    what are you going to do?  How can I enforce it?  I mean,

23    you've let yourself get to the end of a limb.

24          I mean, I just have to tell you now I think Casio has

25    been overly protective.  Don't get me wrong, Casio has played

1  its own games.  They're just not quite as over the top because

2  they don't start with the requests from Papst.  But I mean,

3  Casio can't pretend that none of the requests from Papst are

4  relevant, that they don't understand any of them, that they've

5  never litigated a patent case before.

6       So gentlemen, you have to act as professionals in this

7  matter.  I don't want any more gamesmanship.  I have a booklet

8  here, a big thick three ring booklet with all of your

9  pleadings.  I complained at lunch that in this case nobody

10  knows how to speak in less than a hundred pages.

11       I mean, I'm not going to do this this way.  If you

12  insist on litigating this way, you're going to have to come to

13  court about once a week while I pound at you until I figure out

14  how not to do it.  We've got to get this case to the point

15  where something is able to happen.  And we're not going to be

16  able to play discovery games.

17       Now the problem that I have is Papst said I narrowed, I

18  narrowed, I narrowed.  I still don't know where you are.  I

19  still don't know quite what you've asked for.  I can't enforce

20  anything that you have asked for because you haven't told me

21  what you've literally asked for now.  And then Casio says well,

22  we're going to produce, we're going to produce, we're going to

23  produce and then lo and behold it hasn't produced at all.

24       And then Papst comes back and says but the order that we

25  want you to issue, Judge, is on our first request as they were

1  written not as we've changed them.

2       Now do you understand the problem that I'm having with

3  all of this?

4            MR. STIMPSON:  Yes, Your Honor, Scott Stimpson, I do.

5            MR. SCHNAYER:  Yes, Your Honor, it's Mr. Schnayer.

6            THE COURT:  Good, good.

7       And have we had enough conversation or should we proceed

8  through the motion to compel interrogatory answers which of

9  course was written before this became an MDL?  It was written

10 at a time when Casio was a plaintiff.  Casio is no longer the

11 plaintiff.

12      There are a lot of arguments in the motion to compel

13 interrogatory answers which aren't particularly relevant

14 anymore.  I don't know why you're giving me all of this old

15 stuff to read.  And then I came to Casio's motion to strike

16 Papst's discovery requests and for sanctions.  Some of this

17 discovery requests are properly stricken.  Some of them are

18 not.  I think we've gone through a lot of them already.

19      Have we resolved this issue of what should be stricken

20 and what should not?

21           MR. SCHNAYER:  Your Honor, can I raise one issue with

22 you?

23           THE COURT:  Yes.

24           MR. SCHNAYER:  If I can?

25      You've indicated that financial documents aren't

1  relevant because they don't, they relate to the issue of what's

2  been bifurcated.  I will just tell you that each of the

3  requests that we have we cited case law in our brief that shows

4  that there is case authority to support our requests.  I just

5  want to talk about this one.

6       There are two issues involving financial documents.  One

7  is damages and the second issue is commercial success.  One

8  indicia of patentability is whether a patent is commercially

9  successful.  The commercial success can come from a product of

10 the plaintiff or come from the product of a defendant.  So the

11 issue is in order to show commercial success is an important

12 issue in patent law because if I can prove commercial success,

13 it's an indicia of the patent being patentable.  It's something

14 that's under federal circuit, standard federal circuit law

15 something that is relevant to the issue of patentability of the

16 claims.

17       What you must do in deciding this issue is you must look

18 to see if there's a nexus between the commercial success of the

19 device and sales.  But for example, Casio may have marketing

20 documents.  And they may, and we've seen some of them already.

21 I've seen a number of them that they've produced to us that

22 talk about the features and attributes of their device.

23       If they talk about the features and attributes and some

24 of those relate to the claims of patent in suit, then you've

25 shown a nexus between the commercial success and the claim

1   mentioned.

2        And therefore, in connection with that you need to have

3   financial documents that would show how successful they were

4   when they switched to this technology.  Then you need to have

5   documents which would show marketing issues and things of that

6   nature which could then relate to the issues of the patent in

7   suit.

8        THE COURT:  Do you need that for the Markman hearing?

9        MR. SCHNAYER:  Your Honor, you gave us 25 documents

10  -- the answer is do I need it for the Markman hearing?  I don't

11  need it for the Markman hearing.

12       THE COURT:  Okay.

13       MR. SCHNAYER:  But the problem is if I don't get it,

14  I only have 25 document requests.  It's a very limited number

15  with many different subjects involved in patent law.  So if I

16  try to be specific, too specific, I can't possibly cover all of

17  the subject matters that I have.

18       In this particular one with the financial documents, it

19  is a highly relevant piece of information.  Cases have been

20  overturned on appeal when parties have not been allowed

21  discovery on the issues of connection of the nexus between the

22  intervention and the commercial success and the commercial

23  success itself.

