## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN RE PAPST LICENSING GMBH & CO. KG LITIGATION** _____ **This Document Relates To:** **Casio, No. 06-cv-1751** | **Misc. Action No. 07-493 (RMC) MDL Docket No. 1880** |

### CASIO'S OPPOSITION TO PAPST'S MOTION FOR CLARIFICATION CONCERNING THE SCOPE OF WAIVER

The Court Orders that Papst provide "complete" responses to the Casio discovery requests, and that Papst has waived all privilege and work product protections, need no clarification. They are perfectly clear that Papst must provide responses to the full scope of the Casio discovery requests, and that Papst may not make any privilege or work product objections. Papst's motion is, in reality, a motion for reconsideration and so should face the high requirements of such a motion.

In all the briefing and arguments that have been had on these issues, Papst never requested the carve-outs it does now, and should be precluded from raising these new issues at this very late date. Indeed, it has only raised one of its three issues before (the issue of whether it would need to produce documents to the other manufacturers), and in that instance argued a different position to Judge Collyer, that "a decision in the Casio lawsuit requiring Papst to produce, for example, otherwise privileged documents in that case <u>would likely have the prejudicial consequence of compelling Papst to produce the same documents in the other five MDL cases</u>." Dkt. #4 at 7 (emphasis added).

1

None of Papst's newly-minted carve-out requests are remotely consistent with the Orders of this Court, and none are supported in the case law.

## I.    **PAPST SEEKS RECONSIDERATION**

The Papst motion is, in reality, a request for reconsideration. Motions for reconsideration are only granted when the moving party presents new facts or a clear error of law which compel a change in the Court's ruling. See Judge Kessler's 5/14/07 Scheduling Order, 1:06-cv-01751-RMC-DAR, Dkt #34, at ¶14, *citing New York v. United States*, 880 F. Supp. 37 (D.D.C. 1995).

Moreover, Papst should have made these new arguments seeking privilege waiver limitations in its previous briefings and in the Court hearings, but it never did so. Papst's new arguments, therefore, should be precluded because a motion to reconsider is not "a vehicle for presenting theories or arguments that could have been advanced earlier." *Jones v. Bernanke*, 538 F. Supp. 2d 53, 60 (D.D.C. 2008).

## II.    **PAPST CONTINUES TO VIOLATE THE COURT'S ORDERS**

In an apparent attempt to convince the Court that it has been a model citizen since the Order of Magistrate Judge Robinson, at pages 2-3 of its Memorandum, Papst points to a variety of things it has done in discovery over the past year. But the reality is that the discovery responses that Papst identifies demonstrate its continuing violations of the Court's Orders. In fact, Papst's continuing refusals to abide by Court Orders reached such a level now that Casio is filing a motion for default judgment and dismissal.

For example, despite repeated Court Orders, Papst's recent supplemental response to Casio's Interrogatory No. 1 still lacks claim interpretations. The "interpretation" headings each term had in the prior Papst response now have been eliminated entirely, and there are no definitions provided anywhere in the response. Instead, Papst does the same thing it did in

response to Magistrate Judge Robinson's Order – stating an example or two of what Papst believes falls within the term at issue, but refusing to commit to any interpretations.  Ex. A, s*ee, e.g.,* page 66 ("Input/output devices customary in a host device <u>include, for example</u> . . . ."; emphasis added, and confidential pages removed).  Judge Collyer's April 24, 2008 Order for Papst's claim interpretations (Dkt. #77, paragraph 6(k) was the <u>third</u> Court Order that should have resulted in Papst providing claim interpretations, and is the third Court Order Papst has ignored.

As another example, Magistrate Judge Robinson ordered Papst to produce all its documents in response to the Casio document requests, without objections, within ten calendar days of her May 31, 2007 Order, which would have been on June 10, 2007.  (1:06-cv-01751-RMC-DAR, Dkt. # 36, page 27).  Papst objected to Magistrate Judge Robinson's Order, but only to the part of her Order that held Papst to have waived objections of relevance, confidentiality and privilege.  Indeed, during the April 22, 2008 hearing, counsel for Papst represented to the Court and Casio that the only documents Papst was withholding fell into two categories:  1) privilege and work product; and 2) third party confidential documents.  Ex. B, page 48-49.  Despite these representations, Papst's recent document production includes many non-confidential documents such as prior art, information disclosure statements, documents surrounding the alleged invention, prototypes, and documents relating to Casio products.  These documents should have been produced almost a year ago following Magistrate Judge Robinson's Order, but instead they were inexcusably withheld for the past eleven months.  Moreover, Papst still has not completed its document production.  Thus, even to this date, Papst continues to refuse to comply with Magistrate Judge Robinson's Order requiring the production, and Casio and the Court do not know what else Papst is continuing to withhold.

For these reasons, Papst's argument that the important public policies to protect privilege "should not be overshadowed by a sanction for conduct that occurred early in the case and has since been remedied" should be rejected. Even if the Papst misconduct stopped early in the case, the sanction would still be justified as there is also a public interest in punishing and deterring litigation abuse. *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 763-64 (1980) ("Rule 37 sanctions must be applied diligently both to penalize those whose conduct may be deemed to warrant such a sanction, and to deter those who might be tempted to such conduct in the absence of such a deterrent"), citing *Nat'l Hockey League v. Metro. Hockey Club*, 427 U.S. 639 (1976). And this Court has already held that the sanction at issue "is not too harsh a sanction" because Papst's conduct was "entirely unjustified and inexcusable and smacks of bad faith" (Dkt. #82, page 8).

## III.   PRIVILEGE WAIVER SHOULD NOT BE LIMITED TO CASIO PRODUCTS

Casio's discovery requests were not limited to inquiries on Casio's products only, and the Court has ordered complete responses to them all. As examples, Casio's Document Request 5 sought documents generally on the potential infringement of the patents (not limited to Casio), and Request 12 sought documents on all allegations of infringement made by Papst. Ex. C. It is, therefore, clear that a complete response to these document requests, as ordered by the Court, should include all materials relating to Papst's infringement contentions on any potential infringer, including Casio and others.

Papst's documents on other companies would be very relevant even if the products of the other companies were quite different, because Papst would be making representations about the scope of the patents themselves. In this case, however, they are extremely relevant because Papst sees virtually no differences in the cameras of the various manufacturers. Papst's latest

discovery response, for example, draws no distinction between the cameras of any of the manufacturers – lumping them all together as if they were identical products in Papst's eyes. Ex. A at 4-63. Thus, Papst's documents and information relating to the other manufacturers are very relevant to the Casio infringement allegations. *See Conopco, Inc. v. Warner-Lambert Co*., No. Civ. A. 99-101(KSH), 2000 WL 342872, at *6 (D.N.J. Jan. 26, 2000) ("[D]ocuments relating to the patentee's licensing efforts were relevant to infringement as possibly containing admissions against interest as to the patentee's interpretation of the claims"), *citing Components, Inc. v. Western Elec. Co*., 52 F.R.D. 379 (D.Me. 1971); *see also Schenectady Chemicals, Inc. v. General Electric Co.*, 185 U.S.P.Q. 276, 277 (N.D.N.Y. 1975) (holding that licensing negotiations with other companies are relevant and thus discoverable in assessing the limits of the patent claims).

Therefore, Papst should produce all materials relating to Papst's infringement contentions on any potential infringer.

## IV.    THERE SHOULD NOT BE A TIME LIMIT TO PRIVILEGE WAIVER

Papst's request that privilege waiver be limited to materials that existed as of May 31, 2007 should be denied because "[o]nce a waiver has occurred, 'it is inappropriate to limit waiver on a temporal basis.'" *Bd. of Trs. of the Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc*., 237 F.R.D. 618, 627 (N.D. Cal. 2006), quoting *McCormick-Morgan, Inc. v. Teledyne Indus., Inc*., 765 F. Supp. 611, 613-14 (N.D. Cal. 1991). This is because privilege waiver is a subject waiver, and the waiver should extend to materials relating to the same subject regardless of the time the waiver occurred. *See, e.g., Leland Stanford,* 237 F.R.D. at 628 (holding that the temporal scope of the privilege waiver on the subject matter of inventorship extends from initial contact between inventors and attorney until later documents and communications that directly

cover the issue of inventorship, even though they might post-date the issuance of the patents); *see also Starsight Telecast, Inc. v. Gemstar Development Corp.,* 158 F.R.D. 650, 655 n.5 (N.D. Cal. 1994) (holding that a waiver of attorney-client privilege can extend to documents and communications that post-date the issuance of a patent because they fall within the scope of subject matter waiver).

Papst's "temporal limitation" proposal is also completely arbitrary, and attempts to circumvent the fact that it has a continuing duty to respond to discovery requests. See Fed. R. Civ. P. 26(e)(1) ("[a] party who … has responded to an interrogatory, request for production, or request for admission--should supplement or correct its disclosure or response"). The privileged materials Papst was ordered to produce may include, for example, highly relevant information relating to Papst's infringement positions on the patents-in-suit – an issue that should evolve throughout the case. Setting a temporal limitation on the disclosure of privileged materials would allow Papst to avoid its discovery duties and shield damaging materials created after the proposed date – thereby imposing upon Casio a prejudice not permitted under the principle of fairness. *See Smith v. Alyeska Pipeline Service Co.*, 538 F. Supp. 977, 979 (D. Del. 1982), *judgment aff'd*, 758 F.2d 668 (Fed. Cir. 1984) ("It would be unfair to allow a client to assert the attorney-client privilege and prevent disclosure of damaging communications while allowing the client to disclose other selected communications solely for self-serving purposes").

The *Ronald Katz Tech. Licensing* case cited by Papst does not support Papst's argument. In fact, the reason for the *Ronald Katz* Court to impose temporal limitation is because waiver was related to conception dates and "the issue of the conception date of an invention … is constrained to the time period prior to the filing of the application." *Ronald Katz Technology Licensing, L.P. v. AT&T Corp.*, 191 F.R.D. 433, 441 (E.D. Pa. 2000). Because Papst was

ordered to waive privilege on subject matters which evolve through out the case, the *Ronald Katz* Court's decision does not apply to Papst's case.[1]

Papst's argument based on the *Hickman* case should also be rejected. This is because although, as indicated by the *Hickman* case, the consequences of privilege waiver may be severe, these consequences are justified by Papst's continued failure to following the Court's orders. *See Marx v. Kelly, Hart & Hallman, P.C.*, 929 F.2d 8, 12-13 (1st Cir. 1991) (affirming waiver of privilege and dismissal based on plaintiff's failure to comply with discovery requests and court order); *see also Applied Sys., Inc. v. N. Ins. Co. of N.Y.*, No. 97-C-1565, 1997 WL 639235, at *2-3 (N.D. Ill. Oct 7, 1997) (affirming privilege waiver in view of plaintiff's "flagrant violation of its discovery responsibilities").

## V.    PRODUCTION TO OTHER MDL PARTIES

Papst blows hot and cold with regard to production of these documents to the other manufacturers. Papst already represented to the Court that waiver would likely result in production to the other manufacturers. See 1:07-mc-00493-RMC Dkt. #4 at 7 ("a decision in the Casio lawsuit requiring Papst to produce, for example, otherwise privileged documents in that case would likely have the prejudicial consequence of compelling Papst to produce the same documents in the other five MDL cases").

Papst's request that privileged materials should not be produced to other MDL parties should also be rejected because this type of "selective waiver" has been consistently rejected by the Court. *See Permian Corp. v. United States*, 665 F.2d 1214, 1221 (D.C. Cir. 1981) ("The client cannot be permitted to pick and chose among his opponents, waiving the privilege for some and resurrecting the claim of confidentiality to obstruct others, or to invoke the privilege as

---

[1]    If a temporal limitation was appropriate (and it certainly is not), then May 31, 2007 would not be the right date. Even as of today, Papst has not complied with Magistrate Judge Robinson's Order. Casio is still waiting for the documents to be produced and Papst still has not properly responded to the interrogatories.

to communications whose confidentiality he has already comprised for his own benefit"); *see also Navajo Nation v. Peabody Holding Co., Inc*., 209 F. Supp. 2d 269, 285 (D.D.C. 2002) ( "[A] consistent policy consideration that runs throughout the D.C. Circuit cases is the sense that parties should not be permitted to disclose documents for tactical purposes in one context, and then claim attorney-client privilege in another context").

The bottom line is that the privileges have been waived, and so Papst no longer has them, in this case or any other.  *United States v. United Shoe Machinery Corp.*, 89 F. Supp. 357, 358-59 (D. Mass. 1950) ("The privilege applies only if … the privilege has been (a) claimed and (b) not waived by the client").

## III.    <u>CONCLUSION</u>

For all the foregoing reasons, we respectfully request that the Court deny the Papst Motion for Clarification, and rule that there should be no limitation on Papst's privilege waiver.

Respectfully submitted,

DATED:  May 22, 2008          <u>/s/ J. Kevin Fee          </u>
                              J. Kevin Fee (D.C. Bar No. 494016)
                              Morgan, Lewis & Bockius, LLP
                              1111 Pennsylvania Avenue, NW
                              Washington, D.C. 20004
                              Tel.: (202) 739-3000
                              Fax: (202) 739-3001

                              Scott D. Stimpson (pro hac vice)
                              The Law Office of Scott D. Stimpson
                              Suite 1102
                              445 Hamilton Avenue
                              White Plains, New York 10601
                              Tel: (203) 258-8412

                              Attorneys for Plaintiff and Counter- Defendant Casio
                              America Inc. and Counter-Defendant Casio Computer
                              Co., Ltd.

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN RE PAPST LICENSING GMBH & CO. KG LITIGATION** | |
| _____ | **Misc. Action No. 07-493 (RMC)** |
| **This Document Relates To:** | **MDL Docket No. 1880** |
| **Casio, No. 06-cv-1751** | |

## [PROPOSED] ORDER

Upon consideration of the motion of Papst Licensing GMBH & Co. KG ("Papst") for clarification concerning the scope of waiver, it is hereby

**ORDERED**, that Papst's motion for clarification concerning the scope of waiver is **denied**, and

**IT IS HEREBY ORDERED** that

1.  The Privileged Materials that Papst produces in response to Casio's initial discovery requests shall <u>not</u> be limited to materials that relate solely to Casio's products;

2.  There shall be <u>no</u> temporal limitation on the Privileged Materials that Papst produces in response to Casio's initial discovery; and

3.  The Privileged Materials that Papst produces in response to Casio's initial discovery requests shall be disclosed to Casio <u>and all other parties to this MDL proceeding</u>.

DATED:_____                    _____
                                               Rosemary M. Collyer
                                               United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE PAPST LICENSING GMBH & CO.
KG LITIGATION

_____

This Document Relates To:

Casio, No. 06-cv-1751

Misc. Action No. 07-493 (RMC)
MDL Docket No. 1880

DECLARATION OF J. KEVIN FEE, ESQ.

I, J. Kevin Fee, hereby declare as follows:

1.    I am a partner at the law firm of Morgan, Lewis & Bockius LLP in the Washington D.C. Office located at 1111 Pennsylvania Avenue, NW, Washington, D.C. 20004.

2.    I have been admitted to practice law in the District of Columbia since 2005. I am further admitted to practice law in the states of New York and Pennsylvania.

3.    Attached hereto as Exhibit A is a redacted true and correct copy of Papst Licensing GMBH & Co. KG's Second Supplemental Answers to Casio Inc.'s First Set of Interrogatories (Nos. 1, 3, 4, 5 and 6), served on May 9, 2008.

4.    Attached hereto as Exhibit B is a true and correct copy of the transcript of the April 22, 2008 teleconference before Judge Collyer.

5.    Attached hereto as Exhibit C is a true and correct copy of Plaintiff Casio, Inc's First Set of Requests for the Production of Documents and Things (Nos. 1-21).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  May 22, 2008                    By: _J. Kevin Fee. kx.M_
                                                    J. Kevin Fee

1-NY/2316991.1

EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE PAPST LICENSING GMBH & CO. KG LITIGATION | Misc. Action No. 07-493 (RMC) |
| This Document Relates To: *Casio v. Papst, No. 06-cv-1751* | MDL Docket No. 1880 |

**\*\*\* *CONTAINS HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY INFORMATION UNDER THE PROTECTIVE ORDER*\*\*\***

**PAPST LICENSING GMBH & CO. KG'S SECOND SUPPLEMENTAL ANSWERS TO CASIO INC.'S FIRST SET OF INTERROGATORIES (NOS. 1, 3, 4, 5 and 6)**

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Papst Licensing GmbH & Co. KG ("Papst"), supplements its answers to Casio Inc.'s ("Defendant" or "Camera Manufacturer") First Set of Interrogatories as follows:

## PRELIMINARY STATEMENTS AND GENERAL OBJECTION

1.    These answers are a supplement to Papst's Answers to Casio Inc.'s First Set of Interrogatories served on May 30, 2007, and Papst Licensing's Supplemental Answers to Casio's First Set of Interrogatories served on June 11, 2007.

2.    Papst has not completed its investigation of the facts relating to this action. Accordingly, with respect to all of the Interrogatories, Papst reserves the right to amend and/or supplement its responses, if necessary, with additional information based upon further investigation and discovery, and to rely upon such information in the course of this action and at trial.

3.    In those instances where the responses to Casio Inc.'s interrogatories can be derived from the business records of Papst or from an examination, audit or inspection

of such business records, and the burden of deriving or ascertaining the answer is

substantially the same for Casio Inc. and Papst,  Papst will specify the records from

which an answer may be ascertained and afford Casio Inc.'s counsel a reasonable

opportunity to audit, inspect and copy such records or provide categorized copies of such

records in accordance with Federal Rule of Civil Procedure 33(d).

      4.     In accordance with Judge Collyer's Order dated May 6, 2008, Papst

objects to these interrogatories to the extent that they seek information not relevant to this

action.

## ANSWERS TO INTERROGATORIES

INTERROGATORY NO. 1

      Separately with respect to each claim of the patents-in-suit asserted by Papst to be
infringed (directly or indirectly), and for each accused product, state in full and complete
detail the bases for such charge of infringement including, but not limited to, how Papst
contends that each element of each such claim should be interpreted and provide a
detailed element-by-element comparison for each claim with each such product
(identifying where in each accused product each element is allegedly found, or otherwise
specifically identifying which feature of each accused product is alleged to meet each
claim element).   For each element allegedly met under the doctrine of equivalents,
specifically state all reasons why Papst contends the element in the accused product is
insubstantially different.

ANSWER:

      Subject to the Preliminary Statements and General Objection above which are

incorporated herein, Papst first notes that this interrogatory seeks information and

responses inconsistent with the dates set in the Second Practice and Procedure Order,

Docket No. 36 (April 8, 2008) ("Order").  In the Order, at Paragraph 17, the Court orders

that: "Papst shall file its asserted claims and infringement contentions no later than May

28, 2008."  Papst reserves the right to present its asserted claims and infringement

contentions at the time specified by the Order.  Also, Papst reserves the right to amend or supplement the present response as the parties comply with the disclosure, briefing, and hearing schedule concerning claim construction as set forth in the Order.  Papst further reserves the right to amend or supplement the present response after such time as the Court provides any rulings concerning the scope of the claims of the patents-in-suit.

Papst also notes that Papst served <u>Papst Licensing GmbH & Co. KG's First Joint Set Of Interrogatories To Defendants</u> on the Camera Manufacturers on April 9, 2008. These interrogatories seek, among other things, information concerning USB descriptors and information regarding which SCSI Block Commands and which PTP Commands are supported by each device.  Such information is relevant to the present responses.  Papst does not expect responses from Camera Manufacturers, however, until after service of this interrogatory response.  Papst just received over 60,000 pages of documents from Casio one day before the service of these answers, but Papst has not had an opportunity to review those documents yet and notes that many of the Casio documents are in Japanese.  Nevertheless, Papst provides its responses below based on currently available information.  Papst reserves the right to amend or supplement this response after it receives and evaluates any additional information as may become known as discovery progresses in this case.

