UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re Papst Licensing & Co. KG Patent Litigation | Misc.  Action No. 07-493 (RMC) |
| | MDL Docket No. 1880 |
| This Document Relates To: <br><br> ALL CASES | Hon. Rosemary M. Collyer |

**PAPST'S BRIEF IN OPPOSITION TO THE FIRST WAVE CAMERA MANUFACTURER'S MOTION [DKT #449] FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT BASED ON THE LIMITATION OF "AN INPUT/OUTPUT [A STORAGE] DEVICE CUSTOMARY IN A HOST DEVICE"**

James P. White
Jerold B. Schnayer
Daniel R. Cherry
Walter J. Kawula, Jr.
Joseph E. Cwik
Yasmin S. Schnayer
HUSCH BLACKWELL LLP
120 South Riverside Plaza, 22nd Floor
Chicago, Illinois 60606
(312) 655-1500

*Attorneys for Papst Licensing GmbH & Co. KG*

## TABLE OF CONTENTS

Table of Authorities .................................................................................................... iii

Introduction ....................................................................................................................1

I.      LEGAL STANDARDS GOVERNING SUMMARY JUDGMENT. ..................................3

II.     MSC CAPABLE DEVICES SIGNAL THAT THEY ARE MASS STORAGE
        DEVICES AND THEREBY LITERALLY SATISFY THE "INPUT/OUTPUT
        DEVICE CUSTOMARY IN A HOST DEVICE" LIMITATION. ...................................4

        A.      Mass Storage Devices Are Customary Devices......................................................6

        B.      MSC Capable Devices Behave Just Like A Preferred
                Embodiment Of The Tasler Patents........................................................................7

        C.      The CMs' Argument That The MSC Capable Devices
                Comprise *USB* Mass Storage Class Devices Is Unsupported
                And Contrary To The Court's Claims Construction...............................................11

III.    THE PTP CAPABLE DEVICES, BY SIGNALING THAT THEY ARE "STILL
        IMAGING DEVICES," INFRINGE UNDER THE DOCTRINE OF
        EQUIVALENTS...................................................................................................13

        A.      PTP Capable Devices Signal That They Are Devices
                Which Were Normally Used With Computers At The Time
                Of Invention. .............................................................................................14

        B.      Differences Between Internal and External Input/Output
                Devices Are Insubstantial, From The Perspective Of The
                Invention. ...................................................................................................15

        C.      The CMs' Argument That Still Image Capture Devices Did
                Not Exist At The Time Of Invention Is Unsupported And
                Contrary To The Courts Claim Construction.........................................................22

IV.     THE COURT SHOULD NOT RELY ON THE BERG DECLARATION [DKT.
        # 449-3] BECAUSE THERE ARE NUMEROUS INACCURACIES.............................23

V.      TO THE EXTENT THAT THE CMS DENY THAT DISK DRIVES ARE
        CUSTOMARY OR SCANNERS ARE EQUIVALENT TO BEING
        CUSTOMARY, ADDITIONAL INFORMATION IS REQUIRED UNDER
        RULE 56(D)......................................................................................................25

Conclusion .....................................................................................................................28

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Cordis Corp. v. Boston Scientific Corp.*,
    561 F.3d 1319 (Fed. Cir. 2009), *modifying on other*
    *grounds*, 2006 WL 1305227 (D. Del. 2006)........................................................ 20, 21, 22

*Crown Packaging Technology v. Rexam Beverage Can Co.*,
    559 F.3d 1308 (Fed. Cir. 2009)........................................................................... 2, 3, 25

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*,
    149 F.3d 1309 (Fed. Cir.1998)............................................................................ 3, 20

*Abbott Labs. v. Andrx Pharma., Inc.*,
    473 F.3d 1196 (Fed. Cir. 2007)........................................................................... 20

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242, 106 S.Ct. 2505 (1986).................................................................. 3, 25

*Azhar Ali Khan v Parsons Global Services, Ltd*,
    428 F.3d 1079 (D.C. Cir. 2005) ........................................................................... 25

*Celotex Corp. v. Catrett*,
    477 U.S. 317, 106 S.Ct. 2548 (1986).................................................................. 3, 25

*Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*,
    339 U.S. 605 (1950)............................................................................................. 4

*Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*,
    370 F.3d 1131 (Fed. Cir. 2004)........................................................................... 4

*Kopykake Enterprises, Inc. v. Lucks Co.*,
    264 F.3d 1377 (Fed. Cir. 2001) .......................................................................... 12

*Markman v. Westview Instr., Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) (*en banc*),
    *aff'd* 116 S.Ct. 1384 (1996) ............................................................................... 3

*Metropolitan Life Ins. Co. v. Bancorp. Services, L.L.C.*,
    527 F.3d 1330 (Fed. Cir. 2008)........................................................................... 2, 4, 25

*PC Connector v. Smartdisk*,
    406 F.3d 1359 (Fed. Cir. 2005)........................................................................... 12

*Schoell v. Regal Marine Indus., Inc.*,
    247 F.3d 1202 (Fed. Cir. 2001)........................................................................... 4

*Voda v. Cordis Corp.*,
    536 F.3d 1311 (Fed. Cir. 2008)........................................................................... 18, 19, 20

*Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*
    520 U.S. 17 (1997)........................................................................................................ 4, 20

## INTRODUCTION

The CMs' motion relies on the Court's claims construction no. 15 that states that "customary in a host device" means "normally present (1) *within* the chassis of most commercially available computers (2) *at the time of the invention*."  Modified Order Regarding Claims Construction, Dkt. #337 at 4, ¶15 (italics and parentheticals added) (hereinafter "Modified Order").  The CMs argue that "neither the PTP Accused Devices nor the MSC Accused Devices identify themselves as data input/output [storage] devices that were normally present (1) *within* the chassis of most commercially available computers (2) *at the time of the invention*."  The First Wave Camera Manufacturers' Motion for Summary Judgment of Non-infringement Based on the Limitations of "an Input/Output [a Storage] Device Customary In a Host Device [Dkt. #449] (hereinafter "SJ Customary Motion") at 18 (italics and bracketed material in original; parentheticals added).

The CMs are entirely wrong about Mass Storage Class ("MSC") Capable Devices.[1] When in the MSC mode, the MSC Capable Devices identify themselves as hard disk drives. Third Supplemental Declaration of C. Douglass Locke Concerning the CMs' Motions For Summary Judgment And Papst's Fed.R.Civ.P. 56(d) Motion at ¶¶587-93 (hereinafter, "Locke Decl.") (filed concurrently herewith).  Hard disk drives were normally present *within* the chassis of most commercially available computers *at the time of the invention*.  *Id.* at ¶581.  Indeed, MSC Capable Devices work in exactly the same way as an embodiment in U.S. Patent Nos.

---

[1] MSC Capable Devices are the First Wave CMs' products identified in Tables 12 and 13 of Papst's Revised Asserted Claims and Infringement Contentions [Dkt. #416].

6,470,399 and 6,895,449 (hereinafter "Tasler Patents").   Locke Decl. at ¶575, ¶611, ¶615. Accordingly MSC Capable Devices literally infringe both of the Tasler Patents.

The analysis is different for Picture Transfer Protocol ("PTP") Capable Devices.[2]   When in the PTP mode, the PTP Capable Devices identify themselves as still image capture devices, a type of device which includes scanners.   Locke Decl. ¶¶628-629.   Scanners were available for use with computers *at the time of the invention*.  *Id.* at ¶¶629-634.   They were not, however, typically *within* the chassis of the computer.   There is, nevertheless, infringement of the '399 patent under the doctrine of equivalents because the devices have the same function, operate in the same way, and achieve the same result irrespective of whether the input/output device identified to the host would have been inside or outside the chassis of a computer.  *Id.* at ¶¶645-50.   The user of the interface device would not know, much less care, whether the input/output device identified to the host would have been inside or outside the chassis of a computer.  *Id.* at ¶647.   Infringement under the doctrine of equivalents is a question of fact.  *Crown Packaging Technology v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1312 (Fed. Cir. 2009).

Papst's expert Dr. Locke explains the operation of the MSC capable and PTP capable devices, with particular attention to the errors and omissions in the declarations of Mr. Berg, the CMs' purported expert.   At a minimum, this conflict between opposing experts on crucial facts precludes summary judgment.  *Metropolitan Life Ins. Co. v. Bancorp. Services, L.L.C.*, 527 F.3d 1330, 1338-39 (Fed. Cir. 2008).

---

[2] PTP Capable Devices are the First Wave CMs' products identified in Table 14 of Papst's Revised Asserted Claims and Infringement Contentions [Dkt. #416].

2

I.       **LEGAL STANDARDS GOVERNING SUMMARY JUDGMENT.**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986). The "no genuine dispute" requirement means that "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986). The district court should view the evidence in a light most favorable to the opposing party and resolve doubts in its favor. *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1315 (Fed. Cir. 1998).

The CMs seek summary judgment of non-infringement. Whether a product infringes a patent requires a two step analysis. First, the court must properly interpret the language of the claim. *Markman v. Westview Instr., Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*), *aff'd* 116 S.Ct. 1384 (1996). The Court has already performed this first step. *See*, Dkt. #336, Dkt. #337.

In the second step, "the claim as properly construed must be compared to the accused device or process." *Ethicon*, 149 F.3d at 1315 (quoting *Carroll Touch, Inc. v. Electro Mechanical Sys., Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993)). In this second step, a "determination of noninfringement, either literal or under the doctrine of equivalents, is a question of fact." *Crown Packaging*, 559 F.3d at 1312 (quoting *IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1429 (Fed. Cir. 2000). Expert testimony regarding the presence or non-presence of claim limitations in a product may raise a genuine dispute as to a material fact. *Crown Packaging*, 559 F.3d at 1314-15 (discussing contrasting expert testimony

with respect to the function of the claim limitation "annular reinforcing bead"); *Metropolitan Life*, 527 F.3d at 1338-39.

A genuine dispute of material fact regarding infringement under the doctrine of equivalents may be raised even in the absence of an assertion of literal infringement. The doctrine of equivalents is applied to protect a patentee's rights where there are mere colorable differences over the invention as worded in the claims of a patent. *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 607 (1950). In *Warner-Jenkinson*, the Supreme Court noted that of the two different phrasings of the test for equivalence, one or the other may be "more suitable to different cases, depending on their particular facts". *Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 40, 117 S.Ct. 1040 (1997). Under the "insubstantial differences" test, "[a]n element in the accused device is equivalent to a claim limitation if the only differences between the two are insubstantial." *Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1139 (Fed. Cir. 2004). Under the "function-way-result test," an element in the accused device is equivalent to a claim limitation if it "performs substantially the same function in substantially the same way to obtain substantially the same result as the claim limitation." *Graver Tank*, 399 U.S. at 608. See also, *Schoell v. Regal Marine Indus., Inc.*, 247 F.3d 1202, 1209-10 (Fed. Cir. 2001) (one test to determine whether differences are "insubstantial" is the function-way-result test).

