# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re Papst Licensing GmbH & Co. KG Patent Litigation | Misc. Action No. 07-493 (RMC) |
| | MDL Docket No. 1880 |
| This Document Relates To: | |
| ALL CASES | Hon. Rosemary M. Collyer |

### [REDACTED]
### PAPST'S BRIEF IN OPPOSITION TO THE FIRST WAVE CAMERA MANUFACTURERS' MOTION (DKT #451) FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT OF THE '399 PATENT AND '449 PATENT BASED ON THE COURT'S CONSTRUCTION OF "DATA TRANSMIT/RECEIVE DEVICE"

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ iii

TABLE OF ABBREVIATIONS ............................................................................................ v

INTRODUCTION ................................................................................................................ 1

THE EVIDENCE ................................................................................................................. 5

    A.    Technical or Expert Witness Declarations .............................................................. 5

    B.    Documentary Exhibits .......................................................................................... 6

GENUINE ISSUES OF MATERIAL FACT ........................................................................ 6

ARGUMENT ....................................................................................................................... 7

I.     The Motion for Summary Judgment is Premature and Should Be Denied
      Under F.R.Civ.Proc. 56(d) ...................................................................................... 7

II.    Mr. Berg's Testimony Carries No Weight ................................................................ 10

III.   The CMs Improperly Interpret this Court's Claim Construction No. 3. .................... 17

    A.    The Court Interpreted DTRD in Claim Construction No. 3 for Context
        Only – Not as a Claim Element ............................................................................ 18

    B.    The Court's Claim Construction "When Connected" Does Not Require the
        Interface Device to Send Live Data or Act as a Conduit .................................... 18

        1.    Being "Connected" Does Not Require Live Communication ................. 19

    C.    The CMs' Interpretation of "When Connected" Conflicts with Claim
        Construction No. 20 ("Virtual File") of this Court. ............................................. 21

    D.    The CMs Seek to Reargue Their Already-Rejected "Real-Time" Argument
        in a Different Way, Without Expressly Using Those Words .............................. 22

    E.    The CMs' Interpretation Makes No Sense in Light of the Patent Claims
        and Specification ................................................................................................. 24

        1.    The Claims Do Not Require Passing Live Data to an Attached
            Host Computer. ....................................................................................... 24

            a.    The Claims of the '399 Patent Do Not Limit Claim Scope
                to Only That Mode of Operation. ................................................. 24

            b.      The Claims of the '449 Patent Do Not Limit Claim Scope
to Only That Mode of Operation. ................................................. 26

    2.      The CMs' Interpretation Is Not Supported by the Patent
Specification and Would Exclude Some Preferred Embodiments. .......... 28

    3.      The Use of the Phrase "Present Invention" in the Patent
Specification Is Not a Basis to Limit Claim Scope.................................... 33

    4.      The "Real-Time" Example in the Patents is Different from the
CMs' Intended Meaning of "Real-Time" and Does Not Support the
CMs' Argument ...................................................................................... 34

    5.      The Prosecution Histories of the Patents Do Not Require Any
Limitation on Timing. ............................................................................. 37

    6.      Interpreting the Court's Claim Construction as the CMs Now
Contend Would Violate Federal Circuit Precedents. ............................... 37

    7.      Conclusion Regarding the Interpretation of Claim Construction ............ 39

IV.     **THE CMS INFRINGE VIA THE DOCTRINE OF EQUIVALENTS ...................... 40**

V.     **CONCLUSION ........................................................................................... 44**

**CERTIFICATE OF SERVICE ............................................................................. 45**

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## <u>Federal Cases</u>

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242, 106 S.Ct. 2505 (1986) ........................................................................... 10, 17

*Atlantic Research Marketing Sys., Inc. v. Troy*,
   616 F. Supp.2d 157 (D. Mass. 2009) .................................................................................. 34

*Commonwealth Scientific and Industrial Research Organisation v. Buffalo Technology*
   *(USA), Inc.*,
   542 F.3d 1363 (Fed. Cir. 2008) ........................................................................................... 40

*E-Pass Tech., Inc. v. 3 COM Corp.*,
   343 F.3d 1364 (Fed. Cir. 2003) ........................................................................................... 39

*Fastenetix, LLC. v. Medtronic Sofamor Danek, Inc.*,
   2007 WL 2159613 ................................................................................................................ 28

*Honeywell Inc. v. Victor Company of Japan, Ltd.*,
   298 F.3d 1317 (Fed. Cir. 2002) ........................................................................................... 39

*Howmedica Ostreonics Corp. v. Wright Medical Tech., Inc.*,
   540 F.3d 1337 (Fed. Cir. 2008) ........................................................................................... 39

*Hynix Semiconductor Inc. v. Rambus Inc.*,
   2009 WL 230039, *16 (N.D. Cal. 209 ................................................................................ 28

*IMS Tech., Inc. v. Haas Automation, Inc.*,
   206 F.3d 1422 (Fed.Cir.2000) ............................................................................................. 40

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
   358 F.3d 898 (Fed. Cir. 2004) .................................................................................... 33, 34, 38

*Metropolitan Life Ins. Co. v. Bancorp Services, LLC.*,
   527 F.3d 1330 (Fed. Cir. 2008) ................................................................................... 10, 11, 12

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) .................................................................................... 28, 37, 38

*Praxair, Inc. v. ATMI, Inc.*,
   543 F.3d 1306 (Fed. Cir. 2008) ........................................................................................... 38

*Rambus, Inc. v. Infineon Tech. AG*,
   318 F.3d 1081 (Fed. Cir. 2003) .................................................................................... 33, 34

*Resonate Inc. v. Alteon Websystems, Inc.*,
   338 F.3d 1360 (Fed.Cir.2003) .................................................................................... 38, 39

*SunRace Roots Enterprice Co., Ltd. v. SRAM Corp.*,
   336 F.3d 1298 (Fed. Cir. 2003) ........................................................................................... 39

*Virnetx, Inc. v. Microsoft Corp.*,
    2009 WL 2370727 (E. D. Tex. 2009) ............................................................... 34

*Voda v. Cordis Corp.*,
    536 F.3d 1311 (Fed. Cir. 2008)......................................................................... 41

**Federal Regulations**

F.R.Civ.Proc. 56(d) .......................................................................................... 7, 8

## TABLE OF ABBREVIATIONS

- Papst is citing the page number at the top of the page that is added by the ECF System.

| ABBREVIATION | DOCUMENT |
|---|---|
| '399 Patent column number: line number at Fig. number<br><br>Ex: '399 Patent 4:5-10 | U.S. Patent No. 6,470,399 |
| '449 Patent column number: line number at Fig. number | U.S. Patent No. 6,895,449 |
| Tasler's Patents | Collectively, U.S. Patent Nos. 6,470,399 and 6,895,449 |
| Locke Decl. ¶ Paragraph Number | Dr. Locke's declaration that will be attached to our Responses. |
| STW | Samsung Techwin |
| SOA | Samsung Opto-Electronics America |
| SMF | Statement Of Material Facts |
| Title [Dkt. # Document Number] at page number<br><br>Ex: Papst's Reconsideration Request [Dkt. # 433] at 5 | Citations to the Record |
| Papst's Ex. A, Papst's Ex. B, etc | Exhibits attached to our Responses and Rule 56(d) Motion.<br>We will include with each document a table of exhibits that will list the names of the exhibits. |
| Locke's Ex. 1, Locke's Ex. 2, etc | Exhibits attached to Locke Declaration.<br>We will include with each document a table of exhibits that will list the names of the exhibits. |
| Second PPO [Dkt. # 36] | Second Practice and Procedure Order [Dkt. # 36] |
| Eighth Order Regarding Discovery [Dkt. # 200] | Eighth Order Regarding Discovery: Discovery Disputes And Invalidity Contentions [Dkt. # 200] |
| Tutorial Hearing Tr. at page number: line number (Sept. 3, 2008). | Transcript of Tutorial Hearing (Sept. 3, 2008) |
| Markman Hearing Tr. at page number: line number (date). | Transcript of Markman Hearing (Sept. 22, 2008, Sept. 23, 2008 or Sept. 24, 2008) |
| Fifth PPO [Dkt. # 219] | Fifth Practice and Procedure Order: Regarding Procedure For Claims Construction Hearing [Dkt. # 219] |
| Mod. Mem. Op. [Dkt. # 336] | Modified Memorandum Opinion Regarding Claims Construction [Dkt. # 336] |
| Modified Order [Dkt. # 337] | Modified Order Regarding Claims Construction [Dkt. # 337] |

| ABBREVIATION | DOCUMENT |
|---|---|
| Proposed Entry of Judgment [Dkt. # 346-1] | [HP and Papst's Proposal For] Judgment of Non-Infringement And Stay Of Fee Proceedings During Appeal [Dkt. # 346-1] |
| Papst's Motion To Stay [Dkt. # 347] | Papst's Motion For A Stay of All Other Proceedings While the Hewlett-Packard Case Is On Appeal [Dkt. # 347] |
| CMs' Opp. To Proposed Entry of Judgment and Motion To Stay [Dkt. # 348] | Camera Manufacturers' Opposition to Hewlett-Packard And Papst's Joint Motion For Entry of Judgment and Papst's Motion For A Stay [Dkt. # 348] |
| Papst's Reply To Proposed Entry of Judgment and Motion to Stay [Dkt. # 349] | Papst's Reply Brief in Support of the Joint Motion By Hewlett-Packard And Papst For Entry of Judgment in the Hewlett-Packard Case and in Support of Papst's Motion For A Stay of All Other Proceedings While the Hewlett-Packard Case is On Appeal [Dkt. # 349] |
| CMs' SJ Proposal [Dkt. # 352] | Camera Manufacturers' Proposal Regarding Resolution of This Case On Summary Judgment [Dkt. # 352] |
| Papst's Opp. To SJ Proposal [Dkt. # 355] | Papst's Opposition To Camera Manufacturers' Proposal Regarding Resolution Of This Case On Summary Judgment [Dkt. # 355] |
| CMs' Reply to SJ Proposal [Dkt. # 357] | Reply In Support Of Camera Manufacturers' Proposal Regarding Resolution Of This Case On Summary Judgment [Dkt. # 357] |
| Papst's Surreply To SJ Proposal [Dkt. # 366] | Papst's Surreply To The Reply In Support Of Camera Manufacturers' Proposal Regarding Resolution Of This Case On Summary Judgment [Dkt. # 366] |
| Joint Discovery Proposal [Dkt. # 367] | Joint Proposal Regarding Focused Discovery And Deadlines [Dkt. # 367] |
| Papst's Position Paper [Dkt. # 371] | Papst's Position Paper On Scheduling Order [Dkt. # 371] |
| Sixth PPO [Dkt. #372] | Sixth Practice and Procedure Order: Regarding Scheduling [Dkt. # 372] |
| HP's Motion To Strike [Dkt. # 389] | Hewlett-Packard Company's Motion To Strike Papst Licensing GmbH & Co. KG's Asserted Claims And Infringement Contentions [Dkt. # 389] |
| Papst's Opp. To HP's Motion To Strike [Dkt. # 394] | Papst's Opposition To Hewlett-Packard Company's Motion To Strike Papst Licensing GmbH & Co. KG's Asserted Claims And Infringement Contentions [Dkt. # 394] |
| Final Infringement Contentions [Dkt. # 416] | Papst's Revised Asserted Claims and Infringement Contentions [Dkt. # 416] |
| Papst's Reconsideration Request [Dkt. # 433] | Papst's Request For Partial Reconsideration Of The Court's Order Granting HP's Motion To Strike [Dkt. # 433] |
| SJ Customary Motion [Dkt. # 449] at page number | The First Wave Camera Manufacturers' Motion for Summary Judgment of Noninfringement Based on the Limitation of "an Input/Output [a Storage] Device Customary in a Host Device" [Dkt. # 449] |
| SJ Memory Card Motion [Dkt. # 446] at page number | The First Wave Camera Manufacturers' Motion for Summary Judgment Regarding Memory Cards [Dkt. # 446] |

| ABBREVIATION | DOCUMENT |
|---|---|
| SJ Virtual Motion [Dkt. # 452] at page number | The First Wave Camera Manufacturers' Motion for Summary Judgment of Noninfringement of the '449 Patent ("Simulating a Virtual File System") [Dkt. # 452] |
| SJ Second Connecting Motion [Dkt. #450] at page number | The First Wave Camera Manufacturers' Motion for Summary Judgment of Noninfringement of the '399 and '449 Patents ("Second Connecting Device") [Dkt. # 450] |
| SJ DTRD Motion [Dkt. # 451] at page number | The First Wave Camera Manufacturers' Motion for Summary Judgment of Non-Infringement with Respect to the "Data Transmit/Receive Device" Claim Limitation [Dkt. # 451] |
| SJ Samsung Motion [Dkt. # 448] at page number | Samsung Techwin and Samsung Opto-Electronics America's Motion for Summary Judgment of Non-Infringement as to Wrongfully Accused Products [Dkt. # 448] |
| SJ HP Motion [Dkt. # 454] at page number | Hewlett-Packard Company's Motion for Entry of Judgment Or, In The Alternative, For Summary Judgment of Non-Infringement [Dkt. # 454] |
| SJ Table 15 Motion [Dkt. # 447] at page number | The First Wave Camera Manufacturers' Motion for Partial Summary Judgment as to Papst's Claims of Infringement of the '399 and '449 Patents by Products Identified in Table 15 of Papst's Final Infringement Contentions [Dkt. # 447] |
| [Motion Name] Ex. number or letter [Dkt. # ____ ] at page number | Exhibits to the CMs' Motions |
| Berg Decl. 1 ¶ Paragraph Number [Dkt. # 449-3] | Exhibit 3-Declaration of Expert Paul E. Berg in Support of the First Wave Camera Manufacturers' Motions of Summary Judgment of Noninfringement Based on the Limitations "an Input/Output [a Storage] Device Customary in a Host Device" and "Second Connecting Device" [Dkt. # 449-3] |
| Berg Decl. 2 ¶ Paragraph Number [Dkt. # 451-3] | Exhibit C-Declaration of Expert Paul E. Berg in Support of the First Wave Camera Manufacturers' Motion For Summary Judgment of Non-Infringement With Respect To The "Data Transmit/Receive Deivce" Claim Limitation [Dkt. # 451-3] |
| Lee Decl. ¶ 9 Paragraph Number [Dkt. # 448-2] | Exhibit 2-Declaration of Sang-Yoon Lee in Support of STW/SOA's Motion for Summary Judgment of Noninfringement [Dkt. # 448-2] |
| Papst's Second Connecting Device Brief | Papst's Brief in Opposition To The First Wave Camera Manufacturers' Motion (Dkt #450) For Summary Judgment of Non-Infringement Of The '399 Patent And '449 Patent For Failure to Meet The Second Connecting Device Limitation |
| Papst's DTRD Brief | Papst's Brief in Opposition To The First Wave Camera Manufacturers' Motion (Dkt #451) For Summary Judgment Of Non-Infringement Of The '399 Patent And '449 Patent Based On The Court's Construction Of "Data Transmit/Receive Device" |

| ABBREVIATION | DOCUMENT |
|---|---|
| Papst's Memory Card Brief | Papst's Brief In Opposition To The First Wave Camera Manufacturers' Motion (Dkt #446) For Summary Judgment Regarding Memory Cards |
| Papst's Simulating A Virtual File System Brief | Papst's Opposition To The First Wave Camera Manufacturers' Motion (Dkt #452) For Summary Judgment Of Non-Infringement Of The '449 Patent ("Simulating A Virtual File System") |
| Papst's Table 15 Brief | Papst's Brief Opposing The First Wave Camera Manufacturers' Motion (Dkt #447) For Partial Summary Judgment As To Papst's Claims Of Infringement Of The '399 And '449 Patents By Products Identified In Table 15 Of Papst's Final Infringement Contentions |
| Papst's Samsung Brief | Papst's Brief Opposing Samsung Defendants' Motion (Dkt #448) For Summary Judgment Of Non-Infringement |
| Papst's Customary Input/Output Brief | Papst's Brief in Opposition To The First Wave Camera Manufacturers' Motion (Dkt #449) For Summary Judgment Of Noninfringement Based On The Limitation Of "An Input/Output [A Storage] Device Customary In A Host Device" |
| Papst's Rule 56(d) Brief | Papst's Motion And Memorandum In Support Of Request To Conduct Rule 56(D) Discovery Essential To Oppose The CMs' [Dkt. ## 446-452, 454] Summary Judgment Motions |

## INTRODUCTION

In Dkt. #451, the First Wave Camera Manufacturers (hereinafter the "CMs") seek summary judgment of noninfringement because, they argue, the external accessories are not "data transmit/receive devices" (DTRDs) within the meaning of this Court's Claim Construction No. 3. They contend that to infringe the Tasler patents, camera and digital voice recorder ("DVR") operation is required while a host computer is attached. More specifically, they deny infringement unless the interface device acts as a "conduit" so as to send *live data, as it is being acquired from a DTRD* to a host computer. The motion should be denied for several reasons.

