**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|   |   |
|---|---|
| | ) |
| **IN RE PAPST LICENSING GMBH & CO. KG** | ) |
| **LITIGATION** | ) |
| | )    **Misc. Action No. 07-493 (RMC)** |
| **This document relates to** | ) |
| | )    **MDL No. 1880** |
| **ALL CASES** | ) |
| | ) |
| | ) |
_____ )

**MEMORANDUM OPINION  RE: CAMERA MANUFACTURERS' MOTION FOR
SUMMARY JUDGMENT OF NONINFRINGEMENT WITH RESPECT TO THE
"DATA TRANSMIT/RECEIVE DEVICE" CLAIM LIMITATION**

Papst Licensing GmbH & Co. KG, a German company, sues multiple

manufacturers of digital cameras for alleged infringement of two patents owned by Papst: U.S.

Patent Number 6,470,399 (399 Patent) and U.S. Patent Number 6,895,449 (449 Patent).  The

Camera Manufacturers[1] have moved for summary judgment of noninfringement with respect to

the "data transmit/receive device" claim limitation in both Patents, asserting that when accused

devices (basically, digital cameras) operate in Universal Serial Bus (USB) Mass Storage Class

---

[1] This Multi District Litigation currently consists of First and Second Wave Cases.  The "First
Wave Cases" are: _Fujifilm Corp. v. Papst_, 07-cv-1118; _Matsushita Elec. Indus. Co., Ltd. v.
Papst_, 07-cv-1222; _Papst v. Olympus Corp._, 07-cv-2086; _Papst v. Samsung Techwin Co._, 07-cv-
2088; _Hewlett-Packard Co. v. Papst_, 08-cv-865; and _Papst v. Nikon Corp._, 08-cv-985.  The
"Second Wave Cases" currently are:  _Papst v. Canon_, 08-cv-1406; _Papst v. Eastman Kodak_, 08-
cv-1407; _Papst v. Sanyo_, 09-cv-530.  The Camera Manufacturers seeking summary judgment
here are parties in the First Wave Cases; they are:  Fujifilm Corporation; Fujifilm U.S.A., Inc.;
Fujifilm Japan; Matsushita Electric Industrial Co., Ltd.; Victor Company of Japan, Ltd.;
Olympus Corporation; Olympus Imaging America Inc.; Samsung Techwin Co., Ltd.; Samsung
Opto-Electronics America, Inc.; Panasonic Corporation of North America; JVC Company of
America; Hewlett-Packard Company (HP); Nikon Corporation; and Nikon, Inc.  Papst's
infringement contentions against HP have been stricken and discovery has been stayed.

(MSC) mode they do not infringe the Patents as alleged.  Papst contends that specific external accessories such as lenses, flashes, GPS units, and printers constitute data transmit/receive devices within the meaning of the Patents because such accessories can transmit data to a computer via a camera operating in MSC mode.  However, Papst fails to back up its argument with any evidence that contravenes the Camera Manufacturers' evidence that when the accused cameras are connected to a computer in MSC mode, the specified accessories do not and cannot transmit any data through the camera to the computer.  Thus, such accessories do not and cannot meet the "data transmit/receive device" limitation in the Patents when the camera is in MSC mode.  Papst fails to point to any genuine disputes over issues of material fact.  The Camera Manufacturers' motion for summary judgment will be granted.

## I.  FACTS[2]

Papst alleges that certain accused devices manufactured and/or sold by the Camera Manufacturers are "interface devices" that infringe Claims 1-3, 5, 7, 11, and 14-15 of the 399 Patent and Claims 1-2, 6-9, 12-13, and 15-18 of the 449 Patent.  The accused products include digital cameras, camcorders, and digital voice recorders.

Each of the asserted Patent Claims requires a "data transmit/receive device" that can transmit data to a computer via the invention, an "interface device."  For example, Claim 1 of the 449 Patent states:

What is claimed is:

1.  An interface device for communication between a host device, which comprises drivers for input/output devices customary in a

---

[2] This motion is one of eight filed by the Camera Manufacturers.  In the interest of timely disposition of all, the Court does not recite the full background and assumes familiarity with its prior rulings.  *See, e.g.,* Modified Claims Construction Op. [Dkt. 336]; Sanctions Op. [Dkt. 429].

host device and a multi-purpose interface, and *a data transmit/receive device* comprising the following features:

a processor;

a memory;

a first connecting device for interfacing the host device with the interface device via the multi-purpose interface of the host device; and

a second connecting device for interfacing the interface device with the data transmit/receive device,

wherein the interface device is configured by the processor and the memory in such a way that the interface device, when receiving an inquiry from the host device as to the type of a device attached to the multi-purpose interface of the host device, sends a signal, regardless of the type of the *data transmit/receive device* attached to the second connecting device of the interface device, to the host device which signals to the host device that it is a storage device customary in a host device, whereupon the host device communicates with the interface device by means of the driver for the storage device customary in a host device, and

wherein the interface device is arranged for simulating a virtual file system to the host, the virtual file system including a directory structure.

449 Patent, Claim 1, 11:45-67 & 12:1-6 (emphases added); 399 Patent, Claim 1, 12:41-67 & 13:1-13 (as relevant here, the same as the 449 Patent).[3]

The Court construed the contested claims of the 399 and 449 Patents, finding that the term "data transmit/receive device" means "a device that is capable of either (a) transmitting data to *or* (b) transmitting data to and receiving data from the host device *when connected to the host device by the interface device*." Modified Claims Construction Op. [Dkt. 336] (Claims

---

[3] Citations to the Patents are to "column number: line number." The "interface device" was invented and patented by Michael Tasler, who sold the Patents to Papst. The invention was never produced or used.

Constr. Op.) at 31 (emphasis added); *see also* Order [Dkt. 337] at 2.[4]  The immediate motion for summary judgment is based on the "data transmit/receive device" claim limitation and the Court's determination that a data transmit/receive device is a device capable of data transmission "*when connected to the host device by the interface device*" — that is, when the data transmit/receive device is attached to the invented interface device and thereby connected to the host computer.

The invention at issue is a "Flexible Interface for Communication Between a Host and an Analog I/O Device Connected to the Interface Regardless of the Type of the I/O Device." 399 Patent, Title; 449 Patent, Title.  An I/O device is an input/output device, repeatedly referred to as a "data transmit/receive device" in the Patents.  *See, e.g.*, 399 Patent 3:43-44 & 13:1-2; 449 Patent 4:6-7 & 11:63-64.  A "host" is a computer.  The 449 Patent is a continuation or divisional patent[5] that is quite similar to the 399 Patent.  They share the same block diagram drawings, Figures 1 and 2.  *See, e.g.*, 399 Patent 9:15-16 ("Figure 2 shows a detailed block diagram of an interface device, according to the present invention"); 449 Patent 8:15-16 (same).  The 399 and 449 Patents also share much of the same specification.

The "interface device" is designed to provide data transfer between a data transmit/receive device and a computer without the need for special software; this is

---

[4] The contested terms were almost entirely within Claim One of each Patent.  Pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996), a court is required to construe the contested claims of the patents before a jury can determine whether the accused products infringe.  In claims construction, a court must interpret the words of each contested claim from the perspective of one skilled in the art at the time of invention, in light of the patent documents and the prosecution history.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005).