24       THE COURT:  Okay.  And we are right now aiming for

25  the Markman hearing.  And we are not aiming for the full

1    discovery of the entire matter.  Because the first thing that

2    we do is figure out a claims construction.  And then once the

3    claims have been construed, then the parties continue with

4    their discovery and unless and until the claims are construed,

5    it's very difficult for you to know what to ask for with any

6    precision and for Casio or any other defendant to respond as to

7    whether or not there's a nexus between the commercial success

8    and one of the as construed claims of the patent.

9         But it's interesting that you -- and so therefore, I

10   think that it's not that you're not going to get discovery on

11   these issues, it's that it's premature.  It's a very expensive

12   proposition that we don't have to do now.

13        Now one of the things that you said is that one indicia

14   of patentability is commercial success.  As I understood it,

15   your inventor has no products.

16        MR. SCHNAYER:  Well, no, he -- that's not the case,

17   Your Honor.

18        Can I explain?

19        THE COURT:  Yes.

20        MR. SCHNAYER:  Mr. Tasler who is the inventor is,

21   actually started a company and went into the business of

22   manufacturing these products.  A product that are covered by

23   the patent.

24        Mr. Tasler doesn't have a lot of money.  And couldn't,

25   but he does have products and he does sell products in his

1  area.

2        THE COURT:  Then that's fine.  That's the only answer

3  I need.  I don't need the rest of it.

4        But did you understand my response to your plea for

5  information on commercial success?

6        MR. SCHNAYER:  I understand.  I guess the question is

7  that I'm, I didn't understand that from your prior orders that

8  we were to break discovery down.

9        I understood that we were to break discovery down with

10 regard to damages and willful infringement, but I didn't

11 understand based on the procedural orders that you wanted us to

12 break it down even further.  So --

13       THE COURT:  Well, perhaps my own understanding of

14 this is maturing along with yours, but I think that what I'm

15 trying to do is figure out a way to manage a case in which

16 you've started with these hugely overbroad requests.

17       To this moment sitting here I don't know what the status

18 of your actual discovery between the two of you is and what

19 remains to be decided.  But you started with these hugely

20 overbroad requests and now I'm just trying to figure out a way

21 to get this under control so that you stop quibbling about it,

22 you get what you need and we can get to a Markman hearing.

23       And you are telling me, and this is my understanding of

24 the way it works as well, that commercial success has no

25 bearing on the Markman hearing.  So let's not worry about that

1  now, let's worry about the things that count.  Because of

2  course, there will be more discovery if the Markman hearing

3  doesn't resolve things.

4          MR. SCHNAYER:  The problem that I think most

5  everybody has here is that we directed our discovery under the

6  25 Rule limit to matters that relate to all the issues except

7  for infringement -- excuse me -- except for damages and willful

8  infringement.

9          And I know that our discovery requests were directed to

10  every issue besides that.  We, I think that's my confusion

11  here.  And if the Court wants us to do something, then we'll

12  try and comply with it certainly.  But there was nothing in the

13  practice order that talked about limiting the discovery in the

14  first part of the case to any particular issues except that.

15          So if you want us to do that certainly we'll try and

16  comply with your requests, but it's going to take some time

17  because we have document requests out that are broader than

18  what, than what you talked about now.

19          The other side has document requests that are broader

20  because we were all directing it to broader issues.

21          Then the other problem is how do we keep Casio in line

22  with this and make it consistent because they're being treated

23  differently.

24          We've learned a lot more since the time of Casio's case

25  that we were able to focus some of the issues on real important

1  critical things.  And the problem is that we can't, you know,

2  we were going to talk to Casio whether they would agree to

3  respond to some of that discovery requests and raise it with

4  you if they didn't.

5           THE COURT:  Why don't we just cut to the chase here.

6       Tell me, Mr. Schnayer, what of your requests to Casio

7  you don't have complete answers to today.  I don't care what

8  about last June.  Tell me as of today?

9           MR. SCHNAYER:  I didn't understand the question.

10          THE COURT:  What remains to be produced?  What

11 requests for production and interrogatories do you think you

12 have not yet received full responses?

13          MR. SCHNAYER:  Well, I can go through the

14 interrogatories they basically gave us.

15          THE COURT:  Back up to the documents because we spent

16 more time on documents so far than interrogatories.

17          MR. SCHNAYER:  Your Honor, they only produced to us

18 very limited documents in the case.  They produced to us some

19 manuals that are publicly available that I could have gotten

20 off the internet that aren't sufficiently detailed with the

21 information I need.  They produced a few financial documents to

22 me.  They have not given me any documents on the computer

23 program and how it operates, some of the things I mentioned and

24 what we would need.  I haven't received hardly anything.

25          There's a lot of pages of things because they produced a

1  lot of these manuals that are several hundred pages long, but

2  it's basically nothing.  I don't have anything, I don't have

3  hardly any documents.  They produced recently a few more

4  manuals of publicly available manuals, but I just don't have

5  any documents.

6          THE COURT:  Okay.  Mr. Stimpson, you said you were

7  going to produce everything in the next two weeks, right?