Concerning the request to "state in full and complete detail the bases for such charge of infringement," Papst notes that, at the time of service of these answers, Papst has not had an opportunity to receive sufficient discovery from the Defendants concerning the individual models that the Defendants have made and/or sold, or the geographical locations of such manufacturing and sales.  Nevertheless,  and subject to

further discovery in this case, according to Papst's best understanding at this time,

devices which are believed to be configurable to operate as USB Mass Storage mode

("Mass Storage Class Digital Cameras," or "MSC Digital Cameras") and digital cameras

configured to operate in PTP mode ("PTP Digital Cameras') include at least the

following:

| Camera Brand | Device Model |
|---|---|
| Casio | EXILIM EX-V7 |
| | EXILIM EX-Z110 |
| | EXILIM EX-Z60 |
| | EXILIM EX-Z1050 |
| | EXILIM EX-Z75 |
| | EXILIM EX-S600 |
| | EXILIM EX-Z700 |
| | EXILIM EX-Z1000 |
| | EXILIM Pro EX-P700 |
| | EXILIM EX-Z600 |
| | EXILIM EX-S500 |
| | EXILIM EX-S770 |
| Fujifilm | FINE PIX F10 |
| | FINE PIX F650 |
| | FINEPIX S9100 |
| | FINE PIX A700 |
| | FINE PIX S5600 |
| | FINE PIX E900 |
| | FINE PIX V10 |
| HP | PHOTOSMART R827 |
| | PHOTOSMART R817 |

| Camera Brand | Device Model |
|---|---|
|  | PHOTOSMART M425 |
|  | PHOTOSMART M527 |
|  | PHOTOSMART E427 |
|  | PHOTOSMART R927 |
|  | PHOTOSMART R725 |
|  | PHOTOSMART M627 |
| JVC | GZ-MG67E |
|  | GZ-MG505E |
|  | GZ-MG20E |
| Olympus | STYLUS 760 |
|  | STYLUS 730 |
|  | EVOLT E-410 |
|  | FE-250 |
|  | SP-510UZ |
|  | Stylus 1000 |
|  | FE-190 |
|  | E-500 |
|  | STYLUS 710 |
|  | FE 120 |
|  | SP-500UZ |
|  | mju Digital 600 |
|  | Stylus 720 SW |
| Panasonic | DMC-LZ5 EG |
|  | DMC-LX1 |
|  | DMC-L1K |
|  | PV-GS320 |
|  | HDC-SD1 |

| Camera Brand | Device Model |
|---|---|
| | VDR-D230 |
| | DMC-FX07 |
| | DMC-FX01 |
| | DMC-FX8 EG |
| | DMC-TZ1 EG |
| | DMC-FZ7 EG |
| | DMC-LZ3 |
| Samsung | Digimax L55W |

Subject to the above Preliminary Statements and General Objection and subject to further discovery in this case, according to Papst's best understanding at this time, devices which are believed to be configurable to operate at least as MSC Digital Cameras include:

| Camera Brand | Model |
|---|---|
| JVC | GZ-MG155U |
| Olympus | FE110 |
| | Camedia C 4000 |
| | Camedia C 370 |
| | FE-170 |
| Samsung | SGH-D900i |
| | SGH-D820 |
| | Digimax V700 |
| | Digimax I5 |
| | Digimax A55W |
| | Digimax A40 |
| | NV10 |

| Camera Brand | Model |
|---|---|
| | Digimax S800 |
| | Digimax L85 |
| | PRO815 |

Subject to the above Preliminary Statements and General Objection and subject to further discovery in this case, according to Papst's best understanding at this time, devices which are believed to be configurable to operate at least as PTP Digital Cameras include:

| Camera Brand | Model |
|---|---|
| Fujifilm | FINEPIX A800 |
| | FINEPIX F40FD |
| | FINEPIX Z5FD |
| | FINEPIX S700 |
| | FINEPIX S5 PRO |
| | FINE PIX F31FD |
| | FINE PIX  S6000FD |
| | FINE PIX F20 |

Subject to the above Preliminary Statements and General Objection and subject to further discovery in this case, according to Papst's best understanding at this time, devices identified in the following table are likely to be found to be configurable as a MSC Digital Camera, as a PTP Digital Camera, or both, after additional discovery or investigation:

| Camera Brand | Model |
|---|---|

| Camera Brand | Model |
|---|---|
| Casio | EXILIM EX-Z80 |
| | EXILIM EX-Z1200 |
| | EXILIM EX-Z120 |
| | EXILIM EX-Z50 |
| | EXILIM EX-S100 |
| | QV-R62 |
| | EXILIM EX-P505 |
| | EXILIM EX-Z750 |
| | EXILIM EX-Z57 |
| | EXILIM EX-Z55 |
| | EXILIM EX-Z500 |
| | EXILIM EX-Z200 |
| | EXILIM EX-Z850 |
| | EXILIM EX-Z1080 |
| | EXILIM EX-V8 |
| | EXILIM EX-Z100 |
| | EXILIM EX-Z9 |
| | QV-R4 |
| | QV-R52 |
| | QV-5700 |
| | QV-R3 |
| | EXILIM EX-S10 |
| | QV-R61 |
| | GV-20 |
| | EXILIM EX-S2 |
| | EXILIM EX-M2 |
| | EXILIM EX-Z3 |

| Camera Brand | Model |
| --- | --- |
| | EXILIM EX-S3 |
| | EXILIM EX-Z40 |
| | EXILIM EX-Z4/EX-Z4U |
| | EXILIM EX-S20U |
| | EXILIM EX-M20U |
| | EXILIM EX-P600 |
| | QV-R40 |
| | Exilim EX-Z30 |
| | QV-R51 |
| | EXILIM EX-Z70 |
| Fujifilm | FINEPIX E 550 |
| | FINEPIX J10 |
| | FinePix F30 ZOOM |
| | FinePix A600 ZOOM |
| | FinePix F470 ZOOM |
| | FinePix A500 ZOOM |
| | FinePix A400 ZOOM |
| | FinePix F460 |
| | FinePix A345 ZOOM |
| | FinePix S9500/S9000 |
| | FinePix Z1 |
| | FinePix A350 ZOOM |
| | FinePix Z3 |
| | FinePix F100fd |
| | FinePix S3100 |
| | FinePix F11 ZOOM |
| | FinePix A610 |

| Camera Brand | Model |
|---|---|
| | FinePix A900 |
| | FinePix A920 |
| | FinePix F480 |
| | FinePix F50fd |
| | FinePix S5800 |
| | FinePix Z10fd |
| | FinePix J50 |
| | FinePix S1000fd |
| | FinePix S8100fd |
| | FinePix Z20fd |
| | FinePix F455 ZOOM |
| | FinePix A820 |
| | FinePix S8000fd |
| | FinePix S602Z PRO |
| | FinePix S5500 ZOOM / S5100 |
| | FinePix S5700 |
| | FinePix F401 ZOOM |
| | FinePix A202/A200 |
| | FinePix A203 |
| | FinePix A204/FinePix 2650 |
| | FinePix A303 |
| | FinePix S304/FinePix 3800 |
| | FinePix M603 |
| | FinePix F410 ZOOM |
| | FinePix F700 |
| | FinePix A310 ZOOM |
| | FinePix A210 ZOOM |

| Camera Brand | Model |
|---|---|
| | FinePix F450 ZOOM |
| | FinePix F810 ZOOM |
| | FinePix E510 ZOOM |
| | FinePix F402 |
| | FinePix E500 ZOOM |
| | FinePix A205 ZOOM / A205S |
| | FinePix F440 ZOOM |
| | FinePix S3 PRO |
| | FinePix S20 PRO |
| | FinePix A330 |
| | FinePix A120 |
| | FinePix S3000 Z |
| | FinePix S7000 Z |
| | FinePix A340 |
| | FinePix S5000 Z |
| | FINEPIX S100fs |
| HP | PHOTOSMART R717 |
| | PHOTOSMART M517 |
| | PHOTOSMART M23 |
| | PHOTOSMART M525 |
| | PHOTOSMART R507 |
| | PHOTOSMART R607/R607V/R607XI |
| | PHOTOSMART M22 |
| | PHOTOSMART R837 |
| | PHOTOSMART R818 |
| | PHOTOSMART M415 |

| Camera Brand | Model |
|---|---|
| | PHOTOSMART R967 |
| | PHOTOSMART E327/E327V |
| | PHOTOSMART R727 |
| | PHOTOSMART M417 |
| | PHOTOSMART M407/M407V/M407XI |
| | PHOTOSMART E317/E317V/E317XI |
| | PHOTOSMART 620 |
| | PHOTOSMART M307 |
| | PHOTOSMART E217 |
| | PHOTOSMART 320 |
| | PHOTOSMART 720 |
| | PHOTOSMART 850 |
| | PHOTOSMART 733 |
| | PHOTOSMART 735 |
| | PHOTOSMART 935 |
| | PHOTOSMART 435 |
| | PHOTOSMART 635 |
| | PHOTOSMART 945 |
| | PHOTOSMART R707 |
| | PHOTOSMART 120 |
| | PHOTOSMART R937 |
| JVC | GZ-HD5 |
| | XA-F57P |
| | XA-F107A |
| | GC-A50 |
| | GC-A55 |

| Camera Brand | Model |
|---|---|
| | GC-A70 |
| | XA-C210 |
| Olympus | LS-10 |
| | WS-110 |
| | SP-570UZ |
| | STYLUS 1200 |
| | μ Mini S/Stylus Verve Mini S |
| | μ Mini Digital/Stylus Verve Digital |
| | C-765 UZ |
| | C-770 UZ |
| | C-160/D-395 |
| | C-360 Zoom/D-575 Zoom |
| | C-60 ZOOM |
| | C-725 UZ |
| | C-70 Zoom/C-7000 ZOOM |
| | E-300 / EVOLT E-300 |
| | C-470 Zoom/D-590 Zoom |
| | μ 500/Stylus 500 |
| | C-170/D-425 |
| | C-460 Zoom/D-580 Zoom |
| | C-7070 WideZoom |
| | C-740 UZ |
| | C-480 ZOOM/D-545 ZOOM |
| | C-500 Zoom/D-595 Zoom |
| | C55/C-5500 SPORT ZOOM |
| | μ 400/Stylus 400 |

13

| Camera Brand | Model |
|---|---|
| | IR-300 |
| | C-120/D-380 |
| | C-220 Zoom/D-520 Zoom |
| | C-300 Zoom/D-550 Zoom |
| | C-720 UZ |
| | C-5050 ZOOM |
| | C-50 ZOOM |
| | C-450 Zoom |
| | μ 300/Stylus 300 |
| | C-310 Zoom/D-540 Zoom |
| | C-150/D-390 |
| | C-350 Zoom/D-560 Zoom |
| | C-750 UZ |
| | E-1 |
| | C-5000 ZOOM |
| | C-5060 ZOOM |
| | μ 410/Stylus 410 |
| | C-730 UZ |
| | μ 1010/Stylus 1010 |
| | μ 780/Stylus 780 |
| | E-510 |
| | FE-210 |
| | μ 790 SW/Stylus 790 SW |
| | μ 820/Stylus 820 |
| | μ 830/Stylus 830 |
| | FE-270 |
| | FE-280 |

| Camera Brand | Model |
|---|---|
| | SP-550 UZ |
| | E-3 |
| | FE-290 |
| | µ 1020/Stylus 1020 |
| | µ 1030 SW/Stylus 1030 SW |
| | µ 840/Stylus 840 |
| | µ 850 SW/Stylus 850 SW |
| | FE-340 |
| | FE-350 |
| | E-420 |
| | C-8080 WideZoom |
| | FE-5500/D-630 Zoom |
| | FE-300 |
| | µ 700/Stylus 700 |
| | IR-500 |
| | SP-560 UZ |
| | FE-240 |
| | C-180/D-435 |
| | FE-100 |
| | SP-310 |
| | SP-700 |
| | µ 800/Stylus 800 |
| | µ 810/Stylus 810 |
| | E-330 / Evolt E-330 |
| | FE-180 |
| | FE-230 |
| | µ 770/Stylus 770 |

| Camera Brand | Model |
|---|---|
| | SP-350 |
| | FE-200 |
| | FE-115 |
| | μ 750/Stylus 750 |
| | μ 740/Stylus 740 |
| | SP-320 |
| | FE-140 |
| | FE-130 |
| | DS-20 |
| | FE-310 |
| Panasonic | EB-VS3 / VS3 |
| | DMC-FX100 |
| | Lumix DMC-TZ3 |
| | Lumix DMC-FZ50 |
| | Lumix DMC-FX12 |
| | Lumix DMC-FX30 |
| | Lumix DMC-FZ8 |
| | Lumix DMC-LS75 |
| | Lumix DMC-LZ6 |
| | Lumix DMC-LZ7 |
| | Lumix DMC-LX2 |
| | Lumix DMC-FX10 |
| | Lumix DMC-TZ5 |
| | Lumix DMC-FX55 |
| | Lumix DMC-L10K |
| | Lumix DMC-FS20 |
| | Lumix DMC-FS3 |

| Camera Brand | Model |
| --- | --- |
| | Lumix DMC-FS5 |
| | Lumix DMC-FX35 |
| | Lumix DMC-LZ10 |
| | Lumix DMC-TZ4 |
| | Lumix DMC-FX50 |
| | Lumix DMC-FX33 |
| | Lumix DMC-LZ8 |
| | Lumix DMC-LC43 |
| | Lumix DMC-FX3 |
| | Lumix DMC-FZ18 |
| | Lumix DMC-FZ1 |
| | Lumix DMC-LC33 |
| | Lumix DMC-FX5 |
| | Lumix DMC-FZ10 |
| | Lumix DMC-LC50 |
| | Lumix DMC-LC70 |
| | Lumix DMC-LC1 |
| | Lumix DMC-FX7 |
| | Lumix DMC-LZ2 |
| | Lumix DMC-FZ30 |
| | Lumix DMC-F1 |
| | Lumix DMC-LS2 |
| | Lumix DMC-FZ20 |
| | Lumix DMC-FX9 |
| | Lumix DMC-LZ1 |
| | Lumix DMC-FZ5 |
| | Lumix DMC-FZ4 |

| Camera Brand | Model |
|---|---|
| | Lumix DMC-FZ15 |
| | Lumix DMC-LC80 |
| | Lumix DMC-FZ3 |
| | DMC-LS80 |
| | HDC-SD9 |
| | VDR-D50 |
| | SDR-H18 |
| | EXLIM CARD EX-F1 |
| Ricoh | Caplio GR |
| | GR Digital |
| | Caplio RR120 |
| | Caplio R5 |
| | Caplio GX100 |
| | Caplio R7 |
| | Caplio GR Digital II |
| | Caplio R8 |
| | Caplio RR630 |
| Samsung | SC-HMX10C |
| | L73 |
| | Digimax S600 |
| | Digimax D53 |
| | GX-10 |
| | Digimax S700 |
| | Digimax S1000 |
| | L700 |
| | NV7 OPS |
| | NV3 |

| Camera Brand | Model |
|---|---|
| | Digimax A503 |
| | GX-1L |
| | Digimax S500 |
| | GX-1S |
| | L74 wide |
| | L100 |
| | Digimax L60 |
| | S85 |
| | i8 |
| | S860 |
| | NV40 |
| | NV4 |
| | NV30 |
| | Digimax V6 |
| | Digimax i85 |
| | Digimax i6 PMP |
| | NV11 |
| | L830 |
| | L730 |
| | Digimax L77 |
| | S850 |
| | S630 |
| | S1050 |
| | S730 |
| | NV15 |
| | Digimax 240 |
| | Digimax A6 |

| Camera Brand | Model |
| --- | --- |
| | Digimax 301 |
| | Digimax 202 |
| | Digimax (Cyber) 530 |
| | Digimax U-CA 3 |
| | Digimax 420 |
| | Digimax 401 |
| | Digimax V4 |
| | Digimax 430 |
| | Digimax 201 |
| | Digimax 340 |
| | Digimax 410 |
| | Digimax 350SE |
| | Digimax 230 |
| | NV24 HD |
| | Digimax 360 |
| | Digimax A5 |
| | Digimax V800 |
| | Digimax U-CA 5 |
| | Digimax A50 |
| | Digimax A402 |
| | Digimax A7 |
| | Digimax A4 |
| | Digimax 370 |
| | Digimax U-CA 505 |
| | Digimax L50 |
| | Digimax A400 |
| | Digimax U-CA 4 |

| Camera Brand | Model |
|---|---|
| | Digimax 250 |
| | Digimax V50 |
| | Digimax V5 |
| | Digimax U-CA 401 |
| | Digimax V70 |
| | NV20 |

Papst reserves the right to amend, add to, or otherwise revise the above lists of devices as its investigation proceeds and as discovery in this case proceeds.

Also, as set forth above, Papst has served discovery requests on the Camera Manufacturers, the responses to which are expected to be highly relevant to the preparation of claim charts, but are not available at the time of service of this response. Nevertheless, and without waiving its general objection, Papst provides claim charts for two representative devices: 1) digital cameras which are configurable to operate as MSC Digital Cameras; and 2) digital cameras which are configurable to operate in PTP mode.

The claim charts below provide the infringement analysis with respect to the MSC Digital Cameras identified above:

| '399 Patent Claims | MSC Digital Cameras |
|---|---|
| 1. An interface device for communication between a host device, which comprises drivers for input/output devices customary in a host device and a multi-purpose interface, and a data transmit/receive device, the data | Generally, a preamble is not limiting. This claim covers an interface device as defined in the body of the claim below, and does not expressly require or exclude a host device or a |

| '399 Patent Claims | MSC Digital Cameras |
|---|---|
| transmit/receive device being arranged for providing analog data, comprising: | data/transmit receive device. See the Claim Preamble section below for additional information. |
| a processor; | The interface portion of MSC Digital Cameras typically has a processor, such as a microprocessor or microcontroller. |
| a memory; | The interface portion of MSC Digital Cameras typically includes memory. Also, a socket is typically provided for adding a memory card. |
| a first connecting device for interfacing the host device with the interface device via the multi-purpose interface of the host device; and | The MSC Digital Cameras include a first connecting device comprising a Universal Serial Bus (USB) circuit for interfacing the interface device with a multipurpose USB interface on a host PC. |
| a second connecting device for interfacing the interface device with the data transmit/receive device, the second connecting device including a sampling circuit for sampling the analog data | The MSC Digital Cameras include a second connecting device comprising a sampling circuit and an analog to digital converter. This circuitry |

| '399 Patent Claims | MSC Digital Cameras |
|---|---|
| provided by the data transmit/receive device and an analog-to-digital converter for converting data sampled by the sampling circuit into digital data, | interfaces analog data typically provided by a data transmit receive device (typically including a CCD image sensor) with the interface device. For example some MSC Digital Cameras use a Correlated Double Sampler (CDS). |
| wherein the interface device is configured by the processor and the memory to include a first command interpreter and a second command interpreter, | The interface device of MSC Digital Cameras is configured to include first and second command interpreters as set forth more fully below. |
| wherein the first command interpreter is configured in such a way that the command interpreter, when receiving an inquiry from the host device as to a type of a device attached to the multi-purpose interface of the host device, sends a signal, regardless of the type of the data transmit/receive device attached to the second connecting device of the interface device, to the host device which signals to the host device that it is an input/output device | The first command interpreter may comprise, for example, a USB command interpreter. When a MSC Digital Camera is plugged in to a USB port on a host PC, the camera may receive a "Get_Descriptor" USB command. The "Get_Descriptor" USB command is an inquiry from the host PC. The first command interpreter of the MSC Digital Camera interprets the |

23

| '399 Patent Claims | MSC Digital Cameras |
|---|---|
| customary in a host device, | "Get_Descriptor" USB command and returns the requested descriptor(s). MSC Digital Cameras are believed, for example, to send a signal to the Host PC, regardless of the image sensor, microphone, or other data transmit/receive device which may be attached to the interface device, that the MSC Digital Camera is a mass storage class device, such as a disk drive, which is an I/O device customary in a host PC. See "First Command Interpreter" and "Signals to the Host Device and Customary in a Host Device" sections below for additional information. |
| whereupon the host device communicates with the interface device by means of the driver for the input/output device customary in a host device, and | Upon receiving the information signaling the host computer that the MSC Digital Camera is a mass storage device, the host PC automatically communicates with the interface device of the MSC Digital Camera by |

| '399 Patent Claims | MSC Digital Cameras |
|---|---|
| | means of one or more software drivers for disk drives customary in the host PC. The interface device is configured to respond to communications from one or more of these drivers. For example, when the host PC is configured with the Windows XP operating system, the host PC is believed to communicate with the interface device by means of disk.sys, PartMgr.sys and usbstor.sys. Digital camera-specific drivers are not necessary. The host PC also uses the disk.sys and PartMgr.sys drivers to communicate with hard disk drives, which are input/output devices customary in the host PC. The host PC also uses usbstor.sys to communicate with hard disk drives attached to the USB port. |
| wherein the second command interpreter is configured to interpret a data request | As set forth above, the first command interpreter signals to the host PC that |

| '399 Patent Claims | MSC Digital Cameras |
|---|---|
| command from the host device to the type of input/output device signaled by the first command interpreter as a data transfer command for initiating a transfer of the digital data to the host device. | the MSC Digital Camera is a mass storage device, such as a disk drive. The second command interpreter is configured to interpret data request commands for such disk drives. For example, the second command interpreter may be configured to interpret SCSI Block Commands (SBC) and/or ATAPI commands. This second command interpreter, for example, is believed to interpret the READ(10) command (Operation code 28h). MSC Digital Cameras are believed to interpret this data request command and provide the requested sectors of information, including data representing images acquired by, for example, a CCD sensor and digitized by the second connecting device. |
| 2. An interface device according to claim 1,wherein the drivers for input/output drivers customary in a host device comprise a hard | Windows XP drivers disk.sys and PartMgr.sys are the same drivers that would be used to communicate with a |

26

| '399 Patent Claims | MSC Digital Cameras |
|---|---|
| disk driver, and the signal indicates to the host device that the host device is communicating with a hard disk. | hard disk. The Interface Descriptor signals sent by the MSC Digital Camera indicating a SCSI command set indicate to the host PC that the MSC Digital Camera is a hard disk. |
| 3. An interface device according to claim 1, wherein the memory means comprises a buffer to buffer data to be transferred between the data transmit/receive device and the host device. | MSC Digital Cameras include internal memory and structure for receiving a memory card. The internal memory and/or memory card comprise a buffer to buffer data acquired by the transmit/receive device until it is transferred to the host PC. The MSC Digital Cameras may also comprise a memory buffer used during processing of images acquired by the image sensor. |
| 5. An interface device according to claim 1, wherein the processor is a digital signal processor. | MSC Digital Cameras may further comprise a digital signal processor. |
| 7. An interface device according to claim 2, which further comprises a root directory and | The MSC Digital Cameras are believed to comply with, for example, |

27

| '399 Patent Claims | MSC Digital Cameras |
|---|---|
| virtual files which are present on the signaled hard disk drive and which can be accessed from the host device. | the Design Rule for Camera File System (DCF). The DCF requires a root directory, and for files of images to be placed in certain locations in the directory tree. The files can be accessed from the host device. |
| 11. An interface device for communication between a host device, which comprises a multi-purpose interface and a specific driver for this interface, and a data transmit/receive device, the data transmit/receive device being arranged for providing analog data, comprising: | Generally, a preamble is not limiting. This claim covers an interface device, and does not expressly require or exclude a host device or a data/transmit receive device. See the Claim Preambles section below for additional information. |
| a processor; | The interface portion of MSC Digital Cameras typically has a processor, such as a microprocessor or microcontroller. |
| a memory; | The interface portion of a MSC Digital Camera typically includes memory. Also, a socket is typically provided for adding a memory card. |

28

| '399 Patent Claims | MSC Digital Cameras |
|---|---|
| a first connecting device for interfacing the host device with the interface device via the multi-purpose interface of the host device; and | The MSC Digital Cameras include a first connecting device comprising a Universal Serial Bus (USB) circuit for interfacing the interface device with a multipurpose USB interface on a host PC. |
| a second connecting device for interfacing the interface device with the data transmit/receive device, the second connecting device including a sampling circuit for sampling the analog data provided by the data transmit/receive device and an analog-to-digital converter for converting data sampled by the sampling circuit into digital data, | The MSC Digital Cameras include a second connecting device comprising a sampling circuit and an analog to digital converter. This circuitry interfaces analog data typically provided by a data transmit receive device (typically including a CCD image sensor) with the interface device. For example some MSC Digital Cameras use a Correlated Double Sampler (CDS). |
| where the interface device is configured using the processor and the memory to include a first command interpreter and a second command interpreter, | The interface device of MSC Digital Cameras is configured to include first and second command interpreters as set forth more fully below. |