## II.   MSC CAPABLE DEVICES SIGNAL THAT THEY ARE MASS STORAGE DEVICES AND THEREBY LITERALLY SATISFY THE "INPUT/OUTPUT DEVICE CUSTOMARY IN A HOST DEVICE" LIMITATION.

In the present motion, the CMs deny that a MSC Capable Device in USB Mass Storage Mode "signals to the host device that it is an input/output device customary in a host device"

('399 Patent) or that it is a "storage device customary in a host device" ('449 Patent).  However, the CMs cannot (and do not) deny that disk drives <u>are</u> mass storage devices that <u>were</u> normally present within the chassis of most commercially available computers at the time of the invention, nor can the CMs deny that drivers for mass storage devices such as disk drives were commonly found in most computers at the time of the invention.  E.g., '399 Patent, 4:27-30 ("Drivers . . . which are found in practically all host devices are, for example, drivers for hard disks . . ." ).

Instead, the CMs' main argument is that <u>USB</u> was not customary at the time of the Tasler invention.  SJ Customary Motion [Dkt. #449] at 17-18.  This argument rests on the false assumption that devices as commonplace as hard disk drives somehow become not "customary" when they are attached using a USB connection.  The assumption is false because: 1) the "multi-purpose interface" of the host computer in the Tasler patents need not be "customary," so using a USB socket to connect an interface device to a host computer does not preclude infringement, and 2) even using the USB connection, the MSC Capable Devices send signals that are precisely as described and claimed in the Tasler Patents.

In this regard, the Court has construed "customary in a host device" with respect to input/output devices and storage devices, but <u>not</u> with respect to multi-purpose interfaces:

> The phrase "an input/output device customary in a host device" in the '399 Patent means a "data input/output device that was normally present within the chassis of most commercially available computers at the time of the invention" and the phrase "a storage device customary in a host device" in the '449 Patent means a "storage device that was normally present within the chassis of most commercially available computers at the time of the invention."

Modified Order, Dkt. #337 at 3.  In contrast, the term multi-purpose interface need not be customary:

> The term "multi-purpose interface" means " a communication interface designed for use with multiple devices that can have different functions from each other."

Modified Order, Dkt. #337 at 2.  The words "customary" and "normally present" are not found in this claim construction, so the USB interface need not be "customary" or "normally present." Moreover, the CMs provide no evidence which would suggest that a USB interface does not meet this construction.  Because the "multipurpose interface" need not be "customary," without changing the fact that mass storage devices such as disk drives were "customary" at the time of the invention, the CMs' motion should be denied with respect to MSC Capable Devices.

### A.  Mass Storage Devices Are Customary Devices.

Mass storage devices have been customary in computers for many years.  Locke Decl. ¶¶579-81 .  The term "mass storage device" typically refers to a device that may be used to store large amounts of data.  *Id*. at ¶579.  Disk drives, in particular, are known as mass storage devices. Locke Decl. ¶581-82; Papst's Local Rule 7(h) Concise Statement Of Issues In Opposition To The First Wave Camera Manufacturers' Motion [Dkt #449] For Summary Judgment Of Non-infringement Based On The  "Customary In A Host Device" Limitation ¶1 (filed concurrently with this memorandum) (hereinafter "PAMF").  Disk drives were normally present within the chassis of most commercially available computers by March, 1997.[3]  Locke Decl. ¶581; PAMF

---

[3] The Court has construed the term "customary" with respect to the "time of invention." Modified Order [Dkt #337] at 4.  The Court further indicated that "when" is 1998, "when Mr. Tasler applied for the '399 Patent."  Modified Memorandum Opinion Regarding Claims Construction [Dkt. #336] at 55.  March 3, 1998 is the international filing date for the '399 patent. However, the '399 Patent also claims priority to a German patent application filed on March 4, 1997, which is evidence that the invention had been made by at least that date.  Final Infringement Contentions [Dkt #416] at 78.  Applying the Court's reasoning to the earlier-filed German patent application, this paper will consider the time of the invention to be March, 1997.

¶3.  Moreover, the Tasler Patents expressly identify disk drives as input/output devices that are customary in a host device.  Locke Decl. ¶¶583-84; '399 Patent 5:6-9; 6:7-15.  Indeed, hard disk drives are identified as the *preferred* input/output or storage devices to be emulated by an interface device.  Locke Decl. ¶583; '399 Patent 5:6-9; PAMF ¶2.  In short, a disk drive is a type of mass storage device that is an "input/output device customary in a host device."  Locke Decl. ¶584; PAMF ¶3  See also, Papst's Revised Asserted Claims and Infringement Contentions [Dkt. #416], p. 36 (hereinafter "Final Infringement Contentions").  A disk drive is also a "storage device customary in a host device."  Locke Decl. ¶584;  PAMF ¶3.  The CMs have offered no evidence to the contrary.

**B.     MSC Capable Devices Behave Just Like A Preferred Embodiment Of The Tasler Patents.**

When attached to a host computer via a USB connector, the MSC Capable Devices, when in Mass Storage Class mode, signal to the host computer that they are mass storage devices. Locke Decl. ¶592; PAMF ¶¶10-11, 13.  As explained more fully below, the signal that the MSC Capable Devices send is the same as that shown in examples in the Tasler Patents.

Figure 1 of the Tasler patents, along with the corresponding written description, provides an example of an interface device and will be referred to as the "Example A Interface Device." The Example A Interface Device provides at least one specific way of sending a signal to the host device that it is a customary storage device.  Locke Decl. ¶¶132-33; ¶¶607-11; PAMF ¶9. In this example, the host device sends an "INQUIRY instruction" to the interface device.  The interface device responds with a "signal [that] indicates to the host device that, for example, a hard disk drive is attached" to the host device.  '399 patent at 6:7-15; Locke Decl. ¶¶132-33; ¶¶607-11; PAMF ¶9.  Dr. Locke explains that a skilled person would understand that an

7

INQUIRY instruction (with INQUIRY in all capital letters) is a SCSI command. [4]  Locke Decl. ¶607.  At the time of the invention, and still today, a response to a SCSI INQUIRY command by a hard disk drive would signal to the host computer that the "Peripheral Device Type" of the responding device is "00h."   Locke Decl. ¶609; PAMF ¶9.   This code indicates that the responding device is a "Direct-access device" that communicates using the SCSI Block Command ("SBC") set  Locke Decl. ¶609; PAMF ¶9.  A "Direct-access device" is a type of mass storage device.  Locke Decl. ¶610.   In summary, the Tasler Patents teach, as one example, an interface device responding to a SCSI INQUIRY command by identifying itself as a "Direct-access device," thereby invoking the SCSI Block Command Set to communicate with the interface device.

When operating as a mass storage device, the MSC Capable Devices respond to the host computer in the same way as the Example A interface device.  Locke Decl. ¶615, see also, Locke Decl. ¶306 (comparing Example A to Mass Storage Class response).  The evidence showing this, among other places, [5] is in the "bus traces," or records of communications between a host computer and the attached MSC Capable Devices, that have been offered by the CMs with their motions. Declaration Of Paul E. Berg In Support Of The First Wave Camera Manufacturers' Motion For Summary Judgment Of Non-Infringement With Respect To The "Data

---

[4] The Small Computer System Interface ("SCSI") standards define certain commands and responses, including the SCSI Block Command set.  Locke Decl. ¶ 603.  A SCSI multi-purpose interface is one of the examples given in the Tasler Patents to communicate with the inventive interface devices.  '399 Patent, 9:29-37 (SCSI interface 1220). The SCSI Block Command set is used on several different types of physical connections for hard disk drives, including SCSI and USB.  Locke Decl. ¶ 603.

[5] See also, for example, PAMF ¶ 4 (citing discovery responses by Camera Manufacturers JVC and Panasonic and Locke Decl. ¶589).

Transmit/Receive Device" Claim Limitation [DKT #451-3] at 5, n.2 ("Berg Decl. 2").  Each bus trace offered by the CMs includes "Get_Descriptor" inquiry instructions being sent from the host computer to an accused device.  Locke Decl. ¶586 (the Get_Descriptor inquiries and responses are omitted from the screen shots offered by Mr. Berg.  Berg. Decl. 2 [Dkt. #451-3] Exhibit 3). The "Get_Descriptor" instruction is a USB instruction seeking information concerning the type of the device attached to the host computer.  Locke Decl. ¶587.  In other words, the Get_Descriptor command is a type of "inquiry."  *Id.*

When queried by the computer, the MSC Capable Devices indicate that they are "MASS STORAGE Class" devices, Locke Decl. ¶588, ¶591-92; PAMF ¶11.  "MASS STORAGE Class" devices such as hard disk drives were normally present within the chassis of most commercially available computers by March 1997.  Locke Decl. ¶581; PAMF ¶3.  The MSC Capable Devices also signal to the host computer that the MSC Capable Devices use the SCSI Block Command set to transfer data. Locke Decl. ¶614; PAMF ¶4, ¶11; Final Infringement Contentions [Dkt. #416], pp. 36-38.  This response, indicating that a mass storage device was present, and that the mass storage device uses the SCSI Block Command set to communicate, is just like the Example A described above from the '399 patent.  Locke Decl. ¶615.

Additionally, the MSC Capable Devices, when operating as mass storage devices, actually receive and respond to a SCSI INQUIRY Command, as taught with respect to the Example A Interface Device, in addition to receiving and responding to the Get_Descriptor inquiry described above.  Locke Decl. ¶611; PAMF ¶13.  Each of the "bus traces" provided by the CMs includes an INQUIRY Command going from the host computer to an attached MSC Capable Device.  *Id.* (the INQUIRY instructions and responses by the MSC Capable Devices,

while present in the bus traces, are omitted from the screen shots of the bus traces offered by Mr. Berg.   Berg. Decl. 2 [Dkt. #451-3] Exhibit 3).   In each such occurrence, the MSC Capable Device responds to the INQUIRY Command by indicating that it is a "Direct-Access device" (code "00h"), which is the same response that a hard disk drive would give.  *Id.*; PAMF ¶13.

Indeed, the Nikon D200 (which is the illustrative example of the present motion) goes on to signal that it is a disk drive of the "fixed disk" media type, and that it has 64 sectors per track and four read-write heads.  Locke Decl. ¶¶247-250.  This is all typical of a customary disk drive. Locke Decl. ¶251.  This is exactly what the Tasler Patents teach to one of skill in the art, with respect to the Example A Interface Device.  Locke Decl. ¶611.