Preliminarily, the motion is limited to times when the accused products operate in an "MSC mode." That is one of two ways of transferring data from a camera to a host computer. The other way is called the Picture Transfer Protocol (PTP). A first group of accused cameras use only PTP in transferring data to a host computer. The current motion is inapplicable to those cameras; the CMs have not challenged PTP as noninfringing. A second group of accused cameras permits picture transfer in either the PTP mode or the MSC mode, and that second group cannot be ruled noninfringing via the present motion. A third group of cameras transfers pictures via the MSC mode only, and *only* that group is impacted by the present motion. "Cameras" as used here includes "camcorders." The motion also impacts the DVRs which transfer data to a host computer in a MSC mode.

Turning to the merits, the motion is premature, as we explain below in Argument I. The CMs submitted evidence through Mr. Berg about one, single mode of operation of a few cameras and DVRs. All other cameras and DVRs and all other modes were ignored. If full functionality of the accused products were required at the same time that a host computer is attached, as the CMs contend, then Papst needs discovery on the various modes of camera and DVR operation. Software in digital cameras – like software in many other systems, such as automobiles -- has

1

non-public "back door" modes, and it is very likely that for calibration, diagnostics, etc., a technician uses a "back door" into the software to operate the camera (or DVR) while it is connected to a computer. Papst has not had discovery into the source code, documentation, testimony, and other information needed to explore this. As such, summary judgment is premature.

Second, the declaration of Mr. Berg carries no weight, as explained in Argument II. Mr. Berg is called an "expert in Universal Serial Bus, including MSC communications." [Dkt #451] at 13. He is not an expert in digital systems in general. Much of what Mr. Berg says about digital systems is technically wrong, as shown in Papst's expert declaration of Dr. Douglass Locke. Also, Mr. Berg attests that in one particular mode, some cameras do not allow the camera to take photographs at the same time that a host computer is connected, though they do allow downloads. Mr. Berg does not mention the other modes of camera operation – even other MSC modes. There are other modes, and no witness, much less any employee witness who would possess the manufacturer's technical knowledge, asserts otherwise. Mr. Berg's evidence would not be taken as scientifically valid under F.R. Evid. 702. His declaration lacks foundation; is unreliable, incomplete, and misleading; and it should be given no weight. In short, the CMs' motion is not supported by competent evidence and should be denied for that further reason.

Third, as explained in Argument III, the CMs' interpretation of Claim Construction No. 3 is incorrect. "Transmitting data to … the host device when connected to the host device by the interface device" is not correctly interpreted to require that the interface device act as a "conduit" for live data or the like, but instead that the interface device acquires data from a DTRD and lets a host computer read the data while the host computer is connected to the interface device, regardless of whether the DTRD is connected to the interface device.

2

Interpreting "when connected" to require the interface device to be an immediate conduit of live data, as the CMs contend, contradicts this Court's Claim Construction No. 20 which states that a "virtual file" is constructed from "existing data." This means the data must exist; it must be stored somewhere. Additionally, this Court rejected the CMs' conduit argument once before in claim construction when they attempted to get a "real-time" limitation inserted into the claims. No Tasler claim explicitly recites a "conduit," "real-time," "the same time," or anything of the sort.  No claim language requires the "second connecting device" to be actively receiving live data from a DTRD *at the same time* that data is being provided to the host via the "first connecting device."

Further, the CMs' interpretation also makes no sense in light of the Tasler patent claims and specification. Even though the specification provides an example that uses the words "real-time," the multiple embodiments of the interface device as described in the patents *still* provide some storage of the data acquired from the DTRD. The relevant operations in the patent specifications involve acquiring data from a DTRD via the second connecting device, storing it in some kind of memory, and reading it to the host via the first connecting device in response to a read request. The patents' extensive mention and use of a "file allocation table" (abbreviated as "FAT" in the patents and the computer industry) denotes storage. The purpose of a file allocation table is to tell the system where to look for the data of interest. Neither of the patents mentions acting in "real-time" or as a "conduit" or the like as an object of the invention or in the summary of the invention. The patent specifications contain no disclaimers or disavowals, and there are no file history disclaimers or disavowals. Interpreting "when connected" (from the claim construction order) [Dkt #337] to require conducting live data narrows the claims to the point where disclosed embodiments are excluded, contrary to Federal Circuit law, and this Court could

not have meant to do that.

Fourth, because "real-time" or live data is not required by the claim construction order, then there already is evidence of infringement of the impacted claim elements. This Court ruled that the DTRD is <u>not</u> a claim element, yet the CMs move for summary judgment on the basis that their accused products have no DTRDs. The evidence establishes that the external devices (DTRDs) provide data to the camera or DVR. The camera stores the data from the accessories as EXIF data or a sound file. If a host becomes connected to a camera and requests a data read, the camera sends a copy of the requested data to the host, including the data from the DTRD. Therefore, a camera accessory transmits data to the host while connected to the host by the camera. The DVRs are similar as to their external devices.

Fifth, as explained in <u>Argument IV</u>, Papst presents a substantial case of infringement via the doctrine of equivalents, even if "when connected" were interpreted as the CMs posit and even if there were not literal infringement. An interface device that acquires, stores, and transmits *delayed* data is substantially the same as a structure with the same components but sending *live data while it is being acquired from the DTRD*. All that changes is the length of the time the data is in the memory – which the claims do not even address. The CMs raise the question of "vitiation" but identify no claim element that would be vitiated by application of the doctrine of equivalents. Also, there is no file history estoppel – and the CMs point to none.

The motion – as to unspecified products that the CMs are putting at issue – should be denied for several reasons. First, discovery is necessary, as we explain herein and in the accompanying Papst's Rule 56(d) Brief. In addition, the CMs' motion has no proper foundation or support, there is no showing of entitlement to judgment as matter of law, genuine issues of material fact exist, and Papst has shown that infringement is likely.

## THE EVIDENCE

The evidence before the Court attending the instant motion includes <u>no</u> <u>declarations</u> <u>by</u> <u>employees</u> of the CMs attesting to the capabilities (or lack thereof) of their cameras or DVRs in the MSC mode. Not one CM employee attests that there is no mode of operation using MSC mode in which the accused product is functional and transmits data from attached accessories to the host while all of the devices are connected together at once. Instead, the CMs offer an expert witness declaration, but it fails to address alternative tests and adjustment and repair modes. Papst, on the other hand, presents the declaration of Dr. Locke that does address these and other topics ignored by the CMs' expert.

### A.   Technical or Expert Witness Declarations

1.      The CMs submitted a 53-paragraph declaration by Mr. Paul E. Berg as Dkt #451-3 (referred to herein as "Berg" or" Berg Decl."). Mr. Berg attests to an experiment he conducted using a technical tool called an "Ellisys bus analyzer" Berg ¶28. In that test, Mr. Berg concluded that data was not sent from the "camera" (which he defines as including cameras, camcorders, and digital video recorders, Berg ¶21) to the host computer in the MSC mode while accessory devices were attached; nor would the camera function as a camera. Papst submits that Mr. Berg's testimony is entitled to no weight, as explained below in Argument II.

2.      Papst herewith submits an accompanying, extensive, several hundred paragraph Third Supplemental Declaration of C. Douglass Locke, PhD (hereinafter called "Locke Decl." or "Locke"), together with various documentary exhibits. This omnibus declaration is submitted in connection with Papst's response to all of the pending summary judgment motions. Among other things, Dr. Locke explains that a computer will ask an attached accused camera or DVR in the MSC mode for identification, and the accused camera returns "descriptors" to the computer that cause the computer to communicate with the attached accused product as a disk drive, using disk

drive computer drivers and a disk drive command set. Locke ¶¶231-53. Dr. Locke also explains *inter alia* that the "real-time" aspect of the patents is merely an optional feature that the patents do not say is essential to the invention nor to achieve its objects. Locke ¶¶151-76.  He also addresses test, adjustment, and repair modes of camera operation, explaining that the CMs have not provided discovery on those.  Locke ¶¶357-64.

Dr. Locke challenges many of Mr. Berg's technical assertions. *See generally,* Locke Decl., Section IX. Part A thereof addresses Mr. Berg's statements in Dkt #449-3 for a different summary judgment motion by the CMs, and Parts B and C focus on Mr. Berg's statements in his declaration [Dkt #451-3] for the instant motion. Dr. Locke carefully explains numerous errors in – or at least disagreements with – Mr. Berg's assertions. A table listing the disputed Berg assertions in summary form is included in Argument II as they are too numerous to address individually.

### B.    Documentary Exhibits

The CMs did not file any documentary exhibits beyond the Berg Declaration. Papst is filing various documentary exhibits along with the current Locke declaration.

### GENUINE ISSUES OF MATERIAL FACT

At least the following genuine issues of material fact arise:

1.     Do the accused products have "back door modes" of operation in which they obtain live data from attached accessories and transfer that live data, in MSC mode, to an attached host computer?

2.     Apart from "back door modes," do any of the accused products obtain live data from attached accessories and transfer that live data, in MSC mode, to an attached host computer?

3.      How is data that is acquired from attached accessories processed in the accused products?

4.      What data is sent from the accused products to the host computer?

5.      Is there any support in the Tasler patents to interpret the claim construction as limited to "live" data or the like and, conversely, do the Tasler patents disclose embodiments that store acquired data before providing it to a host computer?

6.      Do the accused products send data to an attached host computer "when connected"?

7.      Are the accused products insubstantially different from, or substantially the same (in terms of function-way-result) as, the claimed inventions within the meaning of the Doctrine of Equivalents?

8.      If the CMs' interpretation of the phrase "when connected" in Claim Construction No. 3 is correct, is an accused product that transmits data that has been stored in a memory for an indeterminate period of time, *i.e.*, *delayed* data, substantially the same as, or insubstantially different from, a device that transmits *live* data as it is being acquired from a DTRD?

## ARGUMENT

**I.      The Motion for Summary Judgment is Premature and Should Be Denied Under F.R.Civ.Proc. 56(d)**

If the CMs are correct that the proper interpretation of Claim Construction No. 3 calls for the accused product to transfer live data to an attached host computer from a DTRD that is generated by the DTRD at the same time and that is attached to the accused product, then facts are unavailable to Papst at present to say whether or not the accused products work that way. Papst requires discovery, and the motion is premature. Because Papst has not had discovery of confidential information about the accused products that the CMs possess but have not yet

produced, which confidential information Papst requires in order to respond to the summary

judgment motion, the motion must be treated under F.R. Civ. Proc. 56(d)). Papst is separately

filing a Rule 56(d) motion.

Through Mr. Berg, the CMs submitted test evidence about one, single mode of operation

of a handful of cameras and DVRs. He ignored all other modes and all other accused products.

Locke ¶541. The Berg testimony suggests that while a camera (or DVR) in MSC mode is

connected to a host computer and to an accessory, the camera (or DVR) cannot take photographs

(or record dictation) in the same way it would without being connected to the host. Assuming

arguendo this factual assertion to be true, and assuming that normal, picture-taking camera

operation (or voice recording) were required while a host computer is attached, Papst needs

discovery on the various other non-standard (or secret) modes of camera and DVR operation.

Software in digital cameras – like software in many other systems, such as automobiles -- has

"back door" modes, as Dr. Locke attests. See generally Locke Section VI, ¶¶357-64 entitled,

"VI. The CMs' Accused Products Have "Back Door" Modes Of Operation, And More

Information Is Needed Concerning Them." Dr. Locke attests, for example that according to his

understanding, modern cameras, camcorders or voice recorders have special test functions and

diagnostic functions, etc. that allow cameras to take pictures or operate accessories while

connected to a host computer, or allow a DVR to make sound recordings while connected to a

host computer:

> There are also other modes of operation that I refer to as "back door" modes
> of operation that that are not described in the user manuals. A "back door" mode
> is a special mode of operation designed to permit someone with special
> knowledge to operate in modes generally unknown to typical purchasers of the
> product. For example, many products have special test functions, access to event
> logs, debugging functions, diagnostic functions, firmware update functions, repair
> and calibration functions. These functions are typically accessed only in a "back
> door" mode.   With respect to cameras, in some of these "back door" modes of

operation I understand that the cameras are likely able to take pictures and/or operate accessories while connected to a host computer.  Similarly, with respect to voice recorders, in some of these "back door" modes of operation I understand that the voice recorders may be able to make sound recordings while connected to a host computer.

*Id.* ¶359.  This is not speculation by Dr. Locke but instead is based on documentary evidence which states: "The camera can be placed in a service diagnostics mode by pressing a combination of keys described in the GUI and diagnostic documents." Locke ¶¶360-61 citing a Hewlett Packard document. This evidence suggests that other CMs would provide similar modes of operation. *See also*, *id.* ¶362 (adjustment procedures in a service manual for a FujiFilm camera).

Papst has not had sufficient discovery into the source code, documentation, testimony, and other information needed to explore the back door modes of operation available in the accused products. This discovery is necessary, as Dr. Locke comprehensively explains. Locke Decl. ¶¶ 560-67. The publicly-available user manuals are helpful yet insufficient to provide the level of technical information needed to address the infringement issues in detail. *Id.* ¶678-90. Dr. Locke describes his need for documentation about the back door modes of the accused products as follows:

> 363.    In evaluating the operation of the CMs' Accused Products with regard to the question of whether they infringe the patents in suit, I would need to know details about all of the various modes of operation of the CMs' Accused Products. The CMs' documentation that I am aware of only indicates that there are some various modes of operation.  I would expect there to be other modes of operation the identity of which is likely to be described in other documents of which I am not yet aware.