[5] The 399 Patent was issued on October 22, 2002, with an application date of March 3, 1998; the 449 Patent was issued on May 17, 2005, with an application date of August 15, 2002.  Because it is a continuation patent,  Papst asserts that the 449 Patent has priority dating back to the 399 Patent.

accomplished by telling the computer that the interface device is a transmit/receive device already known to the computer (and for which the computer already has drivers, i.e., software), regardless of what kind of data transmit/receive device actually is attached to the interface device.  399 Patent, Abstract; 449 Patent, Abstract.  The Patents are "based on the finding that both a high data transfer rate and host device-independent use can be achieved if a driver for an input/output device customary in a host device, normally present in most commercially available host devices, is utilized," instead of special driver software.  399 Patent 4:23-27; 449 Patent 3:27-31 (same); *see also* 399 Patent 6:19-22 (in the preferred embodiment, "[r]egardless of which data transmit/receive device at the output line 16 is attached to the second connecting device, the digital signal processor 13 informs the host device that it is communicating with a hard disk drive"); 499 Patent 5:19-22 (same).[6]  Thus, the purpose of the invention is "to allow fast communication between dissimilar data transmit/receive devices and computers, without the need for special software drivers."  Claims Constr. Op. at 22; *see* 399 Patent 3:24-27 (the purpose of the invention is to provide "communication between a host device and a data transmit/receive device whose use is host device-independent and which delivers a high data transfer rate"); 449 Patent 3:20-23 (same).

The Court determined that the Claims in both Patents provide that the data transmit/receive device is *attached* to the interface device *when* the computer initiates a data transfer from the data transmit/receive device.  For example, Claim One of the 449 Patent states:

> wherein the interface device is configured by the processor and the memory in such a way that the interface device, when receiving an inquiry from the host device as to the type of a  device *attached* to the multi-purpose interface of the host device, sends a signal, *regardless of the type of the data transmit/receive device attached*

---

[6] The specification often refers to Figures 1 and 2 by identifying numbered elements as they appear in the Figures.

> to the second connecting device of the interface device, to the host
> device which signals to the host device that it is a storage device
> customary in a host device, *whereupon the host device
> communicates with the interface device* by means of the driver for
> the storage device customary in a host device.

449 Patent, Claim 1, 11:59-67, 12:1-3 (emphases added); 399 Patent, Claim 1, 12:64-67, 13:1-8

(emphasized portions the same; substitutes the term "input/output device" for "storage device").

Each of the asserted independent Claims contains similar language, indicating that the data

transmit/receive device is attached to the interface device when data is transmitted from the data

transmit/receive device to the computer via the interface device.  *See* 399 Patent, Claims 1, 11,

and 14; 449 Patent, Claims 1, 17, and 18.[7]

Beyond the Claims themselves, the specifications informed the construction that a

data transmit/receive device must be capable of transmitting data to a computer when it is

attached to the computer via the interface device.  With regard to a preferred embodiment of the

invention, the specification states:

> If the user now wishes to read data from the data transmit/receive
> device via the line 16, the host device sends a command . . . ,
> whereby [the second command interpreter] begins to transfer data
> from the data transmit/receive device via the second connecting
> device to the first connecting device and via the line 11 to the host
> device.

---

[7] Claim One of the 399 Patent claims that the interface device is configured by its processor and
memory "to include a first command interpreter and a second command interpreter," *see* 399
Patent 12:62-63, and "the second command interpreter is configured to interpret a data request
command from the host device . . . as a data transfer command *for initiating* a transfer of the
digital data to the host device."  399 Patent, Claim 1, 13:8-12 (emphasis added).  This same
concept is repeated in other Claims.  *See* 399 Patent, Claim 11, 14:17-20 ("the second command
interpreter is configured to interpret a data request command from the host device . . . as a data
transfer command *for initiating* a transfer of the digital data to the host device") (emphasis
added); *id.*, Claim 14, 14:58-61 ("interpreting a data request command from the host device . . .
as a data transfer command *for initiating* a transfer of the digital data to the host device")
(emphasis added).  The 449 Patent does not contain similar "for initiating" language.

399 Patent 6:55-67; 449 Patent 5:55-67 (same). As the Court explained in the Claims

Construction Opinion, a data transmit/receive device does not transmit data to the interface

device until the interface device is connected to the computer:

> [D]ata does not begin to be sent from the data transmit/receive
> device to the interface device until the computer and the interface
> device have established communication; only then does the second
> command interpreter begin "to transfer data from the data
> transmit/receive device via the second connecting device" . . . ,
> then on to "the first connecting device and via the line 11 to the
> host device."

Claims Constr. Op. at 44 (quoting 399 Patent 6:64-67 & 449 Patent 5:64-67). The interface

device allows *attachment* of a variety of data transmit/receive devices. *See* 399 Patent 1:56-59

("It is therefore desirable that an interface be sufficiently flexible to permit *attachment* of very

different electrical or electronic systems *to a host device* by means of the interface.") (emphases

added); 449 Patent 1:57-60 (same). The terms "attachment" and "line" connote a physical

connection. Claims Constr. Op at 37.

Data transfer from a data transmit/receive device to a computer when they are

both connected to the interface device is also described in the specification as follows:

> Preferably, the interface device according to the present invention
> simulates a hard disk with a root directory whose entries are
> "virtual" files which can be created for the most varied functions.
> *When the host device system with which the interface device*
> according to the present invention *is connected* is booted *and a*
> *data transmit/receive device is also attached to the interface device*
> 10, usual BIOS routines or multi-purpose interface programs issue
> an instruction, known by those skilled in the art as the INQUIRY
> instruction, to the input/output interfaces in the host device. The
> digital signal processor 13 receives this inquiry instruction via the
> first connecting device and generates a signal which is sent to the
> host device (not shown) again via the first connecting device 12
> and the host line 11. This signal indicates to the host device that,
> for example, a hard disk drive is attached at the interface to which
> the INQUIRY instruction was sent. . . .

7

> Regardless of which data transmit/receive device at the output line
> 16 is attached to the second connecting device, the digital signal
> processor 13 informs the host device that it is communicating with
> a hard disk drive.

399 Patent 5:67 & 6:1-22 (emphases added); 449 Patent 4:66-67 & 5:1-22 (same).

Even the title of the invention reflects the basic concept of "connectedness" at the time of data transfer. The invention is titled "Flexible Interface for Communication Between a Host and an Analog I/O Device Connected to the Interface Regardless of the Type of the I/O Device." *See* 399 Patent, Title; 449 Patent, Title. The title refers to communication between the computer (host) and the data transmit/receive device (I/O device), via the interface device, when the three are "connected."

Papst filed Final Infringement Contentions asserting that certain accused MSC-capable products are "interface devices" that infringe the Patents. *See* Final Infringement Contentions (FICs) [Dkt. 416], Table 12 (MSC-capable products that allegedly infringe the 399 Patent) & Table 13 (MSC-capable products that allegedly infringe the 449 Patent) (collectively, the "Accused Cameras").[8] Papst also alleges that certain external accessories operate as data transmit/receive devices, leading to infringement when utilized with the Accused Cameras. *See generally* FICs at 7-10.[9] The Final Infringement Contentions identify these "External Accessories" as:

---

[8] Papst's Final Infringement Contentions include two sets of claim charts: a set of charts listing cameras that can communicate with a computer in MSC mode and a set of charts listing cameras that can communicate with a computer in Picture Transfer Protocol (PTP) mode. Some accused products are alleged to operate in both modes. *See, e.g.*, FICs, Table 12 (asserting that Fujifilm model V10 is MSC-capable); *id.*, Table 14 (asserting that Fujifilm model V10 is PTP-capable).