8          MR. STIMPSON:  Well, Your Honor, I can.  In fact, as

9  we speak people are reviewing documents to give them out.

10      If I can, please, just respond to Mr. Schnayer's

11  comments?

12          THE COURT:  Yes.

13          MR. STIMPSON:  We produced marketing materials, we

14  produced mail summaries, we produced all of the manuals for all

15  of the Casio's products and we supplemented that after the stay

16  was lifted.

17      The other stuff we're working on are the documents that

18  show how the Casio cameras operate which is something we agreed

19  to produce.  We're going to produce documents subject to

20  privilege and work product on the patent and I'm sorry it has

21  not been produced as quickly as you would have liked, but we

22  were waiting for that for the protective order but now that

23  it's done we are moving ahead on it.

24      Just -- well, that's it for Casio.

25          THE COURT:  Tell me about the information about

1 commercial success.

2       MR. STIMPSON: Well, there's a couple of responses to

3 that, Your Honor.

4      The first response is Mr. Schnayer has had Casio sale

5 summaries, he has accused Casio of infringing and Magistrate

6 Judge Robinson ordered him to provide a complete response to

7 our interrogatory commercial success and he completely failed

8 to do that.

9      So as part of our other motion what we have asked for is

10 that he shouldn't be able to assert commercial success now. It

11 was a direct order and he just completely refused to comply

12 with it.

13      Secondly, we produced sale summaries and produced

14 marketing materials that Mr. Schnayer is talking about and

15 lastly, I fully agree with your suggestion, Your Honor. It

16 doesn't make any sense to go, if we're going to go down the

17 commercial success road at all it doesn't make any sense to

18 plow down that road when the Court is going to construe the

19 claims and then we'll all have a better idea of what, if

20 anything, needs to be produced.

21      THE COURT: But what about the fact that Mr. Schnayer

22 says that the parties in the other cases is limited to 25

23 interrogatories have used them to cover all areas including

24 commercial success. What you're really basing your in action

25 on is your motion to strike, right?

1        MR. STIMPSON:  Well, first of all, Your Honor, we

2   really, we haven't had in action because we produced the sales

3   summaries.  We produced all of the stuff they need on the

4   cameras and we have produced all of the marketing deals.  I

5   frankly don't know what else they're going to need.

6        But yes, the answer is I don't think that they should be

7   able to assert commercial success based on their failure to

8   comply with Judge Robinson's order.

9        MR. SCHNAYER:  Your Honor, may I respond, please?

10        THE COURT:  Yes.

11        MR. SCHNAYER:  Your Honor, the only way to know

12   whether there's commercial success is for me to have the

13   documents from the files from all of defendants to show that

14   their products actually infringe and to show what their sales

15   have been.  That comes from the files of the camera

16   manufacturers, not from Papst.

17        The only documents that was produced that I am aware of

18   that of sales summaries, and I went through all documents just

19   to check it out was I think one document and I can't tell

20   which, it doesn't list them out.  It doesn't say model A, model

21   B or C.  And it's half projected.

22        If that's what they mean by producing sales documents,

23   Your Honor, I would like to send it in to you to show you, you

24   wouldn't make heads or tails of it if you see it.  And besides,

25   they haven't produced anything based on the prosecution bar

1   issues.  They gave us nothing that was confidential except for

2   a very few minor documents.

3        Anything that had to do with the details of the device

4   that was not, that was not public, anything, they haven't given

5   us.

6        THE COURT:  Wait, wait, wait.  That's because there

7   wasn't a protective order in place.

8        MR. SCHNAYER:  I agree.

9        THE COURT:  And they were arguing as you recall that

10  your firm shouldn't even be in here and be able to see any of

11  these documents.

12       MR. SCHNAYER:  Yes, Your Honor.

13       THE COURT:  So until we got that all wrapped up they

14  weren't going to produce anything which is another one of the

15  reasons why I have to keep asking why am I looking at these old

16  pleadings that aren't up to date?  Why did nobody even update

17  these by two minutes worth of saying oh, and by the way, Judge,

18  this is where we are today.

19       MR. SCHNAYER:  Your Honor, if I can answer.

20       Your Honor, they filed this motion to strike and after

21  they filed the motion to -- we had filed the papers saying that

22  we should start fresh and catch up with everybody else;

23  otherwise, we're going to be doing this twice with everybody.

24  It's going to get very confusing.  We said let's start fresh,

25  new day, let's put everybody in line; otherwise, it's going to

1  get confusing which is what it has done now.

2          THE COURT:  No, no, stop, stop, stop.

3      No, you missed my point.  And so you missed the point.

4  And never mind, I don't need that argument.

5      All right.  So we're going to say that certain of Papst

6  requests as identified here today are going to, are going to be

7  stricken and do not need to be responded to by Casio.

8          The issue of commercial success I think that if there's

9  more information that is specific to the different models of

10  camera and I'm sure that Casio has those things, then Casio

11  must produce those.  You can't just produce commercial success

12  for Casio Digital Cameras world wide or something.  And what's

13  relevant I think is their success in the United States.