29

| '399 Patent Claims | MSC Digital Cameras |
|---|---|
| wherein the first command interpreter is configured in such a way that the interface device, when receiving an inquiry from the host device as to the type of a device attached at the multi-purpose interface of the host device, sends a signal, regardless of the type of the data transmit/receive device attached to the second connecting device of the interface device, to the host device which signals to the host device that it is an input/output device customary in a host device, | The first command interpreter may comprise, for example, a USB command interpreter. When a MSC Digital Camera is plugged in to a USB port on a host PC, the camera may receive a "Get_Descriptor" USB command. The "Get_Descriptor" USB command is a type of inquiry from the host PC. The first command interpreter of the MSC Digital Camera interprets the "Get_Descriptor" USB command and returns the requested descriptor(s). MSC Digital Cameras are believed, for example, to send a signal to the Host PC, regardless of the image sensor, microphone, or other data transmit/receive device which may be attached to the interface device, that the MSC Digital Camera is a mass storage class device, such as a disk drive, which is an I/O device customary in a host PC. See "First |

| '399 Patent Claims | MSC Digital Cameras |
|---|---|
| | Command Interpreter" and "Signals to the Host Device and Customary in a Host Device" sections below for additional information. |
| whereupon the host device communicates with the interface device by means of the specific driver for the multi-purpose interface, and | Upon receiving the information signaling the host computer that the MSC Digital Camera is a mass storage device, the host PC automatically communicates with the interface device of the MSC Digital Camera by means of one or more software drivers specifically adapted for the multipurpose USB interface. For example, when the host PC is configured with the Windows XP operating system, the host PC is believed to communicate with the interface device by means of usbd.sys, which is a specific driver for the multipurpose USB interface. Digital camera-specific drivers are not necessary. |

| '399 Patent Claims | MSC Digital Cameras |
|---|---|
| wherein the second command interpreter is configured to interpret a data request command from the host device to the type of input/output device signaled by the first command interpreter as a data transfer command for initiating a transfer of the digital data to the host device. | As set forth above, the first command interpreter signals to the host PC that the MSC Digital Camera is a mass storage device, such as a disk drive. The second command interpreter is configured to interpret data request commands for such disk drives. For example, the second command interpreter may be configured to interpret SCSI Block Commands (SBC) and/or ATAPI commands. This second command interpreter, for example, is believed to interpret the READ(10) command (Operation code 28h). MSC Digital Cameras are believed to interpret this data request command and provide the requested sectors of information, including data representing images acquired by, for example, a CCD sensor and digitized by the second connecting device. |
| 14. A method of communication between a | This claim covers a method of |

| '399 Patent Claims | MSC Digital Cameras |
|---|---|
| host device, which comprises drivers for input/output devices customary in a host device and a multi-purpose interface, and a data transmit/receive device, the data transmit/receive device being arranged for providing analog data, via an interface device, comprising: | communicating between a host device interface device and a data transmit/receive device via an interface device. See the Claim Preambles section below for additional information concerning the host device and the data/transmit receive device |
| interfacing of the host device with a first connecting device of the interface device via the multi-purpose interface of the host device; | User manuals for the various MSC Digital Cameras instruct users, including users of cameras destined for the U.S., to interface a first connecting device of the MSC Digital Camera with a multipurpose interface of a host PC by connecting the MSC Digital Camera to the USB port on the host PC. |
| interfacing of the data transmit/receive device with a second connecting device of the interface device, the second connecting device including a sampling circuit for sampling the | The MSC Digital Cameras include a second connecting device comprising a sampling circuit and an analog to digital converter. This circuitry |

| '399 Patent Claims | MSC Digital Cameras |
|---|---|
| analog data provided by the data/transmit/receive device and an analog-to-digital converter for converting data sampled by the sampling circuit into digital data; | interfaces analog data typically provided by a data transmit receive device (typically including a CCD image sensor) with the interface device. |
| inquiring by the host device at the interface device as to the type of device to which the multi-purpose interface of the host device is attached; | When a MSC Digital Camera is plugged in to a USB port on a host PC, the host PC may inquire the interface device as to the type of device it is by sending a "Get_Descriptor" USB command. |
| regardless of the type of the data transmit/receive data attached to the second connecting device of the interface device, responding to the inquiry from the host device by the interface device in such a way that it is an input/output device customary in a host device, whereupon the host device communicates with the interface device by means of the usual driver for the input/output device, and | A MSC Digital Camera responds to the "Get_Descriptor" inquiry in such a way that it is an input/output device customary in a host device.  MSC Digital Cameras are believed, for example, to send a signal to the Host PC, regardless of the image sensor, microphone, or other data transmit/receive device which may be attached to the interface device, that |

| '399 Patent Claims | MSC Digital Cameras |
|---|---|
| | the MSC Digital Camera is a mass storage class device, such as a disk drive, which is an I/O device customary in a host PC. See "First Command Interpreter" and "Signals to the Host Device and Customary in a Host Device" sections below for additional information. Upon receiving the information signaling the host computer that the MSC Digital Camera is a mass storage device, the host PC automatically communicates with the interface device of the MSC Digital Camera by means of one or more of the usual software drivers for disk drives customary in the host PC.  For example, when the host PC is configured with the Windows XP operating system, the host PC is believed to communicate with the interface device by means of disk.sys, |

| '399 Patent Claims | MSC Digital Cameras |
|---|---|
|  | PartMgr.sys and usbstor.sys. Digital camera-specific drivers are not necessary. The host PC also uses the disk.sys and PartMgr.sys drivers to communicate with hard disk drives, which are input/output devices customary in the host PC. The host PC also uses usbstor.sys to communicate with hard disk drives attached to the USB port. |
| interpreting a data request command from the host device to the type of input/output device customary in the host device as a data transfer command for initiating a transfer of the digital data to the host device. | A MSC Digital Camera is believed to interpret SCSI Block Commands (SBC) and/or ATAPI commands. For example, the MSC Digital Camera is believed to interpret the READ(10) command (Operation code 28h). MSC Digital Cameras are believed to interpret this data request command and provide the requested sectors of information, including data representing images acquired by, for example, a CCD sensor and digitized |

| '399 Patent Claims | MSC Digital Cameras |
|---|---|
| | by the second connecting device. |
| 15. A method according to claim 14, wherein the drivers for input/output devices customary in a host device comprise a driver for a storage device and in particular for a hard disk drive. | Windows XP drivers disk.sys and PartMgr.sys are the same drivers that would be used to communicate with a storage device comprising hard disk. |

| '499 Patent Claims | MSC Digital Cameras |
|---|---|
| 1. An interface device for communication between a host device, which comprises drivers for input/output devices customary in a host device and a multi-purpose interface, and a data transmit/receive device comprising the following features: | Generally, a preamble is not limiting. This claim covers an interface device, and does not expressly require or exclude a host device or a data/transmit receive device. See the Claim Preambles section below for additional information. |
| a processor; | The interface portion of MSC Digital Cameras typically has a processor, such as a microprocessor or microcontroller. |
| a memory; | The interface portion of a MSC Digital Camera typically includes memory. Also, a socket is typically provided for adding a memory card. |

| '499 Patent Claims | MSC Digital Cameras |
|---|---|
| a first connecting device for interfacing the host device with the interface device via the multi-purpose interface of the host device; and | The MSC Digital Cameras include a first connecting device comprising a Universal Serial Bus (USB) circuit for interfacing the interface device with a multipurpose USB interface on a host PC. |
| a second connecting device for interfacing the interface device with the data transmit/receive device, | The MSC Digital Cameras include a second connecting device comprising a sampling circuit and an analog to digital converter. This circuitry interfaces analog data typically provided by a data transmit receive device (typically including a CCD image sensor) with the interface device. |
| wherein the interface device is configured by the processor and the memory in such a way that the interface device, when receiving an inquiry from the host device as to the type of a device attached to the multi-purpose interface of the host device, sends a signal, regardless of the type of the data transmit/receive device attached to the second connecting device | The interface device is believed to be configured by the processor and a program stored in the memory, for example, in such a way that when the MSC Digital Camera receives a "Get_Descriptor" USB command, the MSC Digital Camera sends the requested descriptor(s). The "Get_Descriptor" USB command is a type of inquiry from the |

| '499 Patent Claims | MSC Digital Cameras |
|---|---|
| of the interface device, to the host device which signals to the host device that it is a storage device customary in a host device, | host PC. MSC Digital Cameras are believed, for example, to send a signal to the Host PC, regardless of the image sensor, microphone, or other data transmit/receive device which may be attached to the interface device, that the MSC Digital Camera is a mass storage class device, such as a disk drive, which is a storage device customary in a host PC. |
| whereupon the host device communicates with the interface device by means of the driver for the storage device customary in a host device, and | Upon receiving the information signaling the host computer that the MSC Digital Camera is a mass storage device, the host PC automatically communicates with the interface device of the MSC Digital Camera by means of one or more software drivers for disk drives customary in the host PC. The interface device is configured to respond to communications from one or more of these drivers, as set forth below. For example, when the host PC is configured with the Windows XP operating system, the host PC is believed |

| '499 Patent Claims | MSC Digital Cameras |
|---|---|
| | to communicate with the interface device by means of disk.sys, PartMgr.sys and usbstor.sys. Digital camera-specific drivers are not necessary. The host PC also uses the disk.sys and PartMgr.sys drivers to communicate with hard disk drives, which are input/output devices customary in the host PC. The host PC also uses usbstor.sys to communicate with hard disk drives attached to the USB port. |
| wherein the interface device is arranged for simulating a virtual file system to the host, the virtual file system including a directory structure. | The interface portion of the MSC Digital Camera is believed to simulate a virtual file system, including, for example, simulating a master boot record, a boot sector and a sequence of sectors comprising at least one file allocation table, at least one directory, and files, as would be found on a disk drive having rotating media. |
| 2. An interface device in accordance with claim 1, in which the directory structure | MSC Digital Cameras may include configuration files and files used for |

| '499 Patent Claims | MSC Digital Cameras |
|---|---|
| has a configuration file for setting and controlling functions of the interface device or an executable or a batch file for conducting a routine stored in the memory or a data file used for transferring data from the data transmit/receive device to the host device or a help file for giving help on handling the interface device. | transferring data from the data transmit/receive device to the host device. |
| 6. An interface device in accordance with claim 1 wherein, in response to a request from the host to read a boot sequence, the processor is arranged to send a virtual boot sequence to the host. | In response to a request from the host PC to read the first sector on the simulated disk drive (a typical location for a master boot record), the processor of the MSC Digital Camera is arranged to send a virtual boot sequence to the host. For example, in response to the request for the first sector, the MSC Digital Cameras is believed to provide 512 bytes of data which contain the information typically found in a master boot record (MBR), including information for at least one partition. |

41

| '499 Patent Claims | MSC Digital Cameras |
|---|---|
| 7. An interface device in accordance with claim 6 wherein the virtual boot sequence includes a starting position and a length of a file allocation table, an indication of a type of the storage device or a number of sectors of the storage device. | The MSC Digital Cameras are believed to provide a boot sequence including a master boot record and a boot sector, which typically include a starting location and a length of a File Allocation Table. |
| 8. An interface device in accordance with claim 7 wherein, in response to a request from the host to display a directory of the storage device, a processor is arranged for transferring the file allocation table and the directory structure to the host. | The MSC Digital Camera is configured such that, in response to a request from the host PC to display a directory of the MSC Digital Camera (which appears to the host PC to be a storage device), the processor is arranged for transferring the file allocation table and the directory structure to the host PC. |
| 9. An interface device in accordance with claim 1 wherein the file allocation table and the directory structure is transferred to the host in response to a request from the host to read data from or store data to the storage device. | The MSC Digital Camera is configured such that, in response to a request from the host PC to read data from or store data to the MSC Digital Camera (which appears to the host PC to be a storage device), the processor is arranged for transferring the file allocation table and the directory |

| '499 Patent Claims | MSC Digital Cameras |
|---|---|
| | structure to the host PC. |
| 12. An interface device in accordance with claim 1 wherein the file allocation table includes information on numbers of blocks occupied by the data file wherein the interface device is arranged for receiving block numbers or a block number range from the host when the host wants to read the data file, and wherein the interface device is arranged to start a data transfer to the host, when the block numbers or the block number range is received from the host. | In FAT file systems believed to be used in the MSC Digital Cameras, the number of the first cluster of a file is in the directory. READ(10) command supports reading a single logical block address comprising a single 512 byte sector, or a starting logical block address plus a transfer length comprising a range of blocks of data. |
| 13. An interface device in accordance with claim 12 wherein the processor is arranged for formatting the data acquired by the second connecting device into blocks having a predetermined size, the predetermined size being suited for the storage device. | It is believed that the processor is arranged for formatting the data acquired by the second connecting device into 512 byte blocks, which is a size being suited for a storage device. |
| 15. An interface device in accordance | The Interface Descriptor sent by the MSC |

| '499 Patent Claims | MSC Digital Cameras |
|---|---|
| with claim 1 wherein the storage device is a hard disk. | Digital Camera indicating a SCSI command set is the same as an Interface Descriptor as would be sent by a hard disk. Thus, the Interface Descriptor signals the host PC that the storage device is a hard disk. |
| 16. An interface device in accordance with claim 1 wherein the memory has a data buffer for permitting independence in terms of time of the data transmit/receive device attachable to the second connecting device from the host device attachable to the first connecting device. | Images are typically stored in a data buffer, permitting time independence from when a photograph is captured and when it is transferred to the host PC. |
| 17. An interface device for communication between a host device, which comprises a multi-purpose interface and a specific driver for this interface, and a data transmit/receive device comprising the following features: | Generally, a preamble is not limiting. This claim covers an interface device, and does not expressly require or exclude a host device or a data/transmit receive device. See the Claim Preambles section below for additional information. |
| a processor; | The interface portion of MSC Digital |

| '499 Patent Claims | MSC Digital Cameras |
|---|---|
| | Cameras typically has a processor, such as a microprocessor or microcontroller. |
| a memory; | The interface portion of a MSC Digital Camera typically includes memory. Also, a socket is typically provided for adding a memory card. |
| a first connecting device for interfacing the host device with the interface device via the multi-purpose interface of the host device; and | The MSC Digital Cameras include a Universal Serial Bus (USB) circuit. A USB interface present on a host PC is a multipurpose interface. |
| a second connecting device for interfacing the interface device with the data transmit/receive device, | The MSC Digital Cameras include a second connecting device comprising a sampling circuit and an analog to digital converter. This circuitry interfaces analog data typically provided by a data transmit receive device (typically including a CCD image sensor) with the interface device. For example some MSC Digital Cameras use a Correlated Double Sampler (CDS). |
| where the interface device is configured using the processor and the memory in | The interface device is believed to be configured by the processor and a |

| '499 Patent Claims | MSC Digital Cameras |
|---|---|
| such a way that the interface device, when receiving an inquiry from the host device as to the type of a device attached at the multi-purpose interface of the host device, sends a signal, regardless of the type of the data transmit/receive device attached to the second connecting device of the interface device, to the host device which signals to the host device that it is a storage device customary in a host device, | program stored in the memory, for example, in such a way that when the MSC Digital Camera receives a "Get_Descriptor" USB command, the MSC Digital Camera sends the requested descriptor(s). MSC Digital Cameras are believed, for example, to send a signal to the Host PC, regardless of the image sensor, microphone, or other data transmit/receive device which may be attached, that the MSC Digital Camera is a mass storage class device, such as a disk drive, which is a storage device customary in a host PC. |
| whereupon the host device communicates with the interface device by means of the specific driver for the multi-purpose interface, and | Upon receiving the information signaling the host computer that the MSC Digital Camera is a mass storage device, the host PC automatically communicates with the interface device of the MSC Digital Camera by means of one or more software drivers for disk drives customary in the host PC. The interface device is |

| '499 Patent Claims | MSC Digital Cameras |
|---|---|
| | configured to respond to communications from one or more of these drivers, as set forth below. For example, when the host PC is configured with the Windows XP operating system, the host PC is believed to communicate with the interface device by means of usbd.sys. Digital camera-specific drivers are not necessary. The host PC also uses the usbd.sys driver to communicate with hard disk drives connected to the USB interface, and hard disk drives are input/output devices customary in the host PC. |
| wherein the interface device is arranged for simulating a virtual file system to the host, the virtual file system including a file allocation table and a directory structure. | The interface portion of the MSC Digital Camera is believed to simulate a virtual file system, including, for example, simulating a master boot record, a boot sector and a sequence of sectors comprising at least one file allocation table, at least one directory, and files, as would be found on a disk drive having rotating media. |

| '499 Patent Claims | MSC Digital Cameras |
|---|---|
| 18. A method of communication between a host device, which comprises drivers for input/output devices customary in a host device and a multi-purpose interface, and a data transmit/receive device via an interface device comprising the following steps: | Generally, a preamble is not limiting. This claim covers a method of communicating between a host device interface device and a data transmit/receive device via an interface device. See the Claim Preambles section below for additional information concerning the host device and the data/transmit receive device |
| interfacing of the host device with a first connecting device of the interface device via the multi-purpose interface of the host device; | User manuals for the various MSC Digital Cameras instruct users, including users of cameras destined for the U.S., to interface the a first connecting device of the MSC Digital Camera with a multipurpose interface of a host PC by connecting the MSC Digital Camera to the USB port on the host PC. |
| interfacing of the data transmit/receive device with a second connecting device of the interface device; | The MSC Digital Cameras include a second connecting device comprising a sampling circuit and an analog to digital converter. This circuitry interfaces analog data typically provided by a data transmit |

| '499 Patent Claims | MSC Digital Cameras |
|---|---|
|  | receive device (typically including a CCD image sensor) with the interface device. |
| inquiring by the host device at the interface device as to the type of device to which the multi-purpose interface of the host device is attached; | When a MSC Digital Camera is plugged in to a USB port on a host PC, the host PC may inquire the interface device as to the type of device it is by sending a "Get_Descriptor" USB command. |
| regardless of the type of the data transmit/receive device attached to the second connecting device of the interface device, responding to the inquiry from the host device by the interface device in such a way that it is a storage device customary in a host device, whereupon the host device communicates with the interface device by means of the usual driver for the storage device, and | A MSC Digital Camera responds to the "Get_Descriptor" inquiry in such a way that it is an input/output device customary in a host device.  MSC Digital Cameras are believed, for example, to send a signal to the Host PC, regardless of the image sensor, microphone, or other data transmit/receive device which may be attached to the interface device, that the MSC Digital Camera is a mass storage class device, such as a disk drive, which is an storage device customary in a host PC. See "First Command Interpreter" and "Signals to the Host Device and |

| '499 Patent Claims | MSC Digital Cameras |
|---|---|
| | Customary in a Host Device" sections below for additional information. Upon receiving the information signaling the host computer that the MSC Digital Camera is a mass storage device, the host PC automatically communicates with the interface device of the MSC Digital Camera by means of one or more of the usual software drivers for disk drives customary in the host PC.  For example, when the host PC is configured with the Windows XP operating system, the host PC is believed to communicate with the interface device by means of disk.sys, PartMgr.sys and usbstor.sys. Digital camera-specific drivers are not necessary. The host PC also uses the disk.sys and PartMgr.sys drivers to communicate with hard disk drives, which are storage devices customary in the host PC. The host PC also uses usbstor.sys to communicate with hard disk drives |

| '499 Patent Claims | MSC Digital Cameras |
|---|---|
| | attached to the USB port. |
| wherein the interface device is arranged for simulating a virtual file system to the host, the virtual file system including a file allocation table and a directory structure. | The interface portion of the MSC Digital Camera is believed to simulate a virtual file system, including, for example, simulating a master boot record, a boot sector and a sequence of sectors comprising at least one file allocation table, at least one directory, and files, as would be found on a disk drive having rotating media. |