In view of the above, a reasonable jury would have to find that MSC Capable Devices, respond to a "Get_Descriptor" command by signaling to the host computer that they are MASS STORAGE Class devices that speak the SCSI Block Command set language.  A jury would also have to find that the MSC Capable Devices, when operating as mass storage devices, respond to SCSI INQUIRY Commands exactly as taught in the Tasler Patents.   A reasonable jury would also have to find that mass storage devices that communicated using the SCSI Block Command set were "customary" devices in host devices at the time of invention.  In view of this, a jury would also have to find that the MSC Capable Devices signal to the host device that the MSC Capable Devices are input/output devices customary in a host device.  Furthermore, a jury would reasonably have to find that such devices also signal to the signal to the host device that the MSC Capable Devices are storage devices customary in a host device.  Thus, infringement is established on this record, or at least a genuine dispute of material fact is established, which

requires denial of the present summary judgment motion with respect to the MSC Capable Devices.

**C.      The CMs' Argument That The MSC Capable Devices Comprise *USB* Mass Storage Class Devices Is Unsupported And Contrary To The Court's Claims Construction.**

The CMs' arguments concerning whether USB existed at the time of invention are factually wrong and, in any event, are irrelevant to the patent claims at issue and the Court's construction of those claims. First, contrary to the arguments by the CMs, at page 10 of their brief, the responses given by the MSC Capable Devices do <u>not</u> expressly signal that they are "<u>USB</u> Mass Storage Class." SJ Customary Motion [Dkt. #449] at 10 (underlining added). Not even the CMs' witness, Mr. Berg, states that the MSC Capable Devices identify themselves as "<u>USB</u> Mass Storage Class" devices. He instead states, as does Dr. Locke, that they identify themselves as "MASS STORAGE Class" devices. *See* Berg Decl. 1,[6] at Table 4.5, line 5, on page 9 of 13 ("Offset" numbered "5" has "Description" of "MASS STORAGE Class, not "<u>USB</u> MASS STORAGE Class"); Locke Decl. ¶588, ¶592. Additionally, in each of the bus traces provided by the CMs, the MSC Capable Devices respond to a SCSI INQUIRY Command by identifying themselves as a "Direct-access device," not as a "USB" device. Locke Decl. ¶611. Accordingly, the CMs' argument that the MSC Capable Devices represent themselves as <u>USB</u> Mass Storage Class Devices is wrong and unsupported by the record.

Additionally, the Tasler Patents do not require the multi-purpose interface to be "customary in a host device." No claims at issue require that the multi-purpose interface be

"customary."  The Court's claim construction said nothing of the kind.  Modified Order, Dkt. #337 at 2.  The CMs did not even ask for such a construction.  See Camera Manufacturers' Appendix Of Proposed Constructions Of Disputed Claim Terms, p. 1 (Dkt. #188-2) (requesting that the multipurpose interface be construed as: "A communication interface designed for use with multiple devices having different functions from each other.").   Thus, the CMs attempt to add limitations to the term "multi-purpose interface" is not only wrong; it is untimely.  Because the claims as written and already construed by the Court do not require the multi-purpose interface to be "customary," it is irrelevant whether the USB Mass Storage Class specification was or was not customary at the time of invention.

Moreover, input/output devices, such as disk drives, may be used with various connections to a host computer.  Using one connection versus another does not change the essential nature of an input/output device. Locke Decl. ¶¶597-99.  For example, hard disk drives have used different types of connections over the years. Locke Decl. ¶599. PAMF ¶5.  The type of connection, however, does not change the essential nature of a hard disk drive.  *Id*. at ¶¶597-99.  A disk drive remains a disk drive, regardless of whether it is attached to a host computer by way of a SCSI connection (as described in the Tasler Patents) or a USB connection.  *Id*.  For the above reasons, the CMs' reliance on cases such as *PC Connector v. Smartdisk*, 406 F.3d 1359 (Fed. Cir. 2005) and *Kopykake Enterprises, Inc. v. Lucks Co.*, 264 F.3d 1377 (Fed. Cir. 2001) is misplaced.  The claims are infringed because mass storage devices were customary at the time of

---

[6] Declaration of Expert Paul E. Berg in Support of the First Wave Camera Manufacturers' Motion for Summary Judgment of Noninfringement Based on the Limitations of "an Input/Output [a Storage] Device Customary In a Host Device [Dkt. #449-3].

the invention, and it is immaterial whether USB (the multi-purpose interface) was customary at the time of the invention.

As a matter of law, a jury would have to disregard the CMs' arguments concerning the timing of the introduction of the USB specifications, and it would have to find that a disk drive is a customary input/output device, regardless of whether it uses a USB connector, a SCSI connector, or some other connector because the Court's claim construction does not require that the connection method be "customary." Thus, notwithstanding the CMs' misplaced arguments, a reasonable jury would still have to find that, when queried by the computer, the MSC Capable Devices identify themselves as input/output devices normally present within the chassis of most commercially available computers at the time of invention. Locke Decl. ¶618; PAMF ¶5. Infringement, therefore, is shown on the record, or at least a genuine dispute as to a material fact regarding literal infringement by the MSC Capable Devices is established.

III.   **THE PTP CAPABLE DEVICES, BY SIGNALING THAT THEY ARE "STILL IMAGING DEVICES," INFRINGE UNDER THE DOCTRINE OF EQUIVALENTS.**

The CMs' argue that PTP Capable Devices do not meet the requirements in the Court's claim construction for a "data input/output device that was normally present [1] within the chassis of most commercially available computers [2] at the time of the invention." Modified Order, [Dkt. #337] (bracketed numerals added.) SJ Customary Motion [Dkt. #449] at 10-11. However, by March of 1997 popular commercially available computers had application and driver-level software for communicating with scanners. Locke Decl. ¶629-¶633. Accordingly, the "at the time of the invention" requirement of the Court's construction of "customary" is met. Applying the "within the chassis" portion of the Court's claim construction, however, Papst did not assert that PTP Capable Devices, when in PTP mode, literally infringe the '399 Patent. Final

Infringement Contentions [Dkt. #416] at 38.   There is, however, infringement under the doctrine of equivalents because the PTP Capable Devices perform the <u>same</u> function in the <u>same</u> way with the <u>same</u> result.   Locke Decl. ¶645-¶652.

A.     **PTP Capable Devices Signal That They Are Devices Which Were Normally Used With Computers At The Time Of Invention.**

The PTP mode works somewhat differently from mass storage class devices.   When queried by a host computer, the PTP Capable Devices respond to the host computer by indicating that they are "Still Image Capture Devices," Locke Decl. ¶636;  Final Infringement Contentions [Dkt. #416], pp. 38, 40; PAMF ¶19.   As Mr. Berg concedes, the term "Still Image Capture Devices" applies, *inter alia*, to scanners.   Berg Decl. 1, ¶20, ¶23.   Locke Decl. ¶637.

Scanners were popular input/output devices associated with personal computers before the date of invention.   For example, Windows 95 was one of the most popular computer operating systems in 1995-1997.   Locke Decl. ¶632; PAMF ¶15.   Windows 95 included application software <u>and</u> driver-level software for scanners.     Locke Decl. ¶¶633-635; PAMF ¶¶16-18.

Windows 95 was shipped with an application program that identified itself as "Imaging for Windows 95."   Locke Decl. ¶633; PAMF ¶16.   "Imaging for Windows 95" was specifically adapted to work with scanners.   Locke Decl. ¶634; PAMF ¶17.  The "Imaging for Windows 95" application program included functions called: "Scan New", "Select Scanner", and "Scan Preferences", each of which indicates that the software supported scanners.   Locke Decl. ¶634; PAMF ¶17.

Windows 95 systems also included some driver software (TWAIN) for use with scanners. Locke Decl. ¶635; PAMF ¶18.   The provision of application software <u>and</u> driver-level software

for scanners on every copy of Windows 95 is evidence that scanners were customary at the time

of the invention.  This establishes the "at the time of invention" aspect of the Court's claim

construction, or at least raises a genuine dispute of material fact.

### B. Differences Between Internal and External Input/Output Devices Are Insubstantial, From The Perspective Of The Invention.

Even though scanners were commonplace as of the date of the invention, Papst has not

contended that scanners were normally located inside the chassis of the host device per the

Court's construction of the term "input/output device customary in a host device."  Final

Infringement Contentions [Dkt. #416] at 38-40.  However, because any differences between the

signals given by devices inside a chassis and those given by devices outside a chassis are

insubstantial with respect to the claims, there is still a genuine dispute as to infringement under

the doctrine of equivalents.  Final Infringement Contentions [Dkt. #416], pp. 38-40.[7]

One reason that differences are insubstantial between input/output devices inside the

chassis and outside the chassis is that the multipurpose interface of the Tasler Patents does not

recognize any such difference.  A SCSI interface (which is given as an example of a multi-

purpose interface in the Tasler Patent) may connect to both internal and external input/output

devices at the same time.  PAMF ¶25, Locke Decl. ¶639; Final Infringement Contentions [Dkt.

#416], p. 39 ("Indeed, SCSI interfaces were often shared between internal and external

_____

[7] Papst's Final Infringement Contentions properly assert infringement under the doctrine
of equivalents with respect to the claim element at issue, even though additional proofs are
provided herein.  E.g., *Keithley v. The Homestore.com, Inc.*, 553 F. Supp. 2d 1148, 1151 (N.D.
Cal. 2008) (Infringement contentions need only state whether the patentee asserts infringement
under the doctrine of equivalents for a claim element; the patentee need not in its contentions
further explain its proofs of equivalency.).

input/output devices."). A host computer with such an interface does not distinguish between internal and external devices connected to the interface. PAMF ¶25; Locke Decl. ¶640. A disk drive mounted internally to a computer and connected by a SCSI bus, for example, and a disk drive mounted externally to a computer and connected by the same SCSI bus, would appear to be the same type of input/output device to the host computer. PAMF ¶25; Locke Decl. ¶641. In this regard, to a host computer with input/output devices connected to a SCSI multipurpose interface, there is no difference in communications between input/output devices connected inside the chassis and those connected outside the chassis. PAMF ¶25; Locke Decl. ¶641.

A second reason that any differences are insubstantial is that a user of the interface device would not know, much less care, whether the input/output device identified to the host would have been inside or outside the chassis of a computer. Locke Decl. at ¶642, ¶647. Moreover, the host computer would not be able to discern any difference. *Id.* at 647.