Locke Decl. ¶363. Dr. Locke also explains the need for various discovery that the CMs have not provided. *Id.* Part XII, ¶¶ 666-697.

Papst discusses in its accompanying Papst's Rule 56(d) Brief that it is improper to grant summary judgment in situations like the present case where the non-movant has not had a

9

sufficient opportunity for discovery into material facts. In that companion motion, Papst cites

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505 (1986), *Metropolitan Life Ins. Co.*

*v. Bancorp Services, LLC.*, 527 F.3d 1330 (Fed. Cir. 2008), and other precedents.  In that motion,

Papst shows why it meets the tests justifying additional discovery, and summary judgment

cannot be granted because Papst has not yet had sufficient discovery.


## II.    Mr. Berg's Testimony Carries No Weight

Conflicts in summary judgment declarations, especially concerning credibility, are not for

courts to resolve in summary judgment motions. *Metropolitan Life,* 527 F.3d at 1338-39.

Weighing the evidence and drawing legitimate inferences from the facts are jury functions, not

those of a judge acting on a summary judgment motion. *Id.* at 1339.

Mr. Berg's credibility in all of his declarations, not only Dkt #451-3, is challenged by

Papst and by Dr. Locke, who the CMs and this Court accepted as an expert. Transcript, Sept. 3,

2008, at pp. 11-14; see especially p. 14, lines 12-15 ("So Dr. Locke, you'll be accepted as an

expert which allows you to testify not only to facts but to your opinions ...") Mr. Berg has <u>not</u>

been accepted as an expert in this case. The CMs call him an "expert in Universal Serial Bus,

including MSC communications." [Dkt #451] at 13. He is not alleged to be an expert in digital

systems in general. Much of what Mr. Berg says about digital systems, and particularly the

digital systems involved in the present case, in his declaration [Dkt #451-3] for this motion is

technically wrong, misleading, or unsupported technically.

Space does not permit a detailed discussion of each of the errors in Mr. Berg's

declaration about digital systems. However, Papst offers the following example of technical

errors of Mr. Berg in his declaration. Mr. Berg testifies [Dkt #451-3] at ¶16 that "the connected

USB MSC device does only what it is told to do by the host." This is incorrect. Dr. Locke

explains that the USB MSC devices having flash memory chips (such as the accused products) perform address translation without being told by the host device to do so (*see* Locke ¶¶515-16), perform wear-leveling independently of the host computer, *id.* ¶517, and in the case of an Eye-Fi card connected to an SD slot in a camera continue to acquire new data and modify previously stored data in the memory card, even though the host did not tell the camera to store such information, *id.* ¶518.

The following table lists other points of disagreement by Dr. Locke and the technical assertions by Mr. Berg in his declaration [Dkt #451-3].

| Mr. Berg testimony in #451-3 | Dr. Locke's refutation |
| --- | --- |
| ¶13. USB simplifies connection to computers because it uses 1 kind of connector | ¶510. No, there are several kinds of USB connectors. |
| *Id.* | ¶511. having a single kind of connector does not simplify connecting external devices |
| ¶15. data transfer and "other standards" | ¶513. not merely "other standards" but preexisting protocols that pre-dated the USB MSC specification. |
| *Id.* | ¶514. Mr. Berg may be equivocating over meaning of "data." |
| ¶16. re hosted connections | ¶¶515-18: three examples contradict Mr. Berg's testimony |
| ¶17. computer has control in MSC mode | ¶519. Mr. Berg is wrong. |
| *Id.* | ¶521. Mr. Berg is unclear re "standard MSC drivers"; no device drivers work on multiple operating systems. |
| *Id.* | ¶522. data *can* be changed, contrary to Mr. Berg's testimony |
| *Id.* | ¶523. no foundation in USB MSC specifications. Mr. Berg wrongly generalizes from external hard drives to all USB MSC devices. |
| ¶18. no data change | ¶525. there *is* data change. |
| ¶19.no storage; restricted data transmission | ¶526. there are no "standard MSC drivers"; untrue that USB MSC device does not store any data from sources other than the attached computer; |
| *Id.* | ¶527. incorrect about what data is transferred. |
| ¶20.data transmission from accessories | ¶¶528-29. Incorrect to say "similarly" because much of what Mr. Berg said previously is wrong. Incorrect re what data gets transferred. |
| *Id.* | ¶¶530-37. discussion of Ellisys Bus Analyzer used by |

11

| Mr. Berg testimony in #451-3 | Dr. Locke's refutation |
|---|---|
| | Mr. Berg. Mr. Berg ignores other aspects of the data. When Dr. Locke analyzed the *full* bus traces, it shows that data from an attached accessory was transmitted to the computer when Nikon D200 was connected. |
| *Id.* | ¶536. EXIF data from the camera accessory is sent by the camera to the host computer. This data includes information from the lens, the flash, and the GPS. |
| *Id.* | ¶537. "I conclude from this information that Mr. Berg is wrong when he states that 'no data can be transmitted from accessories, such as audio sources, audio/video sources, flashes, GPS units, remote control units, lenses and printers . . . to a connected computer via the USB MSC interface.' The above description shows that at least information from a lens attached to the Nikon D200 camera was transferred to the host computer." |
| *Id.* | ¶¶538-39. Mr. Berg apparently based his testimony on information from user manuals for the devices, but Dr. Locke found further information in service manuals showing additional capabilities not found in user manuals. Further discovery should show these capabilities in and out of the MSC mode. |

While Mr. Berg attests at ¶20 that no data from accessories is transmitted, he does not include his test data. However, the CMs produced the test data to Papst, and Dr. Locke analyzed it. What he found in the data leads to the opposite conclusion from what Mr. Berg says. *See* Locke ¶¶530-37.

Mr. Berg also testifies at ¶¶21-53 about a test he conducted on various accused products. Dr. Locke refutes Mr. Berg's assertions and shows that no valid conclusions can be drawn from that test. Dr. Locke refutes this second aspect of Mr. Berg's testimony at ¶¶540-59d. Dr. Locke finds "numerous problems related to Mr. Berg's testing procedures…" Locke ¶540. The tests by Mr. Berg are insufficient to learn whether accessories can transmit data to a computer through a USB MSC device while the device is connected to a computer. *Id.* ¶541. For example,

> … the CMs' products at issue operate in various modes, including, for example, modes for diagnostics, testing, and repair. Mr. Berg does not identify the various modes of operation in the CMs products, nor does he state that he tested the

products in each of these modes.  Mr. Berg's tests are deficient, for example, because (1) he does not state that he investigated or is aware of all modes of operation of the products that he tested and (2) he does not state that he tested the products' capabilities in their various other modes of operation.

*Id.* Other shortcomings in Mr. Berg's testimony include:

- no statement that he communicated with any CM employees re the operation of the CMs products, including any of the modes of operation of the products, *Id.* ¶542;

- without knowing the different modes of operation and other relevant aspects of the operation of the tested products, one cannot evaluate the sufficiency of the tests, *Id.* ¶¶542-43;

- no apparent knowledge about how the products operate in various other modes of operation so that he could evaluate whether his stated conclusions are appropriate, *Id.* ¶544;

- reports no other tests nor awareness of any other tests that were done or could be done that might be inconsistent with his stated conclusions, *Id.* ¶545;

- no apparent qualifications for performing these tests, *Id.* ¶546;

- no statement re whether he is aware of any information that is inconsistent with his stated conclusions or the inferences that the CMs are attempting to draw from his stated conclusions about the tests, *Id.* ¶547;

- not involved in choosing the products or the product accessories, *Id.* ¶548;

- does not state what the proper criteria would be to choose appropriate products and/or product accessories that would support his stated conclusions or the inferences, *Id.*;

- does not state that the tested products and/or product accessories are representative, *Id.*;

- no statements about the protocol that Mr. Berg followed, *e.g,* who designed the protocol; whether he had any input in approving the protocol; whether the protocol was appropriate

to prove the stated conclusions or the inferences, *Id.* ¶549;

- no statements that he even considered the propriety of the protocol, *Id.*;

- no statements of what an appropriate protocol would be, *Id.*;

- no identification of test conditions: host computer, operating system, computer software drivers, other programs on the host computer that may affect the test outcome; and what constitutes a successful or unsuccessful outcome of his tests protocol, *Id.*;

- test was limited to the operation of these products only with respect to information stored in attachable memory cards, *Id.* ¶550;

- no apparent consideration of the internal memories that store information from attachable devices, *Id.* ¶557;

- no disclosure of the type of memory card the test used; reasons for choosing that memory card; who chose it; why that memory card would be appropriate, *Id.* ¶552;

- other types of memory cards may affect the outcome of his tests (e.g., an "Eye-Fi" card operates, in part, as a data transmit/receive device that is capable of generating data in real-time while a USB MSC-capable product is connected to a computer), *Id.* ¶553;

- no disclosure of what Mr. Berg means (¶25) by setting "the camera to operate in the MSC mode," *Id.* ¶554;

- no consideration to other modes which may allow a product to communicate with a connected computer using the USB Mass Storage Class communication protocol, *Id.*;

- no disclosure of whether Mr. Berg attached accessories to the products, *Id.* ¶555;

- no disclosure in ¶¶ 34 and 45 of what a disk image is, or what proper conclusions can be reached by examining disk images, *Id.* ¶556;

- no disclosure in ¶48 of the significance is of running "a bit-by-bit comparison of Image 1

and Image 2" using UltraCompare, or what valid conclusions can be drawn from this, *Id.*

¶554.

Dr. Locke also disagrees with Berg ¶49 that conclusions and inferences can scientifically

be drawn from Mr. Berg's tests:

> For the reasons stated above, I disagree with Mr. Berg's stated conclusion and inferences that CMs purport to draw from his stated conclusions. I note that Mr. Berg only states in his declaration that he tested products with one, unidentified memory card in one particular product mode. Thus, no conclusions can be drawn from this experiment with regard to any other memory card (such as an "Eye-Fi" card), internal memories, or additional product modes. For these reasons, his experiments do not establish that no data could be transmitted "from any of the accessories to the computer when the camera [products] was connected to the computer in MSC mode."

Locke ¶ 558. Dr. Locke also disagrees with Mr. Berg's conclusion (¶50) that "when the camera

was connected to a computer in MSC mode, the camera was not able to take any pictures, video,

or audio":

> I disagree with Mr. Berg's conclusion that "when the camera was connected to a computer in MSC mode, the camera was not able to take any pictures, video, or audio" because Mr. Berg does not state in his declaration that he tested the full range of capabilities of the products in the MSC mode. Mr. Berg states in his declaration that he only tried to press certain buttons on the products to capture pictures, video, or audio (see paragraphs 26 and 39), but did not try to capture pictures, video, or audio in any other manner. Accordingly, the testing procedures only establish that, at best, pictures, video, or audio cannot be taken by pressing the buttons Mr. Berg pressed during the tests. It is possible that pictures, video, or audio can be captured in some other manner that does not require the pressing of a button on the device.

Locke ¶559, 559a-d, 559a-d.

There are even more problems with Mr. Berg's testimony, as Dr. Locke further explains.

Mr. Berg does not testify that he was provided with the basic information that is needed for a

competent technical examination – including documentation for the internal and external

components, assembly and disassembly instructions, diagrams of the main block functions and

documentation describing those, block diagrams of the products, circuit diagrams,

documentation for the file system of each product, and a parts list. *See* Locke Decl. ¶¶542-44. In addition, one would need to know how the computer program operates inside the accused products, including source code and other documents. *Id.* ¶560-67.

Mr. Berg appears unaware of, or chooses not to testify about, the fact that sophisticated software programs frequently have a "back door" to allow service technicians to access the product and perform diagnostics, testing, repair, or other service tasks. There is clear evidence that at least some digital cameras have such "back doors." [REDACTED]

. Dr. Locke attests, "A 'back door' is a special operation designed to permit someone with special knowledge to perform functions unavailable to typical purchasers of the product." *Id.* at ¶359.

[REDACTED

Mr. Berg does not indicate that he tested any other modes of operation of the accused cameras, such as the diagnostic ones. Nor does he say that he even knew about them. If Mr. Berg did test other modes, he does not indicate what the results were. Papst reasonably expects that in a diagnostic mode, there would be full or substantial functionality so that diagnostics can in fact be performed, as noted *supra* in connection with Dr. Locke's testimony at Section VI of his declaration, ¶¶357-64.

Dr. Locke attests that for a full evaluation of the operation of the CMs' cameras from an infringement perspective, he would need to analyze the source code files used to generate the

firmware (computer software) that is contained in each of the accused products. *Id.* at ¶691. Mr. Berg is silent on whether he made any such study or whether he had access to source code for the cameras and DVRs he tested.

Mr. Berg's testimony simply does not establish that data from the accessories for the accused products is unable to be transmitted to the host computer by accused products while the accessory, accused product, and host computer are attached all at once. The CMs' submissions do not provide enough detail to reveal how the accused products actually operate, and such information is not available from public sources. *Id.* at ¶690.

Papst objects to Mr. Berg's testimony for at least the foregoing reasons and requests that no weight be given to it. It would not be taken as scientifically valid, as Dr. Locke explains. The Berg declaration lacks foundation and is unreliable, incomplete, and misleading. It fails to meet the requirements of F.R. Evid. 702 and cannot be the basis for summary judgment.

A movant for summary judgment must present a "properly supported motion." *Anderson,* 477 U.S. at 250. The CMs' motion is not supported by competent or probative evidence and should be denied for at least that further reason.


III.    **The CMs Improperly Interpret this Court's Claim Construction No. 3.**

The CMs' interpretation of the Court's claim construction is incorrect. "Transmitting data to … the host device <u>when</u> <u>connected</u> to the host device by the interface device" is not correctly interpreted to require that the interface device act as a "conduit" for live data, or the like, but instead that the interface device acquires data from a DTRD and lets a host computer read the data from the interface device while the host computer is connected to the interface device.

**A.      The Court Interpreted DTRD in Claim Construction No. 3 for Context Only – Not as a Claim Element**

The CMs' reliance on the recitation of "a data transmit/receive device" in the claims is a

nonstarter, as the DTRD is <u>not a claim element</u> that needs to be present for infringement.  The

claimed interface device is capable of attachment to and detachment from DTRDs.  Indeed, the

Court in its claim construction opinion recognized that the DTRD is not part of Tasler's

invention.  The term was construed by the Court only to provide context for other aspects of the

claimed invention.

> <u>Mr. Tasler did not invent a data transmit/receive device</u>, and Papst objects to any
> construction of the term.  Tr. 1:136 (Papst) ("So our first position, of course, is
> that we shouldn't be defining this as part of the claimed invention.").  While Papst
> asserts that the term "data transmit/receive device" is not a claim limitation, Papst
> concedes that the term may be construed "for context" as "a device that receives
> input and provides data to the interface device."  Papst's App. at 2.  <u>The Court
> agrees that it should not define the nature of a data transmit/receive device</u>.  What
> is at issue, however, is the communication capability between the invented
> interface device and a data transmit/receive device, which is very much part of
> construing the Claims, and the Court construes "data transmit/receive device" in
> this context.