[9] Papst alleges that data transmit/receive devices that can be readily attached/detached from the "interface portion" of a camera include "image sensors, microphones, auto focus devices, image stabilization devices, internal flash units, infrared ports, touch screens, internal GPS units, and exposure units (including color and/or light metering units)." FICs at 10.

(1) audio and audio/visual devices (Table 1);

(2) flashes (Table 2);

(3) external data devices such as GPS units, bar code scanners, and remote control devices (Table 3);

(4) lenses (Table 4); and

(5) printers (Table 6).

*Id.*, Tables 1-4, 6.

The Camera Manufacturers seek summary judgment of noninfringement with regard to the Accused Cameras when they operate in MSC mode according to the following logic:  When an Accused Camera is connected to a computer and is operating in MSC mode, none of the External Accessories can transmit data to the computer.  Therefore, none of the identified External Accessories meets the "data transmit/receive device" claim limitation when an Accused Camera is in MSC mode.  Papst opposes.  *See* Opp'n [Dkt. 484] (redacted, public version filed at [Dkt. 481]).[10]

---

[10] Papst's Final Infringement Contentions fail to allege infringement within the confines of the Court's claims construction.  Instead of expressly alleging that data transmit/receive devices are capable of transmitting data to a computer when a camera is connected to the computer as required by the Claims Construction Opinion, Papst asserts only that data from a data transmit/receive device can be, at some point, transmitted to a computer.  Papst alleges that a microphone is a "data transmit/receive device" because it provides data to "the interface portion of an accused device which *in turn*, transmits the data to a host device when connected to the host device."  FICs at 7 (emphasis added).  Similarly, Papst alleges that data from various "units" or devices is "ultimately" made available to the host device.  *See* FICs at 12, 29 (alleging that autofocus units "communicate information to/from the interface portion of the accused product, and that such information is ultimately made accessible to the host device"); *see also id*. at 13, 31 (identical allegation regarding exposure units such as color and light meters); *id*. at 14, 32 (identical allegation regarding image stabilization devices).  That data from a data transmit/receive device may be "in turn" or "ultimately" transmitted to a computer does not claim a data transmit/receive device "capable of . . . transmitting data to [ ] the host device when connected to the host by the interface device."  *See* Claims Constr. Op. at 31.  Papst seeks a modification of the Claims Construction Opinion and does not pretend that its alleged facts are consistent with the Court's opinion.  *See, e.g.*, Opp'n at 2 ("'Transmitting data to . . . the host device *when connected* to the host device by the interface device' is not correctly interpreted to

## II.  LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  On summary judgment, the burden on a moving party who does not bear the ultimate burden of proof in the case may be satisfied by making an initial showing that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.*

The burden then shifts to the nonmovant to demonstrate the existence of a genuine issue of material fact.  The nonmovant may not rest on mere allegations or denials, but must instead by affidavit or otherwise, present specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c);  *Celotex*, 477 U.S. at 324; *see also Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (nonmovant must present specific facts that would enable a reasonable jury to find in its favor).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor.  *Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position.  *Id.* at 252.  In addition, if the evidence "is merely colorable, or is not significantly

---

require that the interface device act as a 'conduit' for live data or the like, but instead that the interface device acquires data from a [data transmit/receive device] and lets a host computer read the data while the host computer is connected to the interface device, regardless of whether the [data transmit/receive device] is connected to the interface device.").  As discussed below, Papst's request for reconsideration will be denied.

probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations

omitted).  Summary judgment is properly granted against a party who "after adequate time for

discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at

trial." *Celotex*, 477 U.S. at 322.

        Summary judgment can be granted in a patent case if there is no dispute over the

structure of the accused products, at which point the question of infringement "collapses" into

the question of claim construction and may be resolved by the court.  *Desper Prods. Inc. v.*

*QSound Labs Inc.*, 157 F.3d 1325, 1332-33 (Fed. Cir. 1998).  The burden of proving

infringement rests on the patent holder.  *Welker Bearing Co. v. PHD, Inc.*, 550 F.3d 1090, 1095

(Fed. Cir. 2008).  Thus, on summary judgment the Camera Manufacturers bear the burden of

making an initial showing that there is an absence of evidence to support Papst's claim of

infringement, and Papst bears the burden of presenting specific facts showing that there is a

genuine issue for trial.

### III. ANALYSIS

#### A.  Literal Infringement

        To prove literal infringement, a patentee must prove that the accused product

satisfies each and every limitation of a claim.  *Warner-Jenkinson Co. v. Hilton-Davis Chem. Co.*,

520 U.S. 17, 29 (1997); *Rohm & Haas v. Brotech Corp.*, 127 F.3d 1089, 1092 (Fed. Cir. 1997).

The party alleging infringement bears the burden of proof.  *Jazz Photo Corp. v. Int'l Trade*

*Comm'n*, 264 F.3d 1094, 1102 (Fed. Cir. 2001).  To determine whether a patent has been

infringed, a court must (1) construe the patent and (2) compare the devices accused of infringing

to the construed patent claims. *Mars, Inc. v. H.J. Heinz Co., LP*, 377 F.3d 1369, 1373 (Fed. Cir.

2004).  Since this Court already has interpreted the Patents, the Court now proceeds to step two, a comparison of the Accused Cameras to the allegedly infringed Claims.

A patent is literally infringed "when each of the claim limitations reads on, or in other words is found in, the accused device."  *Allen Eng'g Corp. v. Bartell Indus., Inc*., 299 F.3d 1336, 1345 (Fed. Cir. 2002).  If a device does not infringe an independent claim of a patent, the device cannot infringe a claim dependent on that claim.[11]  *Wahpeton Canvas Co., Inc. v. Frontier, Inc*., 870 F.2d 1546, 1552 n.9 (Fed. Cir. 1989).

### 1.  Absence of Evidence to Support Papst's Infringement Allegation

An interface device can satisfy Claim One of the Patents only if it is capable of transmitting data from a data transmit/receive device to a computer when all three are connected. The Camera Manufacturers insist that when an Accused Camera is connected to a computer in MSC mode, it *cannot* transmit data from one of the identified External Accessories.  Instead, when in MSC mode, the computer controls the camera memory that it can access and receives data only from the camera itself, not from an External Accessory.  In this configuration, no data is or can be transmitted from any of the identified External Accessories to the computer. Therefore, the Camera Manufacturers conclude, when any Accused Camera is connected to a computer and operating in MSC mode, the External Accessories cannot not meet the "data transmit/receive device" claim limitation.