14          As a general proposition Papst has to understand that it

15  can only ask for information that a specific corporation would

16  have within its control.

17          Do you understand that?  You can't ask Casio U.S.A. for

18  something it doesn't have.

19          MR. SCHNAYER:  Yes, Your Honor.

20          THE COURT:  It has no obligation to produce something

21  it doesn't have or control.  And we're going to assume that

22  Casio Japan controls its subsidiaries in some fashion or other.

23  But there's no reason to assume that Casio U.S.A. does.

24          MR. STIMPSON:  Your Honor, may I be heard on that

25  issue?

1    THE COURT:  Yes.

2    MR. STIMPSON:  On the control by Casio Japan, first

3    of all, my first thought on that is that there's nothing in

4    these foreign countries, I think you've indicated that already

5    today, in these foreign countries and these foreign Casio

6    related countries that Papst really needs because Casio Japan

7    has the documents that's going to be able to show how the

8    cameras operate and Casio America has sales and all of these

9    other sales subsidiaries or whatever they are all over the

10   world.  I can't imagine there would be anything there that

11   Papst would really be entitled to in the first place.

12   THE COURT:  The only question I had in that regard

13   was whether or not Papst mentioned that it learned that Casio

14   sold some of these cameras I think to Pentax and that Pentax

15   was going to be selling them in the United States.  Is that

16   true?

17   MR. STIMPSON:  Casio sold models to Pentax in 2002

18   and 2004 and those dates are important because Casio Japan

19   didn't know the patent in 2002 or 2003.  And I don't think even

20   in 2004, well, no, they didn't know the patent at all then.  So

21   there's no way Casio, there's no way that Papst could possibly

22   have that could catch those cameras.

23   THE COURT:  I'm sorry, I missed that last statement.

24   There's no way what?

25   MR. STIMPSON:  There's no possible theory of

1   infringement of those cameras because I don't know what Papst

2   is thinking, they haven't articulated any theory, but even if

3   the Court were to allow them to serve things like inducement

4   and contributory infringement despite their refusal to comply

5   with Judge Robinson's order, I mean, you have to have knowledge

6   of the patents and Casio didn't have knowledge of the patents

7   at that time.

8          So there's no conceivable way that those products could

9   ever be accused of infringement that I can see.  So I just

10  can't see how anything from any of these other companies could

11  be relevant.

12         THE COURT:  Mr. Schnayer, before you get too excited

13  about that fact, what information do you have that would

14  suggest that they do have -- let me ask you first.

15         Do agree with the statement by Mr. Stimpson as a matter

16  of law that you must have knowledge of the patents and that if

17  Casio Japan can demonstrate it had no knowledge by an

18  intelligent witness who so swears or otherwise, do you agree

19  that therefore, none of that is relevant?

20         MR. SCHNAYER:  I do agree that in order to show

21  inducement you must have knowledge of patent, I do agree, that

22  is correct.  We need discovery on that issue.  It's a

23  corporation and we've asked some interrogatories and document

24  requests directed to that issue.

25         THE COURT:  Well, I know that that's a theory of

1    patent infringement.  And the question is whether you have any

2    indicia of fact that would suggest that your theory has a basis

3    in fact or whether it's a theory that is in the cross claim,

4    cross complaint but at the moment you just need full discovery

5    to find out whether it is a fact?

6         MR. SCHNAYER:  Your Honor, in approximately 2003 or

7    2004 Mr. Tasler before he got connected with Papst Licensing

8    had people to check the market place to see if there was

9    infringement of these, people wanted to license the patent.  He

10   was actually doing what's called secured licensing if you're

11   interested in this technology.

12        He had somebody look and go around to several different

13   companies and I don't recall offhand if Casio was one, but he

14   had, he sent this out to various companies, Hewlett-Packard was

15   certainly one.  And what he got back from these people were

16   yes, you know, everybody in the industry uses these patents

17   from one particular company but we're not interested in paying

18   you any money for it, go away.  And that's when they came to

19   Papst Licensing.

20        So we do have some evidence to indicate that Mr. Tasler

21   went around and it was a representative of his, went around and

22   tried to see if people were interested in this patent and sent

23   copies of the patent to various companies including a number of

24   the named parties to this lawsuit.

25        I don't recall offhand if Casio was one of those, but it

1    very well could be that they were one of them because he went

2    to a bunch of different companies trying to see if they were

3    interested in it.

4        THE COURT:  Well, you would bear the burden of proof

5    on that point, would you not?

6        MR. SCHNAYER:  Yes, but we would also have the right

7    to do discovery on the issue of whether they have any documents

8    that show that.  If they don't, if they don't have any

9    documents, I mean, they have to make a good faith search to go

10   out there to their facilities in different places to see if

11   they have that information.  If they do, then they would

12   produce it to us.

13       Yes, we ultimately would have the burden because it's

14   infringement but we would need to do discovery on the issue.