The claim chart below provides the infringement analysis with respect to the PTP Digital Cameras identified above:

| '399 Patent Claims | PTP Digital Cameras |
|---|---|
| 1. An interface device for communication between a host device, which comprises drivers for input/output devices customary in a host device and a multi-purpose interface, and a data transmit/receive device, the data transmit/receive | Generally, a preamble is not limiting. This claim covers an interface device as defined in the body of the claim below, and does not expressly require or exclude a host device or a data/transmit receive device. See the Claim Preamble section below for additional information. |

| '399 Patent Claims | PTP Digital Cameras |
|---|---|
| device being arranged for providing analog data, comprising: | |
| a processor; | The interface portion of PTP Digital Cameras typically has a processor, such as a microprocessor or microcontroller. |
| a memory; | The interface portion of PTP Digital Cameras typically includes memory. Also, a socket is typically provided for adding a memory card. |
| a first connecting device for interfacing the host device with the interface device via the multi-purpose interface of the host device; and | The PTP Digital Cameras include first connecting device comprising a Universal Serial Bus (USB) circuit for interfacing the interface device with a multipurpose USB interface on a host PC. |
| a second connecting device for interfacing the interface device with the data transmit/receive device, the second connecting device including a sampling circuit for sampling the analog data provided by the data | The PTP Digital Cameras include a second connecting device comprising a sampling circuit and an analog to digital converter. This circuitry interfaces analog data typically provided by a data transmit receive device (typically including a CCD image |

| '399 Patent Claims | PTP Digital Cameras |
|---|---|
| transmit/receive device and an analog-to-digital converter for converting data sampled by the sampling circuit into digital data, | sensor) with the interface device. For example some PTP Digital Cameras use a Correlated Double Sampler (CDS). |
| wherein the interface device is configured by the processor and the memory to include a first command interpreter and a second command interpreter, | The interface device of PTP Digital Cameras is configured to include first and second command interpreters as set forth more fully below. |
| wherein the first command interpreter is configured in such a way that the command interpreter, when receiving an inquiry from the host device as to a type of a device attached to the multi-purpose interface of the host device, sends a signal, regardless of the type of the data transmit/receive device attached to the second connecting device of the interface device, to the host device which signals to the host device that it is an input/output device | The first command interpreter may comprise, for example, a USB command interpreter. When a PTP Digital Camera is plugged in to a USB port on a host PC, the camera may receive a "Get_Descriptor" USB command. The "Get_Descriptor" USB command is a type of inquiry from the host PC. The first command interpreter of the PTP Digital Camera interprets the "Get_Descriptor" command and returns the requested descriptor(s). PTP Digital Cameras are believed, for example, to send a |

| '399 Patent Claims | PTP Digital Cameras |
|---|---|
| customary in a host device, | signal to the Host PC, regardless of the image sensor, microphone, or other data transmit/receive device which may be attached to the interface device, that the PTP Digital Camera is an imaging device, such as a scanner, which is believed to be an I/O device customary in a host PC. See "First Command Interpreter" and "Signals to the Host Device and Customary in a Host Device" sections below for additional information. |
| whereupon the host device communicates with the interface device by means of the driver for the input/output device customary in a host device, and | Upon receiving the information signaling the host computer that the PTP Digital Camera is an imaging device, the host PC automatically communicates with the interface device of the PTP Digital Camera by means of one or more software drivers for imaging devices customary in the host PC. For example, when the host PC is configured with the Windows XP operating system, the host PC is believed to |

| '399 Patent Claims | PTP Digital Cameras |
|---|---|
| | communicate with the interface device by means of at least usbscan.sys. The host PC also uses usbscan.sys drivers to communicate with scanners which are customary on the host PC. |
| wherein the second command interpreter is configured to interpret a data request command from the host device to the type of input/output device signaled by the first command interpreter as a data transfer command for initiating a transfer of the digital data to the host device. | The second command interpreter may be configured to interpret, for example, interpret certain operation codes specified in PIMA 15740 (the PTP specification). For example, PTP Digital Cameras are believed to interpret and respond to the operation code for the GetObject command (PIMA 15740, 10.4.9). PTP Digital Cameras are believed to interpret this data request command and provide the requested object, including data representing images acquired by, for example, a CCD sensor and digitized by the second connecting device. |
| 3. An interface device according to claim 1, wherein the memory means comprises a buffer to buffer data to be | PTP Digital Cameras include internal memory and structure for receiving a memory card. The internal memory and/or |

| '399 Patent Claims | PTP Digital Cameras |
|---|---|
| transferred between the data transmit/receive device and the host device. | memory card comprise a buffer to buffer data acquired by the transmit/receive device until it is transferred to the host PC. The PTP Digital Cameras may also comprise a memory buffer used during processing of images acquired by the image sensor. |
| 5. An interface device according to claim 1, wherein the processor is a digital signal processor. | PTP Digital Cameras may further comprise a digital signal processor. |
| 11. An interface device for communication between a host device, which comprises a multi-purpose interface and a specific driver for this interface, and a data transmit/receive device, the data transmit/receive device being arranged for providing analog data, comprising: | Generally, a preamble is not limiting. This claim covers an interface device, and does not expressly require or exclude a host device or a data/transmit receive device. See the Claim Preambles section below for additional information. |
| a processor; | The interface portion of a PTP Digital Camera typically has a processor, such as a microprocessor. |

| '399 Patent Claims | PTP Digital Cameras |
|---|---|
| a memory; | The interface portion of a PTP Digital Camera typically includes memory. Also, a socket is typically provided for adding a memory card. |
| a first connecting device for interfacing the host device with the interface device via the multi-purpose interface of the host device; and | The PTP Digital Cameras include first connecting device comprising a Universal Serial Bus (USB) circuit for interfacing the interface device with a multipurpose USB interface on a host PC. |
| a second connecting device for interfacing the interface device with the data transmit/receive device, the second connecting device including a sampling circuit for sampling the analog data provided by the data transmit/receive device and an analog-to-digital converter for converting data sampled by the sampling circuit into digital data, | The PTP Digital Cameras include a second connecting device comprising a sampling circuit and an analog to digital converter. This circuitry interfaces analog data typically provided by a data transmit receive device (typically including a CCD image sensor) with the interface device. For example some PTP Digital Cameras use a Correlated Double Sampler (CDS). |
| where the interface device is configured using the processor and the | The interface device of PTP Digital Cameras is configured to include first and second |

| '399 Patent Claims | PTP Digital Cameras |
|---|---|
| memory to include a first command interpreter and a second command interpreter, | command interpreters as set forth more fully below. |
| wherein the first command interpreter is configured in such a way that the interface device, when receiving an inquiry from the host device as to the type of a device attached at the multi-purpose interface of the host device, sends a signal, regardless of the type of the data transmit/receive device attached to the second connecting device of the interface device, to the host device which signals to the host device that it is an input/output device customary in a host device, | The first command interpreter may comprise, for example, a USB command interpreter. When a PTP Digital Camera is plugged in to a USB port on a host PC, the camera may receive a "Get_Descriptor" USB command. The "Get_Descriptor" USB command is a type of inquiry from the host PC. The first command interpreter of the PTP Digital Camera interprets the "Get_Descriptor" command and returns the requested descriptor(s). PTP Digital Cameras are believed, for example, to send a signal to the Host PC, regardless of the image sensor, microphone, or other data transmit/receive device which may be attached to the interface device, that the PTP Digital Camera is an imaging device, such as a scanner, which is believed to be an I/O |

| '399 Patent Claims | PTP Digital Cameras |
|---|---|
| | device customary in a host PC. See "First Command Interpreter" and "Signals to the Host Device and Customary in a Host Device" sections below for additional information. |
| whereupon the host device communicates with the interface device by means of the specific driver for the multi-purpose interface, and | Upon receiving the information signaling the host computer that the PTP Digital Camera is a mass storage device, the host PC automatically communicates with the interface device of the PTP Digital Camera by means of one or more software drivers specifically adapted for the multipurpose USB interface. For example, when the host PC is configured with the Windows XP operating system, the host PC is believed to communicate with the interface device by means of usbd.sys, which is a specific driver for the multipurpose USB interface. |
| wherein the second command interpreter is configured to interpret a data request command from the host | The second command interpreter may be configured to interpret, for example, interpret certain operation codes specified in |

| '399 Patent Claims | PTP Digital Cameras |
|---|---|
| device to the type of input/output device signaled by the first command interpreter as a data transfer command for initiating a transfer of the digital data to the host device. | PIMA 15740 (the PTP specification). For example, PTP Digital Cameras are believed to interpret and respond to the operation code for the GetObject command (PIMA 15740, 10.4.9). PTP Digital Cameras are believed to interpret this data request command and provide the requested object, including data representing images acquired by, for example, a CCD sensor and digitized by the second connecting device. |
| 14. A method of communication between a host device, which comprises drivers for input/output devices customary in a host device and a multi-purpose interface, and a data transmit/receive device, the data transmit/receive device being arranged for providing analog data, via an interface device, comprising: | This claim covers a method of communicating between a host device interface device and a data transmit/receive device via an interface device. See the Claim Preambles section below for additional information concerning the host device and the data/transmit receive device |
| interfacing of the host device with a first connecting device of the interface | User manuals for the various PTP Digital Cameras instruct users, including users of |

| '399 Patent Claims | PTP Digital Cameras |
|---|---|
| device via the multi-purpose interface of the host device; | cameras destined for the U.S., to interface a first connecting device of the PTP Digital Camera with a multipurpose interface of a host PC by connecting the PTP Digital Camera to the USB port on the host PC. |
| interfacing of the data transmit/receive device with a second connecting device of the interface device, the second connecting device including a sampling circuit for sampling the analog data provided by the data/transmit/receive device and an analog-to-digital converter for converting data sampled by the sampling circuit into digital data; | The PTP Digital Cameras include a second connecting device comprising a sampling circuit and an analog to digital converter. This circuitry interfaces analog data typically provided by a data transmit receive device (typically including a CCD image sensor) with the interface device. |
| inquiring by the host device at the interface device as to the type of device to which the multi-purpose interface of the host device is attached; | When a PTP Digital Camera is plugged in to a USB port on a host PC, the host PC may inquire the interface device as to the type of device it is by sending a "Get_Descriptor" USB command. |
| regardless of the type of the data | PTP Digital Cameras are believed, for |

| '399 Patent Claims | PTP Digital Cameras |
|---|---|
| transmit/receive data attached to the second connecting device of the interface device, responding to the inquiry from the host device by the interface device in such a way that it is an input/output device customary in a host device, whereupon the host device communicates with the interface device by means of the usual driver for the input/output device, and | example, to send a signal to the Host PC, regardless of the image sensor, microphone, or other data transmit/receive device which may be attached to the interface device, that the PTP Digital Camera is an imaging class device, such as a scanner, which is believed to be an I/O device customary in a host PC. See "First Command Interpreter" and "Signals to the Host Device and Customary in a Host Device" sections below for additional information. Upon receiving the information signaling the host computer that the PTP Digital Camera is imaging class device, the host PC automatically communicates with the interface device of the PTP Digital Camera by means of one or more software drivers for imaging devices customary in the host PC. The interface device is configured to respond to communications from one or more of these drivers, as set forth below. For example, when the host PC is configured with the |

| '399 Patent Claims | PTP Digital Cameras |
|---|---|
| | Windows XP operating system, the host PC is believed to communicate with the interface device by means of usbscan.sys. The host PC also uses the usbscan.sys driver to communicate with scanners, which are input/output devices customary in the host PC. |
| interpreting a data request command from the host device to the type of input/output device customary in the host device as a data transfer command for initiating a transfer of the digital data to the host device. | The second command interpreter may be configured to interpret, for example, interpret certain operation codes specified in PIMA 15740 (the PTP specification). For example, PTP Digital Cameras are believed to interpret and respond to the operation code for the GetObject command (PIMA 15740, 10.4.9). PTP Digital Cameras are believed to interpret this data request command and provide the requested object, including data representing images acquired by, for example, a CCD sensor and digitized by the second connecting device. |

Papst reserves the right to amend or to supplement the identification of devices in this response to provide additional designations of devices as being MSC Digital Cameras, PTP Digital Cameras, or both, as discovery progresses in this case and additional information becomes available.

Based on information currently known to Papst, Papst contends that the asserted claims are literally infringed. However, at this point, the Camera Manufacturers have not provided their claim interpretation contentions or Markman briefs. Papst reserves the right to supplement or otherwise amend this response as discovery in this case progresses, and as the claim construction process in this case progresses.

Papst asserts that the apparatus claims are directly infringed by the Digital Cameras-in-suit. However, at this point, the Camera Manufacturers have not provided their claim interpretation contentions or Markman briefs. Papst reserves the right to supplement or otherwise amend this response as discovery in this case progresses, and as the claim construction process in this case progresses.

Additionally, a reasonable opportunity for discovery is likely to yield evidence relating to whether the Camera Manufacturers had or have the requisite intent to induce the infringement of method claims 14 and 15 of the '399 patent, and method claim 18 of the '449 patent. The Digital Cameras-in-suit, on their own, do not perform the step of: "interfacing of the host device with a first connecting device of the interface device via the multi-purpose interface of the host device;" as recited in claim 14 of the '399 patent and claim 18 of the '449 patent. Also, the Digital Cameras-in-suit, on their own, do not perform the step of: "inquiring by the host device at the interface device as to the type of device to which the multi-purpose interface of the host device is attached;" as recited in

claim 14 of the '399 patent and claim 18 of the '449 patent. However, the owners

manuals and other documentation provided by the Camera Manufacturers instruct the end

users of the Digital Cameras-in-suit to connect the cameras to host PCs in such a way that

the steps identified above will be performed. Based on this evidence, the Camera

Manufacturers intended to cause in the U.S. the actual steps that constitute direct

infringement.

In addition, Papst gave notice to each of the Camera Manufacturers that the

Digital Cameras-in-suit, when used in as directed in the user manuals provided with those

devices, infringe the patents-in-suit. The notice provided by Papst is relevant to each

Camera Manufacturer's state of mind. However, the Camera Manufacturers have not, to

date, provided discovery regarding their state of mind regarding their actions vis-à-vis the

patents-in-suit.

### 1.  Claim Preambles

In construing patent claims, structure recited in the preamble of a claim is

generally not considered a limitation of the claim. One generally should look to the body

of the claims, which define the structure of the interface device. In one example, claim 1

of the '399 patent recites the following preamble:

> An interface device for communication between a host device, which
> comprises drivers for input/output devices customary in a host device and
> a multi-purpose interface, and a data transmit/receive device, the data
> transmit/receive device being arranged for providing analog data,
> comprising:

In this claim, the preamble states that the claim is for an "interface device." Other independent apparatus claims of the '399 patent and the '449 patent similarly recite an "interface device." The "interface device" (which is defined later in the body of each claim) is for communicating between a "host device" and a "data transmit/receive device." The claims neither expressly require, nor prohibit, a permanently attached data transmit/receive device. Also, the apparatus claims neither expressly require, nor prohibit, a host device. Instead, the inquiry should be directed to whether the interface portion of a digital camera meets the limitations in the claims for the interface device.

To provide context for the remaining portions of a claim, the term "host device" may be understood to include Personal Computers ("PCs") and other host devices as described in the patent written description. Such host devices typically have or are connectable to input/output devices and have software drivers to operate those input/output devices.

The phrase "an input/output device customary in a host device" may be understood, for example, by referring to the '399 patent, for example, at column 4, lines 23-39, column 4, line 60 to column 5, line 32, column 8, lines 43-67, and column 12, lines 23-40. Input/output devices customary in a host device include, for example, hard disk drives (e.g. column 8, lines 1-11), floppy disk drives, CD –ROM drives, or tape drives (e.g., column 4, lines 23-39) or printers (e.g., column 9, lines 38-48). Similar disclosures may be referred to for an understanding of the phrase "a storage device customary in a host device," as that phrase is used in the claims of the '449 patent.

To provide context for the remaining portions of a claim, the term data transmit/receive devices may be understood to cover an entire spectrum of sensors. The

written description of the '399 patent, for example, gives as an example an image-acquisition system, which is a diagnostic radiology system. In this regard, the term "data transmit/receive device" reads on a CCD image sensor typically found in a digital camera. Also, the term "data transmit/receive device" would read on a microphone.

Additionally, the term data transmit/receive device is recited differently in the two patents-in-suit. For example, in claim 1 of the '399 patent, the data transmit/receive device is recited as "being arranged for providing analog data." (CCD image sensors provide analog data). However, in claim 1 of the 449 patent, there is <u>no</u> recitation that the data transmit receive device be arranged to provide analog data. If there is any interpretation of the term data transmit/receive device, that term in the '449 patent therefore should, for example, be construed more broadly than the data transmit/receive devices of the '399 patent.

## 2. First Connecting Device

An example of a "first connecting device" that is described in the '399 patent and the '449 patent includes an interface circuit. The Digital Cameras in suit all include a first connecting device because they include a Universal Serial Bus (USB) circuit. The USB interface circuit is for interfacing the interface device with a multipurpose USB interface on a host PC.

## 3. Second Connecting Device

The claim language "second connecting device" as recited in claim 1 of the '399 patent covers circuitry in a digital camera-in-suit that serves as the interface between the CCD image sensor (part of the data transmit/receive device) and the processor (part of the interface device):

> a second connecting device for interfacing the interface device with the
> data transmit/receive device, the second connecting device including a
> sampling circuit for sampling the analog data provided by the data
> transmit/receive device and an analog-to-digital converter for converting
> data sampled by the sampling circuit into digital data,

Digital cameras-in-suit typically include a sample-and-hold circuit and an analog to
digital converter as part of the circuitry that interfaces the data transmit/receive device to
the processor of the interface device.  The word "interfacing" does not require, nor does it
prohibit, a permanent interface with a permanently attached data transmit/receive device.

In another example, independent claims 1 and 17 of the '449 patent recite a
"second connecting device for interfacing the interface device with the data
transmit/receive device," which is broader than the language in the '399 patent, because it
does not recite the sampling circuit or the analog-to-digital converter.   Independent claim
18 of the '449 patent recites the step of interfacing a data transmit/receive device with a
broadly recited second connecting device, which does not require any particular sampling
circuit or analog-to-digital converter.

### 4.   First Command Interpreter

The independent claims of the '399 patent recite that the interface device be
configured by the processor and the memory to include a first command interpreter and a
second command interpreter.

In the claims of the '399 patent, the first command interpreter interprets USB
commands, including those USB commands relating to the device enumeration process.
The '449 patent is not limited to a "first command interpreter" because, for example,
claim 1 of the '449 patent recites that the interface device is configured to provide certain
signals in response to a received  inquiry from a host PC.  The host PC is believed to send

several "Get_Descriptor" USB commands to the devices-in-suit. The digital cameras are believed to send responses to the "Get_Descriptor" command which may depend on whether the device is configured as a MSC Digital Camera or a PTP Digital Camera. Such responses are described in further detail below.

**5.   "Signals" to the Host Device and "Customary" in a Host Device**

Claim 1 of the '399 patent recites, in part, that the "the first command interpreter" (which is part of the interface device) sends a signal to the host device "which signals to the host device that it is an input/output device customary in a host device." Claim 1 of the '449 patent recites, in part, that the "interface device" (not necessarily limited to a "command interpreter") sends a signal to the host device "which signals to the host device that it is a storage device customary in a host device."

The phrase "an input/output device customary in a host device" may be understood, for example, by referring to the '399 patent, for example, at column 4, lines 23-39, column 4, line 60 to column 5, line 32, column 8, lines 43-67, and column 12, lines 23-40. Input/output devices customary in a host device include, for example, hard disk drives (e.g. column 8, lines 1-11), floppy disk drives, CD –ROM drives, or tape drives (e.g., column 4, lines 23-39) or printers (e.g., column 9, lines 38-48). Similar disclosures may be referred to for an understanding of the phrase "a storage device customary in a host device," as that phrase is used in the claims of the '449 patent.

The "signals" may be found in the responses to the "Get_Descriptor" USB commands. For example, a Casio Exilim Z75 Digital Camera is believed to respond to a "Get_Descriptor" USB command from a host PC by returning the requested descriptor(s). For example, the Casio Exilim Z75 Digital Camera, when in USB Mass Storage mode, is

believed to return an Interface Descriptor which identifies the Casio Exilim Z75 Digital Camera as having a bInterfaceClass = 0x08, a bInterfaceSubClass = 0x05, and a bInterfaceProtocol = 0x50.  An Interface Descriptor having the above information does not identify the attached device as a camera having an image sensor.  Instead, the Interface Descriptor information given above is believed to signal to the host PC that the Casio Exilim Z75 device is an ATAPI removable rewriteable media device compatible with a SFF-8070i command set.  It is further believed that a host PC receiving the above Interface Descriptor information would recognize the Exilim Z75 digital camera as an ATAPI disk drive.  The host PC automatically loads standard software drivers, such as usbstor.sys, disk.sys and PartMgr.sys, and the host PC communicates with the interface device of the camera by means of such drivers.  The host PC also uses the disk.sys and PartMgr.sys drivers to communicate with hard disk drives.

In another example, a Panasonic DMC-LX1 Digital Camera, when in USB Mass Storage mode, is believed to return an Interface Descriptor which identifies the Panasonic DMC-LX1 Digital Camera as having a bInterfaceClass = 0x08, a bInterfaceSubClass = 0x06, and a bInterfaceProtocol = 0x50.  An Interface Descriptor having the above information does not identify the attached device as a camera having an image sensor.  Instead, the Interface Descriptor information given above is believed to signal to the host PC that the Panasonic DMC-LX1 Digital Camera is a disk drive compatible with a SCSI command set.  It is further believed that a host PC receiving the above Interface Descriptor information would recognize the DMC-LX1 Digital Camera as a SCSI disk drive.  The host PC automatically loads standard software drivers, such as usbstor.sys, disk.sys and PartMgr.sys, and the host PC communicates with the interface device of the

camera by means of such drivers.  The host PC also uses the disk.sys and PartMgr.sys drivers to communicate with hard disk drives.

In another example, an Olympus E-500 Digital Camera, when in USB Mass Storage mode, is believed to return an Interface Descriptor which identifies the Olympus E-500 Digital Camera as having a bInterfaceClass = 0x08, a bInterfaceSubClass = 0x06, and a bInterfaceProtocol = 0x50.  An Interface Descriptor having the above information does not identify the attached device as a camera having an image sensor.  Instead, the Interface Descriptor information given above is believed to signal to the host PC that the Olympus E-500 Digital Camera is a disk compatible with a SCSI command set.  It is further believed that a host PC receiving the above Interface Descriptor information would recognize the Olympus E-500 Digital Camera as a SCSI disk drive.  The host PC automatically loads standard software drivers, such as usbstor.sys, disk.sys and PartMgr.sys, and the host PC communicates with the interface device of the camera by means of such drivers.  The host PC also uses the disk.sys and PartMgr.sys drivers to communicate with hard disk drives.

In another example, in PTP mode, a PTP Digital Camera is believed to respond to a "Get_Descriptor" USB command from a host PC by returning the requested descriptor(s).  For example, the PTP Digital Camera is believed to return an Interface Descriptor which identifies the PTP Digital Camera as having a bInterfaceClass = 0x06. An Interface Descriptor having bInterfaceClass = 0x06 is believed to signal to the host PC that the PTP Digital Camera is an I/O imaging device such as a scanner.  The host PC, in response to this Interface Descriptor, loads and communicates with the interface device of the camera by means of Microsoft standard software drivers, such as usbscan.sys.  The

host PC believed to use the usbscan.sys driver to communicate with imaging devices such as scanners.

### 6. **Host Device Communicates with the Interface Device**

Claim 1 of the '399 patent, for example, recites communication from the host device to the interface device to be by way of a driver for an input/output device customary in a host device:

> whereupon the host device communicates with the interface device by means of the driver for the input/output device customary in a host device, and

The body of claim 1 of the '449 patent, for example, also recites communication between the host device and the interface device, but by way of a driver for a storage device:

> whereupon the host device communicates with the interface device by means of the driver for the storage device customary in a host device, and

Host devices, such as a PC are believed to communicate with the interface device of a Digital Camera-in-suit as recited above. For example, a PC operating Windows XP is believed to communicate with a Casio Exilim Z75 digital camera in USB Mass Storage Mode by means of Microsoft standard software drivers, such as usbstor.sys, disk.sys and PartMgr.sys (disk.sys and PartMgr.sys drivers are also used to communicate with I/O storage devices, such as hard disk drives, and usbstor.sys is used to communicate with hard disk drives attached to a USB port). In another example, a PC operating Windows XP is believed to communicate with a Casio Exilim Z75 digital camera in PTP Mode by means of Microsoft standard software drivers, such as usbscan.sys (the usbscan.sys driver is also used to communicate with imaging devices, such as scanners).