A third reason why any differences are insubstantial is that the patents in suit have an expansive view on what comprises a "host device." Final Infringement Contentions [Dkt. #416] at 39-40. Examples of host devices given in the '399 patent include laptop computers, desktop computers and workstations. '399 patent 2:10-13 ("portable host systems in the form of laptops"), 10:61-64 (laptops) 4:30-36 (IBM PCs and workstations), 8:18-22 (workstations). Thus, "host devices" include systems where everything is in one case (e.g., laptops), and systems where the components are in separate cases and connected by cables (e.g., PCs and workstations).

Additionally, the '399 patent uses the terms "host device," "host system," "processor," "computer" and "computer system" interchangeably. '399 patent, 1:48-51; 5:13-20; 5:20-32; 6:

59-62; 8:1-11; Final Infringement Contentions [Dkt. #416] at 39-40; PAMF ¶27.  The Tasler

Patents' use of the terms "computer" and "computer system" as interchangeable with "host

device" further indicates that components normally outside the chassis may be equivalents of

components normally inside the chassis.  For example, the 1995 American Heritage's Dictionary

of Computer Words defines the word "computer," in part, by stating: "All computers include

these components: . . . input devices, such as a keyboard or a mouse . . . mass storage devices,

such as disk drives and tape drives . . . output devices, such as printers and display screens."

Locke Decl. ¶50-51; PAMF ¶29.  Although devices such as a mouse or a printer are normally

outside the chassis (and sometimes the keyboard and display, also) all of these components are

considered part of the "computer."

Similarly, the Microsoft Computer Dictionary defines a "computer system" as including

"all functional components of a computer and its associated hardware."  Locke Decl. ¶48-49;

PAMF ¶28.  The definition goes on the explain that a "basic microcomputer system includes a

console, or system unit, with one or more disk drives, a monitor, and a keyboard."  Locke Decl.

¶48; PAMF ¶28.  In this definition, components are considered to be part of a "computer

system," even if often-times they are normally placed outside the chassis, such as keyboards and

monitors.  PAMF ¶28.  Whether a component is included with a "computer" or "computer

system" does not turn on whether it is inside the chassis or outside the chassis in these

definitions.  Accordingly, input/output devices outside the chassis, but normally connected to the

"CPU" or "system unit" are equivalent to those "inside the chassis" of a "host device," because

they are nonetheless part of the "computer" or "computer system."

The CMs argue that as a matter of law, a device outside the chassis cannot be equivalent to one inside chassis because "in" and "out" are antithetical concepts (SJ Customary Motion [Dkt. #449] at 22-23), citing several Federal Circuit cases.  The argument misses the point because the claim limitation at issue as construed concerns the signals sent by the PTP Capable Devices in response to an inquiry instruction, not whether any particular input/output devices are inside the chassis or outside.  As demonstrated below, the signals sent by the PTP Capable Devices perform the same function, in the same way, and with the same result, as the claimed signals.

Furthermore, the CMs' argument is too facile and superficial.  First, the argument ignores the way that "computers" and "computer systems" are understood by those in the art to encompass more than just the chassis, but to also include peripherals attached by cables.  Second, infringement under the doctrine of equivalents is not a game of words.  A device that can be verbally characterized as opposite to the claimed invention may still infringe under the doctrine of equivalents.  For example, in *Voda v. Cordis Corp.*, 536 F.3d 1311, 1326-27 (Fed. Cir. 2008), the "curved" portion of the accused catheters was held to be the equivalent of the "straight" portion limitation of Claim 1 of the '625 patent.  "Curved" and "straight" constitute a quintessential pair of opposites.[8]  Despite their verbally antithetical descriptions, the "curved" portion of the accused catheters and the claimed "straight" portion of the patented catheter were

---

[8] According to Aristotle, "straight and curved" were one of the ten pairs of basic opposites identified by Pythagoras.  Ex. A at 2 (http://www.oneonta.edu/faculty/farberas/arth/ARTH209/Doyphoros.html (visited 9/26/2011)).

equivalents because they:

- performed the same function ("extra backup support for the catheter during use");

- in the same way ("engag[ing] the wall of the aorta opposite the coronary ostium for a substantial length during use");

- with the same result ("making it 'difficult to dislodge the guide catheter from its desired orientation' during use").

536 F.3d at 1327.  Likewise, when operated in the PTP mode, the PTP Capable Devices send signals that are equivalent to the claimed signals because they both perform the same function, in the same way and obtain the same result:

- They perform the same function – identifying what type of device the PTP Capable Device is (or purports to be) when attached to a multi-purpose interface to which multiple different types of device may be attached.  This function of the signal in response to the inquiry remains the same, regardless of whether the signaled input/output device would normally be attached inside the chassis or outside the chassis.

- The way that a signal in response to an inquiry identifies the attached PTP Capable Device is also the same – the signal identifies the responding device as a <u>commonly used</u> input/output device, i.e., a device with which the host computer already knows how to communicate.  The way that an input/output device establishes such communication remains the same whether the input/output device is internal or external.

- The result is also the same -- the host computer recognizes the PTP Capable Device (as what it purports to be) and uses a driver that is optimized for the host computer to communicate with the commonly-used input/output device.  Once again, there is no

difference between devices inside the chassis and outside the chassis; the same optimized

drivers are used to communicate with internal and external devices.

Locke Decl. ¶¶643-652;  PAMF ¶¶21-24.  The only difference is that the signal given in the PTP

mode is for devices that are commonly outside, rather than inside, the chassis of the computer.

That, however, has no effect whatsoever on what is being accomplished.  Locke Decl. at ¶626.

Indeed, as discussed above, the user would not notice the difference.  Locke Decl. at ¶627.  *See*

*Voda*, 536 F.3d at 1327 ("would have difficulty distinguishing the two during use.").

Accordingly, there is equivalence because this part of the accused device does not "play[] a role

substantially different from the claimed element."  *Warner-Jenkinson*, 520 U.S. at 40.

The CMs complain that finding equivalence by the PTP mode would violate the "all

elements" rule and "vitiate" a claim element.  SJ Customary Motion [Dkt. #449] at 16.  The

Federal Circuit, however, has repeatedly warned against letting such concerns "swallow" the

doctrine of equivalents.  *Abbott Labs. v. Andrx Pharma., Inc.*, 473 F.3d 1196, 1212 (Fed. Cir.

2007); *Ethicon*, 149 F.3d at 1317.  Tension arises from the fact that "any analysis of

infringement under the doctrine of equivalents *necessarily* deals with subject matter that is

'beyond,' 'ignored' by, and not included in the literal scope of a claim."  *Id*. (court's emphasis).

Accommodating such tension is the purpose of the function-way-result test for equivalency.  The

above-discussed *Voda* case exemplifies how to apply that test to find infringement even when

part of the accused device is describable as the opposite of a claimed element.

Also instructive is *Cordis Corp. v. Boston Scientific Corp.*, 561 F.3d 1319, 1329-30 (Fed.

Cir. 2009), *modifying on other grounds*, Case No. 03-027, 2006 WL 1305227 (D. Del. May 11,

2006), where the court affirmed the jury's finding of equivalency.  The district court had

construed the "corners" limitation in the claims to mean "a place where two surfaces meet to form an angle." 2006 WL 1305227 at * 16.  The accused intravascular stents instead had "purely circular arcs." *Id.*  The jury found equivalency and the accused infringer sought JMOL by arguing that the patentee's "doctrine of equivalents analysis was flawed because it was 'utterly silent on the requirement that a corner must "form an angle."'" *Id.* at *17.  In response the district court reasoned:

> While the risk of vitiation of claims through use of the doctrine of equivalents must be recognized and avoided, it is necessary to acknowledge that <u>any analysis of infringement under the doctrine of equivalents must deal with subject matter that does not fall within the literal scope of the claim language.</u> *See Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1317 (Fed. Cir. 1998).  Here, although the language of the '021 patent does not address "purely circular arcs," it is still possible that a product having such a structure would infringe the "corners" limitation of the '021 patent under the doctrine of equivalents.  In applying the doctrine of equivalents to the "corners" limitation of claim 36 of the '021 patent, <u>it is not proper to import a strict "angle" requirement into that limitation, since doing so would place strictures on the analysis which would cause it to instead become an evaluation of literal infringement.</u>

*Id.* (emphasis added).  The district court pointed out that the patent specification included "rounded corners" as a preferred option.  *Id.*  It also relied on the patentee's expert's testimony using a function-way-result analysis, and the absence of such an analysis by the accused infringer's expert.  *Id.*  A similar situation occurs here.  The patent specification includes printers, which are a form of imaging devices typing outside the computer's chassis, as one of the alternatives for an input/output device customary in a host device.  '399 Patent at 4:30.  Furthermore, as already discussed, Papst's expert testifies to the function-way-result.  Locke Decl. ¶¶643-652.  No such analysis disputing equivalency is even attempted by the CMs or their witness, Mr. Berg.  In *Cordis*, the Federal Circuit held that the district court properly found that

the patentee's expert's testimony was sufficient, and that the claim element was not vitiated by finding that the circular arcs on the accused stents were equivalent to corners with angles. 561 F.3d at 1330. The same result should obtain here.

C.    **The CMs' Argument That Still Image Capture Devices Did Not Exist At The Time Of Invention Is Unsupported And Contrary To The Courts Claim Construction.**

Contrary to the arguments by the Camera Manufacturers, at page 11 of their brief, the responses given by the PTP-Capable Devices to the host computer do not expressly signal that they are new types of devices. SJ Customary Motion [Dkt. #449] at 11. When queried by the computer, the PTP Capable Devices indicate that they are "Still Image Capture Devices," Locke Decl. ¶628; SJ Customary Motion [Dkt. #449] at p. 10. The Camera Manufacturers introduced no evidence that still image capture devices were unknown at the time of invention. Instead, the Camera Manufacturers concede that the category of still image capture devices includes scanners. SJ customary Motion [Dkt. #449 at 10 ("Still Image Capture Devices, such as a camera or scanner."); Berg Decl. 1 at ¶¶20-21. Scanners were popular input/output devices associated with personal computers before the date of the Tasler patents. Locke Decl. ¶630. The Camera Manufacturers attempt to avoid this by arguing that the USB specification for still image capture devices was not released as of the time of the invention. SJ Customary Motion [Dkt. #449] at 11.

As set forth above with respect to MSC Capable Devices, the claims of the Tasler Patents as construed do not require that the multi-purpose interface be "customary in a host device." The USB specification addresses the subject of connecting, i.e., the multi-purpose interface. Because still image capture devices, such as scanners, were commonly used input/output devices at the

time of invention, and because the claims as interpreted do not require the multi-purpose interface to be customary, it is irrelevant whether the USB Still Image Capture Device Class specification existed at the time of invention.