[Dkt. #336] at 27 (emphasis added).  Accordingly, the CMs must look elsewhere in the claims to

find a recitation of a claim element to support their argument.  The CMs cite none, and there is

none.

**B.      The Court's Claim Construction "When Connected" Does Not Require the Interface Device to Send Live Data or Act as a Conduit**

The CMs build their argument on the phrase "when connected to the host device" in the

Court's construction of "data transmit/receive device," which states:

> 3.      The term "data transmit/receive device" means a device that is capable of
> either (a) transmitting data to or (b) transmitting data to and receiving data from
> the host device <u>when connected</u> to the host device by the interface device."

[Dkt #337] at 2 (underlining added). In moving for summary judgment, the CMs interpret that

claim construction in a way that unduly narrows the operation of embodiments described in the

patents. They interpret the Court's claim construction *as if* it required the DTRD to transmit its data *at the same time* as the host device is attached to the (other end of the) interface device and, apparently, for the interface device to send that new data to the host computer *at that time*. Failing that mode of operation, the CMs urge, there is no infringement.

The CMs' argument is built on the questionable premise that the accused products never transmit live data from external accessories to an attached host computer (addressed *supra* at Argument I in connection with the need for discovery), that delayed data transmissions are noninfringing, and that only real-time, "active" transmissions would be infringing.  The only way for them to be noninfringing is to conclude that Tasler never meant to claim subject matter that he clearly disclosed in the patents <u>and</u> that the Court has so found. None of the CMs' premises is correct. To the contrary, a system can infringe regardless of whether it communicates live data or previously-acquired data, *i.e.,* delayed data.  The phrase "when connected" does <u>not</u> require that both the DTRD and the host device be *attached* to the interface device *at the very same time* and that the only claimed communications are ones that occur *at that time*.  Said another way, "when connected" does <u>not</u> imply that <u>only</u> live data falls within the claim scope.

### 1.    Being "Connected" Does Not Require Live Communication

Any interpretation of "when connected" in the claim construction ought to be consistent with the patent disclosures. However, before embarking on that analysis, some commentary on communications may be helpful. Referring to the phrase "when connected," people can be said to be "connected" in many different ways -- by telephone, text messaging, email, fax transmission, or a paper letter delivered by a postal service or courier. All of these permit two-way communication. Parenthetically, the Court ruled in Claim Construction No. 4 that two-way communication is not required. [Dkt #337] at 2. One-way data transmission from the DTRD is a permitted option:

19

4.    The phrase term "for communication between" the host and the data transmit/receive device means "for transmitting data either (a) from the data transmit/receive device to the host or (b) bidirectionally between the host and the transmit/receive device."

A sender might not still be using the communication medium at the same time that the sent message or other content is delivered. Consider a message that is recorded and received at a later time by a recipient. The time that it is received can be indeterminate, spanning a very wide range. For example, a telephone caller may leave voice mail that the called party may retrieve much later and then answer. That is not a "real-time" communication, but the two parties are nevertheless "connected." Delays can range from seconds, minutes, hours, or days in the cases of email, text messaging, or social media exchanges – which are forms of communication.  People are "connected" via these modalities even though the sender and the recipient are not required to be "on line" at the same moment. Two-way communications via the U.S. Postal Service are necessarily spaced apart in time because of the inherent nature of the system. Time is required to receive, sort, transfer, and deliver paper mail. Yet, the parties remain connected through such communications. *Cf.* Exh. 1 at 1 ("Once upon a time, family members living overseas were connected to their loved primarily by epistolary correspondence."); Exh. 2 at 1 ("Write a Letter and be Connected."); Exh. 3 at 1, 2 ("Staying Connected to Your College Kids" by writing "a long, juicy letter.").  In the case of a letter sent by post, the sender (analogous to the DTRD) and the recipient (analogous to the host device) are physically attached to the letter (analogous to the interface device) at different times, yet they are "connected" by the letter because the information is successfully transmitted.  The information in a letter is sent at a different time than the information is read, i.e., the letter is put in the mailbox before the recipient reads it.  The letter is, nevertheless, an effective information-conveying connection even though the communication is not instantaneous.

Accordingly, the phrase "when connected" in Claim Construction No. 3 does not denote or inherently require *simultaneous* physical connection and communication of *live* data.

### C.  The CMs' Interpretation of "When Connected" Conflicts with Claim Construction No. 20 ("Virtual File") of this Court.

The CMs' interpretation of Claim Construction No. 3 is at odds with the language of Claim Construction No. 20 which construes a term in Claim 7 of the '399 patent and states:

> 20.    The term "virtual file" in Claim Seven of the '399 Patent means "files that appear to be but are not physically stored; rather, they are constructed or derived from existing data when their contents are requested by an application program so that they appear to exist as files from the point of view of the host device."

(underlining added). When the Court construed that term, it ruled that virtual files are constructed or derived from "existing data." "Existing data" denotes data that already exists. The data that exists in the Tasler patents is stored data that came from a DTRD. Locke Decl. ¶¶303-04. It does not necessarily mean live data or transitory data, *i.e.*, data which is being acquired from a DTRD at the same time that a "virtual file" is provided by the interface device to the host. *Id.* ¶172-73. A person of ordinary skill in the art would not equate "existing data" to live, incoming data from a DTRD but instead to data that already exists in the interface device. *Id.* ¶¶303-04

The CMs' argument seemingly denies *any* storage of data in the interface device because *live* data must be transferred from a DTRD to the interface device and thence to the host computer while all three are connected together *and operate during this time.* Because "existing data" in the Tasler patents is stored data, the CMs' argument that the claims deal with only *live* data would nullify the Court's Claim Construction No. 20 and therefore cannot be correct.

**D.      The CMs Seek to Reargue Their Already-Rejected "Real-Time" Argument in a Different Way, Without Expressly Using Those Words.**

The CMs have repeatedly urged that the patent claims require the interface device to be a "conduit" that operates "actively" to obtain data in "real-time." In their Opening Markman Brief [Dkt. #188], the CMs urged that the claim phrase "communication between" meant transmitting information bidirectionally *and actively* between two devices. *Id.* at 21. They urged that "actively" means having "real-time" activity:

> The communication must also be active. The plain meaning of "communication" requires an active engagement. Thus, for two devices to be in communication, there must be some real-time activity between them.

*Id.* at 22. Similar contentions by the CMs are that the interface device is merely a conduit, and that it must produce streaming data.[1]

This Court correctly rejected the CMs' argument during claim construction and declined to include "actively" or anything of the sort in its claim construction order and opinion. The CMs now seek to limit the claim scope by interpreting the "when connected" language of Claim Construction No. 3. Having already rejected the CMs' argument for "real-time" data during the *Markman* phase of this case, the Court should not permit the CMs to slip it into the construction of a different part of the claim by interpreting this Court's claim construction, particularly in the

---

[1]    *See* CMs' Opening Markman Brief [Dkt. #188] at 47 ("real-time streaming data"); Markman Hearing Tr. at 45:20 (Sept. 22, 2008) (Counsel for Olympus: "very quickly real time"); "conduit" *id.* at 43:23, 48:10, 48:16, 50:7; Tr. Sept. 23, 2008: 68:4 ("conduit for realtime data transfer"); 139:11-12 ("interface device is really just this conduit"); 141:20 ("just a conduit"); Tr. Sept. 24, 2008 25:12-17 ("The patent always universally in every case describes the data coming from the [DTRD] as coming through what they call the realtime input file which isn't actually a file at all but is the ruse or trick of lowing the realtime input to the host and making it look like a file. So the data files are never stored anywhere" [*sic*].); pp. 26-27 *passim* (same); CMs' Opposition to Papst's Req. for Clarification and Reconsideration [Dkt #323], pp. 10-11 ("actively"); CMs' Proposal ...[Dkt #352] at 2, n. 3 (camera used as "mere conduit"); Mot. For Summ. Jdgmt. [Dkt #452] at 6 ("transient stream"), 9 ("transient, real-time stream"), and 10 ("interface device of '449 patent is a conduit for transferring a transient stream of data ...").

absence of *any* evidence or argument justifying such a change in the Court's construction. Dr. Locke attests that even in the passages where the patents describe an example relating to "real-time," the data that is sent to the host from the interface device <u>is</u> <u>data</u> <u>that</u> <u>has</u> <u>been</u> <u>stored</u> <u>in</u> <u>and</u> <u>retrieved</u> <u>from</u> <u>some</u> <u>blocks</u> <u>of</u> <u>memory</u>. Locke Decl., Section III, Part J, ¶¶151-76.

The Court has issued no claim construction that explicitly limits the interface device to one that must operate in "real-time," provide "streaming" data, operate "actively," or work as a "conduit" for live data. There is no basis to interpret the Court's rulings to impose such a limitation, <u>and the CMs cite no reason to do so</u>.

When the CMs broached the topic of summary judgment, Papst alerted the Court that the CMs' position using "actively" or in "real-time" had already been rejected. Papst explained:

> Furthermore, the Other CMs are twisting the Court's claim construction when they argue that the transfer of data to the computer must be at the same time it is acquired from the data transmit/receive device. They had asked the Court to construe the claims to require that the "communication between" the computer and data transmit/receive device be done "<u>actively</u>," i.e., in "<u>real-time</u>." Doc. No. 188 at 22. <u>The Court did not include that in its claim construction</u>. Doc. Nos. 312 at 30; 336 at 32. The Other CMs are trying to slide that "<u>actively</u>" concept in through the back door of the term "data transmit/receive device." A data transmit/receive device is not an element of the interface device that needs to be present for infringement; that term was construed by the Court only as context for language later in the claims. Doc. No. 336 at 27.

[Dkt #366] at 4 (underscoring added). Not only are the CMs reiterating their already-rejected arguments, but also they approach the Court with no answer to Papst's objection quoted above. The Court has already determined that the interface device does not need to operate in real-time; the communication need <u>not</u> be "active;" and the interface device need <u>not</u> be a "conduit" for live information acquired from a DTRD. The Court did <u>not</u> include such words in its claim interpretation.

### E.    The CMs' Interpretation Makes No Sense in Light of the Patent Claims and Specification

No claim recites "real-time" or live data. No independent claim recites acquiring data from a DTRD via the "second connecting device" at the same time that data is being provided to the host computer via the "first connecting device." No independent claim *requires* the first and second connecting devices to operate at the same time.

### 1.    The Claims Do Not Require Passing Live Data to an Attached Host Computer.

It is one thing for a patent claim to be written broadly enough to *allow* the claimed device to receive live data, process it "on the fly," put it into short-term memory, and output it to an attached host computer, on the one hand; versus, on the other hand, *confining* the claim to that operation *only*, disallowing the storage of acquired data in memory so that it can be copied and outputted to a host computer over and over again, or at a delayed time.

While under the Court's claims construction, the DTRD is "capable of transmitting data to the host device when connected to the host device by the interface device," and assuming *arguendo* that means being "capable" of the transfer of live data to the host device, the following review of the asserted claims demonstrates that there is nothing in the language of the claims that *requires* the interface device to take advantage of that "capab[ility]" of the DTRD.

### a.    The Claims of the '399 Patent Do Not Limit Claim Scope to Only That Mode of Operation.

The preamble of Claim 1 of the '399 patent speaks of "communication between a host device . . . and a data transmit/receive device," but that in and of itself says nothing about <u>when</u> or how that communication takes place. '399 pat. at 11:46-49.

The "processor," "memory," and "first connecting device" elements of that claim do not mention the DTRD. '399 pat. at 11:51-55.

The fourth claim element is the "second connecting device." The claim recites that its function is "for interfacing the interface device with the [DTRD]..." '399 pat. at 12:53-59. Nothing in this claim element, however, requires transmission of data by the DTRD to the host device; it only refers to interfacing between the DTRD and the interface device, not with the host device. *Id.* It does not limit the times when the second connecting device must operate relative to any other claim element.

The recitations concerning the "first command interpreter" element deal only with communications between the host device and the interface device. There is no mention in this claim element of data being transferred by the DTRD, much less of transferring data by the DTRD at the same time that the host device is attached to the interface device. Instead, these recitals concern the interface device identifying itself to the host computer as an "input/output device customary in a host device..." '399 pat. at 12:61-13:8.

The last paragraph of '399 claim 1 contains recitations concerning the "second command interpreter" element. These involve interpreting "a data request command from the host device" as a "data transfer command for initiating a transfer of the digital data to the host device." '399 pat. at 13:8-12. There is no recitation in this claim element of transferring the data to the host device while the DTRD is connected to the interface device or while the DTRD is supplying data to the interface device. *Id.*

In sum, nothing in Claim 1 of the '399 patent takes advantage of the "capab[ility]" of the DTRD for "transmitting data to ... the host device when connected to the host device by in the interface device." *Accord,* independent claims 11, 14. Without such a requirement in the claim, an interface device can infringe even if the data is transmitted to the host computer at a time other than while the DTRD and host device are both connected to the interface device.

With the exception of dependent Claim 3, the remaining claims of the '399 patent are, like Claim 1, devoid of any recitation that takes advantage of the capability of the DTRD to transmit data while the host device is connected to the interface device.

Dependent Claim 3 recites a "buffer to buffer data to be transferred between the DTRD and the host device." The Court has construed this to mean storing data "temporarily to compensate for the differences between the rate of flow of data between the data transmit/receive device and the host device." [Dkt. #336] at 65-66; [Dkt. # 337] at 5, ¶19. The Court specifically rejected Papst's suggestion that this buffer permitted the data to be stored indefinitely. [Dkt. #336] at 63-65. Thus, under the Court's construction, dependent Claim 3 is specific to the transfer of live data. The only difference between this dependent Claim 3 and independent Claim 1 is the recitation in Claim 3 of data buffering by the recited "buffer."

Because the patent contains dependent Claim 3 for the transfer of live data, a presumption arises under the doctrine of claim differentiation that independent Claim 1, on which claim 3 depends, is <u>not</u> limited to live data transfers. In other words, while under the Court's construction the preambles of earlier claims refer to the "capab[ility]" of the DTRD to transmit data while the host device is connected to the interface device, that capability is not utilized until dependent Claim 3.

        **b.**    **The Claims of the '449 Patent Do Not Limit Claim Scope to Only That Mode of Operation.**

The comments in the previous subsection about the preamble and the "processor," "memory," "first connecting device," and "second connecting device" elements of Claim 1 of the '399 patent apply as well to those elements as they are recited Claim 1 of the '449 patent. '449 pat. at 11:45-58.

While Claim 1 of the '449 patent does not have an element named "first command interpreter," it does have recitations quite similar to those in the "first command interpreter" element in the '399 patent, except that the '449 patent refers to "a storage device" customary in a host device rather than an "input/output device" customary in a host device. *Compare* '399 pat. at 12:64-13:8 *to* '449 pat. at 11:59-12:3. This portion of Claim 1 of the '449 patent deals only with communications between the host device and the interface device. It contains no mention of data being transferred by the DTRD, much less of transferring data by the DTRD while the host device is attached to the interface device. '449 pat. at 11:59-12:3.