The Camera Manufacturers note that an ordinary user can observe the fact that an External Accessory does not transfer data to a computer when attached to a camera operating in MSC mode.  A user can attach an External Accessory to an Accused Camera that is connected

---

[11] A claim in "dependent form" incorporates by reference all the limitations of the claim on which it depends and adds something new, giving it a narrower scope than the claim from which it depends.  *See* 35 U.S.C. § 112; *Phillips*, 415 F.3d at 1315.

to a computer and operating in MSC mode.  Using a Windows-based computer, the user can

click on the "My Computer" icon.  A camera connected to a computer in MSC mode will appear

in the "My Computer" directory as a "Removable Disk."  The user can see that the files in the

"Removable Disk" directory do not change if and/or when External Accessories are attached to

the camera.  Papst presents various objections (and attempts to obfuscate) but never actually

contests these assertions by the Camera Manufacturers.  The Court thus takes notice of the

readily observable operation of an Accused Camera operating in MSC mode.

    To further describe the contours of camera operation while in MSC mode, the

Camera Manufacturers present a declaration by Paul Berg.  Mr. Berg is an expert in Universal

Serial Bus (USB) and MSC communications.  Mot. for Summ. J. Re Data Transmit/Receive

Device Limitation [Dkt. 451], Ex. C (Berg Decl.) [Dkt. 451-3] ¶¶ 4-11.  He was one of the

authors of the original USB 1.0 Specification, published in 1996.  *Id*. ¶¶ 5, 7.  Since that time,

USB technology has become his primary focus; he has been a speaker and seminar leader at

numerous meetings of USB implementers; he was a reviewer and contributor for the USB 1.1,

2.0, and 3.0 Specifications.  *Id*. ¶¶ 7, 8.[12]

    USB is a "connection standard" for communication between a computer and

peripherals such as keyboards, mice, and printers.  *Id*. ¶ 13.  Devices that can connect to a

computer using a USB interface can be categorized into different classes, one of which is USB

Mass Storage Class.  USB MSC devices include "memory sticks and external hard drives that

---

[12] Papst challenges Mr. Berg's qualifications as an expert, complaining that he is "not an expert in digital systems in general."  *See* Opp'n at 2, 10-17.  Papst does not explain what it means by "digital systems in general" or why such expertise would be required to evaluate when, and under what circumstances, External Accessories can transfer data through an Accused Camera, operating in MSC mode, to a computer.  This objection to Mr. Berg's qualifications is too amorphous to raise an issue.

can be plugged into the USB port of a computer.  Additionally, other devices, such as digital

cameras, may operate as a USB MSC device when connected to a computer." *Id.* ¶ 14.

Mr. Berg describes generally the operation of an MSC device when it is

connected to a computer as follows:

> 15.  The data transfer between a USB MSC device and a computer
> is governed by the USB Mass Storage Class Specifications and
> other standards, such as the Small Computer System Interface
> ("SCSI") Standards.    These standards define the specific
> commands and specific responses communicated between a
> computer and a USB MSC device.  The way in which those
> commands and responses are transported back and forth across the
> USB connection for a USB MSC device is defined in and governed
> by USB MSC Specifications.

> 16.  When a USB MSC device is connected to a computer by the
> USB interface, the connection is a "hosted" connection.  The host
> (computer) is in charge of the connection, and controls and
> initiates all transmissions that pass through the USB interface.  No
> connected USB MSC device can transfer any data through the
> USB interface without an explicit request from the host.  In other
> words, the connected USB MSC device does only what it is told to
> do by the host.

> 17.  When a USB MSC device is connected to a computer, the
> computer has control over the USB MSC device's memory that it
> can access (the "MSC Memory").  The USB MSC Specifications
> and standard MSC drivers do not support the change of data on a
> connected USB MSC device by anything other than the host
> computer.  These specifications and drivers were based on USB
> MSC devices, such as external hard drives, which have no ability
> to change their stored data, other than by the host computer to
> which it is connected.

> 18.   To allow for proper operation, USB MSC devices cannot
> allow any of their data to change, other than by the connected
> computer.  Errors and/or data loss may occur if the data on a USB
> MSC device were to change other than as directed by the host
> computer to which it is connected.

> 19.  When connected to a computer, the MSC memory of the USB
> MSC devices, operating pursuant to the USB MSC Specifications
> and standard MSC drivers, does not store any data from any source

other than from the computer to which it is connected. The only
data that is capable of being transmitted from the USB MSC
device to the computer is the data that already existed on the USB
MSC device prior to the time the device was connected to the
computer or data from the computer that may be subsequently
transferred to the USB MSC device.

20. Similarly, *no data can be transmitted from accessories*, such
as audio sources, audio/video sources, flashes, GPS units, remote
control unites, lenses and printers, *that are attached to a USB MSC
device*, such as a camera or camcorder, *to a connected computer*
via the USB MSC interface.

Berg Decl. ¶¶ 15-20 (emphases added). Most importantly, Mr. Berg explains that no data can be

transmitted to a computer via the USB MSC interface from External Accessories when such

External Accessories are attached to an Accused Camera operating in MSC mode. *Id.* ¶ 20.

Mr. Berg also tested the MSC-mode operation of various Accused Cameras and

External Accessories. He used a bus analyzer that monitors communications on the USB

connection between a computer and an attached device, and he reports that no data was

transmitted from any External Accessory to the computer when connected to an Accused Camera

which was connected to a computer and which was operating in MSC mode. Berg Decl. ¶¶ 49,

51-53.

Thus, the Camera Manufacturers have made an initial showing in support of

summary judgment—they have pointed to the absence of evidence supporting Papst's claim that

the External Accessories meet the Patents' data transmit/receive device limitation when used

with Accused Cameras operating in MSC mode. *See Celotex*, 477 U.S. at 325 (the burden on a

moving party who does not bear the burden of proof may be discharged by pointing out that

there is an absence of evidence to support the nonmoving party's case.) The burden thus shifts to

Papst to support its claim that the External Accessories are data transmit/receive devices as the

Court construed the term, i.e., devices capable of transmitting data to the host device when

connected to the host by the interface device.  *See* Claims Constr. Op. at 31.  Papst bears the

burden of presenting some evidence that the External Accessories are capable of transmitting

data to a computer when connected to the computer by an Accused Camera operating in MSC

mode.  *See id.* at 322 (summary judgment can be granted against a party who fails to make a

showing sufficient to establish an element essential to the party's case, on which he bears the

burden of proof).  Papst has failed to do so.

### 2.  Papst's Attempt to Create an Issue of Fact

In opposing summary judgment, Papst does not challenge the Camera

Manufacturers' assertion that the functionality of the Accused Cameras and the External

Accessories can be readily observed.  As far as the record reveals, Papst failed to make its own

observations or conduct any tests.  Instead, Papst presents an opposing expert declaration from

Dr. C. Douglass Locke, who challenges Mr. Berg and attempts to raise genuine issues of material

fact for jury determination.  *See* Papst's Notice of Filing Documents [Dkt. 475], Third Locke

Decl. [Dkt. 475-2] ¶¶ 509-559.[13]  Dr. Locke's Declaration does not reveal any genuine issues of

material fact that preclude summary judgment on this motion.  Dr. Locke has shown himself to

be more dedicated to his client than to his science.  Almost every paragraph of his Third

Declaration, as it relates to the critical issues here, contains a statement that is irrelevant,

contradictory, supportive of Mr. Berg's declaration, or plainly dissembling.  Because it is

necessary to understand why Dr. Locke's Third Declaration carries no weight, the Court

elaborates:

---

[13] Dr. Locke's Third Declaration addresses numerous motions; paragraphs 509-559 are relevant here.