15       THE COURT:  Well, but you don't have, from the

16   description you just gave me, you don't have even a small fact

17   toyed to suggest that Casio had knowledge.

18       Now I agree with you that you're allowed to discover,

19   but you're not allowed to discover when you have no basis for

20   your claim.  If you tell me that Mr. Chancellor's agent

21   approached Casio, well then, you know, you are sort of golden,

22   but then you know who he approached and which company.

23       And that's where you start.  You don't ask everybody

24   around the world in every Casio entity.  I mean, this is the

25   problem with the way that you've approached your discovery.

1    You've made these so broad that they are totally impossible of

2    enforcement.  I just, I don't know what you expect me to do for

3    you.

4        MR. SCHNAYER:  Your Honor, I just would like to point

5    out, you know, you were looking at the document requests that

6    was against Casio.  I would say, if you look further on in the

7    exhibits you will see that there's almost an identical document

8    request against Casio Japan.  So that was also the subject of

9    this too.

10       THE COURT:  Yes.  But it's, it is almost an identical

11   and it suffers from the same flaws.  It is so overwritten, so

12   overbroad.  It is so incredibly expensive and burdensome that

13   you haven't given me anything that I can really enforce.  I

14   can't require Casio Japan to require every single Casio entity

15   to produce, this is only an example, every single letter to

16   every single customer about every single Digital Camera that's

17   ever been written about since the beginning of time.  I mean,

18   how could you possibly expect me to be able to enforce that?

19       MR. SCHNAYER:  Your Honor, we've tried to limit that

20   to the issues of the patents in suit.

21       THE COURT:  Well, yes, but then when you say what are

22   the issues in the patents in suit you tell me that they're

23   eight of them and they're eight of them that aren't yet even in

24   English.

25       I'm sorry, Mr. Schnayer, your requests are not limited.

1   They are not reasonable.  And they're not enforceable.

2       Now that doesn't mean that I'm going to let Casio Japan

3   or U.S.A. get away without reasonable responses.  Just because

4   your discovery is not reasonable does not mean that they're

5   going to be able to not respond at all.  But I can't enforce

6   things that are on their face not reasonable that violate the

7   rules of discovery.

8       MR. SCHNAYER:  May I make a suggestion, Your Honor,

9   that might save your time?

10      THE COURT:  Yes.

11      MR. SCHNAYER:  Your Honor has your views known about

12  a number of items in this case.  Maybe the parties could sit

13  down and try and work something out and see if they can come to

14  an agreement after the discussion that we've had here with you

15  here today.

16      THE COURT:  Well, I think that would be the best of

17  all possible worlds.  And I want to assure Mr. Stimpson that I

18  really mean it, that Casio U.S.A. and Casio Japan cannot give a

19  flip of their hands to what are the legitimate aspects to these

20  requests.

21      Now I'm not ruling on sanctions and everything.  I'm not

22  ruling on those right now.  I'm just trying to get a handle on

23  this because you're all swimming around in this deep water

24  getting no where.

25      MR. STIMPSON:  Your Honor, this is Scott Stimpson, I

1  fully appreciate that.  I just want to assure the Court that we

2  are not giving this just a flip of the hand.  We have many,

3  many thousands of documents that we are reviewing and producing

4  right now.

5      THE COURT:  Well, I'm glad for that.  I say go to it

6  and it's time to get it done.  So keep the presses rolling and

7  maybe you should start producing those that are ready to be

8  produced even if you're not ready to produce everything so that

9  Mr. Schnayer at least has something to keep his mind occupied.

10 He's sitting in Chicago being very concerned that he's never

11 getting anything.

12     MR. STIMPSON:  Your Honor, maybe this isn't, since

13 we're talking about the Papst discovery requests, perhaps this

14 isn't the time.  But I should also mention that since this day,

15 Mr. Schnayer will please correct me if I'm wrong, but I don't

16 think we've received any documents from Papst.  I don't think

17 we've received anything on their invention.

18     Papst withheld documents post, anything post complaint

19 for some reason they withheld all of that.  We haven't received

20 any of it.  So while we're talking about dates for production,

21 maybe it might be a good time for me to raise that.

22     THE COURT:  Yeah, because I don't want any more

23 motions to compel.

24     Mr. Schnayer?

25     MR. WHITE:  Your Honor, this is Jim White.  If I

1    could respond to that?

2              THE COURT:  Yes.

3              MR. WHITE:  With respect to the documents to be

4    produced by Papst, there's three categories of documents or two

5    categories of documents to produce as I understand it.  And

6    that would be those documents that were covered by attorney

7    client privilege work client document and some other applicable

8    privilege based upon our filing with the Judge Kessler of our

9    objections to the Magistrate's report and the recommendation.

10              It seemed to be prudent to do that and not turn over

11    those documents prior to getting a ruling on that.  So that has

12    been, those have not been produced.