Claim 11 of the '399 patent and claim 17 of the '449 patent, for example, recite communication from the host device to the interface device to be by way of a driver for an input/output device customary in a host device:

> whereupon the host device communicates with the interface device by means of the specific driver for multipurpose interface, and

Host devices, such as a PC are believed to communicate with the interface device of a Casio digital camera as recited above. For example, a PC operating Windows XP is believed to communicate with a MSC Digital Camera by means of a specific software drivers for the multipurpose USB interface, such as usbstor.sys. In another example, a PC operating Windows XP is believed to communicate with a PTP Digital Camera by means of a specific software driver for the multipurpose USB bus, such as usbscan.sys.

### 7. **Second Command Interpreter**

The "second command interpreter" of claim 1 of the '399 patent is a command interpreter that interprets a data request command:

> wherein the second command interpreter is configured to interpret a data request command from the host device to the type of input/output device signaled by the first command interpreter as a data transfer command for initiating a transfer of the digital data to the host device.

The set of USB commands that are interpreted by the first command interpreter, e.g., the "Get_Descriptor" commands and commands like those, do not have a data request command for retrieving, for example, digital data corresponding to images acquired by a Digital Camera-in-suit. Instead, data request commands are specified in different command sets. For example, the SCSI Block Command ("SBC") set includes READ commands. In another example, the ATAPI command set includes many of the SBC commands. MSC Digital Cameras are believed to interpret and respond to the SBC

READ command.  In USB Mass Storage mode, the Casio Exilim Z75 Digital Camera is believed to respond to, for example, a SCSI READ(10) command by transferring one or more requested sectors as specified by the READ(10) command.  It is further believed that the Casio Exilim Z75 Digital Camera will transfer to a host computer digital data representing images acquired by a CCD image sensor and associated components in response to the READ(10) command.  The READ(10) command is, for example, a standard data request command that a host PC may send to a hard disk drive.

Also, the PIMA 15470:2000 specification specifies commands such as "GetObject" (PIMA Commands).  PTP Digital Cameras are believed to interpret this data request command and provide the requested "object," including data representing images acquired by the CCD sensor and digitized by the second connecting device.

The interpretation of the SBC, ATAPI, and/or PIMA commands is believed to occur in a command interpreter other than the command interpreter that interprets the USB device enumeration commands.

### 8.  Virtual File System

The Digital Cameras in suit are believed to represent to a host PC a file system which simulates the existence of addressable sectors, even though flash memory cards do not have any physical "sectors."  This is an example of virtualization of the file system. The term "file system" generally implies the use of rotating media, which is not present in the Digital Cameras-in-suit.

### 9.  Virtual Boot Sequence

The Digital Cameras in suit are believed to send a virtual boot sequence to the host PC in response to a request from the host PC.  For example the written descriptions

of the patents-in-suit explain that when the host device receives the response that indicates that a drive is present, it then sends a request to the interface device to read the boot sequence.  The written description also explains that on actual hard disks, the boot sequence normally resides on the first sectors of the disk.  It is believed that, upon identifying the MSC Digital Camera as a disk drive, the host PC sends a read request to the MSC Digital Camera to read the first sector of the disk drive (which is a virtual disk drive).

In response to the request to read the first sector of the hard disk, the MSC Digital Camera is believed to send a 512 byte sector of information to the host PC.  This 512 byte sector appears to contain the information of a master boot record (MBR), including partition information, which indicates the location of, for example, a boot sector.  The MBR and the boot sector of the MSC Digital Camera, like the example given in the written description, are believed to include the drive type, the starting position and the length of the file allocation table (FAT), the number of sectors, etc

Documents and things that relate to infringement as pointed out above include, but are not limited to, the patents-in-suit and their respective file histories, the devices made by the Camera Manufacturers that are configurable to operate as a MSC Digital Camera and/or as a PTP Digital Camera, including the devices specifically identified in this response, Universal Serial Bus Specification, Revision 2.0, Universal Serial Bus Common Class Specification, Revision 1.0, Universal Serial Bus Mass Storage Class Specification Overview, Revision 1.2, Universal Serial Bus Mass Storage Class Bulk-Only Transport, Revision 1.0, USB Still Image Capture Device Definition, Revision 1.0, SCSI Block Commands-2 (SBC-2) (T10/1417-D) and/ or SCSI Block Commands - 3

(SBC-3) (T10/1799-D), PIMA 15740:2000, Picture Transfer Protocol (PTP) for Digital Still Photography Devices, and/or ISO 15740:2005, Picture Transfer Protocol (PTP) for Digital Still Photography Devices.

Additional documents that may relate or refer to the infringement of the patents in suit by products manufactured and/or sold by the parties in suit include documents which may be found in the following ranges: PAP0000377-PAP0000509, PAP0018972-PAP0019046, PAP0000920-PAP0001021, PAP 0019082-PAP0019155, PAP0000042-PAP0000106, PAP0019239-PAP0019285, PAP0010286-PAP0019313, PAP0001918-PAP0002010, PAP0021190-PAP0021244, PAP0001622-PAP0001688, PAP0021128-PAP0021182, PAP0000107-PAP0000184, PAP0019314-PAP0019367.


INTERROGATORY NO. 3

Identify all alleged secondary considerations or other objective evidence that defendant contends evidence non-obviousness of any one or more of the claims of the '449 and '399 patents, state all supporting facts including all evidence attributing the secondary considerations to the claims, identify all persons having knowledge or such facts, and identify all documents relating to, referring to, describing or constituting any response hereto.

**ANSWER:**




# REDACTED

**REDACTED**

# REDACTED

INTERROGATORY NO. 4

Identify all persons with or to whom Papst or any other person, has discussed a license, offered a license, negotiated a license or agreed to a license under the patents-in-suit (or any claim thereof), including, but not limited to, the identity of each person communicated with, the date of such communication, the financial terms of such discussion, offer, negotiation or license, the identity of all documents and things concerning each such discussion, offer, negotiation or license, and the identity of persons most knowledgeable about each such discussion, offer, negotiation or license.

**ANSWER:**

# REDACTED

# REDACTED

INTERROGATORY NO. 5

State the art area and level of ordinary skill in the art pertaining to the patents-in-suit and state in detail all bases for each such contention.

ANSWER:

# REDACTED

INTERROGATORY NO. 6

Separately for each claim of the patents-in-suit that Papst asserts is infringed by Casio, describe in full and complete detail the facts concerning the conception and reduction to practice of the alleged invention. To be complete, your response should state the specific dates of such conception and reduction to practice, identify each person involved in such conception and reduction to practice, describe the location and circumstances of the conception and reduction to practice, and identify all documents and things tending to establish, refute or identify the dates, locations, individuals or circumstances sought in this interrogatory and any alleged corroboration.

79

ANSWER:

**REDACTED**

Dated:  May 9, 2008

AS TO PRELIMINARY STATEMENTS
AND GENERAL OBJECTION:

/s/ Jerold B. Schnayer
Jerold B. Schnayer
Joseph E. Cwik
WELSH & KATZ, LTD.
120 South Riverside Plaza ● 22nd Floor
Chicago, Illinois 60606
(312) 655-1500

**Attorneys Papst Licensing GmbH & Co.
KG**

81

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing PAPST'S SECOND SUPPLEMENTAL ANSWERS TO CASIO INC'S FIRST SET OF INTERROGATORIES was caused to be served on this the 9th day of May, 2008 upon the attorneys for the Camera Manufacturers via .pdf format as follows:

*__For The Casio Parties__:*
Laura Krawczyk
Morgan Lewis & Bockius
101 Park Avenue
New York, NY 10178-0060
Phone: (212) 309-6000
Fax: (212) 309-6001
lkrawczyk@morganlewis.com

J. Kevin Fee
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
jkfee@morganlewis.com

Scott D. Stimpson
The Law Office of Scott Stimpson
Suite 1102
445 Hamilton Avenue
White Plains, NY 10601
stimpsonlaw@gmail.com

*__For The Samsung Parties__:*
Patrick J. Kelleher
Drinker Biddle Gardner Carton
191 North Wacker Drive
Suite 3700
Chicago, IL 60606-1698
Phone: (312) 569-1375
Fax: (312) 569-3375
Patrick.kelleher@dbr.com

**_For The Fujifilm Parties_**_:_
Steven J. Routh
Sten A. Jensen
John R. Inge
Robert Wolinsky
Hogan & Hartson, LLP
555 Thirteenth Street, N.W.
Washington, DC 20004
Phone:  (202) 637-5600
Fax:  (202) 637-5910
sjrouth@hhlaw.com
sajensen@hhlaw.com
JRInge@HHLAW.com
RBWolinsky@HHLAW.com


**_For the Olympus Parties_**_:_
Richard de Bodo
Rachel M. Cappoccia
Hogan & Hartson, LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
Phone:  (310) 785-4694
Fax:  (310) 785-4601
rdebodo@hhlaw.com
rmcapoccia@hhlaw.com


**_For The Matsushita and Victory Company of Japan Parties_**_:_
Richard de Bodo
Rachel M. Capoccia
Hogan & Hartson, LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
Phone: (310) 785-4694
Fax: (310) 785-4601
rdebodo@hhlaw.com
rmcapoccia@hhlaw.com

**_For the Ricoh Parties_**:
Paul Devinsky
MCDERMOTT, WILL & EMERY
600 13th Street, NW
Washington, DC 20005-3096
(202) 756-8369
Fax: (202) 756-8087
Email: pdevinsky@mwe.com


**_For Hewlett-Packard_**:
Heather N. Mewes
Fenwick & West, LLP
555 California St., 12th Floor
San Francisco, CA 94104
(415) 875-2300
hmewes@fenwick.com


/s/ Jerold B. Schnayer
Attorney for Papst Licensing GmbH & Co. KG

EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE: PAPST LICENSING        :
GMBH & CO. KG LITIGATION      :
                              :           Misc. Action No. 07-493
                              :           MDL Docket No. 1880
                              :
                              :           Washington, D.C.
                              :           Tuesday, April 22, 2008
- - - - - - - - - - - - - - -x               2:30 p.m.


TRANSCRIPT OF TELECONFERENCE
BEFORE THE HONORABLE ROSEMARY M. COLLYER
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiffs:        Robert F. Muse, Esquire
                           Kerri Dent, Esquire
                           STEIN, MITCHELL & MEZINES
                           1100 Connecticut Avenue, NW
                           Washington, DC  20036

                           James P. White, Esquire
                           Jerold B. Schnayer, Esquire
                           Joseph Swik, Esquire
                           WELSH & KATZ, LTD.
                           120 South Riverside Plaza 22nd Floor
                           Chicago, IL 60606-3912


For the Defendants:        SCOTT D. STIMPSON, Esquire
                           The Law Office of Scott Stimpson
                           445 Hamilton Ave.
                           White Plains, NY  10601

                           J. Kevin Fee, Esquire
                           Laura Krawczyk, Esquire
                           Kevin He, Esquire
                           MORGAN LEWIS & BOCKIUS LLP
                           1111 Pennsylvania Avenue, NW
                           Washington, DC  20004