Thus, notwithstanding the Camera Manufacturers' misplaced arguments, a reasonable jury would find that when queried by the computer, the PTP Capable Devices identify themselves as input/output devices commonly used with most commercially available computers at the time of invention. Locke Decl. ¶628, ¶637. A jury would also reasonably find that signals given in response to an inquiry instruction by input/output devices that are outside the chassis of a host device are equivalents of signals given by input/output devices inside the chassis. Locke Dec. ¶¶643-53. This establishes that the PTP Capable Devices satisfy the "input/output device customary in a host device" language under the doctrine of equivalents, or at least raises a genuine dispute as to a material facts regarding infringement by equivalents.

## IV.   THE COURT SHOULD NOT RELY ON THE BERG DECLARATION [DKT. # 449-3] BECAUSE THERE ARE NUMEROUS INACCURACIES.

The CMs rely on a declaration of Paul Berg (Berg Decl. 1 [Dkt. #449-3] which is wrong or incomplete in many respects. For example, Mr. Berg erroneously claims that three USB specifications "define how MSC devices communicate over USB." Berg Decl. 1, ¶24. Mr. Berg is wrong because the USB specifications do not define any of the actual data transfer commands that are necessary to read from or write to any of the storage locations on a mass storage device.

In contrast to Mr. Berg's opinion, the Universal Serial Bus Mass Storage Class Overview explains that the USB specifications rely on **command sets from existing protocols** for communications:

USB Mass Storage specifications **use the command sets from several existing protocols. The command blocks of these command sets are placed in a USB wrapper** which follows USB protocol.

Locke Decl. ¶499 (emphasis added). The Berg declaration omits any mention of these command sets from existing protocols. The omission is telling because, as set forth above, the MSC Capable Devices use the SCSI Block Command set for actual data transfers, which is the <u>same</u> command set that was used by disk drives at the time of invention. Locke Decl. ¶500 (USB specifications from 2003 and 2008 reference SCSI Command Sets), ¶¶604-606. Mr. Berg also omits the fact that the USB protocols merely transport the commands from the existing protocols in a USB "wrapper."[9] Locke Decl. ¶606 Accordingly, not only is Mr. Berg is wrong when he opines that three USB specifications "define how MSC devices communicate over USB," Berg Decl. 1 at 24, his opinion leads one away from the material fact that the MSC Capable Devices communicate using the same SCSI protocols that are taught by the Tasler Patents.

Additionally, Exhibit 11 to the CMs' brief is Revision 1.4, which is dated February 19, 2010. Mr. Berg fails to identify or attach the versions of the specification that were in effect when the vast majority of the cameras in suit were made and sold. Universal Serial Bus Mass Storage Class Specification Overview Version 1.2 was released on June 23, 2003, and Revision 1.3 was released on September 5, 2008. Locke Decl. ¶500. Mr. Berg's omission leaves out the fact that Revision 1.2 expressly references the SCSI Primary Command Set. Locke Decl. ¶500. The SCSI Primary Command Set is the specification that defines the INQUIRY Command and

---

[9] Mr. Berg's position is analogous to contending that the U.S. Postal Service "defines" how parties conduct discovery in a civil case. The contention would be wrong because, in fact, the Federal Rules of Civil Procedure (i.e., the "existing protocols") define how discovery is actually conducted. The Postal Service merely transports the envelopes in which discovery requests and responses are carried.

responses thereto.  As set forth above, both the interface device of the Tasler Patent and the MSC

Capable Devices use the INQUIRY Command.

Paragraph 20 of the Berg 449-3 Decl., is also wrong.  Mr. Berg states that: *USB*

*SICDD* is only used with "Still Image Capture Devices:"

> 20.       *USB SICDD* is only used with Still Image Capture Devices. *USB SICDD*
> does not define Still Image Capture Devices. Based on my experience in this field,
> Still Image Capture Devices are devices that produce digital still images such as
> digital still picture cameras or scanners.

However, many of the devices in suit can capture video and/or sound, as well as still images, and

support PTP connectivity.  Locke Decl. ¶496.  Motion picture and sound recording devices may

also use PTP.  *Id.*

There are many more incorrect statements made by Mr. Berg.  These incorrect statements

are detailed in Dr. Locke's Declaration at ¶¶489-507.  In view of these inaccuracies, the Court

should not accept Mr. Berg as an expert or rely on his testimony.  Additionally, the contrasting

testimony of these witnesses, at the very least, creates an issue of fact precluding summary

judgment.  *Crown Packaging*, 559 F.3d at 1314-15; *Metropolitan Life*, 527 F.3d at 1338-39.

**V.       TO THE EXTENT THAT THE CMS DENY THAT DISK DRIVES ARE CUSTOMARY OR
           SCANNERS ARE EQUIVALENT TO BEING CUSTOMARY, ADDITIONAL INFORMATION IS
           REQUIRED UNDER RULE 56(D).**

Summary judgment "should be refused where the nonmoving party has not had the

opportunity to discover information that is essential to [its] opposition."  *Anderson*, 477 U.S. at

250 n.5 (1986); *Accord*, *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Azhar Ali Khan v*

*Parsons Global Services, Ltd*, 428 F.3d 1079, 1087 (D.C. Cir. 2005), *reversed on other grounds*

521 F.2d 421 (D.C. Cir. 2008).  In *Metropolitan Life Ins. Co. v. Bancorp Services LLC*, the

Federal Circuit enforced the same rule by vacating a summary judgment and remanding a patent

infringement case after noting that the plaintiff patentee had only had the defendant's source code for "days" before its opposition was due.  527 F.3d at 1334.

Papst has filed herewith a motion and declaration under Fed.R.Civ.P. 56(d) because Papst has not had discovery from the CMs to determine exactly how their devices work.  The CMs' motion should be denied until Papst is able to take the necessary discovery.  As set forth above, Papst believes that it has set forth facts sufficient to demonstrate the presence of the claim limitations at issue in the accused devices, or at least to have raised a genuine issue of material fact.  To the extent that the CMs argue that these facts are insufficiently substantiated, then Papst requires an opportunity to discover additional information from the CMs to respond to their arguments.  This information would include:

- The source code for the CMs' MSC Capable Devices.

- Efforts by the CMs relating to certification of their products with relation to any interface or any operating system, or any other certification process relating to communications between the CMs' products and host computers.

- The CMs' decision to use the USB MSC protocol for communication with a host computer as opposed to, or in addition to, a vendor-specific protocol and the steps taken by the CMs to design their MSC Capable Devices to communicate with an attached host computer.

Locke Decl. ¶¶653-54.  Additional information is specifically identified in Papst's motion for additional discovery pursuant to Rule 56(d), filed concurrently herewith.  This information should show that the CMs selected and adopted the USB Mass Storage Class mode in order to gain the same advantages described in the Tasler Patents.

If the CMs contest (1) whether their PTP Capable Products tell an attached host computer that they are a scanner or (2) whether sending a signal to a host device that an attached device is a scanner or still image capture device is sending a signal to a host device that an attached device

26

is an input/output device located inside the chassis of computer, then the following information is required to respond to the CMs' arguments:

- The source code for the CMs' PTP Capable Devices,

- Efforts by the CMs relating to certification of their products with relation to any interface or any operating system, or any other certification process relating to communications between the CMs' products and host computers,

- The TWAIN protocol and steps taken by the CMs to design any of their products to communicate with a host computer using the TWAIN protocol,

- The CMs' decision to use the USB PTP protocol for communication with a host computer as opposed to, or in addition to, a vendor-specific protocol and the steps taken by the CMs to design their PTP Capable Devices to communicate with an attached host computer.

Locke Decl. ¶¶658-60.   Additional information is specifically identified in Papst's motion for additional discovery pursuant to Rule 56(d).  This information will show whether the CMs' PTP Capable Devices each send a signal that performs substantially the same function, in substantially the same way, to achieve substantially the same result as sending a signal to a host device that an attached device is an input/output device located inside the chassis of computer. This information should also show that the CMs selected and adopted the USB PTP mode in order to gain the same advantages described in the Tasler Patents.

These issues are developed more fully in Papst's motion for additional discovery pursuant to Rule 56(d), filed concurrently herewith.

**CONCLUSION**

For the reasons set forth above, Papst Licensing requests that the Court deny The Camera

Manufacturers' Motion For Summary Judgment.

September 29, 2011                                        Respectfully submitted,


                                                         /s/ Yasmin S. Schnayer
                                                         James P. White
                                                         Jerold B. Schnayer
                                                         Daniel R. Cherry
                                                         Walter J. Kawula, Jr.
                                                         Joseph E. Cwik
                                                         Yasmin S. Schnayer
                                                         HUSCH BLACKWELL LLP
                                                         120 South Riverside Plaza, Suite 2200
                                                         Chicago, Illinois 60606
                                                         (312) 655-1500

                                                         *Attorneys for Papst Licensing GmbH & Co. KG*

CERTIFICATE OF SERVICE

The undersigned counsel for Plaintiff, Papst Licensing GmbH & Co. KG, hereby certifies that on September 29, 2011, a true and correct copy of the forgoing Papst's Brief In Opposition To The First Wave Camera Manufacturer's Motion [Dkt #449] For Summary Judgment Of Non-infringement Based On The Limitation Of "An Input/Output [A Storage] Device Customary In A Host Device" was filed with the Court and served electronically by the Court's CM/ECF System to all registered users.

/s/ Yasmin S. Schnayer
Attorney for Papst Licensing GmbH & Co. KG

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re Papst Licensing & Co. KG Patent Litigation | Misc.  Action No. 07-493 (RMC) |
| | MDL Docket No. 1880 |
| This Document Relates To: ALL CASES | Hon. Rosemary M. Collyer |

**PAPST'S LOCAL RULE 7(h) CONCISE STATEMENT OF ISSUES IN OPPOSITION TO THE FIRST WAVE CAMERA MANUFACTURERS' MOTION [DKT #449] FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT BASED ON THE  "CUSTOMARY IN A HOST DEVICE" LIMITATION**

Papst Licensing GMBH & Co. KG ("Papst") submits this Statement of Genuine Issues pursuant to LCvR 7(h)(1)in opposition to First Wave Camera Manufacturers' Motion for Summary Judgment of Noninfringement Based on the "Customary in a Host Device" Limitation:

**PART I – PAPST'S RESPONSE TO CMS' STATEMENT OF MATERIAL FACTS**

> CMF 1. In U.S. Patent No. 6,470,399 ("the '399 patent"), the Court construed the phrase "an input/output device customary in a host device" as a "data input/output device that was normally present within the chassis of most commercially available computers at the time of the invention" (Dkt. 337, Modified Order Regarding Claim Construction at 3, ¶14; Dkt. 336, Modified Memorandum Opinion Regarding Claims Construction at 53-59).