Claim 1 of the '449 patent ends with the following recitation concerning a virtual file system:

> wherein the interface device is arranged for simulating a virtual file system to the host, the virtual file system including a directory structure.

'449 pat. at 12:4-6. This element relates to the interaction between the interface device and the host device. It says nothing about the transfer of data by the data transfer device, much less about such transfer occurring while the DTRD and the host device are both attached to the interface device.

Asserted dependent Claim 2 of the '449 patent refers to "a data file used for transferring data from the data transmit/receive device to the host device" ('449 pat. at 12:10-11), but there is no mention in this claim of the DTRD transferring data while the host device is attached to the interface device. There is nothing in this claim that excludes transferring data from the DTRD to interface device, storing that data in the interface device, and then at a later time transferring it to the host device.

Asserted dependent Claim 16 recites having "a data buffer for permitting independence in terms of time of the data transmit/receive device attachable to the second connecting device from

the host device attachable to the first connecting device." '449 pat. at 13:10-13.  As with Claim 3 of the '399 patent, the Court has construed Claim 16 of the '449 patent to refer to storing data "temporarily." [Dkt. #336] at 65; [Dkt. #337] at 5, ¶19.  Under that construction, the doctrine of claim differentiation suggests that the other claims, which do not reference buffering, are not limited to real-time data transfer.

The remaining claims of the '449 patent say nothing about the transfer of data by the DTRD, much less about that being done at the same time that the host device is attached to the interface device.

### 2. The CMs' Interpretation Is Not Supported by the Patent Specification and Would Exclude Some Preferred Embodiments.

The CMs make no effort to show support in the patent specifications for their restrictive interpretation in either their memorandum in support of their motion or in their statements of material fact. *See* Dkt. #451.  They cannot because, as we will explain, the patents do <u>not</u> require real-time or live data communications from the DTRDs to the host computer. In fact, preferred embodiments in the patents permit delayed transmissions. This means that following the CMs' view of the Court's claim construction would narrow the claim scope to only a selected mode of operation of preferred embodiments described in the patents, despite a broader disclosure. That is usually wrong. See *Hynix Semiconductor Inc. v. Rambus Inc.*, 2009 WL 230039, *16 (N.D. Cal. 209 (general rule that even a specific disclosure can support more generic claims); *see also, Fastenetix, LLC. v. Medtronic Sofamor Danek, Inc.*, 2007 WL 2159613 (declining to construe patent narrowly because the specification was not narrow); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (warning against confining claims to specific embodiments). It would be wrong in this case too.

The patents are carefully reviewed by Papst's expert, Dr. Locke, in his accompanying comprehensive declaration. In it, he examines *inter alia* how a person skilled in the relevant art regards the patents' statements about the object of the invention, the summary of the invention, and the detailed description of preferred embodiments. *See generally* Locke ¶¶9-12, 58-150. He explains why the CMs' accused products in the MSC mode operate the same way as the preferred embodiments operate. *Id.* ¶¶231-259. Nothing supports the CMs' view that live data must be acquired by the interface and sent to the host as live data. To the contrary, the evidence shows that live data transfer is not required in the patent specification, but is permitted. We turn now to that discussion.

Background of the Invention. Dr. Locke explains that the Background of the Invention section of the patent talks about data acquisition technology. Locke ¶¶13-21. Also, the first page of the patent in the right-hand column under the topic "OTHER PUBLICATIONS" lists two references about "data acquisition." Data acquisition can occur with the data gathering occurring prior to data transfer to a host computer, or it could occur "live." Nothing in the Background of the Invention limits the invention to live data acquisition and transfer operations.

Objects of the Invention. Dr. Locke also reviews the "objects" of the invention as set forth in the "Summary of the Invention" portion of the '399 patent. *Id.* ¶9. The only "object" of the invention mentioned in the specification is this:

> It is an object of the present invention to provide an interface device for communication between a host device and a data transmit/receive device whose use is host device-independent and which delivers a high data transfer rate.

'399 pat. at 3:25-27 (underlining added). Locke ¶9. (The '449 states that this is "the" object of the invention. '449 pat. at 3:20-23.) *Id.* "Host device-independen[ce]" has to do with not needing to add nonstandard drivers onto the host device; it is not about the relationship between the interface device and the DTRD. Locke ¶¶ 10-11, 66-67. A "high data transfer rate" has to

do with the rate of transferring data between the interface device and the host device. *Id.* ¶¶ 11, 66-67. Again, this is not related to communications from the DTRD to the interface. This sole stated object of the invention can be obtained without a transfer of live data from the DTRD to the host device via the interface device. *Id.* ¶64. Some other features are mentioned elsewhere in the patent, but they are ancillary compared to what *is* discussed in the Summary of the Invention.

Summary of the Invention. Dr. Locke reviews the patent's Summary of the Invention. *Id.* ¶¶58-77. It states that both attributes of the object of invention are achieved by making use of a driver for an input/output device already present in the host device:

> The present invention is based on the finding that both a high data transfer rate and host device-independent use can be achieved if a driver for an input/output device customary in a host device, normally present in most commercially available host devices, is utilized.

'399 pat. at 4:23-27. No mention is made here of any need for, or even the desirability of, having the host device and the DTRD be attached to the interface device at the same time.

Carefully reviewing all seven paragraphs of the Summary of the Invention, Dr. Locke testifies, "None of these descriptions of the three aspects describes an interface device that acquires data from a data transmit/receive device and transmits the acquired data to a host device in real-time, i.e. as it is acquired." *Id.* ¶64. He concludes his review of the Summary of the Invention as follows:

> 76.     One of ordinary skill in the art would understand that the *Summary Of The Invention* section emphasizes the "high data transfer rate" and describes an interface device that is "host device-independent" with respect to the transfer of data from the interface device to the host device and provides no details of the transfer of data between the data transmit/receive device and the interface device. Thus, one of ordinary skill in the art would understand that this section describes in detail the communications between the interface device and the host device, and provides no details of the communication between the interface device and the data transmit/receive device.

*Id.* ¶76. As can be seen, and as a person skilled in the art would conclude, the patents' own statements summarizing the invention are devoid of any requirement for live data transfer from an accessory or DTRD to the interface device and thence to the host computer. It is not even mentioned.

Detailed Description of Preferred Embodiments. Dr. Locke discusses how a person skilled in the art would understand some of the detailed descriptions of preferred embodiments. Locke ¶¶ 78-259. The Court will recall that Figure 1 of both patents shows first and second connecting devices 12 and 15, respectively, a digital signal processor 13, and a memory 14:



Briefly, data is acquired from the DTRD (not shown, but indicated at the right side) via the second connecting device 15. The data is handled by the DSP 13 and enters memory 14. Data never travels from the second connecting device 15 to the first connecting device 12 without going through memory 14. Locke ¶84. At such time that the host computer wants it, the data is read (copied) and sent to the host computer via the first connecting device 12.

The patent specification describes multiple preferred embodiments. Locke ¶77. Dr. Locke refers to one of the preferred embodiments as the "Example A Interface Device." *Id.* ¶91. The patent specification explains that the Example A Interface Device, described with reference to

31

Figure 1, uses the "File Allocation Table" ("FAT") file system industry standard. *Id.* ¶93. A file allocation table tells where to find things stored in a memory. *Id.* ¶101. The '399 patent refers to using the FAT system extensively at col. 6, lines 31-47. The data is stored in various physical locations in memory, and when data is to be read by a host computer, the stored blocks of data are accessed by internal circuitry of the interface device from wherever they were stored. This involves using Logical Block Addresses ("LBAs"). *Id.* ¶¶95-119. An ordinarily skilled worker would understand the relevant communications among the DTRD, the interface device of Fig. 1 (above), and a host computer ("HOST" in Fig. 1). *Id.* ¶¶128-149.  The host computer requests data from the interface device, and it comes from the memory. See especially *Id.* ¶149. In sum, the data going to the host computer via line(s) 11 is coming from the memory 14 as data that the interface device 10 has stored there. *Id.* 84. It is stored data. *Id.*  It may have been placed there (hours or days) previously. *Id.* 90.

The invented interface device is created to acquire data. See '399 patent, col. 1, line 13 ("data is to be acquired"); lines 20-22 ("… existing data acquisition systems for computers… The interfaces of this group…"). The invention is not limited to acquiring data and delivering it to a host computer *as streaming data* or *in real-time*, and the CMs offer no support from the patent or their technical witness for such a limitation. Dr. Locke provides a comparison table showing that the accused products operate in the MSC mode exactly like the operation of the Example A Interface Device in the patents. Locke ¶¶ 259-284, 306.

Though not currently mentioned by the CMs in this motion, we digress briefly to dispel the CMs' previously-raised notion that the claim scope should somehow be limited because the patents mention "volatile" memory as one kind of memory. This is not true for the following reasons. Figure 1 of the Tasler patents does not specify volatile memory but instead simply

shows "MEMORY 14." It does not state whether the memory is volatile or nonvolatile. The

specification refers to item 14 as "a memory means." '399 patent at 5:52. The Example A

Interface Device in the specification also does not state whether the memory is volatile or

nonvolatile. The Court's Claim Construction No. 24 says that "memory" means "any type of

memory." Modified Order [Dkt #337] at 5. It does not have to be a "volatile" memory.

Moreover, even a volatile memory will retain its stored data indefinitely and allow that

data to be copied to a host computer at a later time, as long as power is supplied to the memory,

by a battery, for example. It was common by 1997 to include battery backup for this. Locke

Decl. ¶82. As a practical matter, a volatile memory is indistinguishable from a non-volatile

memory. *See generally*, *id.* . ¶¶ 79-83. Another alternative would be to use a non-volatile

memory, which also is within the scope of this Court's Claim Construction No. 24. The CMs

may again raise the issue in their reply brief that in one embodiment the patent specifications

show both volatile and nonvolatile memory.  In addition to being irrelevant for the reasons

stated, this is merely one of several embodiments and not a limitation on the claim scope. In

short, the mention of "volatile" memory in the patents is no basis to limit the claim scope to

handling only live data.

### 3.     The Use of the Phrase "Present Invention" in the Patent Specification Is Not a Basis to Limit Claim Scope.

The example that mentions "real-time" in the patent says it is "a preferred embodiment of

the present invention." '399 pat. 6:48. This appears <u>after</u> a general discussion that does <u>not</u>

mention real-time. *Id.* 5:47-6:47.  The mention in the specification of "the present invention"

does not of itself serve to limit the claims. *E.g.*, *Liebel-Flarsheim Co. v. Medrad, Inc.,* 358 F.3d

898, 909 (Fed. Cir. 2004); *Rambus, Inc. v. Infineon Tech. AG,* 318 F.3d 1081, 1094 (Fed. Cir.

2003); *VirnetX, Inc. v. Microsoft Corp.,* No. 07-cv-80, 2009 WL 2370727, at *17 (E. D. Tex.

July 30, 2009); *Atlantic Research Marketing Sys., Inc. v. Troy,* 616 F. Supp.2d 157, 166 (D.

Mass. 2009). Rather, the context in which the phrase is used must be examined. *VirnetX,* 2009

WL 2370727 at *17; *Atlantic,* 616 F.Supp.2d at 166.   References to "the present invention"

become limiting only if they are used in passages evidencing a clear intent to disclaim broad

claim coverage. *Liebel-Flarsheim,* 358 F.3d at 908 ("Those passages, . . . do not disclaim the use

of the invention in the absence of a pressure jacket"), 909 (no "clear disclaimer of particular

subject matter"); *Rambus,* 318 F.3d at 1095 (The patentee "did not clearly disclaim or disavow

such claim scope in this case.").

     The Tasler patents describes numerous alternative embodiments as each being "according

to the present invention."  The context in which the phrase "according to the present invention" is

used in the patents reveals that the phrase is not intended to limit claim scope. There is no "clear

disclaimer" of claim scope. Locke Decl. ¶¶55-57.

### 4.    The "Real-Time" Example in the Patents is Different from the CMs' Intended Meaning of "Real-Time" and Does Not Support the CMs' Argument

     As noted above in Section IID, the CMs have repeatedly sought to limit the patent claim

scope to "real-time" data. *See supra,* p. 22, n.1.  Other ways they have argued this is to

characterize the interface device as a "conduit" for live data or to operate "actively." *Id.* While

the patents do permit a "real-time data file" to be read, (1) the claims are not confined to that, as

we explained in Section IIE, and (2) there are differences between how the CMs use the phrase

"real-time" and how the patents use it. The Court should be aware of these differences.

     Referring to the first three paragraphs of the "Detailed Description of Preferred

Embodiments" in the '399 patent, 5:47-6:47, Dr. Locke attests that what he calls the Example A

Interface Device from this passage has nothing to do with live data, fresh data, "real-time" data,

or the like. Locke, ¶86-90, 149, 154, 173. Only after discussing those configurations do the

patents speak about another embodiment where the host computer requests reading a file "xy"

('399 pat., 6:57), which might be a "'real-time input' file" (*id.* lns. 62-63). File reading is

discussed further in that same paragraph of the patent and 7:1-22. Dr. Locke reviews this at *Id.*

¶¶151-176. He explains why this is just one of multiple preferred embodiments. *Id.* ¶154. He

states:

> 172. A person of ordinary skill in the art would understand that the Papst Patents
> describe a number of examples of interface devices that have different features.
> The '399 Patent does not state that all of these examples of interface devices must
> include the "realtime" input file option described in the previous paragraph.
>
> 173. The '399 Patent does not state that the interface device must be connected to
> the data transmit/receive device and the host computer at the same time. Nor does
> it state that the interface device must be able to transmit data it receives from the
> data transmit/receive device to the host computer at the same time. For example,
> the Example A Interface Device is not described as requiring either of these
> features.

That is to say, as the patent describes various preferred embodiments, data from a DTRD

does not need to be transferred in real-time, or "live." This is merely one of several options of

one preferred embodiment. Nor does the Summary of the Invention even mention real-time input

files. *Id.*  ¶76. Dr. Locke explains that a "file xy" requested by the host computer might be a

"real-time input" file but "could also be a non-real-time data file whose contents are physically

stored data from the data transmit/receive device, or data from the data transmit/receive device

that has been processed by the interface device." *Id.* ¶157.

A person skilled in the art would understand from the description in the Tasler patents

that a "real-time input" file containing data from a DTRD which is to be sent to a host computer

could be processed in at least three different ways depending largely on how much memory is

available or allocated. *Id.* ¶170.

- First, if enough memory is allocated for all the data that is acquired, the data could be stored in memory. After all the data has been stored, all or designated parts of it could be copied for the host computer in response to a data read command, whenever it arrives. *Id.* The data would also remain in the memory for future data reads.

- Second, using the same memory arrangement as in the first paragraph above, a data read command could be received before the last of the incoming data from the DTRD is received. In this situation, data storage into memory would continue and copied data read out for the host computer could overlap. As above, once the acquired data would also remain in the memory, thus allowing another copy of that same data to be transmitted again from that memory at a later time. *Id.*

- Third, the memory that is allocated for acquired data could be smaller than the amount needed to store all of it. This would allow incoming data to be stored in memory and read out to the host computer, but the data would be overwritten as new data arrives and the overwritten data would not be available for any future download to the host computer. *Id.*

Hence, a person in the art would understand that an interface device in accordance with the Tasler patents is not <u>required</u> to have any capability to transmit real-time data from a data transmit/receive device at all. *Id.* ¶172.