1.  Third Locke Decl. ¶ 513:  Dr. Locke disagrees with Mr. Berg's characterization of the SCSI Standards.  The asserted disagreement is irrelevant and does not create a genuine dispute.

2.  Third Locke Decl. ¶ 514:  Dr. Locke complains that Mr. Berg uses "data" transfer to mean one thing in ¶ 15 of the Berg Declaration, and "appears" to apply a different meaning for "data" transfer elsewhere.  This objection is too vague, imprecise, and uncertain to convey any meaning.  In addition, Dr. Locke's admission that he in fact understands the USB Mass Storage Class communication protocol, to which ¶ 15 of the Berg Declaration refers, reveals the insincerity of the objection.  *See* Third Locke Decl. ¶ 505 (Dr. Locke notes that "USB MSC devices communicate with computers as if they were hard disk drives using SCSI command sets . . . .").

3.  Third Locke Decl. ¶¶ 516 & 517:  Dr. Locke asserts that flash memory chips inserted into USB MSC devices "would perform the address translation function" without command by the host computer so that Mr. Berg's statement (¶ 16), "the connected USB MSC device does only what it is told to do by the host," is wrong.  Whether flash memory chips might perform any function when an Accused Camera in MSC mode is connected to a computer is irrelevant.  Flash memory chips are not the subject the Camera Manufacturers' instant motion.  Most critically, Dr. Locke does not challenge the preceding sentence of Mr. Berg's declaration.  Mr. Berg declared, "No connected USB MSC device can transfer any data through the USB interface without an explicit request from the host."

Berg Decl. ¶ 16.[14]  Dr. Locke asserts that flash memory chips can perform address translation, not that they can transfer data through a digital camera to the computer while the camera is connected to the computer in MSC Mode.

4.  Third Locke Decl. ¶ 518:  Dr. Locke asserts that a USB MSC with an Eye-Fi memory card can act on its own without control by the computer: "While connected, the Eye-Fi card continued to add new data and modify data previously stored in the memory of the card about certain card operations while the card was installed in the camera in the mass storage mode . . . even though the host computer did not tell the camera to store such information."  Again, whatever the accuracy of Dr. Locke's statement concerning Eye-Fi cards, it is not relevant as Eye-Fi cards are not External Accessories and thus are not the subject of the Camera Manufacturers' motion for summary judgment.  Further, that an Eye-Fi memory card might modify data in its *own* memory does nothing to contradict the evidence that an External Accessory cannot transmit data to the computer through an Accused Camera when the camera is in MSC mode.

5.  Third Locke Decl. ¶ 519:  With regard to Mr. Berg's statement in his Declaration ¶ 16 that "the host (computer) is in charge of the connection, and controls and initiates all transmissions that pass through the USB interface,"  Dr. Locke complains that it is not clear what Mr. Berg meant by the statement the computer is "in charge of the connection."  While Dr. Locke claims to finds Mr. Berg's

---

[14] The specifications for the Patents reflect the concept that data is transferred from the data transmit/receive device when commanded to do so by the computer.  *See* 399 Patent 6:55-67 ("If the user now wishes to read data from the data transmit/receive device via the line 16, the host device sends a command . . . , whereby [the second command interpreter] begins to transfer data from the data transmit/receive device via the second connecting device to the first connecting device and via the line 11 to the host device."); 449 Patent 5:55-67 (same).

Declaration unclear, the Court does not.  The statement that the computer is "in charge of the connection" means that the computer "controls and initiates all transmissions that pass through the USB interface," as described by Mr. Berg in the very same sentence.

6. Third Locke Decl. ¶ 520:  Dr. Locke contends that "it is not clear what Mr. Berg defines as 'MSC memory.'"  Mr. Berg's Declaration is unambiguous.  He expressly defined the allegedly vague term, saying, "[w]hen a USB MSC device is connected to a computer, the computer has control over the USB MSC device's memory that it can access (the 'MSC Memory'). The USB MSC Specifications and standard MSC drivers do not support the change of data on a connected USB MSC device by anything other than the host computer."  Berg Decl. ¶ 17.

7. Third Locke Decl. ¶ 521:  Dr. Locke claims to be unclear as to the meaning of "standard MSC drivers."  Dr. Locke's opinion on the alleged lack of clarity is irrelevant to the issues at hand.

8. Third Locke Decl. ¶ 522:  Dr. Locke attacks Mr. Berg's statement that "USB MSC Specifications and standard MSC drivers do not support the change of data on a connected USB MSC device by anything other than the host computer," Berg ¶ 17, because "data can be changed on a USB MSC device independent of an attached host device," for which he references Eye-Fi memory cards.  Again, the point is irrelevant.  The Camera Manufacturers do not seek summary judgment on whether memory cards and/or Eye-Fi cards are data transmit/receive devices.

9. Third Locke Decl. ¶ 523:  Dr. Locke challenges Mr. Berg's statement that USB MSC Specifications and standard MSC drivers "were based on USB MSC

devices, such as hard drives, which have no ability to change their stored data."
Berg Decl. ¶ 17.  Dr. Locke complains that Mr. Berg provides no documentary
support and "even if a typical hard drive may not be able to change its data
independently of the host computer, other kinds of USB MSC devices can change
their data independently of the host computer."  Again, he references only Eye-Fi
memory cards, and again, Eye-Fi memory cards are not External Accessories and
are not relevant to the Camera Manufacturers' motion.

10. Third Locke Decl. ¶ 524:  Dr. Locke continues the same charade.  He addresses
Berg Declaration ¶ 18, which declares, "USB MSC devices cannot allow any of
their data to change, other than by the connected computer . . . ."  Dr. Locke
asserts that Eye-Fi cards can change their internal data, and that any loss of data
can be "ameliorated."  Third Locke Decl. ¶ 524.  Although this paragraph *appears*
to dispute Mr. Berg's Declaration, upon examination, it clearly does not.  Eye-Fi
cards are not at issue here, nor is their ability to ameliorate data loss.

11.  Third Locke Decl. ¶ 526:  Dr. Locke declares, "as discussed above, there are no
'standard MSC drivers.'"  To be precise, what was "discussed above" was Dr.
Locke's professed need for a definition from Mr. Berg as to what are "standard
MSC drivers," *not* that there are no such things.  Dr. Locke notes that an Accused
Camera will continue to store any data it contained before connection to a
computer, which can "include data from sources other than the host computer,
such as data from accessories . . . ."  *Id.*  He finishes this sentence by adding,
"[such as data from accessories] connected to a digital camera that operates in
MSC mode," without specifying that such data must have been received by the

20

camera and stored in the camera's memory before it was connected to the
computer in MSC mode.  Thus, his sentence starts out with an accurate statement
and bends it into an untrue statement.  His attempt to mislead is not overlooked.

12. Third Locke Decl. ¶ 527:  Dr. Locke purports to disagree with Berg Declaration
¶ 19 that "[t]he only data that is capable of being transmitted from the USB MSC
device to the computer is the data that already existed on the USB MSC device
prior to the time the device was connected to the computer or data from the
computer that may be subsequently transmitted to the USB MSC device."  Dr.
Locke declares that "[t]his is incorrect . . . Eye-Fi cards can generate and store
new data even when the device to which the cards is installed is connected to a
host computer in mass storage mode."  Third Locke Decl. ¶ 527.  Again, Eye-Fi
cards are irrelevant to the Camera Manufacturers' motion for summary judgment.