13              The other category of documents that Mr. Stimpson is

14    referring to is we limited them to the complaint.  And that is

15    all of the 408 negotiations with all of the third parties that

16    dealt with licensing, et cetera, et cetera, those types of

17    settlement negotiations.  And those were withheld based upon

18    the fact that we had a situation where we had indicated to

19    Casio that those documents were confidential with respect to

20    the third parties.  And they in fact in a paper that they filed

21    conceded that point, that they were confidential.  So those

22    haven't been produced.

23              In light of Your Honor's recent scheduling order to the

24    extent they relate to damages or at least a reasonable royalty,

25    those are no longer at issue at this particular point in time

1    in any event.

2        So that would be Papst's response to that at this

3    particular point in time in light of the scheduling order and

4    the previous orders in terms of discovery.

5        THE COURT:  So it's your position that Papst doesn't

6    owe Casio any documents?

7        MR. WHITE:  Well, if Your Honor is going to rule for

8    example, on the motion that's pending before Judge Kessler and

9    said we have lost every privilege that we were ever entitled

10   to, then of course we would have to produce documents.

11       THE COURT:  No, I understand that.  But other than --

12       MR. WHITE:  Other than that, I would say given that

13   my understanding is, and Mr. Schnayer can correct me if I'm

14   wrong or Mr. Swik, that would be the case.

15       THE COURT:  So how many pieces of paper has Papst

16   produced to Casio?

17       MR. WHITE:  I don't know the answer to that and I

18   would have to defer to one of my colleagues.

19       THE COURT:  I mean, are we talking tens or hundreds?

20       MR. WHITE:  We're talking about tens of thousands.

21       THE COURT:  What were they?

22       MR. SCHNAYER:  Documents that --

23       THE COURT:  Could you just say who is speaking

24   because we can't see you.

25       MR. SCHNAYER:  Mr. Schnayer, I'm sorry.

1          THE COURT:  Oh, I didn't catch your voice this time,

2    Mr. Schnayer.  I'm sorry.

3          MR. SCHNAYER:  I am sorry, I apologize, Your Honor.

4    I was standing a little bit back from the phone.

5          We've produced documents about early developing history

6    documents to the extent that we had them.  We produced a number

7    of documents.  The, before the case was, before the case was

8    filed we produced documents concerning negotiations.  Nothing

9    afterwards.

10          THE COURT:  And why no documents afterwards?

11          MR. SCHNAYER:  I'm sorry, Your Honor?

12          THE COURT:  Why no documents afterwards?

13          MR. SCHNAYER:  Because those are extremely highly

14    confidential and we had an agreement, I think Mr. White

15    mentioned, that anything that was confidential and subject to

16    the protective order and we can read to you the portion where

17    they agreed to it, then those documents were withheld until we

18    got a ruling on the protective order issue.

19          We produced documents to the file history.  We produced

20    all of the prior art we were aware of.  We produced any kind of

21    manuals that we had that related to their products.  We were

22    able to obtain data sheets and things like that.  There were a

23    number of different documents produced that would be relevant

24    to what we do have of their products.

25          THE COURT:  What about what's the impact of the

1  protective order on the confidential documents?

2        MR. SCHNAYER:  Well, first of all, the documents

3  number one relate to the issue of, relate to the issue of

4  damages.  To the extent that it relates to the issue of damages

5  they don't have to be produced.

6        We've given them all of prior art documents we've been

7  able to find.  Anything that relates to the prior art issues

8  we've produced them and to the extent we haven't produced them

9  we're going to update them and give them whatever we have.  But

10 we've given them tens of thousands of documents.  It's been a

11 pretty significant collection.

12        THE COURT:  What about documents that would exist

13 that were part of the negotiations leading up to the

14 settlements with other parties, would not those documents

15 discuss the particulars of the patent in suit and how they

16 related to the cameras of other manufacturers?  Would not those

17 documents be relevant even if confidential?

18        MR. SCHNAYER:  Some of the documents would discuss

19 how they operated, but they never really got into, nobody ever

20 really gave us any information on their cameras.  Everybody,

21 nobody wanted to including Casio wanted to give us much

22 information on anything.

23        THE COURT:  So Papst was able to walk up to camera

24 manufacturer X and say we think that your camera infringes our

25 patent and have camera manufacturer X say we disagree, but

1  we'll sign a royalty agreement because we don't want to show

2  you our secret information?

3  　　　　MR. SCHNAYER:  No.  Your Honor, they really never

4  showed us confidential information like that.

5  　　　What they did was they argued more that there was

6  discussions about their claim language and things of that

7  nature.

8  　　　　THE COURT:  Right and isn't that relevant?  It's not

9  privileged, isn't that relevant and not confidential?

10  　　　　MR. SCHNAYER:  The problem with the information that

11  we're concerned about is to the extent that this related to any

12  prior art, we certainly produced any of that prior art to

13  everybody.

14  　　　My concern is this that we're, to the extent that they

15  want to get into one party wants to find out what the other

16  party did about licensing, the general licensing issues and the

17  conditions of licensing, we don't think it's fair that they

18  should be allowed to get that information and then use one

19  licensing negotiation against us to argue, you know, hey, why

20  did you offer them this deal or why did you offer them this

21  deal?