COPY

```
 1   Appearances continued:

 2   For the Defendants:           PATRICK J. KELLEHER, Esquire
                                   Drinker Biddle & Reath LLP
 3                                 191 North Wacker Drive
                                   Suite 3700
 4                                 Chicago, IL  60606-1698

 5

 6   Court Reporter:               CRYSTAL M. PILGRIM, RPR
                                   United States District Court
 7                                 District of Columbia
                                   333 Constitution Avenue, NW
 8                                 Room 4704
                                   Washington, DC  20001
 9

10   Proceedings recorded by machine shorthand, transcript produced
     by computer-aided transcription.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE DEPUTY CLERK:  Miscellaneous Action 07-493, Papst

2  Licensing Digital Camera Patent Litigation versus Casio

3  America, Incorporated, et al.

4          Counsel, please identify yourselves for the record.

5          MR. STIMPSON:  For Casio is Scott Stimpson and with

6  me is Kevin Fee, Laura Krawczyk and Kevin He, all of Morgan

7  Lewis.

8          MR. WHITE:  For Papst it's Jim White, Jerry Schnayer,

9  and Joseph Swik.

10         MR. STIMPSON:  Actually, I'm advised that Kevin Fee

11 was lost for some reason.

12         Your Honor, I can conference him back in, if that's

13 okay.

14         THE COURT:  Yes.

15         MR. STIMPSON:  I think I can.

16     You're back on the conference call?

17         MR. FEE:  Thank you.  Sorry about that, Your Honor.

18         THE COURT:  Alrighty.  We're going to make an

19 experiment today to do this by telephone so that people don't

20 have to travel for purposes of arguing what are discovery

21 motions.

22         What it means though is that only one person can speak

23 at a time because only one person can be heard at a time.

24         I don't usually use a gavel because I don't need it in

25 court.  But I do have a gavel and I will use it if people are

1    talking over each other because sometimes the noise of the

2    gavel is loud enough to sort of break through.

3         Do you understand what I'm saying?

4              MR. STIMPSON:  Yes, Your Honor.

5              MR. WHITE:  Yeah, Your Honor.

6              MR. SCHNAYER: Yes, Your Honor.

7              THE COURT:  Now, Papst if Mr. White is going to speak

8    for Papst, then Mr. White is going to speak for Papst.  If

9    Mr. Schnayer wishes to speak to a specific issue, he can speak

10   to a specific issue.  He cannot argue the same points or issues

11   that Mr. White is arguing.

12             MR. WHITE:  Understood, Your Honor.

13             THE COURT:  All right.  Now I'm going to start with,

14   I have four motions here to discuss.  One is Papst's motion to

15   compel production.  One is Papst's motion to compel

16   interrogatory answers.

17        One is Casio's motion for sanctions and to strike

18   Papst's discovery request and one is Casio's motion for

19   sanctions.  These are all kind of related and wrapped up as

20   kind of joint issues.

21        Let me start with the concept that I have three points

22   to make.  One is that the initial Papst's discovery requests

23   were outrageously over the top.  And I don't know about

24   sanctions at the moment.  But I do know that they were

25   outrageously over the top, and I am hopeful that Papst will not

1  be playing those games with the other defendants who are in

2  this case and coming.  I got notice today that Hewlett-Packard

3  would be joining us soon.

4        So I just want to tell Papst's lawyers that we are doing

5  a streamlined piece of litigation here and we are not using

6  discovery as a weapon.  It is a tool of discovery, and so don't

7  do it again.  Now let's move on.

8        The bifurcation which I have ordered it seems to me

9  omits or takes care of 35 requests for production of documents.

10  If you go through it you can figure out which ones they are.

11  And so I think that we don't have to worry about those and we

12  don't have to talk about them.

13        The real question is, the problem that I have is that

14  each of you has filed with me documents that were timely when

15  you filed them last June.  They're not actually timely right

16  now because events have proceeded.

17        Now Papst in its original requests which I said were

18  outrageously over the top says no, no, we've limited them.  And

19  on page 3 of their motion to compel which is document 45 on

20  this docket, Papst lists the eight areas in which it says it

21  really needs discovery.

22        Casio responds and says no, no, no, they say they've

23  narrowed it, but it's not really narrowed and in any event,

24  it's far too broad but we will produce some things.

25        Then if I move forward to document 51 in this docket, I

1  find that Papst redefines what it's seeking on page 1 of that

2  document.  So if I look at document 45 it says number one,

3  Papst is asking about the acquisition and processing of light

4  images by cameras including for example, the conversion of

5  light images into electrical signals representative of the

6  light images.

7      But on page 1 of Papst's reply, Papst tells me no, we've

8  only sought quote, the processing by a camera of electrical

9  signals representative of light signals including the

10 conversion of analog signals representative of light images, et

11 cetera.

12      So you see, I don't know what Papst has asked for.  I

13 can't tell you what Casio has responded.  Casio said last

14 spring we're going to produce some documents.  You haven't told

15 me what documents, if any, Casio has produced in the meantime.

16 I mean, you guys are caught up in litigating something that is

17 half a year or more old.

18      Really, do we need to litigate this?  Do you absolutely

19 have to have an answer to these ancient questions?  Can't I

20 just say listen, this is a patent litigation suit and it's time

21 that we stop playing games and moved forward.

22      Papst has to redo its discovery and it has to redo it in

23 simple English.  But more than that, more than that, Papst

24 maybe this is the way to do this, that Papst should be required

25 to submit a statement to contain a detailed explanation of its

1  infringement contentions which everybody has been asking for

2  since this began.  I assume that Papst has been acting in good

3  faith as it wondered around the world approaching Digital

4  Camera manufacturers, demanding royalties, that Papst has an

5  idea as to how these Digital Cameras infringe its patent.  So I

6  think the thing to do now is to say okay, Papst, put them up.

7      In Papst's briefs because these were filed way last

8  spring, it's still arguing as if Casio is the plaintiff and

9  it's the poor defendant.  After all, Casio came into this

10  litigation let them be prepared to move first.

11      I've already told you Papst is going to be treated as

12  the plaintiff.  Casio and all of the other manufacturers as

13  defendants because that's really the reality of the situation.

14  So Papst has to speak first.  And it's time that Papst did so.

15      Now, let me get back to these motions.  Do you really

16  need me to rule on them all?

17      MR. STIMPSON:  Your Honor, this is Scott Stimpson

18  speaking for Casio.

19      I think three of the motions are very closely related,

20  the motion to strike and two Papst's motions to compel.

21      Actually, Your Honor, our motion to strike might resolve

22  a lot of these issues, I am hopeful, because we have proposed

23  that we produce documents relating and sufficient to show the

24  structure and operation of the camera, and I would hope that

25  that would be enough.

1        I mean, one of the things Your Honor mentioned was the

2   possibility of Papst redoing this discovery and serving

3   additional requests.

4        From Casio's perspective, I mean, we've been through

5   this and it's been an absolute nightmare.

6        THE COURT:  Well, the question is has Casio responded

7   to Papst's discovery?  Well, the first question is what is

8   Papst's discovery?  I mean, I cannot tell you from looking at

9   the documentation you've given me and all of the briefs exactly

10  what it is that Papst is currently asking for or was currently

11  asking for let's say pick a time period last August.  I have no

12  way of knowing because this is a moving bobble.

13       Now this is not the way that you guys should be

14  litigating and it's certainly not the posture you want to be in

15  front of a Court.  You look like you're all playing delay games

16  and expense games instead of serving your clients.

17       Now, I will not allow delay and expense games.  I will

18  be really rough with somebody that I think is only playing

19  delay and expense games.  But this is when the case was before

20  two other judges.

21       So if Papst, if you're confident that Casio knows what

22  Papst has been asking for and if Papst is happy with the

23  information it's received from Casio, well then, fine.  That's

24  great.

25       If you don't know what Papst was asking for, you're in

1  the same position I am and Papst hasn't even told me.  All

2  Papst tells me is well, we've backed up a little.  We started

3  in a simply outrageous place and we've backed up some, but I

4  don't know how far.

5      And I mean, I know that telling Papst that they started

6  in an outrageous place is delivering any new news to any of

7  you.  So that's, you know, and besides which Magistrate Judge

8  Robinson already ruled on this.

9      MR. SCHNAYER:  Your Honor, this is Schnayer.

10  May I speak, please?

11      THE COURT:  Yes, sir.

12      MR. SCHNAYER:  Can I start -- this may take a bit of

13  time too.

14      THE COURT:  I do not want any history.  Mr.Mr.

15  Schnayer, you wasted my time at the last hearing.  Do not waste

16  my time again by positing your client as a really good

17  wonderful group of guys.

18      Now I want you to address the issues we're talking about

19  today.

20      MR. SCHNAYER:  Yes, Your Honor.

21  Let me start by then getting very specific if I can with

22  the issues, the things that are at issue here.  Your Honor, we

23  sent a letter to the opposing counsel dated June 12th, 2007

24  which is part of our filing document 52, I guess it's actually

25  45.

1      The document is Exhibit E to our motion to compel and

2  what we do is we tried to make a list of items that were items

3  that were relevant to the claim language at issue involved in

4  the lawsuit.

5      What we did if you look at our Exhibit F, we take

6  exactly those claim language and we refer specifically to claim

7  one of the patent.  We describe in there with regard to claim

8  one exactly where in the patent claim that it calls for that

9  particular element.  So we tried to be very specific so we can

10  show the Court where that occurred.

11      So each one of our eight elements we showed support in,

12  support in the patent claim.  Recently, Your Honor, Casio --

13  not recently -- but in the end of the last case that was down,

14  when it was down before the prior Judge, they answered

15  supplemental interrogatory answers.  And in those answers they

16  raised the elements of two of the claims that were at issue.

17  Claim one of one patent and claim two is the other patent.

18      If you go through it, it's several pages long, they

19  exactly contest the meaning of claim elements that relate to

20  those particular, the eight items that we included on our list.

21  So they have hotly contested.  They have put those at issue in

22  the case.

23      Then that is one reason why we decided that if we were

24  going to limit things to relate to the issues in the case, the

25  things that they put at issue are things that we should direct

1  our attention to.  They have contested what the claims mean and

2  whether they're, the devices are covered by those claim

3  elements.  So what we tried to do is to say let's limit what

4  we're asking for to those particular elements.

5       Those are the ones that they put at issue.  Those are

6  the ones that they're going to complain about.  Those are the

7  ones that they're addressing in their interrogatory answers so

8  let's put those at issue.

9       By the way, Your Honor, Papst recently filed in

10 accordance with, we had a conference a few weeks ago, we filed

11 our contentions responding very specifically to those claim

12 elements that they had.  We put in a lot of detail.  We're

13 trying to comply with our discovery obligations.

14      We addressed all of, they had pieces of prior art they

15 claim were relevant, we addressed every single piece of prior

16 art.  We explained prior art, we explained why it wasn't

17 invalidating and all of the claim elements, all of their

18 interpretations we explained in great detail why they're wrong

19 and why we don't agree they're correct.

20      THE COURT:  What is the file docket number of the

21 document you're talking about?

22      MR. SCHNAYER:  I'm looking at -- where these

23 attachments are?

24      THE COURT:  Your contentions in a lot of detail and

25 all of that, what docket number is that?

1          MR. SCHNAYER:  It's not filed, it was discovery that

2    was served.  We certainly can send you a copy of it.

3          THE COURT:  Well, filed and served are different.

4    You make me feel better, keep going.

5          MR. SCHNAYER:  You don't have a copy.  We agreed not

6    to, I think we're not suppose to file those.

7          THE COURT:  Correct.

8          MR. SCHNAYER:  Unless it becomes an issue.

9       So we actually provided them with a lot of detail.

10   We're trying to comply with our discovery obligations.  We

11   exactly addressed the issues that they addressed.  But those

12   are the questions that are at issue in this case.

13       And there's a lot of, there's a lot of issues now that

14   that raises under the patent law.  Number one, when you got to

15   know what the level of skill and the art is you got to know

16   what the claim language means.  You got to know what there's,

17   what they call secondary abuse and ability.

18       Secondary dependability are more significant then other

19   issues to the patentability. What they are attempting --

20   failure by others.  Skepticism by people skilled in the art,

21   long felt need, commercial success.  These are very well

22   defined patent law concepts and we tried to address in our

23   papers, in our document requests those issues and then when

24   Casio complained about it and we understand it's a fair amount

25   of documents, but how do you get the documents that are

1    relevant to the patent issues that are in this case without

2    getting them?

3            We limited it, to try to limit it to the issues that

4    we felt were the technical issues that are involved

5    specifically with the claims and with which Casio agreed with

6    because that's the exact issues they raised in their papers.

7        And so we did try and limit the discovery that we had in

8    this case.  And I don't know how to deal with these issues.

9    Unfortunately, some of these are very broad issues.  We tried

10   to cite case law to show you these were issues that are

11   relevant in the patent law.

12           I was involved in a case recently --

13           THE COURT:  I don't need -- wait, wait.  Stop, stop.

14   I don't need to hear more about that.

15           MR. SCHNAYER:  Yes, ma'am.

16           THE COURT:  What I'm trying to do is figure out where

17   we go from here.  Let me just take you through the Papst motion

18   to compel the production of documents.

19           MR. SCHNAYER:  Yes, ma'am.

20           THE COURT:  The first thing is you argue on page 3,

21   this is document number 45 in the docket which is the only way

22   I can keep track of what we're doing, is that here we've

23   limited our requests for documents and we've limited them to

24   these eight issues that are listed there.

25           And then you say Casio must produce documents for

1  products that may yet be accused of infringement.  If things

2  were not used, manufactured, sold or offered for sale, licensed

3  or imported into the United States, they're not relevant and I

4  don't see that Casio has to produce information about them.  I

5  know you have an argument about that.  I'm just telling you I

6  don't see where that comes from.

7      Then we have Casio must produce documents relating to

8  activities outside of the United States.  Communications with

9  customer sales, revenues, profits and marketing materials.

10  These are activities outside of the United States, I don't see

11  that they're relevant.  I literally don't see how

12  communications with customers anywhere else in the world are

13  relevant.  And you haven't limited that request in any fashion

14  to allow it to be relevant.  So all of that gets stricken at

15  the moment.

16      Casio cannot withhold documents on the basis of

17  confidentiality.  I think we have resolved that with a

18  protective order.

19      Casio must, request documents on a date certain.  Casio

20  has agreed to produce all responsive and non-privileged

21  documents.

22      Has that been done?

23      MR. STIMPSON:  Your Honor, we have produced

24  additional documents but they have not all been produced, the

25  reason being that we had a protective order which is now

1   resolved.  They are all going to be produced.  We can start

2   that production as early as maybe this week or next week.  And

3   we have not received many, many documents.

4           THE COURT:  Well, don't talk about what you haven't

5   received.  Talk about what you're going to do.

6       So this is not completed yet and your answer is well, we

7   needed a protective order.  You now have a protective order,

8   you will get this done within two weeks.

9           MR. STIMPSON:  We will, Your Honor.  Thank you.

10          THE COURT:  All right, Casio must produce all other

11  relevant documents.

12      Then we turn the page.  Casio's financial documents.  We

13  don't need financial documents because we've bifurcated.

14      Papst has requested documents on the legal control issue

15  to show that Casio Japan and Casio U.S.A. do have control over

16  other Casio entities.  Just on the face of it since Casio Japan

17  is a defendant, we don't give a damn, excuse the French, for

18  whether Casio U.S.A. has control.  And we will assume that it

19  does not.  If you find any reason to believe that it might,

20  then it might and you can follow that through.  But your

21  request for documents to Casio U.S.A. for documents from some

22  place in Hong Kong or anywhere else is inappropriate and

23  improper.  You can ask Casio Japan about those things and then

24  Casio Japan can argue about their relevance.

25      Now we get down to the details of the information

1   systems.  We have been around and around about the  information

2   systems.  I still don't understand why you want it or need it.

3   And I'm striking it unless you come up with a better reason.

4        Then we move on to documents regarding other lawsuits.

5   You want a previous admissions on claim interpretations and the

6   operation of its cameras.  I'm not quite sure what documents --

7   I'm sorry, I have actually read through all of this but right

8   now I can't recall right now.  What documents, what kinds of

9   other documents are you looking for?

10        MR. SCHNAYER:  We know of one particular case, Your

11   Honor, which was recent we referred to in our papers and the,

12   there were cases where Casio was sued for patent infringement

13   we understand and of these very same product and the issue is

14   if they have documents that were produced or information from

15   that lawsuit that's relevant to this lawsuit, we think it's

16   appropriate that they produce it.

17        These are very, the issues involved in the cases I think

18   are similar.  They involve the electronics of the devices that

19   are at issue here.  And I think we'll probably find it will

20   tell us a lot of details about it.

21        THE COURT:  Okay, but you didn't tell me what

22   documents did you ask for.

23        MR. SCHNAYER:  Well, we asked for the pleadings, and

24   if they produced documents in the case if there was document

25   requests where we can see what kind of documents were produced

1   or things of that nature, then we would like to --

2          THE COURT:  So what you want is for Casio to produce

3   in this litigation everything it produced in another litigation

4   with another party?

5          MR. SCHNAYER:  Yes, Your Honor.

6          THE COURT:  Well that, I mean, that's just grossly

7   overbroad.  I'm sorry, you can't ask things like that.  You

8   have to figure out what your claims are, and then identify

9   whatever kinds of documents you think might be in another piece

10  of litigation and you limit your requests to those kinds of

11  documents.  You don't know the precise document, you know, the

12  one with Bates stamp number 1242, of course not.  But you can't

13  ask for every document ever produced in response to somebody

14  else's document requests.

15         If you think there's something relevant in there to the

16  electronics of the camera operation, then figure out a way to

17  ask for that unless you're already too late.  But that, I mean,

18  that's just, this is the problem we have with the way that you

19  put together your discovery.

20         You did it, I don't know swarth dearth, is that the way

21  you describe this kind of thing?  But it's simply stunning,

22  absolutely stunning and I'm sorry I didn't have the case to

23  begin with because I would have addressed it a long time ago.

24  Here we are a year later and it's long over, water over the dam

25  and I'm still fussing about this nonsense.

1          All right, prior art.  You asked for prior art and Casio

2   said only the prior art on which it intends to rely.

3          How do you defend that position?

4              MR. SCHNAYER:  Here's the problem, Your Honor.

5              THE COURT:  No, no, that's Mr. Schnayer, right?

6              MR. SCHNAYER:  This is Mr. Schnayer.

7              THE COURT:  I don't need to hear from Mr. Schnayer.

8   I misspoke, forgive me if I indicated I did.

9          Who I need to hear from is Mr. Stimpson.

10             MR. STIMPSON:  Yes, Your Honor.

11         If we're not relying on prior art, I don't see how it's

12  relevant.  I mean, Papst has not put forth any position that

13  would -- what I'm really concerned about here is for example,

14  their request is every piece of prior art.  Now on the face of

15  that that may not seem so bad.

16         For example, Casio has I don't know, maybe hundreds of

17  patent applications relating to the technology and every one of

18  those you get prior art cited against every patent application.

19  I mean, we literally read the Papst requests which requires us

20  to prove all that.  It would just be an enormous undertaking.

21         And if there's anything specific that Papst needs for

22  whatever reason, certainly any prior art that we're relying on

23  it is after all a defense, I mean, we'll give it to them.

24             THE COURT:  Read to me because I don't have it -- oh,

25  I do have it but it's hard for me to find -- the exact request

1  for documents here.

2          MR. STIMPSON:  Let me see, this is 51?

3          THE COURT:  Fifty, 51 and 53.

4          MR. STIMPSON:  Fifty-one says all documents

5  constituting recording, evidencing or referring to any alleged

6  prior art relevant.  All documents provide written

7  corroboration.

8      I'm just referring to one more time.  So they refer

9  first of all, it says anything relevant to the fact in the suit

10  and that's a problem because how do we define that.  But if

11  there's anything we're going to rely on of course we're going

12  to give it to them.  If there's anything else that they

13  specifically need, then we would be happy to consider that by

14  just telling us anything relevant to the patent which Papst is

15  interpreting to be relevant to Digital Cameras that is just an

16  enormous undertaking.

17          THE COURT:  Well, now the patents, Mr. Schnayer, what

18  would you tell me because you referenced electronics, what

19  would you tell me these patents actually cover in English?

20          MR. SCHNAYER:  The only way really for me to tell you

21  that is to go through the claims the way I did before.  They

22  cover and I can do this from memory.  But they cover, it's a

23  combination of elements including, and they put this all at

24  issue in recent interrogatory.

25          THE COURT:  No, answer my question.  Don't get

1    argumentative, just answer my question.

2             MR. SCHNAYER:  Could you repeat it, please?

3             THE COURT:  Yeah, tell me what these patents actually

4    cover?

5             MR. SCHNAYER:  I'll do the best I can without patent,

6    the claim in front of me.  They cover variations of a transmit

7    receive device attached to a device called an interface device.

8    The interface device has a circuitry which some of the claims

9    require circuits that sample, signals that come from the data

10   transmit receive device, and then there's an A P converter

11   which converts the analog signal to digital.  Then there is a

12   processor which processes the information, and typically can

13   store the information in a memory that then also this interface

14   device can be hooked up to a standard computer which has

15   software drivers which are customary in device -- excuse me --

16   they have software drivers which are for input output devices

17   customary for example, like a hard disk drive.

18        What happens is the device sends a signal, the computer

19   you connect this interface device to the, to the computer, and

20   the computer sends a signal out saying what are you.  It sends

21   out an inquiry.  There's generally first an interpreter which

22   is a software/hardware function.  In other words, it's a

23   computer operating a certain way which will then send a signal,

24   will send a signal back generally indicating that is it for

25   example, a hard disk drive when in fact it's really connected

1  to a camera.

2      Then the computer is then able to communicate with the,

3  with the interface device by way of that specific driver which

4  typically is a very efficient driver to transport the

5  information which was originally downloaded to the memory for

6  example, and it transmits it to the computer.

7      Now there's some claims directed for example, to exactly

8  how it transmits that information.  Some of the claims require

9  hard disk drives.  The particular information, we generated

10  some very, very, specific interrogatories to these what are

11  called identifiers in computer language.  They're particular

12  pieces of information that you look for and if you know they're

13  there then it goes a long way to tell you whether there's an

14  infringing device.

15      Those are interrogatories we addressed to everybody but

16  Casio because this issue came up about whether we can serve

17  more requests on them.  Those interrogatories we were going to

18  actually propose off the record to Casio, haven't had a chance

19  yet that if they would agree to answer those, those would go a

20  long way to get us a lot of the information we need.

21      But that's a generality of what this patent concerns.

22  It's this interface device with particular circuitry that

23  operates in a certain way and it could be connected to a

24  computer that operates in a certain way.  And the data transmit

25  receive device is for example, a lens.  And it's the way

1   information data like a picture image could come in and then

2   it's made into signals that can then be processed by this

3   interface device.

4           THE COURT:  What does this have to do with the

5   conversion of light images into electrical signals?

6           MR. SCHNAYER:  Because the issue of converting light

7   images into a particular signal is exactly, they claim that

8   the, that is not present in their device and they claim that

9   the data transmit receive device, there's several issues.

10          One is they claim that it doesn't have to be connected

11  to the interface device, they say it could be interchangeable.

12  And they claim that that word doesn't cover their device, their

13  camera.  But the issue of how the light comes in and how it's

14  processed is very significant and how it's processed internally

15  by the micro processor of the control circuit of the camera

16  tells us whether it infringes or not.

17          THE COURT:  Okay.  So then how would you better

18  define your requests for all documents about prior art relevant

19  to the patents in suit?  What does that mean?  What are you

20  asking for?

21          MR. SCHNAYER:  Your Honor, to the extent that they

22  are going to assert prior art against our patents, certainly

23  they should be required to identify those.

24          THE COURT:  Well, yes.  They say, Casio says that any

25  prior art that they're going to rely upon they're going to

1    produce and you're unhappy with that limitation.

2        So I'm saying well, what did you mean when you said

3    prior art relevant to the patents?  I mean, you just described

4    to me what the patents do.

5        MR. SCHNAYER:  If they're going to -- it's the rest

6    of the request that we're concerned about.  It's not the

7    beginning part.

8        If they say we're going to give you all prior art that

9    we consider to be relevant and that we're going to be using,

10   that's fine.  As long as they're limited to that.  But the rest

11   of it is what is important.

12       It says including all documents that provide written

13   corroboration that any actual product constituting alleged

14   prior art was not on sale or sold anywhere in the United

15   States.

16       Prior art doesn't have to be a patent.  It could be

17   somebody invented something.  One of the problems is that if

18   you want to, if you want to be able to cross-examine their

19   prior art, you need all of the background details of that prior

20   art.  So what they may have done for example, and I can tell

21   you I'm sure they did regarding some Kodak prior art.

22       If they have any information about that prior art or

23   devices built in accordance with that prior art, then that's

24   the information we may need to cross-examine that prior art to

25   show what it really meant.  They may say oh, look at what this

1   prior art teaches and they may have documents in their file

2   that show that's not what it teaches, it teaches something

3   different.

4          THE COURT:  Wait, wait, let me go back and read that

5   to me agin.

6          You said written corroboration that any, keep going, any

7   product that was prior art was not on sale?  Is that what you

8   said?

9          MR. SCHNAYER:  Right.  One of the issues is if you

10  had documents concerning prior art one of the issues is whether

11  there was a device on sale in the United States, more than one

12  year, there's a period of time but specifically about the time

13  that patent, he came up with this invention.

14         And they could come in with some documents trying to

15  show that this device was on sale and I have had this happen in

16  cases where they present some of the evidence and not all of