Papst Response:

Papst objects to this statement because it does not state facts concerning infringement or non-infringement.  Claims are construed as a matter of law.  Papst objects to this statement because the quote is incomplete.  See, Modified Order, Dkt. #337 at 3.

1

> CMF 2. In U.S. Patent No. 6,895,449 ("the '449 patent), the Court construed the phrase "a storage device customary in a host device" as a "storage device that was normally present within the chassis of most commercially available computers at the time of the invention" (Dkt. 337, Modified Order Regarding Claim Construction at 3, ¶14; Dkt. 336, Modified Memorandum Opinion Regarding Claims Construction at 53-59).

Papst Response:

Papst objects to this statement because it does not state facts concerning infringement or non-infringement.  Claims are construed as a matter of law.  Papst objects to this statement because the quote is incomplete.  See, Modified Order, Dkt. #337 at 3

> CMF 3. Papst Licensing GmbH & Co. KG ("Papst") has accused only Picture Transfer Protocol ("PTP") capable devices and Mass Storage Class ("MSC") capable devices of infringing the '399 and '449 patents (collectively, "the Asserted Patents").

Papst's Response:

Papst's contentions regarding infringement are stated in Papst's Revised Asserted Claims and Infringement Contentions, Tables 12-14 [Dkt. #416] ("Final Infringement Contentions").  All devices charged with infringement are capable of operating in Mass Storage Class mode, Picture Transfer Protocol mode, or both modes.  The accused devices may be capable of operating in additional modes, for which additional discovery is necessary to assert claims of infringement.  See Locke Decl. ¶¶357-64.  Papst has asserted that U.S. Patent No. 6,470,399 is infringed by MSC Capable Devices and by PTP Capable Devices.  Final Infringement Contentions, at 52-61, 70-78, Table 12, Table 14.  Papst has asserted that U.S. Patent No. 6,895,449 is infringed by MSC Capable Devices.  Final Infringement Contentions, at 61-70, Table 13.

CMF 4. Papst has asserted claims 1-3, 5, 7, 11, 14, and 15 of the '399 patent against MSC capable devices (Dkt. 416, Papst's Revised Asserted Claims and Infringement Contentions ("Papst's Final Contentions"), at Table 12, 220-250).

Papst's Response:

Papst disputes this request to the extent that certain MSC Capable Devices are also PTP Capable, and are the subject of additional assertions of infringement.  Papst also disputes this request to the extent that MSC Capable Devices may be capable of operating in additional modes, for which additional discovery is necessary to assert claims of infringement.  See Locke Decl. ¶¶357-64.

CMF 5. Papst has asserted claims 1, 2, 6-9, 12, 13, 15-18 of the '449 patent against MSC capable devices (Dkt. 416, Papst's Final Contentions at Table 13, 251-286).

Papst's Response:

Papst disputes this request to the extent that certain MSC Capable Devices are also PTP Capable, and are the subject of additional assertions of infringement.  Papst also disputes this request to the extent that the MSC Capable Devices may be capable of operating in additional modes, for which additional discovery is necessary to assert claims of infringement.  See Locke Decl. ¶¶357-64.

CMF 6. Papst has asserted claims 1, 3, 5, 11, and 14 of the '399 patent against PTP capable devices (Dkt. 416, Papst's Final Contentions at Table 14, 287-306).

Papst's Response:

Papst disputes this request to the extent that certain PTP Capable Devices are also MSC Capable, and are the subject of additional assertions of infringement.  Papst also disputes this request to the extent that the PTP Capable Devices may be capable of operating in additional

modes, for which additional discovery is necessary to assert claims of infringement.  See Locke

Decl. ¶¶357-64.

> CMF 7. Papst has not asserted the '449 patent against PTP capable devices
> (See generally, Dkt. 416, Papst's Final Contentions).

Papst's Response:

Papst disputes this request to the extent that certain PTP Capable Devices are also MSC

Capable, and are the subject of additional assertions of infringement concerning MSC Capable

Devices.  Papst also disputes this request to the extent that the PTP Capable Devices may be

capable of operating in additional modes, for which additional discovery is necessary to assert

claims of infringement.  See Locke Decl. ¶¶357-64.

> CMF 8. The only independent claims of the '399 patent are claims 1, 11,
> and 14 (Ex. 1, '399 patent at claims 1, 11, and 14).

Papst's Response:

Papst does not dispute this fact.

> CMF 9. Claims 1, 11, and 14 of the '399 patent each recite the limitation:
> "an input/output device customary in a host device" (Ex.1, '399 patent at
> claims 1, 11, and 14).

Papst's Response:

Papst disputes CMF 9 as phrased.  Claim 1 of the '399 patent recites the following

phrase:

> "sends a signal, regardless of the type of the data transmit/receive device
> attached to the second connecting device of the interface device, to the
> host device which signals to the host device that it is an input/output
> device customary in a host device"

'399 Patent 13:1-8.  Claim 11 has similar language.  '399 Patent, 14:8-15.  Claim 14 recites:

> "responding to the inquiry from the host device by the interface device in
> such a way that it is an input/output device customary in a host device"

'399 Patent 14:52-54.  In each of these cases, there is no limitation that an "input/output device

customary in a host device" is required to be present for infringement, as suggested by the use of

the word "limitation" in CMF 9.  Instead, claims 1 and 11 recite <u>sending</u> a <u>signal</u> having certain

characteristics, and claim 14 requires <u>responding to an inquiry</u> in a certain way.

> CMF 10. The only independent claims of the '449 patent are claims 1, 17,
> and 18 (Ex. 2, '449 patent at claims 1, 17, and 18).

Papst's Response:

> Papst does not dispute this fact.

> CMF 11. Claims 1, 17, and 18 of the '449 patent each recite the limitation:
> "a storage device customary in a host device" (Ex. 2, '449 patent at claims
> 1, 17, and 18).

Papst's Response:

> Papst disputes CMF 11 as phrased.  Claim 1 of the '449 patent recites the following

phrase:

> "sends a signal, regardless of the type of the data transmit/receive device
> attached to the second connecting device of the interface device, to the
> host device which signals to the host device that it is a storage device
> customary in a host device"

'449 Patent, 11:63-67.  Claim 17 has similar language. '449 Patent, 13:30-34.   Claim 18 recites:

> "responding to the inquiry from the host device by the interface device in
> such a way that it is a storage device customary in a host device"

'449 Patent, 14:24-26.  In each of these cases, there is no limitation that "a storage device

customary in a host device" is required to be present for infringement, as suggested by the use of

the word "limitation" in CMF 11.  Instead, claims 1 and 17 recite <u>sending a signal</u> having certain

characteristics, and claim 18 requires <u>responding to an inquiry</u> in a certain way.

> CMF 12. The PCT filing date of the application that lead to the '399
> patent is March 3, 1998 (Ex. 1, '399 patent).

Papst's Response:

Papst does not dispute that one of the priority documents for the '399 patent is PCT

Application No.  PCT/EP98/01187 or that the document indicates that it has a filing date of

March 3, 1998.  However, the fact is disputed as phrased because it is incomplete.  The '399

patent and '449 patent also claim priority to German Patent Application No. 197 08 755, filed

March 4, 1997.

> CMF 13. On September 23, 1998, Universal Serial Bus Specification v.1.1
> published (Ex. 10 at CM021505 and CM021506).

Papst's Response:

Papst admits that Exhibit 10 has September 23, 1998 printed on the cover page.  Papst

objects to this fact as being unclear as to what is meant by "published" and therefore denies CMF

13.  Papst disputes this fact as not being sufficiently proven by a date printed on a face of a

document.

Furthermore, the date on which Universal Serial Bus Specification v.1.1 was published is

irrelevant.  The "multi-purpose interface" of the host computer need not be "customary."  In this

regard, the Court has construed "customary in a host device" with respect to input/output devices

and storage devices, but <u>not</u> with respect to multi-purpose interfaces:

> The phrase "an input/output device customary in a host device" in the '399
> Patent means a "data input/output device that was normally present within
> the chassis of most commercially available computers at the time of the
> invention" and the phrase "a storage device customary in a host device" in

> the '449 Patent means a "storage device that was normally present within the chassis of most commercially available computers at the time of the invention."

Modified Order, Dkt. #337 at 3. In contrast, the term "multi-purpose interface" as construed need not be customary:

> The term "multi-purpose interface" means "a communication interface designed for use with multiple devices that can have different functions from each other."

Modified Order, Dkt. #337 at 2. The Court did not construe the multi-purpose interface (e.g., USB connector) to be "normally present within the chassis of most commercially available host computers at the time of the invention." Accordingly, whether Universal Serial Bus specification v.1.1 was published on a given date is irrelevant.

> CMF 14. On July 11, 2000, Universal Serial Bus Still Image Capture Device Definition revision 1.0 was approved (Ex. 5 at CM012288 and CM012290; Ex. 3, Declaration of Paul Berg ("Berg Decl.") at ¶18).

Papst's Response:

Papst admits that Exhibit 5 has July 11, 2000 printed on the cover page and on the revision history. Papst objects to this fact as being unclear as to what is meant by "approved" and therefore denies CMF 14. Papst disputes this fact as not being sufficiently proven by a date printed on a document. Also, for the reasons set forth above with respect to CMF 13, the date on which Universal Serial Bus Still Image Capture Device Definition revision 1.0 was approved is irrelevant. The "multi-purpose interface" of the host computer need not be "customary."

> CMF 15. Prior to July 11, 2000, Universal Serial Bus Still Image Capture Device Definition was not publicly available (Ex. 5 at CM012288 and CM012290; Ex. 3, Berg Decl. at ¶18).

Papst's Response:

Papst admits that Exhibit 5 has July 11, 2000 printed on the cover page and on the revision history.  Papst objects to this fact as being unclear as to what is meant by "publicly available" and therefore denies CMF 15.  Exhibit 5 does not indicate that it was not publicly available prior to the stated approval date.  Also, for the reasons set forth above with respect to CMF 13, the date on which Universal Serial Bus Still Image Capture Device Definition was publicly available is irrelevant.  The "multi-purpose interface" of the host computer need not be "customary."

> CMF 16. In May of 2000, Photographic and Imaging Manufactures, Inc. ("PIMA 15740:2000") was published (Ex. 6 at CM012334).

Papst's Response:

Papst objects to this fact as being unclear as to what is meant by "published" and therefore denies CMF 16.  Also, the cited page of Exhibit 6 does not indicate whether it was published in May, 2000.  Also, for the reasons set forth above with respect to CMF 13, the date on which Photographic and Imaging Manufactures, Inc. ("PIMA 15740:2000") was published is irrelevant.  The "multi-purpose interface" of the host computer need not be "customary."