This "real-time" data transfer is, accordingly, <u>not</u> a feature that is common to all of the embodiments described in the Tasler patents (such as the Example A Interface Device which does not mention "real-time." Instead, it is only an ancillary feature discussed in the "Detailed Description Of Preferred Embodiments" part of the patent specification. Again, it is not mentioned in the Summary Of The Invention of the patent.

### 5.   The Prosecution Histories of the Patents Do Not Require Any Limitation on Timing.

The CMs' memorandum [Dkt #451] cites nothing from the prosecution histories to support their argument, and indeed there is nothing. The prosecutions say nothing about real-time data transmission. The '399 patent resulted from an international application. Following an International Preliminary Examination Report, Tasler filed a "First Preliminary Amendment" in the USPTO on June 14, 1999. After the USPTO issued a first Office Action, Tasler amended the claims to add the "analog" features and the first and second command interpreters. The application then advanced to issuance. This prosecution did not address or approach the topic of "real-time" communications and therefore has no bearing on the instant motion.

The '449 patent resulted from a "divisional" application of the '399 patent. A preliminary amendment rewrote the claims. Tasler made no substantive comments about the invention in his preliminary amendment. On May 20, 2004, the Examiner at the USPTO then allowed the application with no amendment other than renumbering some claims.

### 6.   Interpreting the Court's Claim Construction as the CMs Now Contend Would Violate Federal Circuit Precedents.

Transferring "live" data is just one of several options described in the Tasler patents, and other modes of operation are set forth which correspond to how the accused cameras actually work in the MSC mode. As such, the description in the patent of a "real-time" transfer of data from the DTRD to the host device via the interface device does not provide a basis for importing a live data transfer requirement into patent claims that do not recite it.  Locke ¶173.

The Federal Circuit's *en banc* decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) illustrates why it would be error to import such a feature.  In *Phillips,* the issue was how to construe the term "baffles" in a claim to vandalism-resistant walls.  The district court had noted that "every textual reference in the Specification and its diagrams show baffle deployment

at an angle other than 90° to the wall faces." 415 F.3d at 1309. The district court then construed

the term "baffles" to have "an oblique or acute angle to the wall face." *Id.* That is, an angle

different from 90°. Initially, a split panel of the Federal Circuit affirmed the district court, noting

that "nowhere in the patent is there any disclosure of a baffle projecting from the wall at a right

angle." *Id.* at 1310. Upon rehearing *en banc*, the full Court of Appeals reversed that claim

construction. *Id.* at 1310. The Court noted that while baffles at angles other than 90° served to

deflect bullets that penetrate the outer panel of the wall structure but those at 90° did not, baffles

at 90° did serve other functions such as structural support. *Id.* at 1310, 1325. The *en banc* Court

held it was error to require the claims to have structure achieving all the disclosed advantages of

the invention.

> The fact that the written description of the '798 patent sets forth multiple
> objectives to be served by the baffles recited in the claims confirms that the term
> "baffles" should not be read restrictively to require that the baffles in each case
> serve all of the recited functions. <u>We have held that "[t]he fact that a patent
> asserts that an invention achieves several objectives does not require that each of
> the claims be construed as limited to structures that are capable of achieving all of
> the objectives.</u>" *Liebel-Flarsheim*, 358 F.3d at 908; *see also Resonate Inc. v.
> Alteon Websystems, Inc.*, 338 F.3d 1360, 1367 (Fed. Cir. 2003). Although
> deflecting projectiles is one of the advantages of the baffles of the '798 patent, the
> patent does not require that the inward extending structures always be capable of
> performing that function. Accordingly, we conclude that a person of skill in the
> art would not interpret the disclosure and claims of the '798 patent to mean that a
> structure extending inward from one of the wall faces is a "baffle" if it is at an
> acute or obtuse angle, but is not a "baffle" if it is disposed at a right angle.

*Id.* at 1326-27 (underlining added).

Other cases have similarly refused to read into the claims all of the advantages disclosed

in the specification. *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1324, 1325-26 (Fed. Cir. 2008)

(requiring claims to meet the "fundamental" or "overall" object of the invention (preventing

hazardous gas release), but declining to limit the claims to another object of the invention

(uniform capillary passages)); *Howmedica Osteonics Corp. v. Wright Medical Tech., Inc.*, 540

F.3d 1337, 1345 n.4 (Fed. Cir. 2008)("An invention may possess a number of advantages or

purposes, and there is no requirement that every claim directed to that invention be limited to

encompass all of them."), quoting *E-Pass Tech., Inc. v. 3 COM Corp.*, 343 F.3d 1364, 1370 (Fed.

Cir. 2003); *Resonate Inc. v. Alteon Websystems, Inc.*, 338 F.3d 1360, 1367 (Fed. Cir. 2003)

(claims need not address all the problems discussed in the specification; "[T]here is no language

in Claim 6 relating to the bottleneck problem or the bypass solution of that problem."); *SunRace*

*Roots Enterprice Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1304 (Fed. Cir. 2003) (declining to

require claimed shift actuator to meet all the "goals of the invention"); *Honeywell Inc. v. Victor*

*Company of Japan, Ltd.,* 298 F.3d 1317, 1326 (Fed. Cir. 2002) ("The fact that the patentee chose

to include language in claim 1 relating to only one of the two cited prior art problems is

persuasive evidence that the claim does not require the solution of both problems.").

Likewise, in the case of the Tasler patents, real-time data transfer is not required to

achieve the stated object of the invention. Locke Decl. ¶11. Accordingly, it be error to further

limit the claims to require "real-time" transfer of data from the DTRD to the host device via the

interface device.

###     7.     Conclusion Regarding the Interpretation of Claim Construction

A plain reading of the claim language reveals that the elements of the asserted claims

never recite taking advantage of the "capab[ility]" of the DTRD to transmit data at the particular

time while the host device is attached to the interface device. The asserted claims instead recite

other features of the invention. Nothing in the patent specification restricts the claims to

operating to send live incoming data "actively" or "in real-time" or for the interface device to be

a "conduit" for immediately transferring data being acquired currently from a DTRT. Also,

nothing in the prosecution history suggests otherwise. While the claims are broad enough to

include this operation, they are not written to exclude other ways that the interface device can

operate. Interpreting the Court's Claim Construction No. 3 to *require* this mode of operation unnecessarily excludes the modes of operation of disclosed embodiments of the disclosed subject matter that store the acquired data for indefinite periods of time and download the data later, upon the request of the host via a "second command interpreter" to transfer data ('399 claim 1) or to have the interface device "simulate[e] a virtual file system to the host…" ('449 claim 1).

Accordingly, infringement of the asserted claims may occur even if data acquired from the DTRD is relayed by the interface device to the host computer at subsequent times.

## IV.    The CMs Infringe via the Doctrine of Equivalents

Even if "when connected" were interpreted as the CMs posit, the equivalency test points to infringement. Infringement, either literal or under the doctrine of equivalents, is a question of fact. *IMS Tech., Inc. v. Haas Automation, Inc.,* 206 F.3d 1422, 1429 (Fed. Cir. 2000). An interface device that acquires, stores, and transmits *delayed* data is substantially the same as a structure with the same components but sending *live data while it is being acquired from the DTRD.* All that changes is the length of the time in memory – which is not addressed in either the claims or the Court's construction of the claims. The application of the doctrine of equivalents does not vitiate any claim element because no claim element says that data storage of a particular duration is required. Also, there is no contention of file history estoppel.

The issue boils down to whether there is a "substantial" or "insubstantial" difference between, on the one hand, having an interface device that receives data from an external DTRD and stores it in memory for an indefinite period of time before readout and, on the other hand, one where the storage in memory is very short so that the acquired data is outputted promptly. *Commonwealth Scientific and Industrial Research Organisation v. Buffalo Technology (USA), Inc.,* 542 F.3d 1363, 1385 (Fed. Cir. 2008) (proper inquiry is whether there are insubstantial

differences in way the "interleavers" operate on data and the result that is obtained; evidence permitted conclusion that accused device and structure patent interleave data in substantially similar manners and produce the same result); *Voda v. Cordis Corp.*, 536 F.3d 1311, 1326-27 (Fed. Cir. 2008) (expert testified that difference was so insubstantial that cardiologists would have difficulty distinguishing the two during use). The CMs' motion suggests no basis for finding this to be a substantial difference, and there is none.

There is equivalency because these two devices differ insubstantially at most. They perform the same function, work the same way, and reach the same result. This is explained by Dr. Locke in his discussion of the patents themselves. Figures 1 and 2 of the patents both show an interface device with a memory. The interface device acquires data from the DTRDs (in this case, external accessories) and processes that data. As Dr. Locke explains, the disclosed embodiments (1) can store the acquired data in memory 14 for later retrieval by the host computer, or (2) they can store the data and simultaneously send it to an attached host computer, or (3) they can simply run the incoming data through a short-term buffer and output it to the host computer with no permanent storage. (Locke Decl. ¶¶70) Whichever modality is chosen, the preferred embodiments acquire the inputted data and use some kind of memory for holding that data. *Id.* ¶¶170-71.

Papst doubts that resort to the doctrine of equivalents is required for this issue, given the Court's ruling that the DTRD itself is not a claim element, and the construction of a DTRD is merely to supply context to the structure that actually is claimed.[2] Whether the interface device

---

[2] The CMs infringe the challenged claim language literally. In responding to the CMs' summary judgment motion [Dkt #450] concerning the "second connecting device" on accused cameras, Papst shows that the cameras acquire data from various accessories that are connectable to the camera via sockets and connectors. The camera stores the acquired data as image data,
(footnote continued next page)

outputs live data or not, the DTRD is still a DTRD. It still produces data to the second

connecting device, and the interface device acquires it. The processor and associated circuits

(*e.g.,* the second command interpreter in '399 patent claim 1) cooperate to output that data.

Additionally, the <u>functions</u> are the same. Both the Tasler preferred embodiment used for

"real-time" operation and the accused products use a memory under control of the internal data

processor in the interface device. In both cases, function is the storage of data from the DTRD.

Locke Decl. ¶¶170-71.

Further, the <u>way they work</u> is the same. Data enters a memory and is stored there until

called for by the host computer. It is copied and read out from the memory at that time. The

interface device (accused camera or DVR) signals the host computer that it (the interface device/

accused camera or DVR) is an input/output device customary to the host device, specifically a

disk drive, and the host computer requests data from the "disk drive" which it believes the

interface device to be. The same signaling occurs and data is copied and read out in the same

way regardless of the duration of data storage in memory. Dr. Locke explains this operation

extensively in a comparison table. See Locke, ¶¶ 259, 284, 306.

Moreover, the <u>result</u> is the same. Data is acquired by the interface device (the camera or

DVR) from a connected DTRD (external accessory) and supplied to the host computer at such

---

sound files, or metadata using the EXIF format and such data is communicated by the camera to
a host computer. In the present motion, the CMs urge that there is no infringement because their
accused cameras and DVRs fail (allegedly) to develop live data, supply it to the accused product,
and have the accused product provide that live data to the host computer while all three devices
are connected together. Papst has shown that if the CMs' interpretation of the Court's claim
construction is indeed a requirement, then Papst requires discovery. Second, Papst shows that a
data transfer from the accused product to the host computer occurs when the host computer
becomes connected to the camera or DVR and requests a data transfer. This occurs regardless of
whether the accessory remains connected to the accused product at the time of the data transfer,
and the claim language at issue is met literally.

time as the host computer wants it.

The Tasler patents say that the interface device is configured so that it appears to be "an input/output device customary in a host device," '399 pat. claim 1, 13:4-5;  or a "hard disk," '399 claim 2, *id* at 13:18; or a "storage device customary in a host device," '449 pat. claim 1, 11:67. By doing this, Tasler achieves his objects of the invention of host device independence and a high data transfer rate from the interface device to the host, irrespective of "real-time" operations or not. Exactly the same thing happens in the case of the accused cameras and DVRs. The CMs admit in their motion that the camera appears to the host computer to be a "removable disk." [Dkt. #451] at 13, n.5. This permits a fast data read.

The CMs urge that the Doctrine of Equivalents cannot be used when doing so would "vitiate a claim limitation." *Id.* at 11. But they identify no such vitiation. They argue only that Papst in its Final Infringement Contentions did not allege that the external camera accessories are DTRDs within the meaning of the Tasler patents, *id.* at 14. To the contrary, however, Papst asserted the doctrine of equivalents in its Final Infringement Contentions. *See* [Dkt #416] at pp. 2-6, 10, 12-16, 22, 26-29, 31-32, 38-40, 46-47, 53, 56, 59, 71-72, 75, 77, and 307. Papst acted in accordance with this Court's Sixth PPO [Dkt #372] calling for Papst to state whether each limitation is asserted to be present in the Accused Instrumentality literally or under the doctrine of equivalents. *Id.* ¶2 quoted at Dkt #429 at 5.

The CMs argue that Papst is barred by the Sanctions Order from arguing the Doctrine of Equivalents. [Dkt. #451] at 9.  This is wrong.  Papst argued equivalency in its Final Contentions, and in the Sanctions Order [Dkt. #429] at 9, n. 7, this Court ruled that "infringement contentions are intended to provide notice and not to provide a forum for litigating substantive issues ..." Papst provided such notice and is accordingly permitted to argue the Doctrine of Equivalents.

## V.      Conclusion

Neither the Court's claim constructions nor the patents require the external accessories to generate data while a host computer is attached to the camera and have it passed by the camera (or digital voice recorder) to that computer *at that very same time*.

The CMs do not identify which products are the subject of this motion, but for all of the reasons set forth herein, the CMs' motion should be denied.

Respectfully submitted,


September 29, 2011                            /s/ Yasmin S. Schnayer
                                             James P. White
                                             Jerold B. Schnayer
                                             Daniel R. Cherry
                                             Walter J. Kawula, Jr.
                                             Joseph E. Cwik
                                             Yasmin S. Schnayer
                                             HUSCH BLACKWELL LLP
                                             120 South Riverside Plaza, 22nd Floor
                                             Chicago, Illinois 60606
                                             (312) 655-1500
                                             *Attorneys for Papst Licensing GmbH & Co. KG*

## CERTIFICATE OF SERVICE

The undersigned counsel for Plaintiff, Papst Licensing GmbH & Co. KG, hereby certifies that on September 29, 2011, a true and correct copy of the foregoing **[REDACTED] PAPST'S BRIEF IN OPPOSITION TO THE FIRST WAVE CAMERA MANUFACTURERS' MOTION (DKT #451 FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT OF THE '399 PATENT AND '449 PATENT BASED ON THE COURT'S CONSTRUCTION OF "DATA TRANSMIT/RECEIVE DEVICE")"** was filed with the Court and served electronically by the Court's CM/ECF System to all registered users.