13. Third Locke Decl. ¶ 529:  Dr. Locke opines broadly that "new data can be
generated by accessories attached to a camera even when the camera is attached
to a computer" and that "[t]his new data can be transferred to the computer, as
explained in paragraph 518 of this declaration."  Paragraph 518 describes the
operation of an Eye-Fi memory card.  *See id*. ¶ 518 ("While connected, the Eye-
Fi card continued to add new data and modify data previously stored in the
memory in the card about certain card operations while the card was installed in
the camera in mass storage mode.").   Again, Eye-Fi memory cards are not
included among the External Accessories discussed here and are not the subject of
the instant motion.  Thus, the operation of Eye-Fi memory cards is irrelevant to
the matter at hand, even if one read ¶ 518 to mean more than it says — i.e., that

Eye-Fi memory cards can add or change data in their memories when attached to a camera in MSC mode that is, in turn, attached to a computer. This alleged "fact" does not convey a data flow from an Eye-Fi card through a camera to a computer nor does it otherwise contradict Mr. Berg.

14. Third Locke Decl. ¶¶ 532-537: Dr. Locke describes Mr. Berg's bus trace evidence regarding a Nikon D200 camera. The Nikon D200 camera transmitted the beginning part of a digital photographic file, *id.* ¶ 535, which included information regarding accessories, such as information from the lens, flash, and GPS. *Id.* ¶ 536. According to Dr. Locke, this proves that "at least information from a lens attached to the Nikon D200 camera was transferred to the host computer." *Id.* ¶ 537. This statement can only have been intended to confuse and dissemble. Dr. Locke's Declaration itself notes that this phenomenon occurred *before* the camera was connected to the computer:

> [T]he Nikon D200 does not have a built in lens, but to operate as intended, requires a lens to be attached to take a picture. . . . Mr. Berg's test results show that data from the attached lens, including data representative of at least the focal length of the attached lens, was communicated from the attached lens to the camera *when he took a picture with the Nikon D200 camera. This data was then stored in a picture file and later transferred to [the] host computer during Mr. Berg's test.*

*Id.* ¶ 555 (emphasis added). In other words, the photo, with lens data, was in the camera's memory *before* the camera was connected to the computer; the camera stored the data and later transferred it to the computer; the lens data was *not* transferred separately from the lens to the computer.

15. Third Locke Decl. ¶ 541 complains that cameras "operate in various modes, including, for example, modes for diagnostics, testing, and repair. Mr. Berg does

not identify any of the various modes of operation in the CMs Accused Products,
nor does he state that he tested the products in each of these modes." In Dr.
Locke's opinion, this made Mr. Berg's tests "deficient." *Id.* The problem with
Dr. Locke's complaint is that Papst only alleged infringement in MSC and PTP
modes and not in any other mode. The only mode relevant to the current motion
is the MSC mode. Mr. Berg's tests were not deficient in the least. Also, Papst
never alleged infringement by way of any "back door" mode for diagnostics,
testing and repair. The Camera Manufacturers do not bear the burden of proof,
much less the burden as to a never-alleged infringement method.

16.  Third Locke Decl. ¶ 542:  Dr. Locke asserts that, in his view, Mr. Berg should
have talked to employees of the Camera Manufacturers about other modes. Dr.
Locke's "view" notwithstanding, Papst alleged infringement by use in MSC or
PTP modes only.

17.  Third Locke Decl. ¶ 554:  Finally, Dr. Locke complains that Mr. Berg "does not
explain what he means by 'MSC mode,' why he used the 'MSC mode,' or
whether the products operate in any other modes when the products would
communicate with a connected computer using the USB Mass Storage Class
communication protocol." Dr. Locke's assertion that he does not understand what
Mr. Berg means when he refers to testing a camera operating in "MSC mode" is
disingenuous. Dr. Locke is no neophyte. *See* Papst's Notice of Filing Documents
[Dkt. 475], Curriculum Vitae for Dr. Locke [475-3].[15]  He fully knows and

---

[15] Dr. Locke obtained a Ph.D. in computer science from Carnegie Mellon in 1986. Curriculum
Vitae for Dr. Locke at 4. He has worked as a consultant (1981 to the present), as an instructor
for the Air Force (1992-1995), and as a scientist at Lockheed Martin (1996-2000). *Id.* at 2-3.

understands the USB Mass Storage Class communication protocol, as he notes in his Declaration that "USB MSC devices communicate with computers as if they were hard disk drives using SCSI command sets . . . ."  Third Locke Decl. ¶ 505. Obviously, Mr. Berg focused on MSC mode, as that was the subject of the Camera Manufacturers' investigation for the purpose of this motion.  Dr. Locke's pretense (that Mr. Berg's statements are unclear) is an attempt to obfuscate the issues.

In sum, Dr. Locke's challenge to the Berg Declaration on MSC USB devices and the operation of the Accused Cameras is full of irrelevancies, hidden agreements with Mr. Berg, and acknowledgement that he fully understands what he contended was unclear.  The Third Locke Declaration does not present any genuine dispute on any material fact.  It offers nothing to the disposition of the motion for summary judgment.

While Papst disagrees with Mr. Berg's conclusion that External Accessories cannot transmit data to a computer when attached to an Accused Camera operating in MSC mode, Papst fails to raise any genuine issue of material fact.  The *only* allegedly contrary evidence that Papst provides is the bus trace of lens data and the Nikon D200.  But Dr. Locke expressly concedes this evidence shows only that the lens transferred data to the camera *before* the camera was connected to the computer.  *See* Third Locke Decl. ¶ 555.

---

Dr. Locke has an "extensive background in areas such as software performance, real-time architecture, design, implementation, and deployment, standards, software engineering maturity, and software organization."  *Id*. at 1.  He has written numerous articles, mostly regarding real-time systems.  *Id*. at 4-6.  Further, "[w]hile he has concentrated more on software and systems design and implementation, his understanding of hardware, including communication protocols, interface mechanisms, and control mechanisms has proven to be critical to the success of many major systems."  *Id*.

24

### 3.  New Theory of Infringement

Papst attempts to ward off summary judgment in various other ways, to no avail.

Papst asserts a new theory of infringement, arguing that some of the Accused Cameras have a

"back door" mode of operation that is used for diagnostics, testing, and repair and that when

operated in this mode, the Accused Cameras can take pictures and operate accessories while

connected to a computer.  *See* Opp'n at 8-9.  Papst also seeks more discovery regarding the

"back door" mode of operation.  *Id.* at 9; *see also* Mot. for 56(d) Disc. [Dkt. 479] at  17-19.

Papst failed, however, to allege infringement based on this "back door" theory in its Final

Infringement Contentions.  It is too late to do so now.  The Court ordered Papst to file final

infringement contentions in compliance with detailed requirements.  *See* Mot. for Sanctions

[Dkt. 388], Ex. A (Tr. of Aug. 31, 2010 Hearing); Sixth Prac. & Pro. Order (Sixth PPO) [Dkt.