22  　　　Those are really highly significant from the standpoint

23  of giving them in the negotiations unreasonable our

24  negotiations from one party to the next, everybody wants to

25  maintain those highly confidential.

1       THE COURT: I can understand that. And I understand

2   that in a certain sense given the business that Papst is in

3   enforcing patents instead of products that would be sort of the

4   crown jewels as to how you negotiated these things. But you

5   haven't come, you asked for a protective order. The protective

6   order is in place. It requires Casio to reveal innards, the

7   other manufacturers to reveal things about the innards of their

8   camera that they think are their crown jewels and now this is

9   the business Papst is in and isn't it relevant to how you

10  enforce the patents and what you really think they mean?

11      MR. SCHNAYER: Your Honor, this is Rule 408. And in

12  fact, in the District of Columbia there's case authority that

13  says this may be privileged and not producible. There are some

14  jurisdictions that indicate that 408 material should not even

15  be produced concerning negotiations.

16      On the other hand, the Court in Washington, the only

17  case that I'm aware of that deals with that issue says we're

18  not ruling on that issue whether it's privileged or not.

19      We intended to raise this issue with the parties to

20  discuss it with them and see if there's some way we can work

21  this out where we can reach a solution that they can accept and

22  we can accept also.

23      THE COURT: Well, I really think you should because

24  it seems to me that at best you might be able to redact some

25  documents so that the specific financial terms of your royalty

54

1    agreements and the financial terms as the negotiations

2    proceeded would not be revealed.  That's really what the crown

3    jewels are all about.

4         But a position that Papst has taken in the past as to

5    the meaning and the scope and the rights that its patents give

6    it, those positions are relevant if you have any writings that

7    speak to that.  And if you've written them to somebody whose an

8    opposing counsel, it's not written to your clients and it's not

9    giving legal advice, it's advocacy.

10        MR. SCHNAYER:  I understand, Your Honor.  And what we

11   will try to do if it's okay with Your Honor is work that out

12   with the other side and there's a number of issues that we

13   really need to address and what we intended to try to set up a

14   conference with everybody to deal with these and a number of

15   other issues.

16        THE COURT:  Okay.  So why don't we do this.  Of

17   course my courtroom deputy has stepped out so I can't do this

18   now.

19        But what we'll do is send you guys back to, back to talk

20   to each other informed if you will by this conversation.  I

21   really need you to start working amicably to resolve these

22   issues.

23        I am more than happy to get involved in the middle and

24   if you can't, I will.  To the extent you can, that's great.  I

25   have as I think I told you other lawsuits where people are just

1    frantic and they can't agree and so we spend a lot of time

2    together.  And I can do that here as well.

3          But you've both started from positions that this is

4    going to be the traditional throw the kitchen sink at each

5    other and we're not going to do that anymore.

6          So what we need is maybe do you think six weeks would be

7    enough time for you to work things out and just sort of have a

8    status call?

9          MR. STIMPSON:  This is Scott Stimpson.

10         That's fine, Your Honor, and if there's time I would

11   like to very briefly respond to a couple of points they made

12   about the document production.

13         THE COURT:  Yes, you can but hold on.

14         Is six weeks sufficient time for you, Mr. Schnayer?

15         MR. SCHNAYER:  Six weeks, I think we have a

16   conference set for June.

17         THE DEPUTY CLERK:  You do.

18         MR. SCHNAYER:  June 5th.

19         THE COURT:  That's a conference with everybody.

20         MR. SCHNAYER:  Okay, I'm sorry.

21         THE COURT:  I'm just talking about a conference with

22   this group of people to address the issues that we've had under

23   discussion today to see if the discovery from Casio has

24   actually arrived, et cetera, et cetera, to see if Papst and

25   then Casio have been able to work out issues concerning the

1  productions because I just, I think the only way that we're

2  going to do this is to have you folks talk to each other and

3  make sense together.

4       If six weeks is when we have our next large conference

5  then let's set this for a little closer in.  That was early

6  June?

7            MR. SCHNAYER:  I think it was June 5th.

8            THE COURT:  June 5th.  So can we back up to before

9  Memorial Day which is I think the last weekend in May and see

10  if there's a time that prior week?

11            THE DEPUTY CLERK:  The week of May 27, Memorial Day

12  is the 26th.

13            THE COURT:  Memorial Day is on the 26th.  How do your

14  days in the week of May 27 look?

15       I'm trying to give you time but I don't want to take

16  time on the day when everybody is gathered.

17            MR. SCHNAYER:  Your Honor, as I told you before I

18  have to be in Germany for a wedding.  I think if it would be

19  the 29th or the 30th, that would work for me.  I'm just part of

20  the wedding festivities, and extend that for a few weeks.

21            THE COURT:  No, I can't do that.

22            THE DEPUTY CLERK:  What if we did it early the week

23  before?

24            THE COURT:  Mr. Schnayer, when do you leave?

25            MR. SCHNAYER:  Right now my wife and daughter are

1  coming out with me.  We leave on the 22nd.