17  the evidence.  There may be other evidence to show that what

18  was sold didn't work.  And all we want to do is make sure that

19  they don't give us part of the information, they give us all

20  the information so we can cross-examine it.  And that's what

21  and that's real clear, that's what we meant by this.  They got

22  to give us all of the information about the prior art so that

23  they can't argue it being something different and we can't

24  cross-examine it.

25         If it's on sale, they assert it's on sale, they got to

1  give us the good documents and bad documents, everything about

2  that document that is on sale so we're not surprised.

3  Otherwise, we have no way of cross examining.

4          THE COURT:  But what you said was written

5  corroboration that any product that was prior art was not on

6  sale.  You didn't say was on sale, you said was not on sale.

7          MR. SCHNAYER:  Right.  And that would be for example,

8  documents -- they may say oh, look, this device was sold.  And

9  here's a document, here's the sales brochure or something that

10  shows that it's on sale.

11      And we may say, wait a minute.  Here's another document

12  to show that it never was delivered, to show it wasn't on sale.

13  They want to show it was on sale.  We want to show it wasn't on

14  sale.

15          THE COURT:  Okay.  Mr. Stimpson, do you understand

16  that?

17          MR. STIMPSON:  I think so, Your Honor.  I think it's,

18  there's no particular prior art I'm thinking of right now, but

19  what they're saying I think is if we're saying a piece of prior

20  art is prior art because it was on sale and we got documents

21  showing it wasn't in fact on sale, then we got to give it to

22  them.  And that's okay, if we're going to do that, we'll give

23  them documents showing that it was on sale.  If we have

24  documents showing that it wasn't on sale, then we'll give them

25  that too.

1          THE COURT:  Alrighty.

2          MR. SCHNAYER:  In addition, Your Honor, if there's

3    any evidence about prior art which relates to the subject

4    matter relevant to the patents in suit, then I think they

5    should be required to produce it.  For example --

6          THE COURT:  I'm afraid that your language is

7    overbroad.  Subject matter that was relevant to the patents in

8    suit.

9          Now, sir, you have to ask for things with more clarity

10   than that if you want to get your request enforced.  I mean,

11   that is a bunch of words that has no meaning, except in your

12   mind, it has no meaning to a reader.  It's too broad.

13         I mean, you just, you can't ask me to enforce that

14   request.  Who knows what you mean?  It's not possible to

15   discern from the words themselves.

16         You know, you're going to have to learn to do this, at

17   least in this case, you're going to have to learn to do this

18   with a lot more specificity than that kind of stuff.  Because I

19   cannot say to Casio you got to produce it because I don't know

20   what you're even asking for.  And I can't ask Casio to spend

21   time on the telephone repeatedly so you can explain to us what

22   it was you meant.

23         MR. SCHNAYER:  Your Honor, may I raise one issue,

24   please?

25         THE COURT:  Yes.

1          MR. SCHNAYER:  One of the things that I would expect

2    to happen with regard to these particular requests counsel for

3    Casio is an experienced patent attorney.  And if we were to sit

4    down and review these together and really had a good faith

5    discussion about these particular requests, I think that he

6    knows what would be appropriate and what he understands, he

7    understands what these are about.  And I think that would be

8    one way for us to try and resolve these matters, and, you know,

9    try and reach agreement on some of this.

10          THE COURT:  Well, you submitted these to the Judge in

11   June of 2007 which means you submitted them to Casio longer ago

12   than that.  And there's been a whole lot of time to talk about

13   and all you managed to do, and this is not directed to you

14   personally, Mr. Schnayer, is just argue about things, the two

15   of you, you're having a great time.

16          Now let me go on.  I think I've gone through Papst's

17   original motion pretty much except for the documents

18   demonstrating the identity of individuals and businesses

19   involved in Casio's infringing activities.

20          Again, I think that you're dangerously close to being so

21   grossly overbroad and you're too late to change it now and now

22   what are you going to do?  How can I enforce it?  I mean,

23   you've let yourself get to the end of a limb.

24          I mean, I just have to tell you now I think Casio has

25   been overly protective.  Don't get me wrong, Casio has played

1  its own games.  They're just not quite as over the top because

2  they don't start with the requests from Papst.  But I mean,

3  Casio can't pretend that none of the requests from Papst are

4  relevant, that they don't understand any of them, that they've

5  never litigated a patent case before.

6      So gentlemen, you have to act as professionals in this

7  matter.  I don't want any more gamesmanship.  I have a booklet

8  here, a big thick three ring booklet with all of your

9  pleadings.  I complained at lunch that in this case nobody

10  knows how to speak in less than a hundred pages.

11      I mean, I'm not going to do this this way.  If you

12  insist on litigating this way, you're going to have to come to

13  court about once a week while I pound at you until I figure out

14  how not to do it.  We've got to get this case to the point

15  where something is able to happen.  And we're not going to be

16  able to play discovery games.

17      Now the problem that I have is Papst said I narrowed, I

18  narrowed, I narrowed.  I still don't know where you are.  I

19  still don't know quite what you've asked for.  I can't enforce

20  anything that you have asked for because you haven't told me

21  what you've literally asked for now.  And then Casio says well,

22  we're going to produce, we're going to produce, we're going to

23  produce and then lo and behold it hasn't produced at all.

24      And then Papst comes back and says but the order that we

25  want you to issue, Judge, is on our first request as they were

1  written not as we've changed them.

2      Now do you understand the problem that I'm having with

3  all of this?

4          MR. STIMPSON:  Yes, Your Honor, Scott Stimpson, I do.

5          MR. SCHNAYER:  Yes, Your Honor, it's Mr. Schnayer.

6          THE COURT:  Good, good.

7      And have we had enough conversation or should we proceed

8  through the motion to compel interrogatory answers which of

9  course was written before this became an MDL?  It was written

10 at a time when Casio was a plaintiff.  Casio is no longer the

11 plaintiff.

12     There are a lot of arguments in the motion to compel

13 interrogatory answers which aren't particularly relevant

14 anymore.  I don't know why you're giving me all of this old

15 stuff to read.  And then I came to Casio's motion to strike

16 Papst's discovery requests and for sanctions.  Some of this

17 discovery requests are properly stricken.  Some of them are

18 not.  I think we've gone through a lot of them already.

19     Have we resolved this issue of what should be stricken

20 and what should not?

21         MR. SCHNAYER:  Your Honor, can I raise one issue with

22 you?

23         THE COURT:  Yes.

24         MR. SCHNAYER:  If I can?

25     You've indicated that financial documents aren't

1  relevant because they don't, they relate to the issue of what's

2  been bifurcated.  I will just tell you that each of the

3  requests that we have we cited case law in our brief that shows

4  that there is case authority to support our requests.  I just

5  want to talk about this one.

6      There are two issues involving financial documents.  One

7  is damages and the second issue is commercial success.  One

8  indicia of patentability is whether a patent is commercially

9  successful.  The commercial success can come from a product of

10 the plaintiff or come from the product of a defendant.  So the

11 issue is in order to show commercial success is an important

12 issue in patent law because if I can prove commercial success,

13 it's an indicia of the patent being patentable.  It's something

14 that's under federal circuit, standard federal circuit law

15 something that is relevant to the issue of patentability of the

16 claims.

17     What you must do in deciding this issue is you must look

18 to see if there's a nexus between the commercial success of the

19 device and sales.  But for example, Casio may have marketing

20 documents.  And they may, and we've seen some of them already.

21 I've seen a number of them that they've produced to us that

22 talk about the features and attributes of their device.

23     If they talk about the features and attributes and some

24 of those relate to the claims of patent in suit, then you've

25 shown a nexus between the commercial success and the claim

1   mentioned.

2        And therefore, in connection with that you need to have

3   financial documents that would show how successful they were

4   when they switched to this technology.  Then you need to have

5   documents which would show marketing issues and things of that

6   nature which could then relate to the issues of the patent in

7   suit.

8        THE COURT:  Do you need that for the Markman hearing?

9        MR. SCHNAYER:  Your Honor, you gave us 25 documents

10  -- the answer is do I need it for the Markman hearing?  I don't

11  need it for the Markman hearing.

12        THE COURT:  Okay.

13        MR. SCHNAYER:  But the problem is if I don't get it,

14  I only have 25 document requests.  It's a very limited number

15  with many different subjects involved in patent law.  So if I

16  try to be specific, too specific, I can't possibly cover all of

17  the subject matters that I have.

18        In this particular one with the financial documents, it

19  is a highly relevant piece of information.  Cases have been

20  overturned on appeal when parties have not been allowed

21  discovery on the issues of connection of the nexus between the

22  intervention and the commercial success and the commercial

23  success itself.

24        THE COURT:  Okay.  And we are right now aiming for

25  the Markman hearing.  And we are not aiming for the full

1   discovery of the entire matter.  Because the first thing that

2   we do is figure out a claims construction.  And then once the

3   claims have been construed, then the parties continue with

4   their discovery and unless and until the claims are construed,

5   it's very difficult for you to know what to ask for with any

6   precision and for Casio or any other defendant to respond as to

7   whether or not there's a nexus between the commercial success

8   and one of the as construed claims of the patent.

9        But it's interesting that you -- and so therefore, I

10  think that it's not that you're not going to get discovery on

11  these issues, it's that it's premature.  It's a very expensive

12  proposition that we don't have to do now.

13       Now one of the things that you said is that one indicia

14  of patentability is commercial success.  As I understood it,

15  your inventor has no products.

16       MR. SCHNAYER:  Well, no, he -- that's not the case,

17  Your Honor.

18       Can I explain?

19       THE COURT:  Yes.

20       MR. SCHNAYER:  Mr. Tasler who is the inventor is,

21  actually started a company and went into the business of

22  manufacturing these products.  A product that are covered by

23  the patent.

24       Mr. Tasler doesn't have a lot of money.  And couldn't,

25  but he does have products and he does sell products in his

1    area.

2         THE COURT:  Then that's fine.  That's the only answer

3    I need.  I don't need the rest of it.

4         But did you understand my response to your plea for

5    information on commercial success?

6         MR. SCHNAYER:  I understand.  I guess the question is

7    that I'm, I didn't understand that from your prior orders that

8    we were to break discovery down.

9         I understood that we were to break discovery down with

10   regard to damages and willful infringement, but I didn't

11   understand based on the procedural orders that you wanted us to

12   break it down even further.  So --

13        THE COURT:  Well, perhaps my own understanding of

14   this is maturing along with yours, but I think that what I'm

15   trying to do is figure out a way to manage a case in which

16   you've started with these hugely overbroad requests.

17        To this moment sitting here I don't know what the status

18   of your actual discovery between the two of you is and what

19   remains to be decided.  But you started with these hugely

20   overbroad requests and now I'm just trying to figure out a way

21   to get this under control so that you stop quibbling about it,

22   you get what you need and we can get to a Markman hearing.

23        And you are telling me, and this is my understanding of

24   the way it works as well, that commercial success has no

25   bearing on the Markman hearing.  So let's not worry about that

1 now, let's worry about the things that count.  Because of

2 course, there will be more discovery if the Markman hearing

3 doesn't resolve things.

4   MR. SCHNAYER:  The problem that I think most

5 everybody has here is that we directed our discovery under the

6 25 Rule limit to matters that relate to all the issues except

7 for infringement -- excuse me -- except for damages and willful

8 infringement.

9   And I know that our discovery requests were directed to

10 every issue besides that.  We, I think that's my confusion

11 here.  And if the Court wants us to do something, then we'll

12 try and comply with it certainly.  But there was nothing in the

13 practice order that talked about limiting the discovery in the

14 first part of the case to any particular issues except that.

15   So if you want us to do that certainly we'll try and

16 comply with your requests, but it's going to take some time

17 because we have document requests out that are broader than

18 what, than what you talked about now.

19   The other side has document requests that are broader

20 because we were all directing it to broader issues.

21   Then the other problem is how do we keep Casio in line

22 with this and make it consistent because they're being treated

23 differently.

24   We've learned a lot more since the time of Casio's case

25 that we were able to focus some of the issues on real important

1   critical things.  And the problem is that we can't, you know,

2   we were going to talk to Casio whether they would agree to

3   respond to some of that discovery requests and raise it with

4   you if they didn't.

5           THE COURT:  Why don't we just cut to the chase here.

6       Tell me, Mr. Schnayer, what of your requests to Casio

7   you don't have complete answers to today.  I don't care what

8   about last June.  Tell me as of today?

9           MR. SCHNAYER:  I didn't understand the question.

10          THE COURT:  What remains to be produced?  What

11  requests for production and interrogatories do you think you

12  have not yet received full responses?

13          MR. SCHNAYER:  Well, I can go through the

14  interrogatories they basically gave us.

15          THE COURT:  Back up to the documents because we spent

16  more time on documents so far than interrogatories.

17          MR. SCHNAYER:  Your Honor, they only produced to us

18  very limited documents in the case.  They produced to us some

19  manuals that are publicly available that I could have gotten

20  off the internet that aren't sufficiently detailed with the

21  information I need.  They produced a few financial documents to

22  me.  They have not given me any documents on the computer

23  program and how it operates, some of the things I mentioned and

24  what we would need.  I haven't received hardly anything.

25          There's a lot of pages of things because they produced a

1  lot of these manuals that are several hundred pages long, but

2  it's basically nothing.  I don't have anything, I don't have

3  hardly any documents.  They produced recently a few more

4  manuals of publicly available manuals, but I just don't have

5  any documents.

6          THE COURT:  Okay.  Mr. Stimpson, you said you were

7  going to produce everything in the next two weeks, right?

8          MR. STIMPSON:  Well, Your Honor, I can.  In fact, as

9  we speak people are reviewing documents to give them out.

10      If I can, please, just respond to Mr. Schnayer's

11  comments?

12          THE COURT:  Yes.

13          MR. STIMPSON:  We produced marketing materials, we

14  produced mail summaries, we produced all of the manuals for all

15  of the Casio's products and we supplemented that after the stay

16  was lifted.

17      The other stuff we're working on are the documents that

18  show how the Casio cameras operate which is something we agreed

19  to produce.  We're going to produce documents subject to

20  privilege and work product on the patent and I'm sorry it has

21  not been produced as quickly as you would have liked, but we

22  were waiting for that for the protective order but now that

23  it's done we are moving ahead on it.

24      Just -- well, that's it for Casio.

25          THE COURT:  Tell me about the information about

1  commercial success.

2          MR. STIMPSON:  Well, there's a couple of responses to

3  that, Your Honor.

4          The first response is Mr. Schnayer has had Casio sale

5  summaries, he has accused Casio of infringing and Magistrate

6  Judge Robinson ordered him to provide a complete response to

7  our interrogatory commercial success and he completely failed

8  to do that.

9          So as part of our other motion what we have asked for is

10  that he shouldn't be able to assert commercial success now.  It

11  was a direct order and he just completely refused to comply

12  with it.

13          Secondly, we produced sale summaries and produced

14  marketing materials that Mr. Schnayer is talking about and

15  lastly, I fully agree with your suggestion, Your Honor.  It

16  doesn't make any sense to go, if we're going to go down the

17  commercial success road at all it doesn't make any sense to

18  plow down that road when the Court is going to construe the

19  claims and then we'll all have a better idea of what, if

20  anything, needs to be produced.

21          THE COURT:  But what about the fact that Mr. Schnayer

22  says that the parties in the other cases is limited to 25

23  interrogatories have used them to cover all areas including

24  commercial success.  What you're really basing your in action

25  on is your motion to strike, right?

1          MR. STIMPSON:  Well, first of all, Your Honor, we

2    really, we haven't had in action because we produced the sales

3    summaries.  We produced all of the stuff they need on the

4    cameras and we have produced all of the marketing deals.  I

5    frankly don't know what else they're going to need.

6          But yes, the answer is I don't think that they should be

7    able to assert commercial success based on their failure to

8    comply with Judge Robinson's order.

9          MR. SCHNAYER:  Your Honor, may I respond, please?

10         THE COURT:  Yes.

11         MR. SCHNAYER:  Your Honor, the only way to know

12   whether there's commercial success is for me to have the

13   documents from the files from all of defendants to show that

14   their products actually infringe and to show what their sales

15   have been.  That comes from the files of the camera

16   manufacturers, not from Papst.

17         The only documents that was produced that I am aware of

18   that of sales summaries, and I went through all documents just

19   to check it out was I think one document and I can't tell

20   which, it doesn't list them out.  It doesn't say model A, model

21   B or C.  And it's half projected.

22         If that's what they mean by producing sales documents,

23   Your Honor, I would like to send it in to you to show you, you

24   wouldn't make heads or tails of it if you see it.  And besides,

25   they haven't produced anything based on the prosecution bar

1   issues.  They gave us nothing that was confidential except for

2   a very few minor documents.

3       Anything that had to do with the details of the device

4   that was not, that was not public, anything, they haven't given

5   us.

6       THE COURT:  Wait, wait, wait.  That's because there

7   wasn't a protective order in place.

8       MR. SCHNAYER:  I agree.

9       THE COURT:  And they were arguing as you recall that

10  your firm shouldn't even be in here and be able to see any of

11  these documents.

12      MR. SCHNAYER:  Yes, Your Honor.

13      THE COURT:  So until we got that all wrapped up they

14  weren't going to produce anything which is another one of the

15  reasons why I have to keep asking why am I looking at these old

16  pleadings that aren't up to date?  Why did nobody even update

17  these by two minutes worth of saying oh, and by the way, Judge,

18  this is where we are today.

19      MR. SCHNAYER:  Your Honor, if I can answer.

20      Your Honor, they filed this motion to strike and after

21  they filed the motion to -- we had filed the papers saying that

22  we should start fresh and catch up with everybody else;

23  otherwise, we're going to be doing this twice with everybody.

24  It's going to get very confusing.  We said let's start fresh,

25  new day, let's put everybody in line; otherwise, it's going to

1   get confusing which is what it has done now.

2              THE COURT:  No, no, stop, stop, stop.

3        No, you missed my point.  And so you missed the point.

4   And never mind, I don't need that argument.

5        All right.  So we're going to say that certain of Papst

6   requests as identified here today are going to, are going to be

7   stricken and do not need to be responded to by Casio.

8        The issue of commercial success I think that if there's

9   more information that is specific to the different models of

10  camera and I'm sure that Casio has those things, then Casio

11  must produce those.  You can't just produce commercial success

12  for Casio Digital Cameras world wide or something.  And what's

13  relevant I think is their success in the United States.

14       As a general proposition Papst has to understand that it

15  can only ask for information that a specific corporation would

16  have within its control.

17       Do you understand that?  You can't ask Casio U.S.A. for

18  something it doesn't have.

19             MR. SCHNAYER:  Yes, Your Honor.

20             THE COURT:  It has no obligation to produce something

21  it doesn't have or control.  And we're going to assume that

22  Casio Japan controls its subsidiaries in some fashion or other.

23  But there's no reason to assume that Casio U.S.A. does.

24             MR. STIMPSON:  Your Honor, may I be heard on that

25  issue?

1          THE COURT:  Yes.

2          MR. STIMPSON:  On the control by Casio Japan, first

3  of all, my first thought on that is that there's nothing in

4  these foreign countries, I think you've indicated that already

5  today, in these foreign countries and these foreign Casio

6  related countries that Papst really needs because Casio Japan

7  has the documents that's going to be able to show how the

8  cameras operate and Casio America has sales and all of these

9  other sales subsidiaries or whatever they are all over the

10  world.  I can't imagine there would be anything there that

11  Papst would really be entitled to in the first place.

12          THE COURT:  The only question I had in that regard

13  was whether or not Papst mentioned that it learned that Casio

14  sold some of these cameras I think to Pentax and that Pentax

15  was going to be selling them in the United States.  Is that

16  true?

17          MR. STIMPSON:  Casio sold models to Pentax in 2002

18  and 2004 and those dates are important because Casio Japan

19  didn't know the patent in 2002 or 2003.  And I don't think even

20  in 2004, well, no, they didn't know the patent at all then.  So

21  there's no way Casio, there's no way that Papst could possibly

22  have that could catch those cameras.

23          THE COURT:  I'm sorry, I missed that last statement.

24  There's no way what?

25          MR. STIMPSON:  There's no possible theory of

1    infringement of those cameras because I don't know what Papst

2    is thinking, they haven't articulated any theory, but even if

3    the Court were to allow them to serve things like inducement

4    and contributory infringement despite their refusal to comply

5    with Judge Robinson's order, I mean, you have to have knowledge

6    of the patents and Casio didn't have knowledge of the patents

7    at that time.

8            So there's no conceivable way that those products could

9    ever be accused of infringement that I can see.  So I just

10   can't see how anything from any of these other companies could

11   be relevant.

12           THE COURT:  Mr. Schnayer, before you get too excited

13   about that fact, what information do you have that would

14   suggest that they do have -- let me ask you first.

15           Do agree with the statement by Mr. Stimpson as a matter

16   of law that you must have knowledge of the patents and that if

17   Casio Japan can demonstrate it had no knowledge by an

18   intelligent witness who so swears or otherwise, do you agree

19   that therefore, none of that is relevant?

20           MR. SCHNAYER:  I do agree that in order to show

21   inducement you must have knowledge of patent, I do agree, that

22   is correct.  We need discovery on that issue.  It's a

23   corporation and we've asked some interrogatories and document

24   requests directed to that issue.

25           THE COURT:  Well, I know that that's a theory of

1  patent infringement.  And the question is whether you have any

2  indicia of fact that would suggest that your theory has a basis

3  in fact or whether it's a theory that is in the cross claim,

4  cross complaint but at the moment you just need full discovery

5  to find out whether it is a fact?

6          MR. SCHNAYER:  Your Honor, in approximately 2003 or

7  2004 Mr. Tasler before he got connected with Papst Licensing

8  had people to check the market place to see if there was

9  infringement of these, people wanted to license the patent.  He

10  was actually doing what's called secured licensing if you're

11  interested in this technology.

12          He had somebody look and go around to several different

13  companies and I don't recall offhand if Casio was one, but he

14  had, he sent this out to various companies, Hewlett-Packard was

15  certainly one.  And what he got back from these people were

16  yes, you know, everybody in the industry uses these patents

17  from one particular company but we're not interested in paying

18  you any money for it, go away.  And that's when they came to

19  Papst Licensing.

20          So we do have some evidence to indicate that Mr. Tasler

21  went around and it was a representative of his, went around and

22  tried to see if people were interested in this patent and sent

23  copies of the patent to various companies including a number of

24  the named parties to this lawsuit.

25          I don't recall offhand if Casio was one of those, but it

1  very well could be that they were one of them because he went

2  to a bunch of different companies trying to see if they were

3  interested in it.

4          THE COURT:  Well, you would bear the burden of proof

5  on that point, would you not?

6          MR. SCHNAYER:  Yes, but we would also have the right

7  to do discovery on the issue of whether they have any documents

8  that show that.  If they don't, if they don't have any

9  documents, I mean, they have to make a good faith search to go

10 out there to their facilities in different places to see if

11 they have that information.  If they do, then they would

12 produce it to us.

13         Yes, we ultimately would have the burden because it's

14 infringement but we would need to do discovery on the issue.

15         THE COURT:  Well, but you don't have, from the

16 description you just gave me, you don't have even a small fact

17 toyed to suggest that Casio had knowledge.

18         Now I agree with you that you're allowed to discover,

19 but you're not allowed to discover when you have no basis for

20 your claim.  If you tell me that Mr. Chancellor's agent

21 approached Casio, well then, you know, you are sort of golden,

22 but then you know who he approached and which company.

23         And that's where you start.  You don't ask everybody

24 around the world in every Casio entity.  I mean, this is the

25 problem with the way that you've approached your discovery.

1   You've made these so broad that they are totally impossible of

2   enforcement.  I just, I don't know what you expect me to do for

3   you.

4          MR. SCHNAYER:  Your Honor, I just would like to point

5   out, you know, you were looking at the document requests that

6   was against Casio.  I would say, if you look further on in the

7   exhibits you will see that there's almost an identical document

8   request against Casio Japan.  So that was also the subject of

9   this too.

10         THE COURT:  Yes.  But it's, it is almost an identical

11  and it suffers from the same flaws.  It is so overwritten, so

12  overbroad.  It is so incredibly expensive and burdensome that

13  you haven't given me anything that I can really enforce.  I

14  can't require Casio Japan to require every single Casio entity

15  to produce, this is only an example, every single letter to

16  every single customer about every single Digital Camera that's

17  ever been written about since the beginning of time.  I mean,

18  how could you possibly expect me to be able to enforce that?

19         MR. SCHNAYER:  Your Honor, we've tried to limit that

20  to the issues of the patents in suit.

21         THE COURT:  Well, yes, but then when you say what are

22  the issues in the patents in suit you tell me that they're

23  eight of them and they're eight of them that aren't yet even in

24  English.

25         I'm sorry, Mr. Schnayer, your requests are not limited.

1  They are not reasonable.  And they're not enforceable.

2      Now that doesn't mean that I'm going to let Casio Japan

3  or U.S.A. get away without reasonable responses.  Just because

4  your discovery is not reasonable does not mean that they're

5  going to be able to not respond at all.  But I can't enforce

6  things that are on their face not reasonable that violate the

7  rules of discovery.

8      MR. SCHNAYER:  May I make a suggestion, Your Honor,

9  that might save your time?

10      THE COURT:  Yes.

11      MR. SCHNAYER:  Your Honor has your views known about

12  a number of items in this case.  Maybe the parties could sit

13  down and try and work something out and see if they can come to

14  an agreement after the discussion that we've had here with you

15  here today.

16      THE COURT:  Well, I think that would be the best of

17  all possible worlds.  And I want to assure Mr. Stimpson that I

18  really mean it, that Casio U.S.A. and Casio Japan cannot give a

19  flip of their hands to what are the legitimate aspects to these

20  requests.

21      Now I'm not ruling on sanctions and everything.  I'm not

22  ruling on those right now.  I'm just trying to get a handle on

23  this because you're all swimming around in this deep water