> CMF 17. Prior to May of 2000, PIMA 15740:2000 was not publicly available (Ex. 6 at CM012334).

Papst's Response:

Papst objects to this fact as being unclear as to what is meant by "publicly available" and therefore denies CMF 16.  Also, the cited page of Exhibit 6 does not indicate whether it was "publicly available" in May, 2000.  Papst disputes this fact as not being sufficiently proven by a date printed on a document.  Also, for the reasons set forth above with respect to CMF 13, the date on which Photographic and Imaging Manufactures, Inc. ("PIMA 15740:2000") was

published is irrelevant.   The "multi-purpose interface" of the host computer need not be "customary."

>CMF 18. On October 22, 1998, Universal Serial Bus Mass Storage Class
>Specification Overview was first released (Ex. 11 at CM012833; Ex. 3,
>Berg Decl. at ¶26).

Papst's Response:

Papst admits that Exhibit 11 has October 22, 1998 printed on the revision history.  Papst objects to this fact as being unclear as to what is meant by "first released" and therefore denies CMF 18.  Papst further disputes this fact as not being sufficiently proven by a date printed on a document.  Also, for the reasons set forth above with respect to CMF 13, the date on which Universal Serial Bus Mass Storage Class Specification Overview was first released is irrelevant. The "multi-purpose interface" of the host computer need not be "customary."

>CMF 19. Prior to October 22, 1998, Universal Serial Bus Mass Storage
>Class Specification Overview was not publicly available (Ex. 11 at
>CM012833; Ex. 3, Berg Decl. at ¶26).

Papst's Response:

Papst admits that Exhibit 11 has October 22, 1998 printed on the revision history.  Papst objects to this fact as being unclear as to what is meant by "publicly available" and therefore denies CMF 19.  Papst further disputes this fact as not being sufficiently proven by a date printed on a document.  Also, for the reasons set forth above with respect to CMF 13, the date on which Universal Serial Bus Mass Storage Class Specification Overview was not publicly available is irrelevant.  The "multi-purpose interface" of the host computer need not be "customary."

> CMF 20. On September 31, 1999, Universal Serial Bus Mass Storage
> Class Bulk-Only Transport was released (Ex. 12 at CM012847; Ex. 3,
> Berg Decl. at ¶27).

Papst's Response:

Papst admits that Exhibit 12 has September 31, 1999 printed on the revision history as the date for Version 1.0, "Final Revision edits for Released Document."  However, September only has 30 days, so the date must be in error.  Also, Papst objects to this fact as being unclear as to what is meant by "released" and therefore denies CMF 20.  Papst disputes this fact as not being sufficiently proven by a date printed on a document.  Also, for the reasons set forth above with respect to CMF 13, the date on which Universal Serial Bus Mass Storage Class Bulk-Only Transport was released is irrelevant.  The "multi-purpose interface" of the host computer need not be "customary."

> CMF 21. Prior to September 31, 1999, Universal Serial Bus Mass Storage
> Class Bulk-Only Transport was not publicly available (Ex. 12 at
> CM012847; Ex. 3, Berg Decl. at ¶27).

Papst's Response:

Papst admits that Exhibit 12 has September 31, 1999 printed on the revision history as the date for Version 1.0, "Final Revision edits for Released Document."  However, September only has 30 days, so the date must be in error.  Also, Papst objects to this fact as being unclear as to what is meant by "publicly available" and therefore denies CMF 21.  Papst disputes this fact as not being sufficiently proven by a date printed on a document.  Also, for the reasons set forth above with respect to CMF 13, the date on which Universal Serial Bus Mass Storage Class Bulk-Only Transport was publicly available is irrelevant.  The "multi-purpose interface" of the host computer need not be "customary."

CMF 22. On December 14, 1998, Universal Serial Bus Mass Storage Class Control/Bulk/interrupt (CBI) Transport was released (Ex. 13 at CM012869; Ex. 3, Berg Decl. at ¶28).

Papst's Response:

Papst admits that Exhibit 13 has December 14, 1998 printed on the revision history as the date for Version 1.0.  Papst objects to this fact as being unclear as to what is meant by "released" and therefore denies CMF 22.  Papst disputes this fact as not being sufficiently proven by a date printed on a document.  Also, for the reasons set forth above with respect to CMF 13, the date on which Universal Serial Bus Mass Storage Class Control/Bulk/interrupt (CBI) Transport was released is irrelevant.  The "multi-purpose interface" of the host computer need not be "customary."

CMF 23. Prior to December 14, 1998, Universal Serial Bus Mass Storage Class Control/Bulk/interrupt (CBI) Transport was not publicly available (Ex. 13 at CM012869; Ex. 3, Berg Decl. at ¶28).

Papst's Response:

Papst admits that Exhibit 13 has December 14, 1998 printed on the revision history as the date for Version 1.0.  Papst objects to this fact as being unclear as to what is meant by "publicly available" and therefore denies CMF 23.  Papst disputes this fact as not being sufficiently proven by a date printed on a document.  Also, for the reasons set forth above with respect to CMF 13, the date on which Universal Serial Bus Mass Storage Class Control/Bulk/interrupt (CBI) Transport was publicly available is irrelevant.  The "multi-purpose interface" of the host computer need not be "customary."

CMF 24. Windows 98 did not provide native support for USB MSC devices (Ex. 7, Microsoft's USB-Storage – FAQ for Driver and Hardware Developers at CM-012493 (Omitting Windows 98 from the list of Windows operating systems that provide native support for USB MSC

devices); Ex. 8, Microsoft's Archive on USB-Storage – FAQ for Driver and Hardware Developers at CM-012498 ("[Windows 98 Gold and Windows 98 Second Edition] do not provide native USB storage support because the USB storage specification was not finalized during the development phase of these versions of Windows")). Thus, a user had to download and/or install drivers to use a USB MSC device with Windows 98 (id.).

Papst's Response:

Papst objects to this fact as being unclear as to what is meant by "native support" and therefore denies CMF 24. Also, for the reasons set forth above with respect to CMF 13, whether Windows 98 provided native support for USB MSC devices is irrelevant. The "multi-purpose interface" of the host computer need not be "customary."

CMF 25. Windows 2000 was the first Windows operating system to provide native support for USB MSC devices (Ex. 7, Microsoft's USB-Storage – FAQ for Driver and Hardware Developers at CM-012493). Thus, Windows 2000 was the first Windows operating system where a user did not have to download and/or install drivers to use a USB MSC (id.; see also Ex. 8, Microsoft's Archive on USB-Storage – FAQ for Driver and Hardware Developers at CM-012498 ("[Windows 98 Gold and Windows 98 Second Edition] do not provide native USB storage support because the USB storage specification was not finalized during the development phase of these versions of Windows")).

Papst's Response:

Papst objects to this fact as being unclear as to what is meant by "native support" and therefore denies CMF 25. Also, for the reasons set forth above with respect to CMF 13, whether Windows 2000 was the first Windows operating system to provide native support for USB MSC devices is irrelevant. The "multi-purpose interface" of the host computer need not be "customary."

CMF 26. Windows 2000 was released on February 17, 2000 (Ex. 14, Microsoft Press Release entitled Gates Ushers In Next Generation of PC Computing With Launch of Windows 2000 at CM-012897).

Papst's Response:

Papst objects to this fact as being unclear as to what is meant by "released" and therefore denies CMF 26.  Papst disputes this fact as not being sufficiently proven by a date printed on a non-authenticated document.  Also, for the reasons set forth above with respect to CMF 13 and CMF25, the date on which Windows 2000 was released is irrelevant.  The "multi-purpose interface" of the host computer need not be "customary."

**PART II – PAPST'S STATEMENT OF ADDITIONAL MATERIAL FACTS**

PAMF1.      A hard disk drive is a type of mass storage device.  Locke Decl. ¶¶581-82.   The

Tasler Patents refer to disk drives as "mass storage devices."  '399 Patent, 8:55-67

(referring to the "mass storage device of the host device" in the same context as the "hard

disk of the host device"; 12:1-4 (SCSI hard disk of the host device is "a real SCSI mass

storage device");  Locke Decl. ¶582.  In this case, "mass" means a large amount.  Locke

Decl. ¶579.

PAMF 2.      Hard disk drives are identified in the Tasler Patents as the *preferred* input/output

or storage devices to be emulated by an interface device.  '399 patent, 5:6-9 ("The

interface device according to the present invention therefore simulates, both in terms of

hardware and software, the way in which a conventional input/output device functions,

preferably that of a hard disk drive."); Locke Decl. ¶583.

PAMF 3.      Mass storage devices, such as hard disk drives, were normally present within the

chassis of most commercially available computers by March, 1997.   Locke Decl. ¶581.

A disk drive is a type of mass storage device that is an input/output device (or storage

device) customary in a host device.  .   Locke Decl. ¶584.  Drivers for mass storage

devices such as disk drives were commonly found in most computers at the time of the

invention.  E.g., '399 Patent, 4:27-30 ("Drivers . . . which are found in practically all host

devices are, for example, drivers for hard disks . . . ").

14

PAMF 4.      MSC Capable Devices operating in Mass Storage Class mode, when attached to a

host computer, signal to the host computer that they are a mass storage device that

communicates using a disk drive language.  In particular, the Accused Devices provide

one of two signals to the host computer:

> bInterfaceClass:  0x08 (Mass Storage Class)
> bInterfaceSubClass: 0x06  (SCSI)
> bInterfaceProtocol: 0x50 (Bulk-Only Transport).

or

> bInterfaceClass:  0x08 (Mass Storage Class)
> bInterfaceSubClass: 0x05 (ATAPI)
> bInterfaceProtocol: 0x50 (Bulk-Only Transport).

Papst Licensing's Amended Asserted Claims And Infringement Contentions [Dkt. #416]

("Final Infringement Contentions"), at  36-37; Locke Decl. ¶588.  See also, e.g., Victor

Company of Japan, Ltd. And JVC Americas Corp's Second Supplemental objections and

Responses to Papst's Second Revised First Set of interrogatories (Interrogatories 1, 7 and

3), pp. 7-8, Exhibit 2;  Matsushita Electric Industrial Co., Ltd. And Panasonic Corp. of

North America's Second Supplemental Objections and Responses to Papst's Revised

First Set of Interrogatories (Interrogatories 1, 2 and 3) pp. 7-8, Exhibit 2.  The Nikon

D200 that is an example in the CMs motion gives the first set of responses

(bInterfaceSubClass=0x06).  These responses cause the MSC Capable Devices to be

recognized by the host computer as disk drives.  Locke Decl. ¶¶589-590.