/s/ Yasmin S. Schnayer
Yasmin S. Schnayer
Husch Blackwell LLP
120 S. Riverside Plaza, Suite 2200
Chicago, Illinois  60606
312 655-1500 (Tel)
312 655-1501 (Fax)

Counsel for Papst Licensing GmbH & Co. KG

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re Papst Licensing GmbH & Co. KG Patent Litigation | Misc. Action No. 07-493 (RMC) |
| | MDL Docket No. 1880 |
| This Document Relates To: | |
| ALL CASES | Hon. Rosemary M. Collyer |

[REDACTED]

PAPST'S LOCAL RULE 7(H) STATEMENT OF MATERIAL FACTS
IN OPPOSITION TO THE FIRST WAVE CAMERA MANUFACTURERS'
MOTION (DKT #451) FOR SUMMARY JUDGMENT OF NONINFRINGEMENT
RE "DATA TRANSMIT/RECEIVE DEVICE"

## TABLE OF CONTENTS

**Page**

I.    PAPST'S RESPONSE TO THE CMS' ASSERTED FACTS ...................................... 1

II.   PAPST SUBMITS THE FOLLOWING STATEMENT OF MATERIAL FACTS . 12

CERTIFICATE OF SERVICE ............................................................................... 18

i

I.      **PAPST'S RESPONSE TO THE CMS' ASSERTED FACTS**

The CMs designate their asserted material facts (Dkt. #451 beginning at ECS file

page 17, et seq.) as "SMF." Papst hereby responds pursuant to LCvR 7(h) and then submits its

own statement of issues and statement of facts.

> **SMF 1.** Each of the asserted claims of U.S. Patent No. 6,470,399 ("'399 patent")
> and U.S. Patent No. 6,895,449 ("'449 patent") requires an "interface device" that
> can transmit data from a "data transmit/receive device" to a host device.

**Response: Papst does not deny that each of the asserted claims of the '399 and '449 Patents**

**cover "interface devices" and that data from an attached data transmit/receive device**

**consistent with the various claim construction rulings of the Court can be processed and**

**ultimately that processed information at some time is transmittable from the interface**

**device to a number of host devices, consistent with the Court's claim construction rulings.**

**Papst denies the remainder of this SMF, which is confusing as to which of the particular**

**claim construction rulings or claim elements it is referring to.**

> **SMF 2.** The Court construed the "data transmit/receive device" term of the claims of the
> '399 and '449 patents to mean "a device that is capable of either (a) transmitting data to
> or (b) transmitting data to and receiving data from the host device when connected to the
> host device by the interface device."
>
> **Citation:** Modified Order Regarding Claims Construction at 2 [Dkt. No. 337];
> Modified Memorandum Opinion Regarding Claims Construction at 31 [Dkt. No.
> 336].

**Response: Papst denies that the citations for this SMF are for the correct claim terms**

**stated in the body of the SMF.  Papst does not deny that the CMs have accurately stated in**

**quotes the Court's claim construction ruling with regard to this particular claim term.**

> **SMF 3.** Papst's Revised Asserted Claims and Infringement Contentions ("Final
> Infringement Contentions") include claim charts based on cameras that can
> communicate with a computer in Mass Storage Class ("MSC") mode.
>
> **Citation:** Papst's Final Infringement Contentions at 4, 51-78 [Dkt. No. 416].

**Response:** Does not deny that some of the Final Infringement Contentions include claim charts based on cameras that are "MSC Capable Devices" as that term is described in Papst's Final Infringement Contentions. Some of the claim charts are not. Also see paragraphs 231-259, 306-314, 488-559d, and 568-626 of Locke's Declaration which are incorporated herein by reference which describe, inter alia, how the CMs' Accused Products operate with respect to the MSC mode.

> **SMF 4.** Papst contends that the products identified in Tables 12-13 of its Final Infringement Contentions ("Accused Cameras") infringe the '399 and '449 patents in MSC mode.
>
> **Citation:** Papst's Final Infringement Contentions at 220-286 [Dkt. No. 416].

**Response:** Papst does not deny that Table 12 states, "MSC Capable Devices that infringe the '399 Patent." Papst does not deny that Table 12 lists (1) various models of CM Accused Products that operate in an MSC mode and (2) the various claims of the '399 Patent infringed by each model. Papst does not deny that Table 13 of its Final Infringement Contentions states, "MSC Capable Devices that infringe the '449 Patent." Papst does not deny that Table 13 lists (1) various models of CM Accused Products that operate in an MSC mode and (2) the various claims of the '449 Patent infringed by each model. Papst denies the remaining asserted facts in SMF 4.

> **SMF 5.** Papst contends that audio and audio/visual sources are "data transmit/receivedevices [sic]."
>
> **Citation:** Papst's Final Infringement Contentions at 6-7, 22; Table 1, pp. 79-86 [Dkt. No. 416].

**Response:** Papst does not deny that a skilled person would understand that Papst's Final Infringement Contentions state that there are a number of different kinds of dissimilar electronic devices that are attachable to the "audio" connectors and "audio/visual" connectors of the CMs' Accused Products and that such devices are "data transmit/receive

devices." **Also see paragraphs 370-374 and 417-436 of Locke's Declaration which are**

**incorporated herein by reference.  Papst denies the remaining factual assertions in SMF 5.**

> **SMF 6.** Papst contends that flashes are "data transmit/receive devices."
>
> **Citation:** Papst's Final Infringement Contentions at 7-8, 22-23; Table 2, pp. 87-89 [Dkt. No. 416].

**Response: Papst does not deny that various kinds of dissimilar flash units that operate**

**differently are "data transmit/receive devices."  Also see paragraphs 370-374 and 437-463**

**of Locke's Declaration which are incorporated herein by reference where Dr. Locke (1)**

**describes various kinds of flash units, and other dissimilar electronic devices, that can be**

**connected to the "accessory shoe" connector of certain CM Accused Products, (2) why**

**those "data transmit/receive devices" are dissimilar, and (3) why Papst's Final**

**Infringement Contentions describes these devices.**

> **SMF 7.** Papst contends that "external data devices," such as a "GPS unit," a "bar code scanner unit" and a "remote control device" are "data transmit/receive devices."
>
> **Citation:** Papst's Final Infringement Contentions at 8-9, 23-24; Table 3, p. 90 [Dkt. No. 416].

**Response: Papst does not deny that in its Final Infringement Contentions it described**

**various dissimilar external electronic devices, such as various kinds of GPS units, bar code**

**scanners and remote control devices, that are "data transmit/receive devices."  Also see**

**paragraphs 370-374 and 464-468 of Locke's Declaration which are incorporated herein by**

**reference.  Papst denies that it characterizes such devices as "external data devices," and**

**denies all other assertions in SMF 7.**

> **SMF 8.** Papst contends that lenses are "data transmit/receive devices."
>
> **Citation:** Papst's Final Infringement Contentions at 9, 24-25; Table 4, pp. 91-92 [Dkt. No. 416].

**Response:** Papst does not deny that it contends that all lenses are "data transmit/receive devices." See, for example, paragraphs 469-474 of Locke's Declaration which are incorporated herein by reference. Papst contends that there are a number of different types of electronic lenses and other electronic devices that have different kinds of internal electric circuitry and that are dissimilar data transmit/receive devices that can be attached to various ones of the CMs' Accused Products as stated in Papst's Final Infringement Contentions.

> **SMF 9.** Papst contends that printers having PictBridge functionality are "data transmit/receive devices."
>
> **Citation:** Papst's Final Infringement Contentions at 10, 25-26; Table 6, pp. 125-143 [Dkt. No. 416].

**Response:** Papst does not deny that it contends in its Final Infringement Contentions that various kinds of printers having PictBridge functionality are dissimilar "data transmit/receive devices." See paragraphs 486-487 of Locke's Declaration, which are incorporated herein by reference and which discuss Papst's Final Infringement Contentions with respect to this subject and describes a number of different kinds of dissimilar printers that operate differently.

> **SMF 10.** When the Accused Cameras are connected to a computer in MSC mode, the cameras no longer function as cameras.
>
> **Citation:** Declaration Of Paul E. Berg In Support Of The First Wave Camera Manufacturers' Motion For Summary Judgment Of Non-Infringement With Respect To The "Data Transmit/Receive Device" Claim Limitation ("Berg Declaration") at ¶ 50 (Exhibit C).

**Response:** Denied. The statement in paragraph 50 of Mr. Berg's declaration do not support SMF 10. Also see paragraphs 357-364, 509-567 of Dr. Locke's Declaration, and particularly paragraphs 540-559d of Dr. Locke's Declaration, which are hereby incorporated by reference, that point out the many false and misleading statements in the

Berg declaration about these tests.  Further, Papst objects to the Declaration of Paul E.

Berg as unreliable, lacking in foundation, misleading, and containing numerous false

statements based on the paragraphs of Dr. Locke's Declaration identified in this response.

Also see paragraphs 488-508 of Dr. Locke's Declaration which are hereby incorporated by

reference and which are relevant to this subject.  The basis for these objections are also

explained in Papst's accompanying brief in opposition to the CMs' motion.

> **SMF 11.** When the Accused Cameras are connected to a computer in MSC mode,
> the computer takes control of the camera's memory [so] that it can access (the
> "MSC memory").
>
> **Citation:** Berg Declaration at ¶ 17 (Ex. C).

**Response: Denied.  See Locke Decl. paragraphs 357-364, 509-567, and particularly**

**paragraphs 520-523.  Papst objects to the Declaration of Paul E. Berg as unreliable, lacking**

**in foundation, misleading, and containing numerous false statements based on the**

**paragraphs of Dr. Locke's Declaration identified in this response.  Also see paragraphs**

**488-508 of Dr. Locke's Declaration which are hereby incorporated by reference and which**

**are relevant to this subject.  The basis for these objections are also explained in Papst's**

**accompanying brief in opposition to the CMs' motion.**

> **SMF 12.** When the Accused Cameras are connected to a computer in MSC mode,
> the computer can access the images previously stored on the camera.
>
> **Citation:** Berg Declaration at ¶¶ 17, 19 (Ex. C).

**Response: Papst objects to this SMF because it is unclear what is meant by "the computer**

**can access the images previously stored on the camera."  The cameras do not store images,**

**they store data representative of images.  Such data is stored in the memory chips of a**

**camera as described in paragraphs 231-259 of Dr. Locke's Declaration which are**

**incorporated herein by reference.  Those paragraphs describe the process by which a host**

computer connected to the accused cameras can access the data stored in the camera's

memories that is representative of images.  Papst also objects to the Declaration of Paul E.

Berg as unreliable, lacking in foundation, misleading, and containing numerous false

statements based on the paragraphs of Dr. Locke's Declaration identified in this response.

Also see paragraphs 488-567 of Dr. Locke's Declaration which are hereby incorporated by

reference and that comment on the many inaccurate and misleading statements in the Berg

declaration.  Particularly see paragraphs 520-523 and 526-527 of Dr. Locke's Declaration

which specifically address the inaccuracies in paragraphs 17 and 19 of the cited Berg

declaration.  The basis for these objections are also explained in Papst's accompanying

brief in opposition to the CMs' motion.

> **SMF 13.** When the Accused Cameras are connected to a computer in MSC mode,
> the camera only transmits data explicitly requested by the computer.

> **Citation:** Berg Declaration at ¶ 16 (Ex. C).

<u>Response</u>: Denied. The CMs reference paragraph 16 of the Berg Declaration as a citation

to their response.  In paragraphs 515-519 of Dr. Locke's Declaration which are

incorporated herein by reference, Dr. Locke explains why the statements contained in

paragraph 16 of the Berg Declaration are wrong.  In addition, Papst needs additional

discovery to know when the Accused Products are connected to a computer in the MSC

mode.  For example, the CMs' products operate in what are called "back door" modes.  In

paragraphs 357-364 and 560-567 of Dr. Locke's declaration which are incorporated herein

by reference, Dr. Locke explains why in his opinion information is needed to know whether

the Accused Cameras operating in these back door modes are operating in the "MSC

mode."  Dr. Locke also addresses what documents are needed in this regard in these

paragraphs of Locke's Declaration.  Further, Papst objects to the Declaration of Paul E.

Berg as unreliable, lacking in foundation, misleading, and containing numerous false

statements based on the paragraphs of Dr. Locke's Declaration identified in this response.

See paragraphs 509-559d of Dr. Locke's Declaration which are hereby incorporated by

reference and are relevant to this subject.   The basis for these objections are also explained

in Papst's accompanying brief in opposition to the CMs' motion.

> **SMF 14.** When the Accused Cameras are connected to a computer in MSC mode,
> no data is transmitted from any External Accessory2 through the camera to the
> connected computer.
>
> **Citation:** Berg Declaration at ¶¶ 20, 49, 51-52 (Ex. C).

**Response: Denied.** Papst incorporates herein by reference paragraphs 528-537 and 540-

559d of Dr. Locke's Declaration.   Further, Papst objects to the Declaration of Paul E. Berg

as unreliable, lacking in foundation, misleading, and containing numerous false statements

based on the paragraphs of Dr. Locke's Declaration identified in this response.   Also see

paragraphs 488-527, 538-539, and 560-567 of Dr. Locke's Declaration which are hereby

incorporated by reference and are relevant to this subject.   The basis for these objections

are also explained in Papst's accompanying brief in opposition to the CMs' motion.

> **SMF 15.** Mr. Berg confirmed that cameras do not function as cameras when
> connected to a computer in MSC mode.
>
> **Citation:** Berg Declaration at ¶ 50 (Ex. C).

**Response: Denied** that Mr. Berg confirmed that cameras do not function as cameras when

connected to a computer in MSC mode.   The CMs cite ¶ 50 of the Berg Declaration, and

Mr. Berg does not confirm this statement in ¶ 50.   Dr. Locke discusses the tests performed

by Mr. Berg referred to in SMF 15 and explains why those tests do not support the CMs'

assertion that Mr. Berg confirmed that cameras do not function as cameras when

connected to a computer in MSC mode.   See paragraphs 509-559d of Dr. Locke's

Declaration which are incorporated herein by reference.  Further, Papst objects to the

Declaration of Paul E. Berg as unreliable, lacking in foundation, misleading, and

containing numerous false statements based on the paragraphs of Dr. Locke's Declaration

identified in this response.  Also see paragraphs 488-508 and 560-567 of Dr. Locke's

Declaration, which are hereby incorporated by reference.  The basis for these objections

are also explained in Papst's accompanying brief in opposition to the CMs' motion.

> **SMF 16.** Mr. Berg confirmed, by using a bus analyzer that monitors all communications on the USB connection between a computer and attached device, that no data was transmitted from any External Accessory to the computer when connected to an Accused Camera in MSC mode.
>
> **Citation:** Berg Declaration at ¶¶ 49, 51-52 (Ex. C).

**Response:** Denied.  See paragraphs 509-559d of Dr. Locke's declaration and particularly

paragraphs 558-559c, in which Dr. Locke discusses the tests performed by Mr. Berg

referred to in SMF 16 and explains why those tests do not support the CMs' assertions in

SMF 16.  Further, Papst objects to the Declaration of Paul E. Berg as unreliable, lacking in

foundation, misleading, and containing numerous false statements based on the paragraphs

of Dr. Locke's Declaration identified in this response.  Also see paragraphs 488-508 and

560-567 of Dr. Locke's Declaration, which are hereby incorporated by reference and are

relevant to this subject.  The basis for these objections are also explained in Papst's

accompanying brief in opposition to the CMs' motion.