372].  Because Papst filed Final Infringement Contentions that failed to comply with Court's

orders, the Court barred Papst from advancing any arguments for infringement (or against claims

of noninfringement) that either (1) are not based solely on this Court's constructions of the

Patents or (2) are not already set forth specifically and explicitly in Papst's Final Infringement

Contentions.  *See* Sanctions Op. [Dkt. 429] at 13; Sanctions Order [Dkt. 430] at 2.  Accordingly,

Papst is barred from asserting this new theory of infringement.

### 4.  "Real Time" Data Transmission

Additionally, Papst mischaracterizes the Camera Manufacturers' motion as

interpreting the Patents to require simultaneous physical connection and communication of live

"real time" data (i.e., data streaming).  *See* Opp'n at 19 (Papst asserts that the Camera

Manufacturers' argument is "built on the questionable premise that the accused products never

transmit live data from external accessories to an attached host computer . . . , that delayed data

transmissions are noninfringing, and that only real-time, 'active' transmissions would be

infringing."). Papst blatantly errs in so advertising the Camera Manufacturers' motion. The

Claims and the specifications do not require that all transfers of data from a data transmit/receive

device be "real time" transfers, and the Camera Manufacturers do not contend that they do.[16]

Papst explains that the Patents cannot possibly require live data streaming,

because to construe them this way would nullify Claims concerning "virtual files."[17] The Court

construed the term "virtual files" to mean "files that appear to be but are not physically stored;

rather, they are constructed or derived from existing data when their contents are requested by an

application program so that they appear to exist as files from the point of view of the host

device." Claims Constr. Op. at 67. Because virtual files are derived from "existing data," Papst

reasons that they are not derived from live incoming data. Opp'n at 21.[18] Papst's warning that

agreement with the Camera Manufacturers would invalidate claims dealing with "virtual files" is

---

[16] Papst protests that "[n]o claim language requires the 'second connecting device' to be actively receiving live data from a [data transmit/receive device] *at the same time* that data is being provided to the host via the 'first connecting device.'" Opp'n at 3. The Court did not adopt "real time" data transmission as a Claim limitation. The Patents refer to "real time" data transfer only as a preferred embodiment. *See* 399 Patent 9:24-27 (in the preferred embodiment of the invention, "the digital signal processor implements a fast Fourier transformation (FFT) in real time and also optional data compression of the data to be transferred from the data transmit/receive device to the host device"); 449 Patent 8:24-27 (same). While this point is accurate, it is not argued by the Camera Manufacturers.

[17] Papst refers particularly to dependent Claim 7, which claims an interface device according to Claim 2 and "which further comprises a root directory and *virtual files* which are present on the signaled hard disk drive and which can be accessed from the host device." 399 Patent 13:33-36 (emphasis added).

[18] "Existing data" may reside in the interface device. *See* 399 Patent, Claim 8, 13:38-39 ("virtual files comprise a configuration file in text format which are stored in the memory means" of the interface device); *id.*, Claim 9, 13:43-47 (virtual files may "comprise batch files or executable files for the microprocessor means which are stored on the interface device to perform data processing, independently of the host device, of data received via the second connecting device").

based wholly on the incorrect assertion that the Camera Manufacturers interpret the Patents as requiring "real time" data streaming.  The Camera Manufacturers do not assert that the Patents require "real time" data transmission; their motion is based on the Court's definition of "data transmit/receive device" and the fact that External Accessories do not meet the definition because they cannot transmit data to a computer when they are attached to the Accused Cameras operating in MSC mode.  This is the case regardless of the timing of data transmission.

### 5.  Papst's Request for Reconsideration

Papst also opposes summary judgment by asking the Court to reconsider its construction of the "data transmit/receive device" claim limitation.  This is Papst's third motion to obtain reconsideration of claims construction.  In its first motion, Papst sought reconsideration of the "data transmit/receive device" claim limitation, arguing that a data transmit receive/device could engage in one-way or in two-way communication, that is, it could send data to the interface device or it could send data to and receive data from the interface device.  Mot. Recons. [Dkt. 321].  The Court granted that motion.  *See* Claims Constr. Op. at 2, 27-31 (modifying prior Op. [Dkt. 312]).  Papst's second motion for reconsideration sought reconsideration of other claim limitations.[19]  *See* Mot. Recons. [Dkt. 339].  It was denied.  *See* Order [Dkt. 343] (finding that Papst did not present a valid basis for reconsideration and that Papst's piecemeal approach to litigation was not justified).

Papst now asks the Court to reconsider its determination that a "data transmit/receive device" is a device capable of data transmission when connected to a computer by the invented interface device.  *See* Claims Const. Op. at 31.  Papst presents two arguments.

---

[19] Less formal efforts to achieve reconsideration of various Patent terms construed by the Court have peppered Papst's filings.

First, Papst contends that the "data transmit/receive device" is not a claim limitation at all and should not be treated as limiting the scope of the Patents.  Papst made this argument already, and the Court addressed it as follows:

> Mr. Tasler did not invent a data transmit/receive device, and Papst objects to any construction of the term.  Tr. 1:136 (Papst) ("So our first position, of course, is that we shouldn't be defining this as part of the claimed invention.").  While Papst asserts that the term "data transmit/receive device" is not a claim limitation, Papst concedes that the term may be construed "for context" as "a device that receives input and provides data to the interface device."  Papst's App. at 2.  The Court agrees that it should not define the nature of a data transmit/receive device.  What is at issue, however, is the communication capability between the invented interface device and a data transmit/receive device, which is very much part of construing the Claims, and the Court construes "data transmit/receive device" in this context.

Claims Constr. Op. at 27.  Papst reads this portion of the Claims Construction Opinion too broadly.  While the Court agreed that Mr. Tasler did not invent a data transmit/receive device and agreed that the precise nature of the data transmit/receive device should not be defined, the Court determined that it was necessary to define the "communication capability" of the data transmit/receive device.  *Id.*  The Court proceeded to define the term, in accordance with its "communication capability," as "a device that is capable of either (a) transmitting data to or (b) transmitting data to and receiving data from the host device when connected to the host device by the interface device."  *Id.* at 27, 31.  In addition, the Court held that the preamble, which describes the invention as "an interface device for communication between a host device . . . and a data transmit/receive device," 399 Patent 12:42-46 & 449 Patent 11:45-49, operated as a claims limitation.  *See* Claims Constr. Op. at 18-23.  Thus, the data transmit/receive device, per the definition provided by the Court, is in fact a claims limitation.

Second, Papst argues that the Court should redefine "data transmit/receive device" to mean "a device that is capable of either (a) transmitting data to or (b) transmitting data

to and receiving data from the host device *regardless of whether it is connected* to the host device by the interface device."  Papst argues that the word "connected" does not mean "attached" or physically connected.  Instead, Papst argues that the word should be accorded a looser meaning and that "connected" should be interpreted to mean joined by communication, as people are "connected" when they communicate by letter or email.  *See* Opp'n at 19-21.