2          THE COURT:  Okay.  So we need to do something before

3  the 22nd.  So look back to the 19th.  I don't know what day of

4  the week that is.

5          MR. SCHNAYER:  Monday, Your Honor.

6          THE COURT:  Will you be in your office on Monday the

7  19th?

8          MR. SCHNAYER:  Yes, I will be.

9          THE COURT:  What am I doing on Monday, the 19th?

10         THE DEPUTY CLERK:  You're available all afternoon.

11         THE COURT:  I'm available in the afternoon.  Can you

12  gentlemen pick a time when Mr. Schnayer and Mr. White at least

13  can be representing Papst and Mr. Stimpson and whomever else he

14  chooses for Casio?

15         MR. STIMPSON:  That's fine, Your Honor.  We can pick

16  one now, I'm free the entire day.

17         MR. SCHNAYER:  This is Mr. Schnayer.  If we can have

18  it maybe 3 o'clock, your time, Eastern time, we can do it, it

19  will be 2 o'clock Chicago time?

20         THE COURT:  Can I make it 2:30 because 3 o'clock gets

21  pushed into something else.  So 2:30 we should be able to do

22  it.

23      What's the date?

24         THE DEPUTY CLERK:  May 19th.

25         MR. SCHNAYER:  Is that 2:30 Eastern time?

1          THE COURT:  Yes, that's 2:30 Eastern time so that's

2  1:30 your time, it rushes your lunch.

3          MR. SCHNAYER:  That's fine.  We'll have a meeting

4  we'll work around.  I'm sorry, Your Honor, we'll deal with it.

5          THE COURT:  Okay, so let's take a deep breath.  We'll

6  step back.

7      You guys talk to each other about this set of issues, do

8  some of the discovery, the bifurcation and stuff that's outside

9  of the United States and other things as we discussed here.

10          And I will continue and finally rule on the motions

11  for sanctions and what amounts to a question of enforcing Judge

12  Robinson's order.  I'm treating Casio's -- I'm sorry -- Papst

13  filing as a motion to the judge to consider the Magistrate

14  Judge's ruling, right, sort of like an appeal?

15          MR. SCHNAYER:  Yes, Your Honor.  No objection.

16          THE COURT:  Alrighty.  Thank you.

17          MR. STIMPSON:  Your Honor --

18          THE COURT:  I'm sorry, I promised you you could talk,

19  Mr. Stimpson, and then I cut you off.

20          MR. STIMPSON:  I hate to have everybody walk out of

21  the room and suddenly I stop, I'm sorry.  But just very briefly

22  on the Papst document request.

23          THE COURT:  Yes.

24          MR. STIMPSON:  On all of these negotiations they have

25  had with other people and they have cut them off at the filing

1    date of the complaint, they're saying because they're

2    confidential, they're saying, you know, Mr. Schnayer says it's

3    not fair for them to get this and he's got 408 objections.

4        I mean, I know that's an order that's still pending

5    before you, Your Honor. But all Magistrate Judge Robinson

6    ordered them to provide a complete response so that they waive

7    those objections. I have seen those documents. I have not

8    seen any real confidentiality agreements.

9        In fact, some of these companies said no way, we're not

10   keeping this confidential. Papst would say at the end of their

11   first letter by the way, we consider this all confidential. I

12   think that's what Mr. Schnayer is referring to, to hold all of

13   this stuff back.

14       We haven't received that I know of anything on the

15   invention, anything on the inventor. Mr. Schnayer was very

16   careful to say that he gave it to us to the extent that he had

17   them so apparently we are not getting anything from the

18   inventor. So, I mean, we can raise these issues later if you

19   like.

20       THE COURT:  No, don't raise them later.

21       Mr. Schnayer, we already talked about the inventor.

22   Papst is deemed to control the inventor. He is required to

23   work with you. You have to get stuff from the inventor, you

24   cannot hide behind the fact that he is not Papst.

25       MR. STIMPSON:  And the rest of it I guess, Your

1   Honor, we can just wait and see how the other motions come out.

2           THE COURT:  Okay.

3           MR. STIMPSON:  Thank you very much.

4           THE COURT:  Mr. Schnayer, are you still there?

5           MR. SCHNAYER:  Yes, I am, Your Honor.

6           THE COURT:  Okay, I just want to make sure.

7           MR. SCHNAYER:  I was here, Your Honor.

8           THE COURT:  All right.  We'll talk to you later.

9                           -oOo-

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

1    I certify that the foregoing is a true and correct
2    transcript, to the best of my ability, of the above pages, of
3    the stenographic notes provided to me by the United States
4    District Court, of the proceedings taken on the date and time
5    previously stated in the above matter.

6    I further certify that I am neither counsel for, related
7    to, nor employed by any of the parties to the action in which
8    this hearing was taken, and further that I am not financially
9    nor otherwise interested in the outcome of the action.

Crystal M. Pilgrim, RPR

5/2/08
Date