24  getting no where.

25      MR. STIMPSON:  Your Honor, this is Scott Stimpson, I

1  fully appreciate that.  I just want to assure the Court that we

2  are not giving this just a flip of the hand.  We have many,

3  many thousands of documents that we are reviewing and producing

4  right now.

5        THE COURT:  Well, I'm glad for that.  I say go to it

6  and it's time to get it done.  So keep the presses rolling and

7  maybe you should start producing those that are ready to be

8  produced even if you're not ready to produce everything so that

9  Mr. Schnayer at least has something to keep his mind occupied.

10  He's sitting in Chicago being very concerned that he's never

11  getting anything.

12        MR. STIMPSON:  Your Honor, maybe this isn't, since

13  we're talking about the Papst discovery requests, perhaps this

14  isn't the time.  But I should also mention that since this day,

15  Mr. Schnayer will please correct me if I'm wrong, but I don't

16  think we've received any documents from Papst.  I don't think

17  we've received anything on their invention.

18        Papst withheld documents post, anything post complaint

19  for some reason they withheld all of that.  We haven't received

20  any of it.  So while we're talking about dates for production,

21  maybe it might be a good time for me to raise that.

22        THE COURT:  Yeah, because I don't want any more

23  motions to compel.

24     Mr. Schnayer?

25        MR. WHITE:  Your Honor, this is Jim White.  If I

1   could respond to that?

2          THE COURT:  Yes.

3          MR. WHITE:  With respect to the documents to be

4   produced by Papst, there's three categories of documents or two

5   categories of documents to produce as I understand it.  And

6   that would be those documents that were covered by attorney

7   client privilege work client document and some other applicable

8   privilege based upon our filing with the Judge Kessler of our

9   objections to the Magistrate's report and the recommendation.

10         It seemed to be prudent to do that and not turn over

11  those documents prior to getting a ruling on that.  So that has

12  been, those have not been produced.

13         The other category of documents that Mr. Stimpson is

14  referring to is we limited them to the complaint.  And that is

15  all of the 408 negotiations with all of the third parties that

16  dealt with licensing, et cetera, et cetera, those types of

17  settlement negotiations.  And those were withheld based upon

18  the fact that we had a situation where we had indicated to

19  Casio that those documents were confidential with respect to

20  the third parties.  And they in fact in a paper that they filed

21  conceded that point, that they were confidential.  So those

22  haven't been produced.

23         In light of Your Honor's recent scheduling order to the

24  extent they relate to damages or at least a reasonable royalty,

25  those are no longer at issue at this particular point in time

1    in any event.

2          So that would be Papst's response to that at this

3    particular point in time in light of the scheduling order and

4    the previous orders in terms of discovery.

5          THE COURT:  So it's your position that Papst doesn't

6    owe Casio any documents?

7          MR. WHITE:  Well, if Your Honor is going to rule for

8    example, on the motion that's pending before Judge Kessler and

9    said we have lost every privilege that we were ever entitled

10   to, then of course we would have to produce documents.

11         THE COURT:  No, I understand that.  But other than --

12         MR. WHITE:  Other than that, I would say given that

13   my understanding is, and Mr. Schnayer can correct me if I'm

14   wrong or Mr. Swik, that would be the case.

15         THE COURT:  So how many pieces of paper has Papst

16   produced to Casio?

17         MR. WHITE:  I don't know the answer to that and I

18   would have to defer to one of my colleagues.

19         THE COURT:  I mean, are we talking tens or hundreds?

20         MR. WHITE:  We're talking about tens of thousands.

21         THE COURT:  What were they?

22         MR. SCHNAYER:  Documents that --

23         THE COURT:  Could you just say who is speaking

24   because we can't see you.

25         MR. SCHNAYER:  Mr. Schnayer, I'm sorry.

1          THE COURT:  Oh, I didn't catch your voice this time,

2    Mr. Schnayer.  I'm sorry.

3          MR. SCHNAYER:  I am sorry, I apologize, Your Honor.

4    I was standing a little bit back from the phone.

5          We've produced documents about early developing history

6    documents to the extent that we had them.  We produced a number

7    of documents.  The, before the case was, before the case was

8    filed we produced documents concerning negotiations.  Nothing

9    afterwards.

10          THE COURT:  And why no documents afterwards?

11          MR. SCHNAYER:  I'm sorry, Your Honor?

12          THE COURT:  Why no documents afterwards?

13          MR. SCHNAYER:  Because those are extremely highly

14    confidential and we had an agreement, I think Mr. White

15    mentioned, that anything that was confidential and subject to

16    the protective order and we can read to you the portion where

17    they agreed to it, then those documents were withheld until we

18    got a ruling on the protective order issue.

19          We produced documents to the file history.  We produced

20    all of the prior art we were aware of.  We produced any kind of

21    manuals that we had that related to their products.  We were

22    able to obtain data sheets and things like that.  There were a

23    number of different documents produced that would be relevant

24    to what we do have of their products.

25          THE COURT:  What about what's the impact of the

1  protective order on the confidential documents?

2       MR. SCHNAYER:  Well, first of all, the documents

3  number one relate to the issue of, relate to the issue of

4  damages.  To the extent that it relates to the issue of damages

5  they don't have to be produced.

6       We've given them all of prior art documents we've been

7  able to find.  Anything that relates to the prior art issues

8  we've produced them and to the extent we haven't produced them

9  we're going to update them and give them whatever we have.  But

10  we've given them tens of thousands of documents.  It's been a

11  pretty significant collection.

12       THE COURT:  What about documents that would exist

13  that were part of the negotiations leading up to the

14  settlements with other parties, would not those documents

15  discuss the particulars of the patent in suit and how they

16  related to the cameras of other manufacturers?  Would not those

17  documents be relevant even if confidential?

18       MR. SCHNAYER:  Some of the documents would discuss

19  how they operated, but they never really got into, nobody ever

20  really gave us any information on their cameras.  Everybody,

21  nobody wanted to including Casio wanted to give us much

22  information on anything.

23       THE COURT:  So Papst was able to walk up to camera

24  manufacturer X and say we think that your camera infringes our

25  patent and have camera manufacturer X say we disagree, but

1  we'll sign a royalty agreement because we don't want to show

2  you our secret information?

3           MR. SCHNAYER:  No.  Your Honor, they really never

4  showed us confidential information like that.

5       What they did was they argued more that there was

6  discussions about their claim language and things of that

7  nature.

8           THE COURT:  Right and isn't that relevant?  It's not

9  privileged, isn't that relevant and not confidential?

10          MR. SCHNAYER:  The problem with the information that

11 we're concerned about is to the extent that this related to any

12 prior art, we certainly produced any of that prior art to

13 everybody.

14      My concern is this that we're, to the extent that they

15 want to get into one party wants to find out what the other

16 party did about licensing, the general licensing issues and the

17 conditions of licensing, we don't think it's fair that they

18 should be allowed to get that information and then use one

19 licensing negotiation against us to argue, you know, hey, why

20 did you offer them this deal or why did you offer them this

21 deal?

22      Those are really highly significant from the standpoint

23 of giving them in the negotiations unreasonable our

24 negotiations from one party to the next, everybody wants to

25 maintain those highly confidential.

1    THE COURT:  I can understand that.  And I understand

2 that in a certain sense given the business that Papst is in

3 enforcing patents instead of products that would be sort of the

4 crown jewels as to how you negotiated these things.  But you

5 haven't come, you asked for a protective order.  The protective

6 order is in place.  It requires Casio to reveal innards, the

7 other manufacturers to reveal things about the innards of their

8 camera that they think are their crown jewels and now this is

9 the business Papst is in and isn't it relevant to how you

10 enforce the patents and what you really think they mean?

11    MR. SCHNAYER:  Your Honor, this is Rule 408.  And in

12 fact, in the District of Columbia there's case authority that

13 says this may be privileged and not producible.  There are some

14 jurisdictions that indicate that 408 material should not even

15 be produced concerning negotiations.

16    On the other hand, the Court in Washington, the only

17 case that I'm aware of that deals with that issue says we're

18 not ruling on that issue whether it's privileged or not.

19    We intended to raise this issue with the parties to

20 discuss it with them and see if there's some way we can work

21 this out where we can reach a solution that they can accept and

22 we can accept also.

23    THE COURT:  Well, I really think you should because

24 it seems to me that at best you might be able to redact some

25 documents so that the specific financial terms of your royalty

1   agreements and the financial terms as the negotiations

2   proceeded would not be revealed.  That's really what the crown

3   jewels are all about.

4        But a position that Papst has taken in the past as to

5   the meaning and the scope and the rights that its patents give

6   it, those positions are relevant if you have any writings that

7   speak to that.  And if you've written them to somebody whose an

8   opposing counsel, it's not written to your clients and it's not

9   giving legal advice, it's advocacy.

10       MR. SCHNAYER:  I understand, Your Honor.  And what we

11  will try to do if it's okay with Your Honor is work that out

12  with the other side and there's a number of issues that we

13  really need to address and what we intended to try to set up a

14  conference with everybody to deal with these and a number of

15  other issues.

16       THE COURT:  Okay.  So why don't we do this.  Of

17  course my courtroom deputy has stepped out so I can't do this

18  now.

19       But what we'll do is send you guys back to, back to talk

20  to each other informed if you will by this conversation.  I

21  really need you to start working amicably to resolve these

22  issues.

23       I am more than happy to get involved in the middle and

24  if you can't, I will.  To the extent you can, that's great.  I

25  have as I think I told you other lawsuits where people are just

55

1  frantic and they can't agree and so we spend a lot of time

2  together.  And I can do that here as well.

3      But you've both started from positions that this is

4  going to be the traditional throw the kitchen sink at each

5  other and we're not going to do that anymore.

6      So what we need is maybe do you think six weeks would be

7  enough time for you to work things out and just sort of have a

8  status call?

9      MR. STIMPSON:  This is Scott Stimpson.

10      That's fine, Your Honor, and if there's time I would

11  like to very briefly respond to a couple of points they made

12  about the document production.

13      THE COURT:  Yes, you can but hold on.

14      Is six weeks sufficient time for you, Mr. Schnayer?

15      MR. SCHNAYER:  Six weeks, I think we have a

16  conference set for June.

17      THE DEPUTY CLERK:  You do.

18      MR. SCHNAYER:  June 5th.

19      THE COURT:  That's a conference with everybody.

20      MR. SCHNAYER:  Okay, I'm sorry.

21      THE COURT:  I'm just talking about a conference with

22  this group of people to address the issues that we've had under

23  discussion today to see if the discovery from Casio has

24  actually arrived, et cetera, et cetera, to see if Papst and

25  then Casio have been able to work out issues concerning the

1 productions because I just, I think the only way that we're

2 going to do this is to have you folks talk to each other and

3 make sense together.

4        If six weeks is when we have our next large conference

5 then let's set this for a little closer in.  That was early

6 June?

7             MR. SCHNAYER:  I think it was June 5th.

8             THE COURT:  June 5th.  So can we back up to before

9 Memorial Day which is I think the last weekend in May and see

10 if there's a time that prior week?

11            THE DEPUTY CLERK:  The week of May 27, Memorial Day

12 is the 26th.

13            THE COURT:  Memorial Day is on the 26th.  How do your

14 days in the week of May 27 look?

15        I'm trying to give you time but I don't want to take

16 time on the day when everybody is gathered.

17            MR. SCHNAYER:  Your Honor, as I told you before I

18 have to be in Germany for a wedding.  I think if it would be

19 the 29th or the 30th, that would work for me.  I'm just part of

20 the wedding festivities, and extend that for a few weeks.

21            THE COURT:  No, I can't do that.

22            THE DEPUTY CLERK:  What if we did it early the week

23 before?

24            THE COURT:  Mr. Schnayer, when do you leave?

25            MR. SCHNAYER:  Right now my wife and daughter are

1    coming out with me.  We leave on the 22nd.

2             THE COURT:  Okay.  So we need to do something before

3    the 22nd.  So look back to the 19th.  I don't know what day of

4    the week that is.

5             MR. SCHNAYER:  Monday, Your Honor.

6             THE COURT:  Will you be in your office on Monday the

7    19th?

8             MR. SCHNAYER:  Yes, I will be.

9             THE COURT:  What am I doing on Monday, the 19th?

10            THE DEPUTY CLERK:  You're available all afternoon.

11            THE COURT:  I'm available in the afternoon.  Can you

12   gentlemen pick a time when Mr. Schnayer and Mr. White at least

13   can be representing Papst and Mr. Stimpson and whomever else he

14   chooses for Casio?

15            MR. STIMPSON:  That's fine, Your Honor.  We can pick

16   one now, I'm free the entire day.

17            MR. SCHNAYER:  This is Mr. Schnayer.  If we can have

18   it maybe 3 o'clock, your time, Eastern time, we can do it, it

19   will be 2 o'clock Chicago time?

20            THE COURT:  Can I make it 2:30 because 3 o'clock gets

21   pushed into something else.  So 2:30 we should be able to do

22   it.

23        What's the date?

24            THE DEPUTY CLERK:  May 19th.

25            MR. SCHNAYER:  Is that 2:30 Eastern time?

1          THE COURT:  Yes, that's 2:30 Eastern time so that's

2   1:30 your time, it rushes your lunch.

3          MR. SCHNAYER:  That's fine.  We'll have a meeting

4   we'll work around.  I'm sorry, Your Honor, we'll deal with it.

5          THE COURT:  Okay, so let's take a deep breath.  We'll

6   step back.

7          You guys talk to each other about this set of issues, do

8   some of the discovery, the bifurcation and stuff that's outside

9   of the United States and other things as we discussed here.

10         And I will continue and finally rule on the motions

11  for sanctions and what amounts to a question of enforcing Judge

12  Robinson's order.  I'm treating Casio's -- I'm sorry -- Papst

13  filing as a motion to the judge to consider the Magistrate

14  Judge's ruling, right, sort of like an appeal?

15         MR. SCHNAYER:  Yes, Your Honor.  No objection.

16         THE COURT:  Alrighty.  Thank you.

17         MR. STIMPSON:  Your Honor --

18         THE COURT:  I'm sorry, I promised you you could talk,

19  Mr. Stimpson, and then I cut you off.

20         MR. STIMPSON:  I hate to have everybody walk out of

21  the room and suddenly I stop, I'm sorry.  But just very briefly

22  on the Papst document request.

23         THE COURT:  Yes.

24         MR. STIMPSON:  On all of these negotiations they have

25  had with other people and they have cut them off at the filing

1  date of the complaint, they're saying because they're

2  confidential, they're saying, you know, Mr. Schnayer says it's

3  not fair for them to get this and he's got 408 objections.

4      I mean, I know that's an order that's still pending

5  before you, Your Honor.  But all Magistrate Judge Robinson

6  ordered them to provide a complete response so that they waive

7  those objections.  I have seen those documents.  I have not

8  seen any real confidentiality agreements.

9      In fact, some of these companies said no way, we're not

10 keeping this confidential.  Papst would say at the end of their

11 first letter by the way, we consider this all confidential.  I

12 think that's what Mr. Schnayer is referring to, to hold all of

13 this stuff back.

14     We haven't received that I know of anything on the

15 invention, anything on the inventor.  Mr. Schnayer was very

16 careful to say that he gave it to us to the extent that he had

17 them so apparently we are not getting anything from the

18 inventor.  So, I mean, we can raise these issues later if you

19 like.

20     THE COURT:  No, don't raise them later.

21     Mr. Schnayer, we already talked about the inventor.

22 Papst is deemed to control the inventor.  He is required to

23 work with you.  You have to get stuff from the inventor, you

24 cannot hide behind the fact that he is not Papst.

25     MR. STIMPSON:  And the rest of it I guess, Your

1  Honor, we can just wait and see how the other motions come out.

2          THE COURT:  Okay.

3          MR. STIMPSON:  Thank you very much.

4          THE COURT:  Mr. Schnayer, are you still there?

5          MR. SCHNAYER:  Yes, I am, Your Honor.

6          THE COURT:  Okay, I just want to make sure.

7          MR. SCHNAYER:  I was here, Your Honor.

8          THE COURT:  All right.  We'll talk to you later.

9                         -oOo-

1                              CERTIFICATE

2          I certify that the foregoing is a true and correct

3    transcript, to the best of my ability, of the above pages, of

4    the stenographic notes provided to me by the United States

5    District Court, of the proceedings taken on the date and time

6    previously stated in the above matter.

7          I further certify that I am neither counsel for, related

8    to, nor employed by any of the parties to the action in which

9    this hearing was taken, and further that I am not financially

10   nor otherwise interested in the outcome of the action.

11

12

13   Crystal M. Pilgrim, RPR                    5/2/08
                                                _____
                                                    Date

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT C

J. Kevin Fee
**Morgan, Lewis & Bockius LLP**
(A Pennsylvania Limited Liability Company)
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
Tel.: (202) 739-3000

Scott D. Stimpson, Esq. (*pro hac vice*)
Jeffrey M. Gold, Esq. (*pro hac vice*)
Morgan Lewis & Bockius LLP
101 Park Avenue
New York, New York 1018-0060


Attorneys for Plaintiff
Casio Inc.


**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CASIO INC.,** <br><br> **Plaintiff** <br><br> v. <br><br> **PAPST LICENSING GMBH & CO. KG** <br><br> **Defendant.** | **Case No. 1:06-CV-01751** <br><br><br> **CASIO INC.'S FIRST SET OF REQUESTS FOR THE PRODUCTION OF DOCUMENTS AND THINGS TO PAPST LICENSING GMBH & CO. KG** |

**PLAINTIFF CASIO INC.'S FIRST SET OF REQUESTS**
**<u>FOR THE PRODUCTION OF DOCUMENTS AND THINGS (NOS. 1-21)</u>**

Pursuant to the provisions of Rule 34 of the Federal Rules of Civil Procedure,

Plaintiff Casio Inc. ("Casio"), requests that Defendant, Papst Licensing GMBH & Co. KG

("Papst"), produce for inspection and copying at the offices of Morgan, Lewis & Bockius LLP,

1111 Pennsylvania Avenue, NW, Washington, D.C. 20004, the documents and things in Papst's possession, custody or control designated in the following requests within thirty (30) days after service hereof.

## INSTRUCTIONS

A.    Documents shall be produced in the form in which the documents have been kept in the usual course of business, including any folders or other file materials in or with which the documents have been maintained.

B.    A schedule of documents withheld from production by reason of any privilege or other immunity from discovery shall accompany the production. For each withheld document, the schedule shall specify:

1)    the type of document;

2)    the basis for the privilege or other immunity asserted;

3)    the name, title or job description, if any, and address of the author;

4)    addressee and each recipient of a copy of the document;

5)    the date of the document;

6)    the organization, if any, with which the author, addressee, and each recipient of a copy of the document were then connected;

7)    the general subject matter of the document; and

8)    the location of the files where the original and each copy are kept.

Each withheld document shall be given an index number for simplification of identification. The schedule shall be sufficiently detailed to permit Casio to determine whether to take further steps to require its production.

C.    The following requests shall be deemed to be continuing so that with respect to any request herein, or part thereof, as to which defendant, after responding, discovers additional information and/or documents responsive thereto, Casio requests that defendant provide such

2

information and/or documents to Casio within thirty (30) days after acquiring knowledge of their existence or advise Casio in writing as to why such additional information and/or documents cannot be provided within the specified period.

D.     If defendant contends that any of the following requests is objectionable in whole or in part, defendant shall state with particularity each objection, the basis for it and the categories of information and documents and things to which the objection applied, and defendant shall respond to the request insofar as it is not deemed objectionable.

## DEFINITIONS

A.     As used herein, the term "defendant" or "Papst" refers to the named defendant in this action, and includes any parents, predecessor companies, subsidiaries, divisions and/or associated organizations, and present and former officers, directors, trustees, employees, staff members, agents, and/or representatives, including counsel.

B.     As used herein, the term "document" includes any tangible thing from or on which information can be stored, recorded, processed, transmitted, inscribed or memorialized in any way by any means regardless of form.  Any such document bearing on any sheet (front or back), margin, attachment or enclosure thereof, any marks, such as, without limitation, initials, stamped initials, comments, or notations of any character, which are not part of the original text or reproduction thereof, is to be considered and produced as a separate document.

C.     The term "'449 patent" refers to U.S. Patent No. 6,895,449.

D.     The term "'399 patent" refers to U.S. Patent No. 6,470,339.

E.     "Patents-in-suit" shall refer to the '449 and '399 patents collectively.

F.     The term "Patent Office" means and refers to the United States Patent and Trademark Office.

G.    The phrase "Papst's patents and applications" means and refers to patent applications (including abandoned, prospective, and pending applications) and patents, foreign and domestic (expressly including but not limited to, the '449 and '399 patents and all foreign counterpart patents and applications) related in any way to data communication devices or digital camera technology.

## REQUESTED DOCUMENTS

### DOCUMENT REQUEST NO. 1:

With regard to Papst's patents and applications related to data communication devices or digital camera technology.

a)  Each and every patent and application, and copies of their prosecution histories;

b)  Each and every document and thing provided to the prosecuting attorney(s) or agent(s), including but not limited to, all draft applications, comments, prior art and/or notes;

c)  Each and every document and thing which was furnished to a U.S. Patent Examiner or analogous foreign authority in connection with the prosecution;

d)  Each and every document and thing relating to, referring to, describing, evidencing or constituting any interviews with a U.S. Patent Examiner or analogous foreign authority;

e)  Each and every document and thing relating to, referring to, describing, evidencing or constituting any request, written or oral, to provide evidence, information, or an affidavit or declaration in connection with the prosecution;

f)  Each and every document and thing relating to, referring to, describing, evidencing or constituting the ownership of, or assignment or other transfer of, any right, title, or interest in such application or patent; and

g)  Each and every document and thing relating to, referring to, describing, evidencing or constituting any consideration of who should be named as inventor(s).

**DOCUMENT REQUEST NO. 2:**

Each and every paper or report (whether accepted for publication or not, and including any drafts or preprints) relating to, referring to, describing, evidencing or constituting any subject matter described or claimed in Papst's patents and applications.

**DOCUMENT REQUEST NO. 3:**

All documents related to the alleged conception and reduction to practice of the subject matter described and/or claimed in Papst's patents and applications, including but not limited to:

a)     Each and every document and thing containing any information relating to, referring to, describing, evidencing or constituting invention disclosures and the first written description thereof;

b)     Each and every document and thing relating to, referring to, describing, evidencing or constituting the conception and/or actual reduction to practice thereof;

c)     Each and every document and thing relating to, referring to, describing, evidencing or constituting any corroboration of the conception and/or actual reduction to practice thereof; and

d)     Each and every notebook and other record of the work, research, results, speculations, or conclusions relating to, referring to, describing, evidencing or constituting any subject matter claimed or disclosed in each of Papst's patents and applications.

**DOCUMENT REQUEST NO. 4:**

Each and every document and thing relating to, referring to, describing, or evidencing the strength, coverage, legal significance, or business significance of each Papst patent and application.

**DOCUMENT REQUEST NO. 5:**

Each and every document and thing which addresses, analyzes, assesses or otherwise concerns the potential infringement, patentability, validity and/or enforceability of one or more claims of Papst's patents and applications.

**DOCUMENT REQUEST NO. 6:**

Each and every document and thing relating to, referring to, describing, evidencing or constituting any consideration, negotiation or execution of any license, covenant not to sue, or other agreement relating to, referring to, describing, evidencing or constituting any subject matter claimed or disclosed in each of Papst's patents and applications.

**DOCUMENT REQUEST NO. 7:**

Each and every document and thing relating to, referring to, describing, evidencing or constituting any communication with third parties regarding any subject matter claimed or disclosed in each of Papst's patents and applications.

**DOCUMENT REQUEST NO. 8:**

Any and all models and prototypes of the subject matter disclosed or claimed in one or more of Papst's patents and applications.

**DOCUMENT REQUEST NO. 9:**

Each and every document and thing relating to, referring to, describing, evidencing or constituting one or more of the Casio products accused of infringement.

**DOCUMENT REQUEST NO. 10:**

Each and every document and thing relating to, referring to, describing, evidencing or constituting any testing, experimentation, research, or development conducted or being conducted relating to the subject matter of one or more of Papst's patents and applications.

**DOCUMENT REQUEST NO. 11:**

All prior art to the '449 or '399 patents of which defendant is aware, including but not limited to any art that describes or otherwise discloses, individually or in combination with other items of prior art, data communication devices or digital camera technology and any prior art identified by third parties.

**DOCUMENT REQUEST NO. 12:**

Each and every document and thing relating to, referring to, describing, evidencing or constituting any allegations made by or on behalf of defendant that anyone has infringed one or more claims of any Papst patent and/or application.

**DOCUMENT REQUEST NO. 13:**

All documents and things that discuss, comment upon, refer to or otherwise relate to the '399 patent and/or the '449 patent or any foreign counterpart.

**DOCUMENT REQUEST NO. 14:**

Documents sufficient to demonstrate whether defendant has complied with the marking or notice provision under 35 U.S.C. § 287.

**DOCUMENT REQUEST NO. 15:**

Each and every document and thing supporting or contradicting any Papst allegation or argument in this case, including, but not limited to, all documents and things supporting or contradicting allegations and arguments relating to the alleged infringement and willfulness, and any allegations and arguments related to secondary considerations of non-obviousness and conception/reduction to practice dates.

**DOCUMENT REQUEST NO. 16:**

Documents sufficient to describe any and all (past, present, or possible future) Papst document retention policies.

**DOCUMENT REQUEST NO. 17:**

Documents which state or describe the business purpose and corporate structure of Papst including, but not limited to the limited and general partners, the number of people employed and the ownership structure.

**DOCUMENT REQUEST NO. 18:**

All documents and things concerning or relating to other cases filed by defendant relating to the '399 or '449 patents, including but not limited to all deposition transcripts, pleading and other documents exchanged by or between the parties.

**DOCUMENT REQUEST NO. 19:**

Each and every document and thing identified in, responsive to, used in responding to, or relating in any way to Plaintiff's First Set of Interrogatories.

**DOCUMENT REQUEST NO. 20:**

All documents defendant intends to rely upon or use at trial in this case.

**DOCUMENT REQUEST NO. 21:**

All documents and things supporting or refuting any alleged secondary considerations.

Respectfully submitted,

DATED:  March 2, 2007

J. Kevin Fee
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
Tel.: (202) 739-3000

Scott D. Stimpson, Esq. (*pro hac vice*)
Jeffrey M. Gold, Esq. (*pro hac vice*)
Morgan Lewis & Bockius LLP

101 Park Avenue
New York, New York 1018-0060

Attorneys for Plaintiff
Casio Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2007, I caused a true and correct copy of the attached document to be served on the following as described below:

**By Hand Delivery**
Campbell Killefer
Venable LLP
575 7th Street, N.W.
Washington, DC 20004

**By First-Class Mail**

Jerold B. Schnayer
Joseph E. Cwik
Welsh & Katz, Ltd.
120 South Riverside Plaza, 22nd Floor
Chicago, IL 60606

J. Kevin Fee