PAMF 5.      Hard disk drives are (or have been) available with numerous different connections

to computers, such as AT Attachment (ATA), Small Computer System Interface (SCSI),

Serial ATA (SATA), and Serial Attached SCSI (SAS).  Locke Decl. ¶599.  Regardless of

which connection is used, the input/output device remains a disk drive.  Locke Decl.

¶600.  A hard disk drive does not become a new type of input/output device simply because the connectors change.  Locke Decl. ¶¶598-600.

PAMF 6.      One common language for hard disk drives to use to communicate with a host computer is a set of commands and responses known collectively as "SCSI."  The SCSI standards concerning block access commands (SCSI Block Command set) are used to communicate with disk drives on connections such as the ATA Packet Interface (ATAPI), USB Mass Storage class and FireWire SBP-2 (found on many models of Apple computers).  Locke Decl. ¶603.

PAMF 7.      A SCSI interface is one of the examples of a multipurpose interface given in the Tasler Patents.  '399 patent, 9:29-27 (SCSI interface 1220).

PAMF 8.      In the context of the Tasler Patents, a person of ordinary skill in the art would recognize the INQUIRY command (with "INQUIRY" in all capital letters) to be a SCSI instruction from the SCSI Primary Command set (SPC).  Locke Decl. ¶608.

PAMF 9.      The '399 patent discusses the SCSI INQUIRY command, and the interface device's response, as follows:

When the host device system with which the interface device according to the present invention is connected is booted and a data transmit/receive device is also attached to the interface device 10, usual BIOS routines or multi-purpose interface programs issue an instruction, known by those skilled in the art as the INQUIRY instruction, to the input/output interfaces in the host device. The digital signal processor 13 receives this inquiry instruction via the first connecting device and generates a signal which is sent to the host device (not shown) again via the first connecting device 12 and the host line 11. This signal indicates to the host device that, for example, a hard disk drive is attached at the interface to which the INQUIRY instruction was sent.

'399 patent, 6:3-15; Locke Decl. ¶40; ¶608.  At the time of the invention, and still today, a response to a SCSI INQUIRY command would include information that signaled to the

host computer the "Peripheral Device Type" of the responding device.  Locke Decl. ¶¶607-11.  A hard disk drive responding to an INQUIRY command would be expected to return a Peripheral Device Type of "00h," indicating that it is a "Direct-access device." Locke Decl. ¶¶610-611.  Furthermore, the SCSI specifications indicate that Direct-access devices communicate using the SCSI Block Command ("SBC") set. *Id*.  Thus, a person in the art would understand that this example of the interface device would send a signal to the host device that it is a direct-access mass storage device which communicates using the SCSI Block Command set (SBC).  Locke Decl. ¶611.

PAMF 10.   The MSC Capable Devices, when in Mass Storage Mode, respond to two types of "inquiry" instructions.  First, they respond to the USB Get_Descriptor instruction.  Second, they respond to the SCSI INQUIRY instruction.  Locke Decl. ¶¶588, 592-94, 612-615.

PAMF 11.   Regarding the USB Get_Descriptor inquiry instruction, when queried by the computer, the Mass Storage Class Capable Devices, indicate that they are "MASS STORAGE Class" devices. Locke Decl. ¶¶592-94.

PAMF 12.    The MSC Capable Devices also tell the computer that they speak "SCSI Transparent Command set."  Locke Decl. ¶613.  This response indicates that the MSC Capable Devices use the SCSI Block Command set.  The responses, indicating that a mass storage device is present, and that the mass storage device uses the SCSI Block Command set to communicate, is just like the example given in the '399 patent. *Id.*

PAMF 13.   Regarding the SCSI INQUIRY Command, the MSC Capable Devices respond to the actual SCSI INQUIRY command as taught in the '399 patent. Locke Decl. ¶611.  The

MSC Capable Devices indicate that they are Peripheral Device Type "00h," which corresponds to direct-access device.  *Id.*

PAMF 14.  Scanners were popular input/output devices associated with personal computers before the date of invention.  Locke Decl. ¶631.

PAMF 15.  Windows 95 was one of the most popular computer operating systems in 1995-1997. Locke Decl. ¶633.

PAMF 16.  Windows 95 was shipped with an application program that identified itself as "Imaging for Windows 95."  Locke Decl. ¶633.

PAMF 17.  "Imaging for Windows 95" was specifically adapted to work with scanners. Locke Decl. ¶634.  The "Imaging for Windows 95" application included functions called: "Scan New", "Select Scanner", and "Scan Preferences", each of which indicates that the software was designed to work with scanners.  Locke Decl. ¶634.

PAMF 18.  Windows 95 systems also included certain driver software for use by the computer when communicating with scanners.  Locke Decl. ¶635.  This technology is referred to by the name TWAIN.  Locke Decl. ¶635.  The following software files/drivers may be found in the "Windows" directory of a Windows 95 computer: Twain.dll, Twain.log, Twain_32.dll, Twain001.Mtx, Twunk_16, Twunk_32, Twunk002.MTX, and Twunk003.mtx.  The TWAIN software provided some compatibility with scanners.  *Id.*

PAMF 19.  When queried by the computer, the PTP Capable Devices in PTP mode indicate that they are "Still Image Capture Devices."  Locke Decl. ¶636.  The PTP Capable Devices provide this response even if they also record sound and motion pictures.

PAMF 20.    The term "Still Image Capture Devices" applies, among other things, to scanners. Locke Decl. ¶637.  As set forth above, scanners were in common use with commercially available computers by at least 1995-1997.  *Id.*  at ¶631.

PAMF 21.    The function of sending a signal that signals to the host device that the attached interface device is an input/output device customary in a host device is to identify what type of device the PTP Capable Device is (or purports to be) when attached to a multi-purpose interface to which multiple different types of device may be attached.  This function of the signal in response to the inquiry remains the same, regardless of whether the signaled input/output device would normally be attached inside the chassis or outside the chassis.  Locke Decl. ¶¶646-48.

PAMF 22.    The way that a signal in response to an inquiry identifies the interface device as a customary device is that the signal identifies the responding device as a commonly used input/output device, i.e., a device with which the host computer already knows how to communicate.  The way that an input/output device establishes such communication remains the same whether the input/output device is internal or external.  For example, a SCSI input/output device would give the same response to a SCSI INQUIRY command regardless of whether the input/output device was located inside the chassis or outside the chassis.  Locke Decl. ¶¶646, 649-50.

PAMF 23.    The result of signaling that the interface device is a known device is the same regardless of whether the signaled input/output device is internal or external.  The host computer recognizes the interface device (not necessarily for what it is, but for what it purports to be) and uses a driver that is optimized for the host computer to communicate

19

with the commonly used input/output device.  Once again, there is no difference between devices inside the chassis and outside the chassis; the same optimized drivers are used to communicate with internal and external devices. Locke Decl. ¶¶646, 651.

PAMF 24.      A host computer with a SCSI multi-purpose interface as described in the specifications of the Tasler Patents may have both internal and external input/output devices connection on the same SCSI multi-purpose interface.  Locke Decl. ¶639.  A host computer with such an interface would not distinguish between internal and external devices connected to the SCSI interface.  Locke Decl. ¶640.

PAMF 25.      To a host computer with input/output devices attached to a SCSI multipurpose interface, there is no difference in communications between input/output devices inside the chassis and outside the chassis.  Locke Decl. ¶641.

PAMF 26.      Examples of host devices given in the '399 patent include laptop computers, desktop computers and workstations.  '399 patent 2:10-13 ("portable host systems in the form of laptops"), 10:61-64 (laptops) 4:30-36 (IBM PCs and workstations), 8:18-22 (workstations).   Thus, examples of "host devices" given in the Tasler Patents include systems where everything is in one case (e.g., laptops), and systems where the components are in separate cases and connected by cables (e.g., PCs, workstations).  *Id.*

PAMF 27.      The '399 patent uses the terms "host device," "host system," "processor," "computer" and "computer system" interchangeably.  '399 patent, 1:48-51; 5:13-20; 5:20-52; 6:59-62; 8:1-11.

PAMF 28.         The *Microsoft Computer Dictionary*, Third, Fourth, and Fifth Editions, defines

"computer systems" as follows:

> **computer system** *n.* The configuration that includes all functional components of
> a computer and its associated hardware.  A basic microcomputer system includes
> a console, or system unit, with one or more disk drives, a monitor, and a
> keyboard.  Additional hardware, called *peripherals*, can include such devices, as a
> printer, a modem, and a mouse.  Software is usually not considered part of a
> computer system, although the operating system that runs the hardware is known
> as system software.

"Computer System." *Microsoft Computer Dictionary.* 3rd ed. 1997 (page 111); Locke Decl. ¶48-

49.  This definition defines a "computer system" to include "peripherals," which "can include

such devices, as a printer, a modem, and a mouse."  Locke Decl. ¶48-49.

PAMF 29.         *The* definition of "computer" in the 1995 American Heritage's dictionary,

*Dictionary of Computer Words*, is as follows:

> **computer** A programmable machine that performs high-speed processing of
> numbers, as *well* as of text, graphics, symbols, and sound.  Modern computers are
> *digital*.  The computer's physical components are called *hardware*; its programs
> and data are called *software*.  All computers include these components:
>
> • a central processing unit, referred to as the CPU, that interprets and executes
>   instructions
> • input devices, such as a keyboard or a mouse, through which data and
>   commands enter the computer
> • memory that enables a computer to store programs and data
> • mass storage devices, such as disk drives and tape drives, that store large
>   amounts of data and
> • output devices, such as printers and display screens, that show the results after
>   data has been processed by the computer.

"Computer." *Dictionary of Computer Words.* Revised edition. 1995  (pages 51-52); Locke Decl.

¶50-54.

September 29, 2011                    Respectfully submitted,


/s/ Yasmin S. Schnayer
James P. White
Jerold B. Schnayer
Daniel R. Cherry
Walter J. Kawula
Joseph E. Cwik
Yasmin S. Schnayer
HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
(312) 655-1500

*Attorneys for Papst Licensing GmbH & Co. KG*

**CERTIFICATE OF SERVICE**

The undersigned counsel for Plaintiff, Papst Licensing GmbH & Co. KG, hereby certifies that on September 29, 2011, a true and correct copy of the forgoing Papst's Local Rule 7(h) Concise Statement Of Issues In Opposition To The First Wave Camera Manufacturers' Motion [Dkt #449] For Summary Judgment Of Non-infringement Based On The "Customary In A Host Device" Limitation was filed with the Court and served electronically by the Court's CM/ECF System to all registered users.


/s/ Yasmin S. Schnayer
Attorney for Papst Licensing GmbH & Co. KG