> **SMF 17.** Mr. Berg's analysis of the cameras' memory verified that the External Accessories did not store any data on the cameras' MSC memory when connected to a computer in MSC mode.
>
> **Citation:** Berg Declaration at ¶ 53 (Ex. C).

**Response:** Denied.  See paragraphs 509-567 of Dr. Locke's Declaration which are

incorporated herein by reference and which support the conclusion that Mr. Berg's

analysis of the camera memories do not verify that the External Accessories do not store any data in the memory chips of the cameras when connected to a computer in the MSC mode. Further, Papst objects to this SMF because it is unclear what is meant by the cameras' "MSC memory." Papst also objects to the Declaration of Paul E. Berg as unreliable, lacking in foundation, misleading, and containing numerous false statements based on the paragraphs of Dr. Locke's Declaration identified in this response. Also see paragraphs 488-508 of Dr. Locke's Declaration, which are hereby incorporated by reference and are relevant to this subject. The basis for these objections are also explained in Papst's accompanying brief in opposition to the CMs' motion.

> **SMF 18.** In its Final Infringement Contentions, Papst did not set forth any argument that any of the External Accessories meet the "data transmit/receive device" claim limitation of either the '399 or '449 patents under the doctrine of equivalents.
>
> **Citation:** Papst's Final Infringement Contentions, *passim* [Dkt. No. 416].

**Response:** Papst objects to this SMF because the term "data transmit/receive device" is not a claim limitation. [Dkt. # 336, p. 27] This is discussed extensively in Section III of Papst's accompanying brief in opposition to the CMs' motion, which is incorporated herein by reference. Moreover, the CMs' motion applies an interpretation of the term "data transmit/receive device" that is different than the Court's definition of the term "data transmit/receive device." To the extent the CMs' are requesting the Court to further construe the term "data transmit/receive device" or to further construe other terms in the claims of the Tasler Patents in the guise of addressing "data transmit/receive device," Papst objects and believes that any further construction of any terms is contrary to the Court's express indications. To the extent any allegations remain, denied. [Dkt. # 416, pp. 4-5.]

Moreover, Papst did explain why the various attachments are DTRDs that connect to various connectors on the accused products. See, for example, ¶¶ 412-487 of Dr. Locke's Declaration which are hereby incorporated by reference and which explain (1) several dissimilar data transmit/receive devices that can be attached to the CMs' Accused Products and (2) that Papst's Infringement Contentions explain these dissimilar devices. Papst's Final Infringement Contentions also state that Further, Papst objects to this SMF because it is unclear what is meant by the cameras' "External Accessories."

> **SMF 19.** "Papst is barred from advancing any arguments for infringement, or against the Camera Manufacturers' claims of noninfringement, that are not set forth specifically and explicitly in the Final Contentions."
>
> **Citation:** Order on Camera Manufacturers' Motion for Sanctions ¶ 3 [Dkt. No. 430].

**Response:** To the extent SMF 19 quotes a part of the Court's Order on the CMs' Motion For Sanction, Papst does not deny that the quoted portions state what is in the quotes. [Dkt. # 430, ¶ 3.] However, SMF 19 is denied because it is a legal conclusion, not a material "fact," and is only a quote from the Court's Order and does not refer to the Memorandum Opinion that explains relevant aspects of the Court's reasoning. For example, the Court stated in the Memorandum Opinion on this issue that: "Infringement contentions are intended to provide notice and not to provide a forum for litigating substantive issues ..." [Dkt. #429 at p. 9, n. 7.] Papst provided such notice and is accordingly permitted to argue the Doctrine of Equivalents. See paragraphs 412-487 of Dr. Locke's Declaration, which are incorporated herein by reference, that explain how Papst's Final Infringement Contentions provided such notice and pp. 4-5 of Papst's Final Infringement Contentions that state that the CMs' Accused Products infringe under the doctrine of equivalents [Dkt. # 416, pp. 4-5]. Moreover, the CMs have asserted claim constructions in their summary judgment motions

that (1) are inconsistent with the Court's prior claim construction rulings and/or (2) are additional constructions of the Court's current claim construction. Papst should be allowed to address these new issues.

> **SMF 20.** "Papst is barred from modifying its Revised Final Asserted Claims and Infringement Contentions [Dkt. No. 416]."
>
> **Citation:** Order on Camera Manufacturers' Motion for Sanctions ¶ 1 [Dkt. No. 430].

**Response**: To the extent SMF 20 quotes a part of the Court's Order on the CMs' Motion For Sanction, admitted. [Dkt. # 430, ¶ 3.] However, SMF 20 is denied because it is a legal conclusion, not a material "fact," and is only a quote from the Court's Order and does not refer to the Memorandum Opinion that explains relevant aspects of the Court's reasoning. Moreover, the CMs have asserted claim constructions in their summary judgment motions that (1) are inconsistent with the Court's prior claim construction rulings and/or (2) are additional constructions of the Court's current claim construction. Papst should be allowed to address these new issues.

## II.     PAPST SUBMITS THE FOLLOWING STATEMENT OF MATERIAL FACTS

**Court Rulings, Prior Documents Filed With the Court, Etc.**

**Papst Fact 1.**     This Court ruled that "data transmit/receive devices" (DTRDs) are <u>not</u> part

of the claims, as follows:

> Mr. Tasler did not invent a [DTRD] *** The Court agrees that it should not define
> the nature of a [DTDR]. What is at issue, however, is the communication
> capability between the invented interface device and a [DTDR], which is very
> much part of construing the Claims, and the Court construes [DTDR] in this
> context.

[Dkt #336 at p. 27].

**Papst Fact 2.**     The Court construed the term "data transmit/receive device" as follows:

> 3.     The term "data transmit/receive device" means a device that is capable of
> either (a) transmitting data to or (b) transmitting data to and receiving data from
> the host device when connected to the host device by the interface device."

[Dkt #337 at 2].

**Papst Fact 3.**     The Court construed DTRD only for context in the Tasler patent claims.

[Dkt #336 at 27 ("…and the Court construes 'data transmit/receive device' in this context").

**Papst Fact 4.**     The Court did <u>not</u> construe the asserted Tasler patent claims as having a

requirement that the DTRDs must actively send "live" data to the host computer via the camera

while all three are connected together. *See* Dkt ## 336-337.

**Papst Fact 5.**     The Court construed "for communication between" as follows:  4.  The

phrase term "for communication between" the host and the data transmit/receive device means

"for transmitting data either (a) from the data transmit/receive device to the host or (b)

bidirectionally between the host and the transmit/receive device." Dkt. # 337, p. 2.

**Papst Fact 6.**     Papst previously stated to the Court:

Furthermore, the Other CMs are twisting the Court's claim construction when they argue that the transfer of data to the computer must be at the same time it is acquired from the data transmit/receive device. They had asked the Court to construe the claims to require that the "communication between" the computer and data transmit/receive device be done "actively," i.e., in "real-time." Doc. No. 188 at 22. The Court did not include that in its claim construction. Doc. Nos. 312 at 30; 336 at 32. The Other CMs are trying to slide that "actively" concept in through the back door of the term "data transmit/receive device." A data transmit/receive device is not an element of the interface device that needs to be present for infringement; that term was construed by the Court only as context for language later in the claims. Doc. No. 336 at 27.

Dkt #366, p.3.

**Papst Fact 7.**    The CMs previously urged that the Tasler patent claims require the interface device to be a "conduit" that operates "actively" to obtain data in "real-time." In their Opening Markman Brief [Dkt. #188], the CMs urged that the claim phrase "communication between" meant transmitting information bidirectionally and actively between two devices. *Id.* at 21. They urged that "actively" means having "real-time" activity:

> The communication must also be active. The plain meaning of "communication" requires an active engagement. Thus, for two devices to be in communication, there must be some real-time activity between them.

*Id.* at 22. *See also*, CMs' Opening Markman Brief [Dkt. #188] at 47 ("real-time streaming data"); Markman Hearing Tr. at 45:20 (Sept. 22, 2008) (Counsel for Olympus: "very quickly real time"); "conduit" *id.* at 43:23, 48:10, 48:16, 50:7; Tr. Sept. 23, 2008: 68:4 ("conduit for realtime data transfer"); 139:11-12 ("interface device is really just this conduit"); 141:20 ("just a conduit"); Tr. Sept. 24, 2008 25:12-17 ("The patent always universally in every case describes the data coming from the [DTRD] as coming through what they call the realtime input file which isn't actually a file at all but is the ruse or trick of lowing the realtime input to the host and making it look like a file. So the data files are never stored anywhere" [*sic*].); pp. 26-27 *passim* (same); CMs' Opposition to Papst's Req. for Clarification and Reconsideration [Dkt #323], pp. 10-11 ("actively"); CMs' Proposal ...[Dkt #352] at 2, n. 3 (camera used as "mere conduit");

Mot. For Summ. Jdgmt. [Dkt #452] at 6 ("transient stream"), 9 ("transient, real-time stream"), and 10 ("interface device of '449 patent is a conduit for transferring a transient stream of data …").

**Papst Fact 8.**    Papst asserted the doctrine of equivalents in its Final Infringement Contentions. *See* Dkt #416 at pp. 2-6, 10, 12-16, 22, 26-29, 31-32, 38-40, 46-47, 53, 56, 59, 71-72, 75, 77, and 307.

**Papst Fact 9.**    This Court's Sixth Practice & Pretrial Order Dkt #372 called for Papst to state whether each limitation is asserted to be present in the Accused Instrumentality literally or under the doctrine of equivalents. *Id.* ¶2 quoted at Dkt #429, p. 5.

**Papst Fact 10.**    In the Sanctions Order [Dkt. #429] at p. 9, n. 7, the Court ruled that "infringement contentions are intended to provide notice and not to provide a forum for litigating substantive issues …" Papst provided such notice.


**Discovery**

**Papst Fact 11.**    The CMs have not produced to Papst the source codes for the accused products.

**Papst Fact 12.**    The CMs have not produced the service manuals for the accused products.

**Papst Fact 13.**    Papst requires discovery to determine the material facts on the structure and operation of the accused products, especially their source code and various modes of operation, some of which are not public.  Locke Decl. ¶¶ 560-67.  Papst has not had access to these confidential documents from the CMs.

**Papst Fact 14.**    Papst has not had sufficient discovery into the source code, documentation, testimony, and other information needed to explore the back door modes of

operation available in the accused products. This discovery is necessary, as Dr. Locke

comprehensively explains. Locke Decl. ¶¶ 560-67. The publicly-available user manuals are

insufficient to provide the level of technical information needed to address the infringement

issues in detail. *Id.* ¶678-90.

**Papst Fact 15.**   The CMs have not provided evidence to Papst on how data acquired from

attachable devices is processed in the accused products or sent to a host computer.

**Papst Fact 16.**   The CMs have not provided evidence to Papst on whether live data can be

obtained from attached devices and transferred in MSC mode by an accused product to a host

computer.


**<u>Accused Products</u>**

**Papst Fact 17.**   The accused products have "back door" access that allows the

performance of functions that the accused products ordinarily would not perform, so far as

known to general users of the camera from reading the user manual. *See generally*, Locke Decl.

Section VI, ¶¶357-64 entitled, "VI. The CMs' Accused Products Have "Back Door" Modes Of

Operation, And More Information Is Needed Concerning Them."

**Papst Fact 18.**   There is evidence that digital cameras have such "back doors."



Dr. Locke attests, "A 'back door' is a special

operation designed to permit someone with special knowledge to perform functions unavailable

to typical purchasers of the product." *Id.* at ¶556.

**Papst Fact 19.**   The CMs have not produced documents or other information sufficient to allow Papst to examine the back door modes of the accused products.


## The CMs' Test Evidence

**Papst Fact 20.**   Mr. Berg, the technical witness hired by the CMs, performed a test on some cameras and reports findings in his declaration at Dkt. 451-3 ¶¶21-53.

**Papst Fact 21.**   Papst challenges the testimony of Mr. Berg as technically incomplete, faulty, unable to support scientific conclusions, and rife with problems. Locke Decl. ¶¶510-559d; see generally, *Id.* ¶¶488-559d.

**Papst Fact 22.**   Mr. Berg does not indicate that he tested any other modes of operation of the accused cameras, such as the diagnostic ones.

**Papst Fact 23.**   Mr. Berg does not say that he knew about any other modes of operation of the accused cameras, such as the diagnostic ones.

**Papst Fact 24.**   If Mr. Berg did test other modes, he does not indicate what the results were.

**Papst Fact 25.**   There is reason to believe that in a diagnostic mode, there would be full or substantial functionality so that diagnostics can in fact be performed.

**Papst Fact 26.**   Dr. Locke attests that to evaluate of the operation of the CMs' cameras from an infringement perspective, he would need to analyze the source code files used to generate the firmware (computer software) that is contained in each of the accused products. *Id.* at ¶559. Mr. Berg is silent on whether he made any such study or whether he had access to source code for the cameras he tested.

**The Tasler Patents**

**Papst Fact 27.**   Persons in the art would not understand that either of the Tasler patents is limited to an interface device that provides streaming data or requires operation in "real time." Locke Decl. ¶¶560-567 and references cited therein.

**Papst Fact 28.**   None of the independent claims of the Tasler patents contains language that calls for streaming data or requires operation in "real time." *See generally*, '399 patent claims 1, 11, 14; '449 patent claims 1, 17, 18.

**Evidence of Infringement via the Doctrine of Equivalents**

**Papst Fact 29.**   Dr. Locke explains why he believes the accused products are equivalent to the claimed invention in function, way, and result. Locke Decl. ¶¶170-71, 259, 284, 306.

**Papst Fact 30.**   Dr. Locke explains that the CMs' accused products operating in the mass storage class mode operate the same way as an example in the Tasler patents. Locke Decl. ¶¶231-259.

Respectfully submitted,

Dated:  September 29, 2011

/s/ Yasmin S. Schnayer
James P. White
Jerold B. Schnayer
Daniel R. Cherry
Walter J. Kawula, Jr.
Joseph E. Cwik
Yasmin S. Schnayer
HUSCH BLACKWELL LLP
120 South Riverside Plaza, 22nd Floor
Chicago, Illinois 60606
(312) 655-1500

*Attorneys for Papst Licensing GmbH & Co. KG*

**CERTIFICATE OF SERVICE**

The undersigned counsel for Plaintiff, Papst Licensing GmbH & Co. KG, hereby certifies that on September 29, 2011, a true and correct copy of the foregoing **[REDACTED] PAPST'S LOCAL RULE 7(H) STATEMENT OF MATERIAL FACTS IN OPPOSITION TO THE FIRST WAVE CAMERA MANUFACTURERS' MOTION (DKT #451) FOR SUMMARY JUDGMENT OF NONINFRINGEMENT RE "DATA TRANSMIT/RECEIVE DEVICE"** was filed with the Court and served electronically by the Court's CM/ECF System to all registered users.

/s/ Yasmin S. Schnayer
Yasmin S. Schnayer
Husch Blackwell LLP
120 S. Riverside Plaza, Suite 2200
Chicago, Illinois  60606
312 655-1500 (Tel)
312 655-1501 (Fax)

*Counsel for Papst Licensing GmbH & Co. KG*