The Court declines the invitation to construe yet again the term "data transmit/receive device."  The Court already ruled, and Papst fails to meet the standard for reconsideration.  *Singh v. George Wash. Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005) (reconsideration may be permitted when a court has patently misunderstood a party, has made a decision outside the adversarial issues presented to the court by the parties, has made an error not of reasoning but of apprehension, or where a controlling or significant change in the law or facts has occurred since the submission of the issue to the court.)  There has been no controlling or significant change in the law or the facts, and Papst fails to show that the Court patently misunderstood a party, made a decision outside the adversarial issues presented, or made an error of apprehension.  As described in detail above, the Court's definition of "data transmit/receive device" is well-grounded in the language of the Patents:

> (1)  Data does not begin to be sent from the data transmit/receive device to the interface device until the computer and the interface device have established communication.  Claims Constr. Op. at 44; *see also* 399 Patent 6:64-67 & 449 Patent 5:64-67.

> (2)  The specification describes communication between a computer and a data transmit receive device when they are *both* connected to the interface device.  *See* 399 Patent 5:67 & 6:1-15 (communication begins "[w]hen the host device system with which the interface device according to the present invention is connected is booted and a data transmit/receive device is also attached to the interface device."); 449 Patent 5:2-6 (same).

> (3) The title of the Patents, "Flexible Interface for Communication Between a Host and an Analog I/O Device Connected to the

> Interface Regardless of the Type of the I/O Device," describes the
> invention as a device for communication between the computer
> and a data transmit/receive device when the three are "connected."
> *See* 399 Patent, Title; 449 Patent, Title.

The Court will deny Papst's request for reconsideration.

Because the External Accessories cannot transmit data to a computer when connected to a computer by an Accused Camera operating in MSC mode, the External Accessories do not meet the "data transmit/receive device" claim limitation. Because Papst has failed to demonstrate any genuine issue of material fact regarding this motion, the motion for summary judgment of noninfringement will be granted in favor of the Camera Manufacturers.

### B.  Doctrine of Equivalents

Papst also objects to summary judgment, asserting that the Accused Cameras infringe under the doctrine of equivalents. This doctrine is inapplicable here. The essential inquiry in a determination under the doctrine of equivalents is whether "the accused product or process contains elements identical or equivalent to each claimed element of the patented invention." *Am. Calcar, Inc. v. Am. Honda Motor Co.*, 651 F.3d 1318, 1338 (Fed. Cir. 2011) (quoting *Warner-Jenkinson*, 520 U.S. at 40). An element in an accused product is deemed to be equivalent to a claim limitation if the difference between the two is "insubstantial" to a person of ordinary skill in the art. *Wavetronix v. EIS Elec. Integrated Sys.*, 573 F.3d 1343, 1360 (Fed. Cir. 2009). In order to assess insubstantiality, a court considers whether an element of the accused product "performs substantially the same function in substantially the same way to obtain the same result" as the patented invention. *Am. Calcar*, 651 F.3d at 1338. This is often referred to as the "function/way/result test." *Id*. A patentee alleging infringement under the doctrine of equivalents must submit particularized evidence of equivalence and must explain specifically

why the difference between what the claims literally require and what the accused products actually do is "insubstantial." *Id*.

The Final Infringement Contentions fail to assert specific claims that the External Accessories meet the "data transmit/receive device" claim limitation under the doctrine of equivalence with the precision that the Court required. *See* Mot. for Sanctions, Ex. A (Tr. of Aug. 31, 2010 Hearing); Sixth Prac. & Pro. Order (Sixth PPO). Papst is barred from now making a more explicit claim. *See* Sanctions Op. at 13 (as a sanction for its misconduct, Papst may not advance any claim for infringement not already set forth specifically and explicitly in the FICs); Sanctions Order at 2 (same).

## C. Papst's Request for Additional Discovery

Papst filed a motion for Rule 56(d) discovery, claiming that it needs further fact discovery to oppose summary judgment. *See* Mot. for 56(d) Disc. [Dkt. 479]; Reply [Dkt. 515]. Federal Rule of Civil Procedure 56(d) provides:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1) defer considering the motion or deny it;
>
> (2) allow time to obtain affidavits or declarations or to take discovery; or
>
> (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d). "The nonmoving party bears the burden of identifying the facts to be discovered that would create a triable issue and the reasons why the party cannot produce those facts in opposition to the motion. The nonmoving party must show a reasonable basis to suggest that discovery would reveal triable issues of fact." *Scott-Blanton v. Universal City Studios Prods. LLP*, 246 F.R.D. 344, 347 (D.D.C. 2007), *aff'd* 308 F. App'x 452 (D.C. Cir. 2009). A

generalized, speculative request for more discovery is insufficient; a request for more discovery must show that "further *specific* discovery will defeat a summary judgment motion." *Estate of Parsons v. Palestinian Auth.*, 715 F. Supp. 2d 27, 35 (D.D.C. 2010), *aff'd*, No. 10-7085, 2011 WL 3528749 (D.C. Cir. Aug. 12, 2011).

Papst seeks information regarding "real time" operation and "back door" connection. *See generally* Mot. for Rule 56(d) Disc. at 15-19; Reply at 3-6. Further, Papst wants to depose Mr. Berg regarding "various secret back door modes of operation." Reply at 5. Papst fails to show, however, how such discovery would reveal triable issues of fact. As explained above, the Camera Manufacturers do not contend that the Court's construction of the "data transmit/receive device" claim limitation requires "real time" communication. Also, Papst's Final Infringement Contentions do not include any allegations of infringement by devices operating in a "back door" mode. "Real time" operation and "back door" connection are not at issue here.

Accordingly, the Camera Manufacturers have met their burden on summary judgment (1) by pointing to the readily observable fact that External Accessories cannot transfer data to a computer when attached to an Accused Camera operating in MSC mode and (2) by submitting Mr. Berg's Declaration. As the party opposing summary judgment, Papst then bore the burden of demonstrating a genuine issue of material fact requiring trial. It failed to do so with Dr. Locke's Declaration or in any other way.

## IV.  CONCLUSION

The Camera Manufacturers' motion for summary judgment of noninfringement with respect to the "data transmit/receive device" claim limitation [Dkt. 451] will be granted.[20]

---

[20] Papst moved to file a surreply in opposition to the Camera Manufacturers' motion for summary judgment with respect to the "data transmit/receive device" limitation. *See* Mot. for

When operating in MSC mode, the Accused Cameras (identified in Tables 12 and 13 of the Final

Infringement Contentions) do not infringe the 399 Patent or the 449 Patent (either literally or

under the doctrine of equivalents) based on the External Accessories because such External

Accessories do not meet the "data transmit/receive device" claim limitation.  The External

Accessories, identified in Tables 1-4 and 6 of the Final Infringement Contentions, are audio

sources, audio/video sources, flashes, external data devices (including GPs units, bar code

scanner units, and remote control devices), lenses, and printers.  Papst's motion for Rule 56(d)

discovery [Dkt. 479] is denied with regard to that portion of the motion dealing with the "data

transmit/receive device" claim limitation.  A memorializing Order accompanies this Opinion.


Date:  May 8, 2013                         _____/s/_____
                                           ROSEMARY M. COLLYER
                                           United States District Judge

---

Leave to File Surreply [Dkt. 516].  Because surreplies are disfavored in this District and because the Camera Manufacturers' Reply did not raise new issues, Papst's motion to file a surreply will be denied. *See Crummey v. Social Security Admin.*, 794 F. Supp. 2d 46, 62 (D.D.C. 2011).